THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

PACKET INTELLIGENCE LLC, §
§
v. § CASE NO. 2:16-CV-230-JRG
§
NETSCOUT SYSTEMS, INC., et al. §
§
§

# CLAIM CONSTRUCTION
# MEMORANDUM AND ORDER

Before the Court is Plaintiff Packet Intelligence LLC's ("Plaintiff's") Opening Claim Construction Brief (Dkt. No. 55). Also before the Court are Defendants NetScout Systems, Inc., Sandvine Corporation, and Sandvine Incorporated ULC's (collectively, "Defendants'") response (Dkt. No. 57) and Plaintiffs' reply (Dkt. No. 58).

The Court held a claim construction hearing on March 2, 2017.

**Table of Contents**

**I. BACKGROUND**..................................................................................................................2
**II. LEGAL PRINCIPLES**........................................................................................................3
**III. AGREED TERMS**.............................................................................................................5
**IV. DISPUTED TERMS**..........................................................................................................5
   A. "conversational flow[s]" and "conversational flow sequence" ..........................................6
   B. "flow-entry database"..........................................................................................................7
   C. "parser record" ..................................................................................................................10
**V. CONCLUSION**..................................................................................................................16

## I. BACKGROUND

Plaintiff brings suit alleging infringement of United States Patents No. 6,651,099 ("the '099 Patent"), 6,665,725 ("the '725 Patent"), 6,771,646 ("the '646 Patent"), 6,839,751 ("the '751 Patent"), and 6,954,789 ("the '789 Patent") (collectively, the "patents-in-suit," which are also sometimes referred to as the "Asserted Patents") (Dkt. No. 55, Exs. A–E). Plaintiff submits that the patents-in-suit "are generally directed to classifying and monitoring network traffic." (Dkt. No. 55, at 1.)

The '099 Patent, for example, is titled "Method and Apparatus for Monitoring Traffic in a Network" and issued on November 18, 2003. The Abstract of the '099 Patent states:

> A monitor for and a method of examining packets passing through a connection point on a computer network. Each packets [*sic*] conforms to one or more protocols. The method includes receiving a packet from a packet acquisition device and performing one or more parsing/extraction operations on the packet to create a parser record comprising a function of selected portions of the packet. The parsing/extraction operations depend on one or more of the protocols to which the packet conforms. The method further includes looking up a flow-entry database containing flow-entries for previously encountered conversational flows. The lookup uses the selected packet portions and determining [*sic*] if the packet is of an existing flow. If the packet is of an existing flow, the method classifies the packet as belonging to the found existing flow, and if the packet is of a new flow, the method stores a new flow-entry for the new flow in the flow-entry database, including identifying information for future packets to be identified with the new flow-entry. For the packet of an existing flow, the method updates the flow-entry of the existing flow. Such updating may include storing one or more statistical measures. Any stage of a flow, state is maintained, and the method performs any state processing for an identified state to further the process of identifying the flow. The method thus examines each and every packet passing through the connection point in real time until the application program associated with the conversational flow is determined.

The patents-in-suit all claim priority to, and incorporate by reference, Provisional Application No. 60/141,903, filed on June 30, 1999. The applications that led to the '099 Patent, the '725 Patent, the '646 Patent, and the '751 Patent were all filed on June 30, 2000. The application that led to the '789 Patent was filed on October 14, 2003, and the '789 Patent is a

continuation of the '099 Patent. Plaintiff submits that "[t]he specifications of the Asserted Patents are similar . . . ." (Dkt. No. 55, at 6 n.4.) Also, the patents-in-suit filed on June 30, 2000, incorporate each other by reference. '099 Patent at 1:11–36; '724 Patent at 1:12–38; '646 Patent at 1:12–33; '751 Patent at 10:7–35. The Court therefore cites the specification of only the '099 Patent unless otherwise indicated.

## II. LEGAL PRINCIPLES

This Court's claim construction analysis is guided by the Federal Circuit's decision in *Phillips v. AWH Corporation*, 415 F.3d 1303 (Fed. Cir. 2005) (en banc). In *Phillips*, the court reiterated that "the claims of a patent define the invention to which the patentee is entitled the right to exclude." 415 F.3d at 1312 (quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)). "The construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction." *Id.* at 1316 (quoting *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998)).

In claim construction, patent claims are generally given their ordinary and customary meaning, which "is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Id.* at 1312-13. This principle of patent law flows naturally from the recognition that inventors are usually persons who are skilled in the field of the invention and that patents are addressed to, and intended to be read by, others skilled in the particular art. *Id.*

Despite the importance of claim terms, *Phillips* made clear that "the person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the

specification." *Id.* The written description set forth in the specification, for example, "may act as a sort of dictionary, which explains the invention and may define terms used in the claims." *Markman*, 52 F.3d at 979. Thus, as the *Phillips* court emphasized, the specification is "the primary basis for construing the claims." *Phillips*, 415 F.3d at 1314–17. However, it is the claims, not the specification, which set forth the limits of the patentee's invention. Otherwise, "there would be no need for claims." *SRI Int'l v. Matsushita Elec. Corp.*, 775 F.2d 1107, 1121 (Fed. Cir. 1985) (en banc).

The prosecution history also plays an important role in claim interpretation as intrinsic evidence that is relevant to the determination of how the inventor understood the invention and whether the inventor limited the invention during prosecution by narrowing the scope of the claims. *Phillips*, 415 F.3d at 1314–17; *see also Microsoft Corp. v. Multi-Tech Sys., Inc.*, 357 F.3d 1340, 1350 (Fed. Cir. 2004) (noting that "a patentee's statements during prosecution, whether relied on by the examiner or not, are relevant to claim interpretation"). In this sense, the prosecution history helps to demonstrate how the inventor and the United States Patent and Trademark Office ("PTO") understood the patent. *Id.* at 1317. Because the prosecution history, however, "represents an ongoing negotiation between the PTO and the applicant," it may sometimes lack the clarity of the specification and thus be less useful in claim construction. *Id.*

Courts are also permitted to rely on extrinsic evidence, such as "expert and inventor testimony, dictionaries, and learned treatises," *id.* (quoting *Markman*, 52 F.3d at 980), but *Phillips* rejected any claim construction approach that sacrifices the intrinsic record in favor of extrinsic evidence. *Id.* at 1319. Instead, the court assigned extrinsic evidence, such as dictionaries, a role subordinate to the intrinsic record. In doing so, the court emphasized that claim construction issues are not resolved by any magic formula or particular sequence of steps.

*Id.* at 1323–25. Rather, *Phillips* held that a court must attach the appropriate weight to the sources offered in support of a proposed claim construction, bearing in mind the general rule that the claims measure the scope of the patent grant. "In cases where . . . subsidiary facts are in dispute, courts will need to make subsidiary factual findings about [the] extrinsic evidence. These are the 'evidentiary underpinnings' of claim construction [discussed] in *Markman*, and this subsidiary factfinding must be reviewed for clear error on appeal." *Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 841 (2015).

## III. AGREED TERMS

In their December 9, 2016 Joint Claim Construction and Prehearing Statement (Dkt. No. 53, at 2) and their February 17, 2017 Joint Claim Construction Chart (Dkt. No. 59, at 4), the parties set forth their agreement as to the following term in the patents-in-suit:

| Term | Agreement |
| --- | --- |
| "child protocol" | "a protocol that is encapsulated within another protocol" |

## IV. DISPUTED TERMS

The Court herein addresses the disputed terms in the order in which they have been presented in the Joint Claim Construction and Prehearing Statement and the Joint Claim Construction Chart filed by the parties. (Dkt. No. 53, at Exs. A & B; Dkt. No. 59.)

The parties appear to agree that the disputed terms should have the same construction across all of the patents-in-suit. (*See* Dkt. No. 55, at 6; *see also Omega Eng'g, Inc, v. Raytek Corp.*, 334 F.3d 1314, 1334 (Fed. Cir. 2003) ("we presume, unless otherwise compelled, that the same claim term in the same patent or related patents carries the same construed meaning").)

**A. "conversational flow[s]" and "conversational flow sequence"**

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| "sequence of packets that are exchanged in any direction as a result of an application program activity that may involve more than one connection and more than one exchange of packets between a client and server related to a particular application program" | "the sequence of packets that are exchanged in any direction as a result of an application program activity, where some such sequences of packets involve more than one connection" |

(Dkt. No. 53, Ex. A, at 1; *id.*, Ex. B, at 2; Dkt. No. 55, at 20; Dkt. No. 57, at 2; Dkt. No. 59, at 2.) The parties submit that the term "conversational flow[s]" appears in Claim 1 of the '099 Patent, Claims 10, 15, and 17 of the '725 Patent, Claims 1, 7, and 16 of the '646 Patent, Claims 1 and 17 of the '751 Patent, and Claims 1, 19, and 44 of the '789 Patent. (Dkt. No. 53, Ex. A, at 1; *id.*, Ex. B, at 2.) The parties submit that the term "conversational flow sequence" appears in Claims 1 and 5 of the '099 Patent and Claim 32 of the '789 Patent. (Dkt. No. 53, Ex. A, at 1; *id.*, Ex. B, at 2.)

At the March 2, 2017 hearing, the parties reached agreement that **"conversational flow"** and **"conversational flow sequence"** should be construed to mean **"the sequence of packets that are exchanged in any direction as a result of an activity—for instance, the running of an application on a server as requested by a client—and where some conversational flows involve more than one connection, and some even involve more than one exchange of packets between a client and server."**

B. "flow-entry database"

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| No construction necessary. However, to the extent the Court determines a specific construction is warranted:<br>"an organized electronic collection of flow entries" | "a database configured to store entries that individually describe a previously encountered single connection flow and entries that individually describe a previously encountered flow involving more than one connection" |

(Dkt. No. 53, Ex. A, at 2; *id.*, Ex. B, at 3; Dkt. No. 55, at 14; Dkt. No. 57, at 8; Dkt. No. 59, at 2–3.)  The parties submit that this term appears in Claims 1, 3, and 6 of the '099 Patent, Claim 15 of the '725 Patent, Claims 1, 7, 9, 16, and 19 of the '646 Patent, Claims 1 and 17 of the '751 Patent, and Claims 1, 11, 19, 22, 33, and 44 of the '789 Patent.  (Dkt. No. 53, Ex. A, at 2; *id.*, Ex. B, at 3; Dkt. No. 55, at 14; Dkt. No. 59, at 2.)

(1)  The Parties' Positions

Plaintiff argues that "a 'flow-entry database' is simply an electronic collection of flow entries," and "the claim language confirms [Plaintiff's] interpretation of this disputed term." (Dkt. No. 55, at 15 & 16.)  Plaintiff also submits that "[t]he term 'flow-entry database' is never used to describe anything more than an electronic collection of individual flow entries."  (*Id.*, at 16.)  Plaintiff concludes that "no specific construction is necessary because this term would be easily understood and applied by a jury."  (*Id.*, at 17.)  Further, Plaintiff argues, Defendants' proposed construction merely repeats the words of the disputed term while adding several unsupported limitations.  (*Id.*, at 17–18.)

Defendants respond that this is "not a generic term," and the term has no meaning apart from the patents-in-suit.  (Dkt. No. 57, at 9.)  Defendants also highlight that "every single independent claim involving this limitation recites that a flow-entry database includes flow entries for 'previously encountered conversational flows.'"  (*Id.*)  Defendants conclude that

"[a] database that is not configured to store conversational flow entries cannot possibly carry out the claimed inventions, and cannot possibly maintain consistency with the claim limitations in which this term resides." (*Id.*, at 11.)

Plaintiff replies that "the Applicants specifically defined 'flow' as 'a stream of packets being exchanged between any two addresses in a network.'" (Dkt. No. 58, at 5 (citing Dkt. No. 55, at 14; citing '099 Patent at 12:4–5).) Plaintiff also argues that "[i]t is unclear what Defendants mean by 'individually describe,' nor did they cite support in the specification for such a requirement." (*Id.*, at 6.)

At the March 2, 2017 hearing, Plaintiff argued that Defendants are improperly conflating the term "flow" with the term "conversational flow." Plaintiff also argued that Defendants' proposal would require, without support, that each flow must be associated with only a single entry. Defendants responded that they would be amenable to removing the word "individually" from their proposed construction.

(2) Analysis

Claim 1 of the '099 Patent, for example, recites in relevant part (emphasis added):

> . . .
>     (d) a memory storing a *flow-entry database including a plurality of flow-entries for conversational flows encountered by the monitor*;
>     (e) a lookup engine connected to the parser subsystem and to the flow-entry database, and configured to determine using at least some of the selected portions of the accepted packet if there is an entry in the flow-entry database for the conversational flow sequence of the accepted packet; . . . .

Thus, the "flow" in the term "flow-entry database" can include "conversational flows." As noted above, the parties have agreed upon a construction for "conversational flow."

Plaintiff argues that the claims themselves adequately explain the meaning of "flow-entry database." Although above-quoted Claim 1 of the '099 Patent, for example, recites that a "flow-

entry database" includes a plurality of flow entries, Plaintiff has not shown that the claims sufficiently describe the meaning of "flow-entry." (*See* Dkt. No. 55, at 18–19.) Further, Plaintiff has not shown that the recital of specific limitations, such as in dependent claims, necessarily precludes such limitations from being part of the meaning of the disputed term. *See, e.g., Wenger Mfg., Inc. v. Coating Mach. Sys., Inc.*, 239 F.3d 1225, 1233 (Fed. Cir. 2001) ("Claim differentiation, while often argued to be controlling when it does not apply, is clearly applicable when there is a dispute over whether a limitation found in a dependent claim should be read into an independent claim, *and that limitation is the only meaningful difference between the two claims*.") (emphasis added). On balance, the Court rejects Plaintiff's argument that "this term would be easily understood and applied by a jury." (Dkt. No. 55, at 17.)

As to the proper construction, the specification discloses that a "flow entry" is a database entry that describes a flow:

> A flow is a stream of packets being exchanged between any two addresses in the network.
>
> * * *
>
> The parser record is passed onto lookup process 314 which looks in an internal data store of records of known flows that the system has already encountered, and decides (in 316) whether or not this particular packet belongs to a known flow as indicated by the presence of a flow-entry matching this flow in a *database of known flows 324*. A record in database 324 is associated with each encountered flow.
>
> * * *
>
> The flow-entry database 324 stores flow-entries that include the unique flow-signature, state information, and extracted information from the packet for updating flows, and one or more statistical [*sic*] about the flow. *Each entry completely describes a flow.*

'099 Patent at 12:4–5, 13:54–61 & 14:14–18 (emphasis added); *see id.* at 32:5–9 ("A new signature (i.e., a key) will be created and the creation of the server state (904) will be stored as an

entry identified by the new signature in the flow-entry database. That signature now may be used to identify packets associated with the server."); *see also 3M Innovative Props. Co. v. Tredegar Corp.*, 725 F.3d 1315, 1321 (Fed. Cir. 2013) ("Idiosyncratic language, highly technical terms, or terms coined by the inventor are best understood by reference to the specification.").

As to Defendants' proposal that the flow entries must "describe a previously encountered single connection flow" and "describe a previously encountered flow involving more than one connection," Defendants themselves have submitted that "encountered" and "conversational flows" appear in surrounding claim language. (*See* Dkt. No. 57, at 9–10.) For example, above-quoted limitation (d) in Claim 1 of the '099 Patent recites (emphasis added): "a memory storing a flow-entry database including a plurality of flow-entries *for conversational flows encountered by the monitor*." Because such limitations are recited by other claim language, the Court hereby expressly rejects Defendants' proposal to include such limitations as part of the construction of "flow-entry database."

Therefore, the Court construes **"flow-entry database"** to mean **"a database configured to store entries, where each entry describes a flow."**

C. **"parser record"**

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| No construction necessary. However, to the extent the Court determines a specific construction is warranted:<br>    "information from a parsing/slicing/extraction operation" | "a data structure containing a flow signature for a packet, a hash and at least parts of the packet's payload for further processing"[1] |

---

[1] Defendants previously proposed: "a data structure containing a flow signature for a packet and at least parts of the packet's payload not used to build the signature." (Dkt. No. 53, Ex. B, at 4.)

(Dkt. No. 53, Ex. A, at 4; *id.*, Ex. B, at 4; Dkt. No. 55, at 7; Dkt. No. 57, at 11; Dkt. No. 59, at 3.) The parties submit that this term appears in Claims 7 and 16 of the '646 Patent and Claims 1, 17, 19, 42, and 44 of the '789 Patent. (Dkt. No. 53, Ex. A, at 4; *id.*, Ex. B, at 4; Dkt. No. 55, at 7; Dkt. No. 59, at 3.)

(1) The Parties' Positions

Plaintiff argues that "the claims themselves define the meaning of 'parser record,'" and "none of these claims require that the parser record contain a 'flow signature' as Defendants propose." (Dkt. No. 55, at 10.) Also, Plaintiff argues that Defendants' proposed phrase "flow signature" is unclear. (*Id.*, at 12.) Plaintiff further argues, as to Defendants' previously proposed construction, that "there is nothing in the claim language supporting Defendants' 'parts of a packet payload not used to build a signature' limitation." (*Id.*, at 13.)

Defendants respond that this is a "coined term" and that there is no evidence that this term has any meaning outside of the patents-in-suit, and Defendants argue that their proposed construction "gives the term the meaning attributed to it by the Asserted Patents." (Dkt. No. 57, at 12.) Defendants also submit that "the specification explains what a flow signature is and how it is built, and it also explains what a hash is and how it is generated." (*Id.*, at 14.) Finally, Defendants argue that "[t]he alternative construction proposed by Plaintiff is actually inconsistent with the specification, because a 'parser record' is not simply information that has been parsed, sliced or extracted from a packet." (*Id.*, at 16.)

Plaintiff replies that Defendants' proposal imports limitations from a preferred embodiment. (Dkt. No. 58, at 2.)

(2) Analysis

The specification refers to a "parser record" that has "data from [a] packet" and that includes a "signature":

> These extraction operations (in the form of commands and associated parameters) are passed to the extraction process 306 implemented by an extracting and information identifying (EII) engine that extracts selected parts of the packet, including identifying information from the packet as required for recognizing this packet as part of a flow. The extracted information is put in sequence and then processed in block 312 to build a unique *flow signature* (also called a "key") for this flow. A flow signature depends on the protocols used in the packet. For some protocols, the extracted components may include source and destination addresses. For example, Ethernet frames have end-point addresses that are useful in building a better flow signature. Thus, the signature typically includes the client and server address pairs. The signature is used to recognize further packets that are or may be part of this flow.
>
> In the preferred embodiment, the building of the flow key includes generating a *hash* of the signature using a hash function. The purpose if [*sic*] using such a hash is conventional—to spread flow-entries identified by the signature across a database for efficient searching. The hash generated is preferably based on a hashing algorithm and such hash generation is known to those in the art.
>
> In one embodiment, the parser passes data from the packet—a *parser record*— that includes the *signature* (i.e., selected portions of the packet), the hash, and the packet itself to allow for any state processing that requires further data from the packet. An improved embodiment of the parser subsystem might generate a parser record that has some predefined structure and that includes the signature, the hash, some flags related to some of the fields in the parser record, and parts of the packet's payload that the parser subsystem has determined might be required for further processing, e.g., for state processing.

'099 Patent at 13:14–47; *see id.* at 20:16–18 ("The process starts at 801 from FIG. 7 with the parser record that includes a signature, the hash and at least parts of the payload."); *see also id.* at 16:21–28 ("a short-cut recognition pattern—a signature").

These disclosures of a "signature," a "hash," and "parts of the packet's payload," however, are specific features of particular embodiments that should not be imported into the claims. *See Phillips*, 415 F.3d at 1323 ("although the specification often describes very specific

embodiments of the invention, we have repeatedly warned against confining the claims to those embodiments"). The disclosure of a "hash" being used "[i]n the preferred embodiment" is consistent with disclosing that a hash is optional.

Defendants urged at the March 2, 2017 hearing that Defendants' proposed construction is supported by consistent disclosure in the specification. In some circumstances, consistent usage of a term in the specification "can inform the proper construction of that term." *Wi-LAN USA, Inc. v. Apple Inc.*, 830 F.3d 1374, 1382 (Fed. Cir. 2016); *see also Nystrom v. TREX Co.*, 424 F.3d 1136, 1144 (Fed. Cir. 2005). Here, however, the specification discusses a "parser record" primarily in terms of the purpose that it serves rather than the content that must be stored in the record:

> The parser record is passed onto lookup process 314 which looks in an internal data store of records of known flows that the system has already encountered, and decides (in 316) whether or not this particular packet belongs to a known flow as indicated by the presence of a flow-entry matching this flow in a database of known flows 324. A record in database 324 is associated with each encountered flow.

'099 Patent at 13:53–60. Further, although Defendants have argued that all of the disclosed parser records include at least a signature, a hash, and at least portions of the payload, differences between the various disclosed parser records are noteworthy. For example, whereas some parser records are disclosed as containing entire packets (and thus entire payloads), some are disclosed as containing only portions of payloads. *See id.* at 13:37–47. Likewise, whereas some parser records are disclosed as containing flags, others are not. *See id.*

On balance, surrounding claim language sufficiently explains the meaning of "parser record." Claim 7 of the '646 Patent, for example, recites (emphasis added):

> 7. A packet monitor for examining packet[s] passing through a connection point on a computer network, each packet[] conforming to one or more protocols, the monitor comprising:

>    a packet acquisition device coupled to the connection point and configured to receive packets passing through the connection point;
>    an input buffer memory coupled to and configured to accept a packet from the packet acquisition device;
>    *a parser subsystem* coupled to the input buffer memory, the parsing subsystem *configured to extract selected portions of the accepted packet and to output a parser record containing the selected portions*;
>    a memory [for] storing a database of one or more flow-entries for any previously encountered conversational flows, each flow-entry identified by identifying information stored in the flow-entry;
>    a lookup engine coupled to the output of the parser subsystem and to the flow-entry memory and configured to lookup whether the particular packet whose parser record is output by the parser subsystem has a matching flow-entry, the looking up using at least some of the selected packet portions and determining if the packet is of an existing flow;
>    a cache subsystem coupled to and between the lookup engine and the flow-entry database memory providing for fast access of a set of likely-to-be-accessed flow-entries from the flow-entry database; and
>    a flow insertion engine coupled to the flow-entry memory and to the lookup engine and configured to create a flow-entry in the flow-entry database, the flow-entry including identifying information for future packets to be identified with the new flow-entry,
>    the lookup engine configured such that if the packet is of an existing flow, the monitor classifies the packet as belonging to the found existing flow; and if the packet is of a new flow, the flow insertion engine stores a new flow-entry for the new flow in the flow-entry database, including identifying information for future packets to be identified with the new flow-entry,
>    wherein the operation of the parser subsystem depends on one or more of the protocols to which the packet conforms.

Claim 16 of the '646 Patent likewise recites, in relevant part (emphasis added):

> . . .
> (b) performing one or more parsing/extraction operations on the packet to create a parser record comprising a function of selected portions of the packet; . . . .

Claims 1, 17, 19, 42, and 44 of the '789 Patent are similar. For example, Claim 19 of the '789 Patent recites in relevant part (emphasis added):

> . . .
> (c) a parser subsystem coupled to the input buffer memory and including a slicer, the parsing subsystem configured to extract selected portions of the accepted packet and to output a parser record containing the selected portions; . . . .

Thus, surrounding claim language, such as set forth above, sufficiently explains the meaning of "parser record" as used in the claims in which "parser record" appears.

As to Defendants' proposal of "signature," Plaintiff has also argued claim differentiation as to Claim 18 of the '646 Patent and Claims 6 and 48 of the '789 Patent. Claim 18 of the '646 Patent, for example, recites (emphasis added):

> 18. A method according to claim 16, wherein the function of the selected portions of the packet forms a *signature* that includes the selected packet portions and that can identify future packets, wherein the lookup operation uses the signature and wherein the identifying information stored in the new or updated flow-entry is a signature for identifying future packets.

Although Claim 18 thus recites more than merely a "signature," *see Wenger*, 239 F.3d at 1233 (quoted above), it is noteworthy that a "signature" limitation is recited in this dependent claim rather than in independent Claim 16. *See Phillips*, 415 F.3d at 1315 ("the presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim"). Similarly, Plaintiff has argued claim differentiation as to "hash," such as in dependent Claim 9 of the '646 Patent and dependent Claim 22 of the '789 Patent. (*See* Dkt. No. 58, at 2–3.)

Finally, Plaintiff has submitted technical dictionary definitions of "parse." (Dkt. No. 58, Ex. I, *Microsoft Computer Dictionary* 333 (4th ed. 1999) (defining "parse" as "[t]o break input into smaller chunks so that a program can act upon the information"); *id.*, Ex. H, *Microsoft Press Computer Dictionary* 292 (2d ed. 1994) (similar).) Although these definitions do not necessarily demonstrate that the term "parser record" has a well-known meaning, this evidence nonetheless supports Plaintiff's argument that the word "parser" refers to a well-known concept in the relevant art.

The Court rejects Defendants' proposed construction in light of the analysis above. No further construction is necessary, particularly in light of the context provided by surrounding claim language. *See U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997) ("Claim construction is a matter of resolution of disputed meanings and technical scope, to clarify and when necessary to explain what the patentee covered by the claims, for use in the determination of infringement. It is not an obligatory exercise in redundancy."); *see also O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1362 (Fed. Cir. 2008) ("[D]istrict courts are not (and should not be) required to construe every limitation present in a patent's asserted claims."); *Finjan, Inc. v. Secure Computing Corp.*, 626 F.3d 1197, 1207 (Fed. Cir. 2010) ("Unlike *O2 Micro*, where the court failed to resolve the parties' quarrel, the district court rejected Defendants' construction."); *ActiveVideo Networks, Inc. v. Verizon Commcn's, Inc.*, 694 F.3d 1312, 1326 (Fed. Cir. 2012); *Summit 6, LLC v. Samsung Elecs. Co., Ltd.*, 802 F.3d 1283, 1291 (Fed. Cir. 2015).

Therefore, the Court construes **"parser record"** to have its **plain meaning**.

## V. CONCLUSION

The Court adopts the constructions set forth in this opinion for the disputed terms of the patent-in-suit, and in reaching conclusions the Court has considered and relied upon extrinsic evidence. The Court's constructions thus include subsidiary findings of fact based upon the extrinsic evidence presented by the parties in these claim construction proceedings. *See Teva*, 135 S. Ct. at 841.

The parties are ordered that they may not refer, directly or indirectly, to each other's claim construction positions in the presence of the jury. Likewise, the parties are ordered to refrain from mentioning any portion of this opinion, other than the actual definitions adopted by

the Court, in the presence of the jury. Any reference to claim construction proceedings is limited to informing the jury of the definitions adopted by the Court.

Within thirty (30) days of the issuance of this Memorandum Opinion and Order, the parties are hereby ORDERED, in good faith, to mediate this case with the mediator agreed upon by the parties. As a part of such mediation, each party shall appear by counsel and by at least one corporate officer possessing sufficient authority and control to unilaterally make binding decisions for the corporation adequate to address any good faith offer or counteroffer of settlement that might arise during such mediation. Failure to do so shall be deemed by the Court as a failure to mediate in good faith and may subject that party to such sanctions as the Court deems appropriate. No participant shall leave the mediation without the approval of the mediator.

**So ORDERED and SIGNED this 14th day of March, 2017.**

_____
RODNEY GILSTRAP
UNITED STATES DISTRICT JUDGE