```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE EASTERN DISTRICT OF TEXAS
 2                    MARSHALL DIVISION

 3
   PACKET INTELLIGENCE LLC      )(      CIVIL DOCKET NO.
 4                              )(
                               )(      2:16-CV-230-JRG
 5                              )(
                               )(
 6 VS.                          )(      MARSHALL, TEXAS
                               )(
 7                              )(
   NETSCOUT SYSTEMS, INC.       )(
 8 TEKTRONIX COMMUNICATIONS,    )(      OCTOBER 10, 2017
   AND TEKTRONIX TEXAS LLC      )(      8:36 A.M.
 9

10                    TRANSCRIPT OF JURY TRIAL

11          BEFORE THE HONORABLE JUDGE RODNEY GILSTRAP

12                 UNITED STATES DISTRICT JUDGE

13 APPEARANCES:

14 FOR THE PLAINTIFF:        Mr. Paul J. Skiermont
                           Ms. Sadaf R. Abdullah
15                          Mr. Steven K. Hartsell
                           Mr. Alexander E. Gasser
16                          Mr. Steve J. Udick
                           SKIERMONT DERBY LLP
17                          2200 Ross Avenue
                           Suite 4800W
18                          Dallas, Texas   75201

19 COURT REPORTER:          Ms. Shelly Holmes, CSR, TCRR
                           Official Court Reporter
20                          United States District Court
                           Eastern District of Texas
21                          Marshall Division
                           100 E. Houston Street
22                          Marshall, Texas   75670
                           (903) 923-7464
23

24

25 (Proceedings recorded by mechanical stenography,
   transcript produced on CAT system.)
```

```
 1   FOR THE PLAINTIFF:     Mr. William E. Davis, III
                            THE DAVIS FIRM, PC
 2                          213 N. Fredonia Street
                            Suite 230
 3                          Longview, Texas    75601

 4   FOR THE DEFENDANTS:    Ms. Melissa Smith
                            GILLAM & SMITH
 5                          303 South Washington Avenue
                            Marshall, Texas    75670
 6
                            Mr. Eric Kraeutler
 7                          MORGAN LEWIS & BOCKIUS
                            1701 Market Street
 8                          Philadelphia, Pennsylvania   19103

 9                          Mr. Michael Lyons
                            Mr. Ahren C. Hsu-Hoffman
10                          Mr. Michael F. Carr
                            Ms. Karon N. Fowler
11                          Mr. Thomas Y. Nolan
                            MORGAN LEWIS & BOCKIUS
12                          1400 Page Mill Road
                            Palo Alto, California    94304
13
                            Mr. Adam A. Allgood
14                          MORGAN LEWIS & BOCKIUS
                            1000 Louisiana Street
15                          Suite 4000
                            Houston, Texas    77002
16
                            Mr. Charles E. Phipps
17                          Mr. Paul D. Lein
                            LOCKE LORD LLP
18                          2200 Ross Avenue
                            Suite 2800
19                          Dallas, Texas    75201

20                          Mr. Scott D. Wofsy
                            LOCKE LORD, LLP
21                          1 Canterbury Green
                            201 Broad Street
22                          Stamford, Connecticut    06901

23

24

25
```

<u>P R O C E E D I N G S</u>

1

2          (Jury out.)

3          COURT SECURITY OFFICER:  All rise.

4          THE COURT:   Be seated, please.

5          Good morning, Counsel.

6          I understand, Mr. Skiermont, you'll be

7  doing opening statements for Plaintiff; is that correct?

8          MR. SKIERMONT:  Yes, Your Honor.

9          THE COURT:  Would you like a warning on

10  your time?

11          MR. SKIERMONT:  Five minutes, please.

12          THE COURT:  Okay.  And how about opening

13  statements for Defendant?

14          MR. KRAEUTLER:  Eric Kraeutler for the

15  Defendants, Your Honor.  And I will not need a warning.

16          THE COURT:  All right.  And do I

17  understand, Ms. Abdullah, that you are expecting a baby;

18  is that correct?

19          MS. ABDULLAH:  Yes, Your Honor.

20          THE COURT:  All right.  Because of that

21  condition, should you need to excuse yourself for any

22  reason during the course of the trial, you may simply

23  walk behind counsel tables and go in and out that side

24  door as you might need to.

25          MS. ABDULLAH:   Thank you.  I appreciate

1  it.  I will do my best not to disrupt the proceedings.

2                THE COURT:  That -- that latitude applies

3  to you only.  Unless there's somebody else in a similar

4  condition that I'm not aware of.  Okay.

5                MS. ABDULLAH:  Thank you.

6                THE COURT:  All right.  Counsel, unless

7  either side has something else we need to take up before

8  I bring in the jury, we'll bring the jury in and begin

9  with opening statements.

10                All right.  Then bring in the jury,

11  please.

12                COURT SECURITY OFFICER:  All rise for the

13  jury.

14                (Jury in.)

15                THE COURT:  Good morning, ladies and

16  gentlemen.  Welcome back.  Please have a seat.

17                Members of the jury, you'll recall that

18  last week we selected and seated you as the jury in this

19  case, and I gave you my preliminary instructions.  We

20  are now prepared and at the proper place to begin with

21  opening statements from both Plaintiff and then

22  Defendant.

23                I remind you of all the instructions I

24  gave you earlier.  That will apply throughout the trial

25  until such time as I discharge you from your position as

1  jurors.

2              With that, we'll now hear opening

3  statements beginning with the Plaintiff.

4              MR. SKIERMONT:  Thank you, Your Honor.

5              THE COURT:  You may proceed,

6  Mr. Skiermont.

7              MR. SKIERMONT:  Thank you, Your Honor.

8              May it please the Court.

9              Good morning, ladies and gentlemen.

10             My name is Paul Skiermont, and it's my

11  great honor to represent Packet Intelligence and present

12  our opening statement to the members of the jury and

13  this honorable Court.

14                 This is an important case.  It's

15  important to the owner of the patents, Packet

16  Intelligence, whose owners took a risk to leave their

17  businesses and start a new one investing substantial

18  resources, time and money, to build their licensing

19  business.

20             And it is important to the inventors of

21  the patents, including the first listed inventor, Mr.

22  Dietz, who you will hear from today is the first

23  witness, and he's in the courtroom.

24             Mr. Dietz, if you'll stand up.

25             (Witness complies.)

1              MR. SKIERMONT:  And it's also important

2  to Mr. Maixner, one of the -- one of the other inventors

3  who y'all also will hear from today.

4              Mr. Maixner, if you could stand up.

5              (Witness complies.)

6              MR. SKIERMONT:  Thank you.

7              The inventors, Mr. Maixner, Mr. Dietz,

8  and their co-inventors, did the hard work to create the

9  inventions that you'll hear about today.  On behalf of

10  the entire Packet Intelligence team, we know that your

11  service on this jury is a tremendous burden to each of

12  you, and we want -- deeply grateful and appreciate your

13  service.

14              In a nutshell, this case is about a big

15  corporation that is using property without permission

16  that it does not own, and the owner of that property is

17  standing up for its rights.

18              The property is in your binder.  It's the

19  three United States patents, Tabs 1, 2, and 3 behind the

20  patents.  And what I'm holding up are the official

21  certified copies of the three United States patents that

22  are the same -- other than the cover and the gold seal,

23  are the same as the ones that are in your binder.

24              The big corporation that is using the

25  property without permission is the Defendant in this

case, NetScout.  And the owner for the -- of the

property standing up for their rights is the Plaintiff,

Packet Intelligence.

Now, before I give you a roadmap of the

opening statement, I want to introduce you to Packet

Intelligence.

In 2008, Mr. Brad Brunell, who's sitting

at counsel table, and Mr. Phil Vachon, who's in the

gallery, went into a patent licensing business together

after having been introduced by a mutual friend.  Both

had been senior executives at two of the world's largest

and most demanding computer technology companies.  Mr.

Brunell was the general manager for intellectual

property at Microsoft, and Mr. Vachon worked for Oracle

and ran the organization, licensing software to large

telecommunications companies.

Both chose to leave behind the financial

security and prestige of their jobs at Microsoft and

Oracle to take a risk and start their own business.

They saw a market opportunity to create a

new business, to use the experience they had gained at

Microsoft and Oracle in licensing to start their own

licensing business, and they took the lead.

While they set out hoping to build a

successful business, and, of course, make money, another

1   one of their priorities was to be able to spend more

2   time with their then young families.  That was almost 10

3   years ago.  The kids are grown.  They have remained

4   partners in their successful business and are now good

5   friends.

6             In my opening today, I want to cover a

7   little bit about U.S. patent laws and the background.  I

8   want to introduce you to the three patents in the case.

9   And I want to preview the witnesses and evidence that

10  you will hear during the trial that we think will

11  establish three things.

12            No. 1, Packet Intelligence, which we'll

13  refer to throughout the trial by its abbreviation, PI --

14  PI's patents are foundational and have received great

15  respect for many years and in many different ways.

16            No. 2, we think the evidence at trial

17  will show that NetScout is using PI's property without

18  permission and in reckless disregard for PA's -- PI's

19  property rights.

20            And, 3, we think the evidence will show

21  that NetScout's excuses for using PI's property without

22  permission are not credible.

23            As you heard a little bit on the video

24  last week from Judge Fogel, patents are property and

25  have some similarities to what we normally think of as

1   property, like a house or land or a deed.

2             A common analogy is that a patent is like

3   a deed.  A deed is to real property, and it sets out the

4   metes and bounds or boundaries of the land that is

5   owned.

6             We call patents intellectual property.

7   And like the deed to -- to a house, the numbered

8   paragraphs that appear at the end of each of the three

9   patents in your binder, called claims, define the

10  boundaries of the intellectual property in the patent

11  that has been granted by the United States Government to

12  the patent owner for a limited time.

13            If you own your -- if you own or rent

14  your home, you have rights inside the walls of your

15  residence.  Someone who doesn't have permission can't

16  come into your house.  If they do without your

17  permission, they would be a trespasser.  And if someone

18  is trespassing, you can call the police.

19            If you own a patent, you have rights to

20  the invention described in the claims.  And if someone

21  is using the patented invention without your permission,

22  that's called infringement.  But unlike for trespassers,

23  you cannot call the police on patent infringers.

24            Instead, you can take infringers to Court

25  under our patent laws and present your infringement case

1  to a jury like the eight of you.  And that's why we're

2  here.

3            As Judge Fogel explained on the video you

4  saw last week, in exchange for creating an invention and

5  disclosing it to the world in a published patent, the

6  owner of the patent receives some rights from the U.S.

7  Government.  The -- the patent owner gets to keep all

8  others from using the invention described in their

9  claims for a period of 20 years from the date they first

10  apply for the patent.

11            This is the fundamental bargain,

12  disclosure of the invention to everyone for the rights

13  to the exclusive use to that invention for a limited

14  time.

15            At the end of that limited term, anybody

16  who wants to use the inventions disclosed in the patent

17  can do so, and they can do so for free.  But for that

18  20-year patent term, there is a promise, a promise made

19  by the U.S. Government to patent owners that the

20  invention will be protected for the limited term.

21            It was intended that our patent system

22  would create the greatest innovative economic engine in

23  the world, and it has.  In fact, patents are so vital to

24  our country, it is the very first article of the U.S.

25  Constitution.

1              Then Secretary of State Thomas Jefferson

2    was the first director of the U.S. Patent Board, and,

3    indeed, he was the first patent examiner, who you'll

4    hear about a little bit in this trial.

5              And one fun fact to leave you with about

6    patents before I move on to talk about the three patents

7    in this case, the first United States patent was Patent

8    No. X00001.  It was examined by Mr. Jefferson himself,

9    and as you can see on your screens, it was signed by

10   President George Washington.

11             Let's talk about the three patents that

12   are in this case that I showed you the certified copies

13   of.

14             What's interesting is that the original

15   copy of every patent comes with a cover page that I'm

16   displaying on your screens.  And what's -- what it says

17   that is interesting is right at the top, it says:  The

18   director of the United States Patent and Trademark

19   Office has received an application for a patent for a

20   new and useful invention.  The title and description of

21   the invention are enclosed.  The requirements of law

22   have been complied with, and it has been determined that

23   a patent on the invention shall be granted under the

24   law.

25             That cover page was the cover page to all

1  three of the United States patents at issue in this

2  case.   The three patents in the case that are in your

3  jury note -- juror notebook are in order.   The first one

4  is the '725 patent, the second one is the '751 patent,

5  and the third one is the '789 patent.

6                And we refer to patents, even though

7  they -- we are now in the million -- we saw Patent No.

8  X1, and we are now into -- in this case, the patents are

9  in the six millions.   So I'm showing on your screen

10  there's three patents in the case, and on the cover of

11  the patent, you can see we'll refer to the '725 patent

12  as the last three digits of that patent number.   And

13  I've highlighted for you the inventors of that patent

14  and the dates that -- it was filed and the date it was

15  issued.

16                On the right-hand side of this -- on the

17  screen, you can see that the '725 patent, there were two

18  United States patent examiners, a primary and an

19  assistant.   And then you will see there are references

20  cited on the face of the patent.   And let me just take a

21  moment to -- to tell you what the references cited is.

22                References cited are older patents,

23  patents that issued before the application of the

24  invention being applied for that are related or relevant

25  or precedent somehow for the patent that is being

1  applied for.  There are primarily two sources of the

2  references cited, either the applicant can cite previous

3  patents in describing their invention and explaining how

4  it is an advance over the -- over the previous patents.

5            And United States patent examiners, when

6  examining patents, search for previous patents that

7  might be related to or relevant to the patent they are

8  examining to determine if someone else had patented

9  these ideas first.

10            And so every patent in this case has a

11  references cited section.  We'll talk a little bit more

12  about that later in the opening.

13            I turn now to the snapshots of the '751

14  patent.  You'll see highlighted, again, are the

15  inventors and the references cited.  And there's a

16  different examiner of this patent than there was for the

17  '725 patent.

18            And the '789 patent is now on your

19  screen, and you'll see there, there are a number of

20  inventors on the '789 patent.  You'll notice that Mr.

21  Dietz was the first listed inventor on each one.  And

22  this one also contains references cited document, and

23  had a third patent examiner that examined this patent.

24  Four patent examiners on three United States patents.

25            You'll hear from several witnesses today

who are here to explain the patented invention.  At a

very high level, what you will hear is that the

invention is directed to fundamental improvements to

network monitors that analyze traff -- data traffic

traveling over a network.  And the analysis allows

network operators, like AT&T or Verizon, to make

critical decisions about the security, performance, and

cost of their network.

The inventors, you will hear, came up

with special techniques for analyzing network data and

developed a way to track network data based on a user's

activity.  You'll hear that they were the first ones to

figure out how to track network data in this way.  And

they coined a phrase that they use in their patents

called "conversational flows" to describe some of these

special techniques.  The details of how are set forth in

the claims that are at issue in this case, and there are

two claims from each patent that are at issue in this

trial.

In the '725 patent, that's Claims 10 and

17.  In the '751, it is Claims 1 and 5.  And then the

'789 patent, it is Claims 19 and 20.

And what I'm putting up on your screen is

the -- an -- an exemplary claim, the Claim 19 of the

'789 patent.  And you'll notice that there are a lot of

1    words in that claim, and I'll explain how we're going to

2    go through those during the trial a bit later, but the

3    important thing for now to -- to understand is that the

4    details or the how of how the inventors went about

5    classifying network data traffic in this novel way are

6    described in these lengthy claims that we will go

7    through during the trial.

8              Packet Intelligence's, or PI's, patents,

9    the evidence presented during trial will reveal that

10   those inventions have received industry respect over

11   many years in many different ways.

12             Mr. Dietz was the first -- the first

13   inventor listed.  He co-founded a company with three of

14   his friends in the late 1980s.  And in the mid to --

15   from the mid '90s to 2000, Mr. Dietz served as the chief

16   technology officer of the company he founded called

17   Technically Elite.

18             During this time, Mr. Dietz and his team

19   of co-inventors worked to develop their invention, filed

20   for patent applications, and realized the importance of

21   the inventions and what they were doing which was

22   tracking user activity.  And another way -- word you'll

23   hear is "tracking user activity" means tracking the

24   applications that a user uses, like the ESPN website or

25   Netflix or Skype or another application.

1          And because of what their inventions were

2    about and the work they were doing, they changed their

3    name, the company name, from Technically Elite to

4    Apptitude, A-p-p, Apptitude.

5          In August of 2000, Mr. Dietz and his

6    co-founders sold Apptitude to a publically-traded

7    company called Hi/Fn, H-i-f-n, for millions of dollars.

8    In connection with the purchase, Hi/Fn acquired

9    ownership of the then pending patent applications that

10   are at issue in this case that Mr. Dietz and his team

11   had filed while at Apptitude.  Mr. Dietz became vice

12   president and chief technology officer of Hi/Fn and

13   continued to work on the inventions and filed additional

14   patent applications.

15         In 2009, he -- they -- I'm sorry, they

16   applied for and were granted the three bolded patents

17   that are on the timeline on the right-hand side in the

18   yellow bold.  And they also applied for and received

19   patents from other large companies from around the

20   world, including receiving patents on their inventions

21   in China, Japan, Germany, and Australia.

22         In 2009, a company called Exar purchased

23   Hi/Fn, and Exar acquired ownership of the patents at

24   issue in this case.  The evidence at trial will show,

25   and you will hear, that Exar ultimately decided to focus

1    on unrelated technology, and did not have the capability

2    or interest in investing the resources to build a

3    licensing program for the patents that it acquired from

4    Hi/Fn, and that is where Packet Intelligence enters the

5    picture.

6                    Mr. Brunell and Mr. Vachon had worked for

7    years to find valuable but overlooked intel --

8    intellectual property.  And when they found Mr. Dietz's

9    patent portfolio was not being used by Exar, they

10   conducted extensive research to verify the quality of

11   the inventors, the quality of the patents, and they

12   spent additional time and money researching network

13   communication vendors and whether they were using the

14   inventions described and claimed in the Dietz patents.

15                   After their due diligence, they invested

16   a considerable amount of their hard earned money to

17   purchase the patent portfolio from Exar that -- that are

18   at issue in this case.

19                   The evidence at trial will also

20   establish, we believe, that one of the reasons Mr.

21   Brunell and Packet Intelligence was confident in the

22   value and strength of the patents they were purchasing

23   was based on a patent quality metric, in part, called

24   forward citation analysis.  And let me explain just a

25   little bit about what a forward citation is.

1              As I just mentioned during the patent

2  application process, I put up the '751, again, just so

3  you can see the references cited.

4              During the patent application process,

5  both the applicant and examiner -- patent examiner cites

6  to previous patents they consider relevant.  And those

7  appear in this references cited portion of the patent.

8  So forward citations means citations that appear in

9  later patents filed by other companies who have cited

10 the Dietz's patents in their own patent applications,

11 either the company cites it or a patent examiner when

12 examining a patent filed by another company found the

13 Dietz patents and cited it against the application that

14 they were examining.

15             And as it turns out, PI's patents in this

16 case appear in the references cited section in hundreds

17 of patents issued to major technology companies.  The

18 three patents-in-suit are cited by leading technology

19 companies, and not only just one time or even five

20 times.  IBM has cited to the patents-in-suit 76 times;

21 AT&T, 64; Cisco, 59; Amazon, 22; Microsoft, 21.  And you

22 can see the forward citations of the other highly

23 regarded companies on the slides.

24             In addition, last but certainly not

25 least, the Defendants in this case, NetScout, Tektronix,

and the companies that NetScout has acquired have also

filed patent applications that cite to the Dietz

patents, and those patent applications include those

filed by Tektronix and companies NetScout acquired like

Fluke and Network General.

Now, to be clear, forward citations do

not establish infringement, and they do not establish

that the patent is valid.  But they do show awareness

within the industry of the cited patents, and they can

be a signal that the highly cited patent may be

foundational or otherwise valuable.

So what did Packet Intelligence do after

they acquired the patents?  They launched their

licensing program based on research into companies that

appeared to be using the patented inventions.  To date,

PI has licensed these patents in this case to two major

companies in the networking industry.

In 2000 -- in March of 2014, Huawei

agreed to pay slightly more than 2.5 percent of relevant

U.S. revenue for a license to PI's patents.  PI had sued

Huawei for patent infringement in this Court, and before

the case went to trial, Packet Intelligence granted a

license to Huawei, meaning they gave Huawei permission

to use their patented invention, in exchange for Huawei

paying a 2.5 percent royalty.

1          You will also hear in March of 2005, Cisco

2   agreed to pay millions of dollars to license PI's

3   patents.  PI had sued Cisco in this court for patent

4   infringement.  And before the lawsuit ended, before the

5   case went to trial, Packet Intelligence granted

6   permission to Cisco to use the patented invention in

7   exchange for a Cisco payment of millions of dollars.

8          And Mr. Brunell will walk through these

9   agreements with you and talk more about them when he

10   takes the stand today.

11          The patents in the United States, the

12   worldwide patents in Japan, Germany, Australia, and

13   other places, the Apptitude and Hi/Fn acquisitions, the

14   forward citations, the licenses by Huawei and Cisco,

15   those are all signs of respect and acknowledgement of

16   the patents that are in this case and that you're going

17   to hear about during trial.

18          So that brings us to NetScout.  The

19   evidence will show that NetScout is generating enormous

20   revenue and profits from its use of PI's patented

21   property without permission.

22          The accused products in this case, there

23   are two of them, both of these products are -- were

24   originally developed and sold by a company called

25   Tektronix.  And in 2015, NetScout acquired Tektronix and

1 acquired the two products you see on the screen.

2             On your left is the GeoProbe G10, and

3 that's a network monitor.  And on the right, it will be

4 referred to as the GeoBlade.  And so you will hear the

5 GeoProbe G10 often referred to as the G10, and the

6 GeoBlade is the GeoBlade.

7             You're going to hear testimony that

8 NetScout's products infringe PI's patents from Dr. Kevin

9 Almeroth, who is in Court today.  He will testify later

10 today.  He's an independent expert witness, meaning he's

11 not an employee of Packet Intelligence.  He doesn't have

12 any ax to grind.  When he started his infringement

13 analysis, he wasn't leaning one way or the other like

14 you were asked about during jury selection.

15             Dr. Almeroth is a professor at the

16 University of California Santa Barbara.  He has a

17 Bachelor of Science, a Master's, and a Ph.D., in

18 computer science, all from Georgia Tech.  And he is a --

19 an award winning teacher.  He will explain all of the

20 analysis he conducted and the methodology he employed to

21 reach his conclusion and his opinion, that in his expert

22 opinion NetScout's two products infringe the six

23 asserted claims in this patent.

24             So what did Dr. Almeroth do to determine

25 that those product -- products infringe?  During a

1  process known as pre-trial discovery, Packet

2  Intelligence and Dr. Almeroth were able to gain access

3  to NetScout's highly confidential internal company

4  documents, including the source code or the computer

5  instructions that run the two accused products and make

6  them do what they do.

7              He was able to review those documents,

8  the internal ones.  He was able to review the marketing

9  documents that the Defendants use to sell their

10  products.  I mentioned the source code.  And he was also

11  able to review the testimony of witnesses from

12  depositions that the Packet Intelligence attorneys took

13  during discovery.

14              What -- and Judge Gilstrap talked a

15  little bit about a deposition last week.  But as a

16  reminder, what a deposition is, is both parties get the

17  opportunity to cross-examine the other side's witnesses

18  under oath.  And it is videotaped and transcribed, like

19  these -- like the proceedings here are transcribed

20  verbatim word-for-word by the talented court reporter in

21  this courtroom.  And based on the transcripts of those

22  depositions, Mr. Almeroth was able to read how the

23  NetScout engineers and other employees describe the

24  operation of their infringing products.

25              And Dr. Almeroth will testify that the

1  evidence establishes all the things he looked at that I

2  just described that NetScout's products contain and use

3  each one of those little paragraphs of each of the

4  asserted claims in the patents.

5           THE COURT:  Five minutes remaining.

6           MR. SKIERMONT:  Thank you, Your Honor.

7           To give you a sense of that infringement

8  analysis, what Dr. Almeroth will do, as you see on the

9  right-hand side of the slide, he's going to break up the

10  elements of Claim 19, for example, into kind of bite

11  size pieces and on the left side he's going to explain

12  the evidence that was produced in this case in the form

13  of documents and witnesses to explain infringement.

14           You'll also hear that the sales and

15  profits of the GeoProbe and G10 (sic) have been

16  enormous.  From the time damages start in this case

17  through trial, NetScout's revenue on the accused

18  products exceeds $400 million, and their gross profit

19  approaches $225 million.

20           Let's talk about NetScout's excuses.

21  First, NetScout may -- may tell you there's no

22  infringement at all.  They hired a consultant,

23  Mr. Waldbusser, and we think that when you're able to

24  observe and compare the methods that Dr. Almeroth used

25  and Mr. Waldbusser's methods, that you will find that

1  Dr. Almeroth's testimony is more credible.  And as Judge

2  Gilstrap will tell you, it will be up to you, after you

3  see all the evidence and hear the testimony of those two

4  experts, to decide who you think is more credible.

5                 And importantly, remember, that the

6  burden of proof for infringement on Packet Intelligence

7  is the preponderance of the evidence or more likely than

8  not, the Scales of Justice tip slightly in favor of

9  infringement.

10                 Second -- and we think that will be more

11  than satisfied after you hear Dr. Almeroth.

12                 Second, NetScout will say, well, if you

13  don't like our non-infringement excuse, then all three

14  of PI's patents are invalid.  NetScout's burden of proof

15  on invalidity, recall, is higher than Packet

16  Intelligence's burden of proving infringement.

17                 To prove invalidity, they must prove by

18  clear and convincing evidence, meaning that you must

19  have an abiding conviction that the patents are invalid

20  after you hear all the evidence in this case.  We don't

21  think they will be able to satisfy that burden.

22                 NetScout is going to assert that Mr.

23  Dietz and his team allegedly got the idea for their

24  invention from an industry working group called the RMON

25  Working Group, and you'll hear a lot about that during

the trial, but you're going to hear from Mr. Dietz

himself.  And you're going to hear from the other

inventors, and you're going to hear from other people

who knew about that working group.

And you should listen very carefully to

that testimony about RMON because what you're going to

hear is that the patented inventions are a very

different technology than what was in the RMON standard,

and you're also going to hear that the patent examiners

who reviewed these patents knew about RMON and issued

the patents under the law to Packet Intelligence anyway.

You are also going to see -- and pay

close attention to this.  When they're showing you RMON

documents, you might even see some in NetScout's

opening.  They're going to show you documents from that

RMON Working Group, and one of the people you're going

to see is a gentleman named Mr. Andy Bierman from Cisco.

And he was one of the leading members of the RMON

Working Group.  He's never said that the patents are

invalid because of RMON.  And, in fact, his company,

Cisco, paid millions of dollars to license these

patents.

So when you see those documents with Andy

Bierman's name all over them from the RMON Working

Group, ask yourself:  Why would Cisco pay millions of

1  dollars to take a license if all the patents disclose is

2  old RMON technology that Cisco knew all about and helped

3  develop?

4          Finally, NetScout might say that even if

5  we did infringe and even if you're now willing to

6  invalidate the patents, those patents have very little

7  value.  But Judge Gilstrap will instruct you at the end

8  of the case, that if we prove NetScout infringed, they

9  must pay a reasonable royalty.

10          NetScout is going to come in here and

11  tell you we invented this technology with others.

12  They're going to complain that everyone else is wrong

13  about PI's patents, the Patent Office, the inventors,

14  Mr. Brunell, and Mr. Vachon, Cisco and Huawei, Dr.

15  Almeroth, they're all wrong.  But we think that after

16  you hear all the evidence presented during the trial,

17  you'll agree that this is a case about the arrogance of

18  a big corporation that is using respected property that

19  it does not own without permission.

20          We all know that when someone takes

21  something you own and refuses to play by the rules, you

22  have two choices.  You can sit back and take it or you

23  can stand up and fight for your rights.  Packet

24  Intelligence is standing up.

25          And at the end of the trial, I'm going to

1  come back in our closing argument, and I'm going to ask

2  for your help to make NetScout play by the rules.

3           Thank you.

4           THE COURT:  All right.  Defendant may now

5  present its opening statement to the jury.

6           MR. KRAEUTLER:  Thank you, Your Honor.

7           May it please the Court and ladies and

8  gentlemen.

9           My name is Eric Kraeutler, and along with

10  my colleagues, Mike Lyons and Melissa Smith, who you met

11  last week during jury selection, it's my privilege to

12  represent the Defendants in this case, Tektronix Texas,

13  which is now known as NetScout Texas, and NetScout

14  Systems.

15           At counsel table with us today is Richard

16  Kenedi.  Mr. Kenedi is the former president of Tektronix

17  Texas and is now a senior officer at NetScout because

18  Tektronix became a part of NetScout in 2015.

19           Also in the courtroom is Jeff Levinson,

20  and Mr. Levinson is the vice president and general

21  counsel of NetScout.

22           Finally, I'd like to acknowledge Steve

23  Waldbusser, who is in the audience.  Mr. Waldbusser will

24  testify on behalf of NetScout at this trial, and I'll

25  have more to say about him during this opening

1  statement.

2              This case is not about Packet

3  Intelligence's financial dealings or its successes or

4  the history of the patents after they were granted.

5  This is -- this case is about taking something that

6  doesn't belong to you.  It's about stolen ideas, and

7  it's about taking credit for what other people have

8  done.

9              Mr. Kenedi came here today, as have we

10  all, because Tektronix takes these allegations

11  seriously.  We are here to defend ourselves.  The

12  patents are invalid.  The people who applied for these

13  patents used the ideas of other people and claimed them

14  as their own.  And the evidence will prove it.

15              The allegations about Tektronix's

16  products are false.  The accused products don't

17  infringe, and the evidence will prove that, as well.

18              We didn't ask for this lawsuit, not by

19  any means.  But we did ask for this trial because

20  Tektronix has lived with these allegations for a year

21  and a half or more, and because this is our opportunity

22  to stand our ground and to come to this Court for

23  justice.

24              The Plaintiff never notified Tektronix

25  about these patents before taking this matter to Court.

Tektronix and NetScout knew nothing about these patents
until they got sued.  No one has alleged that Tektronix
or NetScout copied anything.  The products that are
alleged to infringe were developed by Tektronix years
before they knew anything about Packet Intelligence or
its patents.

So this case is not about what Tektronix
did.  This case isn't even about Packet Intelligence.
Packet Intelligence doesn't claim to have invented
anything.  They weren't even around when these patents
were being applied for.  They bought these patents as an
investment years after the patents were procured by
others.

This case is about the people who filed
these patent applications, including the alleged
inventors and a gentleman named Dov Rosenfeld, the
patent agent who wrote the claims.  It is about how they
got patents based on other people's concepts.  It is
about how they got patents based on something -- how
they got something that was not new, something that
already was being made and used by others before the
applications were filed.

The evidence will show that the people
who filed these patent applications were not entitled to
patent protection because they derive their so-called

inventions from the works of others.  And the evidence

will show that these patents are invalid because they --

what they claimed was not new, because in October 1998,

months before the patent applications were even filed,

NetScout had prepared -- had had introduced into the

market software and products that did everything claimed

in the patents.

You see, Tektronix got sued in this case

because it's alleged that two of their products infringe

the claims of the patent.  NetScout got sued just

because they had acquired Tektronix several months

before the suit was filed.  There are no NetScout

products at issue in this case.

But the Plaintiff picked on the wrong

combination of companies because NetScout was a pioneer

and is a leader in developing network monitoring

technology.  It is a large company, but it was founded

almost 30 years ago by a gentleman who came from India

with nothing in his pocket and built the company purely

based on his skill at -- at coding software and thinking

about products that would be needed in the marketplace.

And NetScout made the thing that's

claimed in these patents before the patent applications

were even filed.

During this trial, you'll hear that in

the 1990s, people in businesses were beginning to use

personal computers, and people in the computer industry

were thinking about how to make networks operate better.

Any of you who are old enough to remember

what computers were like in the 1990s will remember they

were slow, they were unstable, sometimes the packets

that are supposed to carry information across networks

just got lost.  Sometimes the networks just didn't work.

And so a small number of people from

companies -- large companies and small innovative

companies and from some of the great engineering

colleges in the United States, they got together, and

they began to develop standards for products that would

monitor the performance of networks, help to solve

problems, and make networks better.  They worked through

an organization known as the Internet -- as the Internet

Engineering Task Force.  The IETF is a worldwide

organization dedicated to network communications.  The

IETF develops standards that are like blueprints for the

people who make products, like computers and servers and

routers.  The IETF is a big organization that operates

through small -- smaller working groups that are

established to deal with specific topics.

And around 1991, the IETF formed a

working group known as the remote monitoring, or RMON

1  Working Group, to create standards for network

2  monitoring devices.  It's called RMON, or remote

3  monitoring, because the devices which are called probes

4  would be distributed physically throughout the computer

5  network, and they would operate on a 24/7 basis, and

6  they would acquire information which network managers

7  used to solve problems and make network communications

8  better.

9           Anil Singhal, the co-founder of NetScout,

10  which originally was called Frontier Software, was one

11  of the original participants in the RMON group, and he

12  was one of the leading contributors to that group.

13  And other network monitoring manufacturers also

14  participated in the RMON Working Group.  They

15  contributed what they knew.  They worked together to

16  develop good methods and systems for network monitoring.

17  Because they had this idea that if everyone worked

18  together and contributed what they knew that networks

19  would get better and that there would be a better and

20  bigger market for the network monitoring devices that

21  was helping to make networks better.

22           One of the key people in the RMON Working

23  Group was Steve Waldbusser.  He was not a manufacturer

24  or seller of equipment.  He was the head of the

25  information technology department at Carnegie Mellon

University in Pittsburgh, which truly is one of the great engineering schools in the United States.  So he was a user of products.

In a group made of competitors, he was neutral.  He was trusted by other members of the working group.  He was selected to be the editor of the remote monitoring standards that were developed by the group and the draft standards produced by the RMON Working Group.  He kept track of the technology that was being contributed by different companies and by people like Mr. Singhal who were contributing the ideas -- their ideas to the group.

Mr. Waldbusser wrote some of the key documents produced by the Working Group, and the Working Group created a new written standard that said what remote monitoring probes should do and how they should do it.  You'll hear that it was understood among members of the working group that they were contributing ideas for the good of the industry and that the work of the committee belonged to no one, and it belonged to everyone.

Early on, it became clear that there was so much work to do that the work of developing a standard would be broken into pieces.  In November 1991, the RMON Working Group published the first piece, its

1  first standard which we call RMON1.  And you'll see that

2  the name of the author on this document is S.

3  Waldbusser, Steve Waldbusser.

4           The RMON standard was immediately

5  successful, and let me tell you what that means.  It was

6  immediately successful because it was published and

7  manufacturers promptly began to make products to meet

8  the standard.  They called these RMON probes or RMON

9  monitors.  And that term was actually used to market the

10  products so people would know they were based on the

11  standards.

12           One of the standards -- once the standard

13  was published, manufacturers began to manufacture

14  products, and NetScout was one of the first companies to

15  make an RMON probe.  It was known as the NetScout 6010

16  Probe.  It is from a very long time ago.  It's -- the

17  photograph appears on your screen.  It was released for

18  sale in 1992, the date, I think, Ms. Smith asked you to

19  remember during jury selection.

20           And meanwhile, the RMON Working Group

21  continued meeting to develop other pieces of the

22  standard.  And as the working group achieved success, as

23  I described it, other people joined.  And one of the

24  people who joined was Mr. Dietz who joined the working

25  group after it completed its work on the RMON1 standard.

And as you've heard, Mr. Dietz is the alleged lead inventor on the patents that are being asserted against Tektronix.  But before he submitted his patent application in 1999, he attended the RMON Working Group meeting -- meetings for years.  He attended the working group meetings from 19 -- the early '90 -- 1990s until 1997.  He received copies of the draft standards and comments regarding the draft standards and communications among members of the group.  He sat in rooms where the RMON Working Group was meeting.  These were conference rooms at companies, meeting rooms at hotels and universities.  Wherever the meetings were held, he sat in those rooms, and he listened to the ideas of others.

One problem that the committee worked on had to do with what the patent calls connection flows and conversational-flows.  For some customers, it's important to know that multiple connections across the network may relate to -- to a single activity and therefore be part of a single conversational flow because it can help provide very specific information about network traffic, the specific applications that customers are using, who is using the applications, when they are using the applications, and so forth.

Excuse me.

1    On November 25th, 1996, another date that

2 I'll ask you to remember, the RMON Working Group

3 published a draft standard that addressed connection

4 flows and conversational flows.  It identified and

5 described a method to correctly attribute data that is

6 transmitted in a single connection as belonging to an

7 existing conversation.

8    The method was called TrackSessions.  The

9 three authors of the TrackSessions document are listed

10 on the cover page, but the authors also acknowledged the

11 contributions of three additional members of the working

12 group, including Mr. Singhal, the co-founder of

13 NetScout.  Mr. Dietz's name does not appear anywhere on

14 these -- in these documents.

15    In January 1997, the RMON Working Group

16 published another document that was authored by

17 Mr. Waldbusser.  This document, along with the

18 TrackSessions document -- draft standard, became known

19 as the RMON2 standard.  And you'll hear that the

20 TrackSessions' functionality, the ability to identify

21 conversational flows is included in every patent claim

22 that has been asserted against Tektronix.

23    The inventors said in the patent that

24 this ability, which is straight out of the RMON Working

25 Group, is what distinguished their invention from prior

1  art network devices.

2          What the patent doesn't say is that the

3  RMON Working Group had already identified and solved the

4  conversational-flow problem.

5          The Patent Office received no information

6  about the RMON Working Group or its standards.  So when

7  the Patent Office received these patent applications,

8  when the Patent Office reviewed these patent

9  applications, when the Patent Office issued these

10  patents they were in the dark.  You have heard that

11  patents are entitled to a presumption of validity, and

12  they are.

13          But as you saw in the patent video that

14  was shown to you during the jury selection process, the

15  issue of validity ultimately is -- is for you, the jury,

16  to decide, particularly when there are facts or

17  arguments that the Patent Office did not consider.

18          Even before the RMON2 standard was

19  published, NetScout was incorporating RMON2 technology,

20  including TrackSessions, into its NetScout probe.  By

21  October 1998, at the latest, more than eight months

22  before the patent applications were filed, NetScout

23  probes, including the existing NetScout 6010 Probe,

24  fully implemented RMON2 technology, including

25  TrackSessions.  It was in the hands of NetScout's

customers, and it was being used.  And the Patent Office received no information about the NetScout products that contain the TrackSessions capability and the other RMON2 capabilities.

The evidence that Mr. Dietz and the other alleged inventors were not true inventors, that they derived their invention from the work of others will be clear.

One of the documents you'll see in this trial is a summary of the alleged invention that the patent agent, Mr. Rosenfeld, prepared in 1998 based on information that it received from Mr. Dietz.  It is called an invention disclosure form.  And it was standard operating procedure for Mr. Rosenfeld.

Remember the date of the draft standard regarding TrackSessions' capability, November 25th, 1996.  What is the date that Mr. Dietz told Mr. Rosenfeld that he conceived of his invention? December 1996.  And you will see the way that the invention disclosure form describes the problem that the invention was intended to solve, and you will have the opportunity to compare it with the RMON committee's description years before.

The patent itself uses some of the same words that are in the RMON standard.  The inventors

1  claimed to have invented session tracking -- or

2  TrackSessions, and you will see in the patent, session

3  tracking, tracking sessions, and very similar

4  terminology.

5           Now, let me talk with you about the

6  Tektronix products at issue in this case, the G10 Probe

7  and the GeoBlade Probe.  You will hear that in the early

8  days of network monitoring, there were two very

9  different markets for network probes.

10          First, data networks where customers were

11  large businesses that had their own computer networks

12  and also the United States Government and the armed

13  forces which operate large data networks.

14          And secondly, voice networks where the

15  customers were telephone companies.  Prior to 2015,

16  NetScout was the leading network monitoring company for

17  data.  And Tektronix Texas was the leading network

18  monitoring company for voice.  Tektronix sold its

19  products to telephone companies.  They only sold their

20  products to telephone companies.

21          The invention in this case,

22  TrackSessions, or the ability to identify conversational

23  flows was important to customers who wanted detailed

24  information about the nature of traffic on their data

25  networks.  It was important to companies that ran data

1  networks.  It was not important to the telephone

2  companies.  They were interested in things like

3  troubleshooting and call tracing.  They were interested

4  in whether calls went through.

5              Remember the commercial, do you hear me

6  now, that's what they were interested in.  That was the

7  problem they wanted to solve, and it had nothing to do

8  with TrackSessions.

9              You will hear that the G10 and GeoBlade

10  Probes are part of a family of products that's been

11  around since the 1990s and that was designed for voice

12  networks.  The base products monitor connection flows

13  only.  They don't use TrackSessions.  They don't do what

14  the patent claims.

15             There are add-on features that can be

16  purchased for these products, and you'll hear about some

17  of them.  And some of them are alleged to incorporate

18  TrackSessions, but generally, they need to be separately

19  licensed and purchased for additional money.  And the

20  telephone companies generally don't buy the add-on

21  features.  They don't need them, and they don't want

22  them.

23             And so in addition to the inventors not

24  being eligible for patent protection because their ideas

25  were derived from others, in addition to the patents

being invalid because NetScout had a product that met
all the claims of the patents months before the patents
were applied for, in addition to all that, the G10 Probe
and the GeoBlade Probe just don't infringe.  Our
evidence will be straightforward.  It will be in the
form of witnesses and documents.

So let me tell you about the witnesses
who will testify on behalf of Tektronix and NetScout.

You will hear from several
representatives of Tektronix, including Richard Kenedi,
who's with us today, and Heather Broughton.

Mr. Kenedi is the former president of
Tektronix Texas.  He knows the voice network market
because he started as a software developer for a
telephone company.  And he will tell you about
Tektronix's business and the technology that it has
developed for those telephone company customers.

Ms. Broughton is the director of
marketing for Tektronix.  She also started at a
telephone company.  She was actually the person on the
phone with you troubleshooting and tracing your calls
and helping to solve your problems, and she got started
with Tektronix because she was using their products and
was interested in learning more.  Ms. Broughton will
testify regarding the accused products in this case.

1          Anil Singhal will testify on behalf of

2   NetScout and Tektronix.  He is the co-founder and the

3   chief executive officer of NetScout.  He founded this

4   company in the 1980s, again, at a time that he had

5   nothing.  Mr. Singhal will describe his work on the RMON

6   Working Group and in developing RMON products.  He will

7   testify about the true origins of what's claimed in

8   these patents.

9          Rajeev Nadkarni is a director of

10  engineering at NetScout.  He's been with NetScout since

11  the very beginning, more than 28 years, the beginning of

12  the company.  He will testify about the investigation he

13  undertook to confirm and prove that NetScout's

14  TrackSessions's software was being used by NetScout's

15  customers no later than October 1998.

16          And finally, Steve Waldbusser will

17  testify.  Mr. Waldbusser will testify on behalf of

18  NetScout and Tektronix as an expert witness and also as

19  a fact witness.  He will testify regarding the work of

20  the RMON committee, about the development of

21  TrackSessions, about what Mr. Dietz would have received

22  and witnessed as a committee member.  Mr. Waldbusser

23  will testify that the people who put their names on

24  these patents were not the true inventors of what is

25  claimed, that they derived their patents from the work

1  of others.

2              And Mr. Waldbusser will testify about

3  source code, which is computer language but in a form

4  that it can be read by human beings.  He reviewed the

5  source code of the NetScout product that was in use more

6  than eight months before the patent applications, and he

7  reviewed the source code of the Tektronix products which

8  are -- which are alleged to infringe.

9              He will test -- he will testify that the

10  NetScout probe that predated the patent applications

11  incorporated TrackSessions.  It did everything that's

12  claimed in the patents.  And ultimately, that those

13  probes invalidate the patents.  And he will testify that

14  the Tektronix probes did not incorporate TrackSessions,

15  monitored connection flows, not conversational flows,

16  did not practice the alleged invention, and ultimately

17  that they do not infringe the patents.

18              I want to thank you for your service and

19  for your kind attention today.  At the conclusion of the

20  evidence, I'll have the opportunity to talk with you

21  once again.  At that time, you'll have heard the

22  witnesses, and you will have seen the documents.  You

23  will have heard and seen things that the Patent Office

24  never did.  At that time, we'll ask you to find that Mr.

25  Dietz and the other alleged inventors who put their

1  names on these patents were not eligible for patent

2  protection because they are not the true inventors of

3  what is claimed.   The patents are invalid because they

4  were anticipated by the NetScout products and that the

5  products designed and manufactured by Tektronix Texas

6  for its telephone company customers do not infringe.

7                    Thank you very much.

8                    THE COURT:   Counsel, approach the bench,

9  please?

10                   (Bench conference.)

11                   THE COURT:   Mr. Skiermont, at least twice

12 in your opening, you referred to the Defendants as "the

13 big corporation."   I don't intend to let the Defendants

14 denigrate the Plaintiffs as a troll or a non-practicing

15 entity.   And I don't intend for the Plaintiffs to

16 denigrate the Defendants as that big corporation.   This

17 is not a case about David and Goliath, and I intend to

18 instruct the jury at closing or in advance of closing

19 that all parties are to be treated as equals.   So I'm

20 instructing you not to make references to either

21 Defendant or any Defendant as a big corporation going

22 forward.

23                   MR. SKIERMONT:   Yes, Your Honor.

24                   THE COURT:   Okay.   All right.

25                   MR. SKIERMONT:   Thank you, Your Honor.

 1              MR. KRAEUTLER:  Thank you, Your Honor.

 2              (Bench conference concluded.)

 3              THE COURT:  All right.  Those of you

 4  present in the courtroom who anticipate being called as

 5  a witness in this case, I'm going to ask all such

 6  persons to come forward at this time so that our

 7  courtroom deputy can administer the oath to the

 8  witnesses in the case.  If you're going to be a witness

 9  for either party, please come forward at this time.

10              And, Counsel, during the trial if you are

11  to call someone who's not here now and not sworn, please

12  let me know, and we'll swear them at that time.

13              MR. SKIERMONT:  Yes, Your Honor.

14              THE COURT:  All right.  Ms. Lockhart, if

15  you'll swear these witnesses, please.

16              (Witnesses sworn.)

17              THE COURT:  Thank you.  You may return to

18  your seats.

19              Does either party wish to invoke the

20  Rule?

21              MR. DAVIS:  Yes, Your Honor.

22              THE COURT:  All right.  And I assume that

23  does not apply to expert witnesses?

24              MR. DAVIS:  That's correct, Your Honor.

25              THE COURT:  Okay.

1              MR. KRAEUTLER:   Your Honor, may we

2  approach?

3              THE COURT:   Approach the bench.

4              MR. KRAEUTLER:   Thank you.

5              (Bench conference.)

6              MR. KRAEUTLER:   Your Honor, I just

7  wanted -- I -- I'm glad that it doesn't apply to experts

8  and, of course, Mr. Waldbusser is our expert.  He, also,

9  will to some extent be a fact witness because he'll be

10 recounting things that happened in the RMON committee,

11 and I just didn't want to let this go by without getting

12 that clarification.

13             THE COURT:   If somebody's an expert

14 witness and they're not covered by the Rule, the fact

15 that they may give fact testimony is not going to

16 disqualify them from being present in the courtroom.

17             MR. KRAEUTLER:   Thank you, sir.

18             THE COURT:   Okay.

19             MR. DAVIS:   Yes, sir.

20             (Bench conference concluded.)

21             THE COURT:   All right.  The Rule has been

22 invoked which means if you are a fact witness in this

23 case and you are not one of the representatives of the

24 parties, then you are to excuse yourself and remain

25 outside the courtroom until such time as you're called

1  to testify.  This does not apply to expert witnesses and

2  does not apply to corporate representatives.  But if you

3  are neither of those and you are -- anticipate being

4  called as a fact witness in the case, then you are

5  subject to the Rule and must remain outside the

6  courtroom until such time as you're called to testify.

7                    So any such fact witnesses to which the

8  Rule applies as I've explained it, should excuse

9  themselves at this time.

10                    (Witnesses leave the courtroom.)

11                    All right.  Plaintiff, are you prepared

12  to call your first witness?

13                    MR. DAVIS:  We are, Your Honor.

14                    THE COURT:  Call your first witness.

15                    MR. DAVIS:  Your Honor, Plaintiff calls

16  inventor, Mr. Russell Dietz, to the stand.

17                    THE COURT:  All right.  Mr. Dietz, if

18  you'll come forward.

19                    You've been sworn already, so if you'll

20  have a seat at the witness stand.

21                    And if we have notebooks to pass out,

22  let's get that done.

23                    Mr. Nance -- Mr. Nance, if you'll hand

24  this notebook to the witness, please.

25                    THE WITNESS:  Thank you, sir.

```
 1                    THE COURT:  All right.  Counsel, you may

 2  proceed.

 3      RUSSELL DIETZ, PLAINTIFF'S WITNESS, PREVIOUSLY SWORN

 4                       DIRECT EXAMINATION

 5  BY MS. ABDULLAH:

 6      Q.    Good morning.  Would you please introduce

 7  yourself to the jury?

 8      A.    Sure.  My name is Russell Dietz.

 9      Q.    Mr. Dietz, are you married?

10      A.    Yes, I am.  I've been married for 34 years.

11  As a matter of fact, my wife Carla is in the gallery

12  today.

13      Q.    Do you have any kids?

14      A.    Yes, I do.  I have three sons, one is 26, my

15  middle son is 23, and my youngest is 19.

16      Q.    And where do you live, Mr. Dietz?

17      A.    I live in San Jose, California.

18      Q.    What is your job?

19      A.    I'm currently the chief security officer and

20  the general manager of industrial Internet cyber

21  security for General Electric.

22      Q.    And can you describe what kind of work you do

23  as vice president, chief security officer, and general

24  manager of cyber security at GE?

25      A.    Sure.  I'm responsible for the product
```

1  security and for the cyber security for General

2  Electric's industrial Internet of things and their

3  overall industrial products.

4      Q.   Can you give us some examples of the kind of

5  work you do?

6      A.   Absolutely.  I deal with things like global

7  cyber warfare protection of power plants, water

8  processing facilities, gas and oil manufacturing and

9  extraction systems.

10      Q.   Have you received any security clearance from

11  the United States Government?

12      A.   Yes, several.

13      Q.   What's the highest level you've ever received?

14      A.   The highest level of security clearance is top

15  secret.

16      Q.   Were there any requirements for attaining that

17  level?

18      A.   Yes.  In a top secret security clearance,

19  there are background checks -- numerous background

20  checks, polygraph or lie detector tests.

21      Q.   And approximately how long have you been with

22  GE?

23      A.   About three years.

24      Q.   What kind of work did you do before you joined

25  GE?

1    A.    Before GE, I was CTO at a number of different

2  companies, starting about 1995.

3    Q.    Have you attended college?

4    A.    Yes, I did.  For a couple years, I attended

5  college.

6    Q.    Did you graduate?

7    A.    No.  No, I never got my degree.

8    Q.    And why did you decide not to pursue your

9  degree?

10    A.    Actually, I was getting lots of offers to go

11  out and do interesting things in the technology world,

12  and it looked like a better thing to do at the time.

13    Q.    Why are you here today, Mr. Dietz?

14    A.    Well, let's see, I'm here today because, as

15  you heard earlier, I'm the lead inventor on the patents

16  that are part of the case that we have here.  But also,

17  you know, NetScout has claimed that myself and the team

18  of inventors were actually taking the work of the RMON

19  Working Group at the time and were not responsible for

20  leading and designing the invention.  And I'm here to

21  set that record straight.

22    Q.    Do you have any ownership interest in PI?

23    A.    No, I don't.

24    Q.    Do you have any stake in the outcome of this

25  litigation?

1      A.    No.

2      Q.    What was the name of the company where you and

3 the rest of the inventors created your invention?

4      A.    Well, when we started the invention, the name

5 of that company was Technically Elite.

6      Q.    And when did you start working for Technically

7 Elite?

8      A.    Well, actually I'm one of the co-founders of

9 Technically.  I started the company in about 1989 with

10 three other friends of mine.

11      Q.    Can you tell us generally what the invention

12 is about?

13      A.    Yeah, sure, absolutely.  So the -- what the

14 invention is about is being able to provide an easier

15 way to show how traffic in a network is -- is really

16 related to the apps or the -- the pages that we browse

17 when we're looking at things across a network.

18      Q.    And what exactly is a network?

19      A.    Well, the closest thing I can point to is

20 probably, you know, the highways and -- and roads that

21 we have today that connect different destination that we

22 -- we come and go from.  If you think about it, you

23 know, a -- a network is basically a digital version of

24 -- of those highways and roads.

25      Q.    And what would you mean by traffic on a

1 network?

2    A.   Well, traffic is very much like that analogy

3 where we have cars or trucks.  So think of on the roads,

4 we have cars or trucks going to different destinations

5 and from other places.  And in a -- in a network, it's a

6 very similar kind of a way where except instead of cars

7 and trucks, we have packets.

8    Q.   What's a packet?

9    A.   Let's see, a packet is basically byte size

10 pieces of -- of information.  So instead of like people

11 or things and trucks and cars, think of it as byte size

12 pieces of the app or web page you're browsing moving

13 across the network.

14    Q.   Would you please explain to the jury how the

15 invention came about?

16    A.   Yeah, absolutely.  I'd be happy to.

17        So the invention came about because in the

18 time period that was going on, the Internet was moving

19 from very simple ways of -- of showing things, networks

20 were very simple to very fast.  Lots of things were

21 going on.  The Internet was starting to come together.

22 And also things were getting much more complex.

23        And we realized that it was more important to

24 understand how we, as individuals, were using things in

25 the network, and less interesting to understand the

1    technical details of what was going on.

2         So we wanted to make sure we could surface a

3    way to -- to figure out what was going on in this fast

4    and very complex place the -- the network had become.

5         Q.   What did network traffic look like in the

6    early days of the Internet?

7         A.   Well, to help along with this, I've got a -- a

8    slide that I've prepared.

9         In the -- in the early days, what things

10   looked like is basically you were on your -- you know,

11   your PC or your desktop computer.  And basically, you

12   know, we had the introduction of web browsers.  And web

13   browsers typically just displayed information from a

14   single server someplace -- you know, one place in the

15   network.

16        So it was a very simple way to say that

17   whatever was on your desktop was being driven by or

18   provided by -- across the network from that one server.

19        Q.   And how did that change?

20        A.   Well, what changed is -- is in this time

21   period, is we started to see applications and web pages

22   become very, very rich.  And we saw lots of -- of new

23   things getting presented in those.  Those rich

24   applications were made up of -- of lots of different

25   things.

1        As a matter of fact, I have another slide that

2  will -- will take us into what we see today, and it was

3  very similar to what was evolving at the time.

4        So in the example you see in front of you, you

5  have basically your smartphone.  And if you look on that

6  smartphone, what you're going to notice is we're in this

7  ESPN app or you were browsing ESPN.com, let's say.  When

8  you do that, you'll notice that there are lots of

9  different things that are coming at you.  There's, of

10  course, the -- the ESPN app itself.  And then inside of

11  it, you can see things like, you know, box scores or

12  information about a game that maybe you were interested

13  in or your favorite team.  You know, ads coming up about

14  an upcoming game that's -- that you're going to maybe be

15  interested in watching and want to know more about.  And

16  then even things like, you know, streaming video with

17  highlights from a game, along with lots of other --

18  other buttons and functions that you could push to get

19  more capability out of that simple little app that we've

20  got on our smartphone today.

21     Q.   And was there a particular word that you would

22  use for the link between the different sources and the

23  data displayed?

24     A.   Sure.  If we were to take a look at the next

25  slide that I have, we can start to look at what we call

1  connection flows.  So a connection flow is basically

2  that connection between that particular piece, like

3  let's say the ESPN highlights going to that ESPN server,

4  or the -- the ad being served up by the ad server, or we

5  see them now today where we -- content delivery systems

6  today that actually make sure that that video is as

7  close to you as possible so that when it's streaming

8  over your wireless provider's network, it looks really

9  acceptable and happens without jitter.  And those are

10  each individual connection flows.

11      Q.   Using this example that you have here, what

12  was the problem that you and your group noticed in the

13  mid-'90s time frame?

14      A.   Well, the problem that we noticed was that

15  more and more connection flows were -- were -- were

16  related to what it is that you were doing in the

17  application and how that was happening was missing.

18           So -- so, in other words, you couldn't really

19  see it.

20           So let me show you another slide that gives

21  you a view of what was going on.

22           So basically, what I've done here is think of

23  that app or that web page that you're using made up of

24  lots of these different connection flows.  And the

25  problem is, is that each of them are different or -- or

1   unique.  But how do I know that that's all related to

2   that one app or -- or the one web page that I'm looking

3   at?

4           So we started to see that it wasn't just

5   three, as I have here in this -- this diagram, but it

6   was starting to become tens or hundreds of these

7   different things.  And how do I really associate that?

8   And that was becoming a very big problem because

9   wireless network providers and other kinds of networks

10  that were coming up in front of and around the Internet

11  were having a very difficult time being able to make

12  sure that the services that were provided to present

13  those apps or web pages to you were being delivered and

14  that they could figure out that that app that you're

15  running is actually related to all of those connection

16  flows.

17      Q.   And how did you and your team of other

18  inventors solve that problem of not being able to group

19  those different connections?

20      A.   Well, you know, what we did was we came up

21  with a way -- a new way of associating all of those

22  packets that I -- that I described, pulling information

23  out of all those packets that I described earlier, and

24  -- and -- and associating that information back with all

25  of these different -- these different connection flows.

1          Basically, we created a new view into that

2   app.

3          And on -- on the -- on the next slide, I can

4   show you what that looked like.

5          So what we -- what we came up with was a way

6   to take information from all of those different packets

7   in each of those connection flows and create a

8   conversational flow.  And the conversational flow, as we

9   see in this picture, can be 3 or 300 or 30 different

10  connection flows, but they're all associated now to that

11  one application, the app on your phone and that web

12  page.

13      Q.   And is conversational flow the term that's

14  used in your team's patents?

15      A.   Yes, it is.

16      Q.   Who exactly was in that group at Technically

17  Elite that was working on this project?

18      A.   Actually, again, another slide that I have

19  here for you shows all of the inventors.  So there was

20  myself, Mr. Joseph Maixner, Mr. Andrew Koppenhaver,

21  Mr. Will Bares, William Bares, Mr. Haig Sarkissian, and

22  Mr. James Torgerson.  So we had a good team of people

23  working on different aspects of the problem.

24      Q.   And can you talk a little bit about what each

25  person's contribution was?

1      A.    Yeah, absolutely.  You know, so starting --

2  starting with Mr. Torgerson, Mr. Sarkissian, and Mr.

3  Bares, they worked on the different aspects that we

4  would use in hardware related to that speed that I

5  talked about.  So the faster things were going, the --

6  the more we had to figure out how to make things happen

7  in -- in hardware systems so they could make it at that

8  speed.

9            And then Mr. Koppenhaver and Mr. Maixner

10  worked on a lot of the software and a lot of the

11  different protocols that were used involved in making up

12  those connection flows and, finally, the conversational

13  flow.

14            And then I, myself, was involved in actually

15  working through all of the more complex problems, making

16  sure that the team was working together on solving those

17  problems, and staying focused on the -- the app, the

18  piece that's important to each of us and what it is we

19  use every day.

20      Q.    Can you tell us what the process was that you

21  and your team undertook to develop the invention?

22      A.    Absolutely.  We -- for -- for the periods of

23  time where we were working together on the invention, we

24  would get together face-to-face at least once a quarter

25  in a room and -- basically like a war room, and work

1  through some of the harder problems that we had found

2  that we were running into.  Coming up with different

3  parts of how we were going to solve the problem.

4         And then every week or every month we would

5  get together on either videoconferences or conference

6  calls to hash through problems that we were running into

7  and come up with new ways to work through them.

8         Mr. Maixner and I actually worked in the same

9  office, so he and I would get to spend more time

10 together, you know, working through some of the more

11 complex apps and applications and web pages we needed to

12 be able to understand.

13     Q.   And what time period are we talking about

14 here?

15     A.   The -- the -- the big breakthroughs for us

16 happened in -- in the 1998 time frame.

17     Q.   I'd like to introduce what has been

18 preadmitted as DX-517, and it's there in the notebook in

19 front of you, Mr. Dietz.

20     A.   Thank you.

21     Q.   And can you tell us what this document is?

22     A.   Let's see, yes.  This document looks to be

23 some of the notes taken by Dr. Rosenfeld during the --

24 the disclosure process in the invention.

25     Q.   And who is Dr. Rosenfeld?

1    A.   Dr. Rosenfeld is the -- the patent agent that

2 I worked with in the creation of the patents.

3    Q.   Did you have conversations with Dr. Rosenfeld

4 about the invention?

5    A.   Yes.  Dr. Rosenfeld and I got to know each

6 other very well.  I'm -- I'm a technical guy, okay.  So

7 Dr. Rosenfeld is -- is -- being a patent agent, knows a

8 lot more about how to turn the technical things into an

9 invention.  So it was -- he was -- we spent many, many

10 hours together going through what we were working on.

11    Q.   If you would turn to Page 7, please.  Under

12 the record's section, do you see the subtitle

13 Development Description and Records?

14    A.   Yes, yes, I do.

15    Q.   What is shown in that section?

16    A.   Yeah, what is shown in this section is the

17 rest of the information that was left off of the

18 material that was used this morning, and it shows the --

19 the actual steps that we went through to -- to finally

20 end up in the early 1998 time frame with what we had,

21 which was the invention.

22    Q.   And is that generally consistent with your

23 memory of these events?

24    A.   Yeah, actually, it's -- it's quite consistent

25 with the memory of the events the -- the -- that I

1   can -- can bring to my thoughts by looking through it.

2   I actually look back at this now, and Mr. --

3   Dr. Rosenfeld did a good job of going back to some of

4   the initial thoughts through when we finally had our

5   breakthroughs.

6       Q.   Using what's written here, where exactly is

7   the breakthrough kind of described?

8       A.   The -- the -- the breakthrough is really

9   described towards the end of the paragraph, which you

10  would see here, in the early 1998 period between January

11  and March.  And this is when we kind -- then we -- when

12  we really figured out how to deal with the

13  performance-related issues of how we could come up with

14  a conversational flow.

15          If you remember, I mentioned earlier today

16  that -- that performance was one of the driving issues

17  behind how we were trying to help really get to a

18  conversation flow.  And it wasn't until we figured out

19  those elements that we actually realized we had

20  something that was commercial, that people would use,

21  and -- and that was the breakthrough moment for us.

22      Q.   Does this section continue on to the next

23  page?

24      A.   Yes, it does.  It -- it goes on to -- to show

25  actually how we continued to break that breakthrough

1  moment down into practice.  And when we actually finally

2  started to have a system that we considered was viable

3  and -- and something that we could actually deploy and

4  sell.  In other words, we had something we could

5  actually, you know, take to market.

6      Q.   So this morning when Mr. Kraeutler used this

7  document to say that your invention happened in December

8  of 1996, was that correct?

9      A.   No.

10      Q.   Can you explain?

11      A.   Yeah.  When you -- when you actually work on

12  an invention and what -- and what Dr. Rosenfeld was

13  doing, he was walking through the processes of -- of

14  what an invention would come through.  And, as a matter

15  of fact, again, I wasn't an expert at it, so, you know,

16  I needed -- I needed Dr. Rosenfeld to help me, and he

17  wanted to go back from when we had things that were

18  already existing that we knew and built on, all the way

19  through when we finally had a working invention and we

20  had the unique new thing that we could bring, you know,

21  to the market.

22      Q.   How did you and your team feel about this

23  invention?

24      A.   We were really excited about it.  Again,

25  I'm -- I love technology.  I always have.  And it was --

1   it was -- it was pretty exciting to come up with

2   something.

3          We -- we really, you know, didn't know the

4   impact of it.  We were just excited because we were

5   solving problems, and -- and it was a lot of fun to do

6   that.

7      Q.   Can you describe some of the advantages

8   presented by your group's invention?

9      A.   No, absolutely.  So what's really interesting,

10  and I've -- and I've kind of prepared a slide just to

11  kind of help us through it -- or actually, you know, and

12  understand what we were going to do with them.

13         But let me talk through them and give you the

14  -- the -- the kind of big areas that were important.

15         The first big thing that we really came to was

16  -- was security.  So if we look at today, and even at

17  that time what's happening with -- with securing

18  networks, if you think about it, what it's related to is

19  the application or function that you're actually doing.

20  And service providers and -- and network operators

21  wanted to come up with ways to basically protect

22  about -- protect and -- and defend against things

23  related to what we use as individuals and users.

24         So there were really new ways to come up with

25  creating security policies to help protect against

1  malware and other things coming in that we couldn't do

2  in the past.

3        Another -- another big area that was pretty

4  exciting was -- was dealing with -- was dealing with the

5  overall quality of service, right?

6        So if we think about it, more and more of the

7  voice calls that we make today are happening over

8  digital networks and even over the Internet.  Well,

9  making sure all those packets that I talked about arrive

10  at the right time so that the call sounds good, that was

11  a pretty exciting thing, especially being able to help

12  service providers understand how to leverage the

13  Internet as part of that.

14        And then the last piece that became really

15  critical, and I know we see it today, is dealing with

16  network policy.  And -- and what do I mean by that?

17  Well, if you think about it, the -- we all -- we all

18  think of the Internet as the Internet, this big cloud.

19  Well, in reality, it's a collection of lots of networks

20  that are -- that are run by lots of people.  And those

21  different networks aren't all designed to carry the --

22  the type of content that we would use.

23        So when you're on a wireless network, you only

24  want certain kinds of video streams to come in.  You

25  don't want, you know, full HD Netflix streaming over

1  that network.

2       So with -- with our new invention, we could

3  actually come up with ways to help use the conversation

4  flow to actually make sure that full HD streaming didn't

5  consume and rob you of all of your wireless bandwidth

6  when you were trying to use your mobile device.

7       Q.   Why did you and your team decide to file

8  patent applications on that technology?

9       A.   Well, I wish I could take credit for that, but

10  I -- I can't.  As my wife will tell you, I get more

11  excited about the technology sometimes and kind of

12  forget about making money off of it.  So set at the

13  time, it was probably not high on my radar screen.  It

14  wasn't something I was thinking about.

15       As a matter of fact the CFO at Apptitude,

16  Mr. Jack Lazar, was the one who came to me and said, you

17  know, it's probably a good idea, Russ, if we actually

18  look at coming up with a way to protect the intellectual

19  property.  And so we might want to look at whether we

20  should be filing patents on all of this work that you

21  guys have been doing.  So it was -- it was Mr. Lazar's

22  idea to -- to patent the solution.

23       Q.   And why was it important to the company to

24  protect the intellectual property?

25       A.   Well, as we can see from the timeline that --

1  that Dr. Rosenfeld laid out, we'd invested a lot of

2  effort and resources.  And not only that, we invested a

3  lot of -- of financial resources into actually bringing

4  the invention to practice, actually turning it into

5  something we could use.

6          And on top of that, as was brought up in the

7  opening statements today, the company was -- was so

8  excited about the intellectual property that they were

9  about to change the name of the company to Apptitude so

10 we could focus on apps, and also talking about things

11 like application recognition and application visibility.

12         So those are big investments to make, and --

13 and having the intellectual property protection was --

14 was key to that.

15     Q.   When did you file those applications?

16     A.   Let's see, we first filed the provisional

17 application in June of 1999.

18     Q.   And did you file additional applications after

19 that?

20     A.   Yes, we did.  In June of 2000, we -- we filed

21 the individual patents themselves -- the full patents

22 themselves.

23     Q.   I'd like to introduce PTX-3.  And this is also

24 Tab 1 in the juror notebook.  And can you tell us what

25 this document is?

1    A.   Yes.   This is -- this is Patent '725 that was

2   talked about earlier today.

3    Q.   And is it one of the patents that you and your

4   team came up with?

5    A.   Yes, it is.

6    Q.   I'd like to look at now PTX-7, which is Tab 2

7   of the juror notebook.

8         And can you tell us what this document is?

9    A.   Yeah.   This is -- this is Patent '751 that was

10   talked about today in the opening.

11    Q.   And is this another one of the patents that

12   you and your team came up with?

13    A.   Yes, it is.

14    Q.   And let's also take a look at PTX-9, which is

15   Tab 3 in the juror notebook.   And please tell us what

16   this document is.

17    A.   And -- and this is Patent '789 that was talked

18   about in the opening today.

19    Q.   And is this also one of the patents that

20   resulted from your team's work?

21    A.   Yes, it is.

22    Q.   And are you a named inventor on all three of

23   these patents that we've just looked at?

24    A.   Yes, I am.   I'm the lead inventor named in all

25   three of these patents.

1      Q.   Now, after you filed these patents, what

2  happened to Technically Elite, the company?

3      A.   Well, as -- as I talked about earlier, not

4  long after that, towards the -- the -- the end of 1999,

5  we changed the name of the company to Apptitude, and we

6  became very focused on how to solve the problem of

7  application visibility and -- and capability so that --

8  so that we -- because we knew that apps and web pages

9  and applications were going to be the way that things

10  were going to be used in the future.

11           In addition to that, it was also around the

12  time that the -- the infamous dot com crash occurred

13  which was in the early 2000 time period.  And for those

14  of us that have been involved in -- in different

15  Internet activities, it was -- it was a tough time.

16  So it became a little bit harder to get investment to

17  continue what we were doing.  So we went and sought out

18  companies that might be interested in the technology

19  that we had to see if we could, you know, continue

20  moving forward.

21           And in August of 2000, the company was

22  acquired by Hi/Fn.

23      Q.   Why was Hi/Fn interested in your company?

24      A.   Well, Hi/Fn was actually involved in -- in two

25  areas, security and network optimization, making

networks go faster.  And so they were very interested in the technology the company had and the customers that we had.

Q.   How much did Hi/Fn pay for Apptitude?

A.   Let's see, Hi/Fn paid approximately $80 million in public equity -- public stock for the company.

Q.   Did you join Hi/Fn when they acquired Apptitude?

A.   Yes, I did.  I was -- I took on the role of vice president and chief technology officer for Hi/Fn.

Q.   Did the other inventors also go with you?

A.   Yes, absolutely.  All of the other inventors came and continued their efforts at Hi/Fn.  Two of the -- two of the inventors on the team were consultants, so Mr. Bares and Mr. Sarkissian, and they continued on as consultants with us at Hi/Fn.

Q.   Now, Mr. Dietz, were you in the courtroom when NetScout's Counsel said that your patents are basically the same thing as the work of the RMON Working Group?

A.   Yes, I was.

Q.   Do you agree with that statement?

A.   No.

Q.   Can you explain, please?

A.   Absolutely.  So if we were to look at the --

1    the work that -- that -- that my team did and what

2    the -- and the work that the RMON Working Group was

3    doing, I mean, basically, the RMON Working Group was in

4    the -- was in the place of management within the IETF.

5    And management meant presenting information or

6    interacting with managing networks.  The RMON Working

7    Group was building data structures, okay, ways to

8    present information.  It wasn't building anything

9    related to how information was acquired or found or

10   discovered or measured.

11       Q.   Can you explain a little bit more what you

12   mean by RMON was basically just data structures?

13       A.   Sure.  So when you look at things like RMON

14   and other things in management at that time, it was --

15   it was a -- it was a way to -- to standardize how we

16   presented information about network systems.  Well,

17   information was presented in what we call a MIB, a

18   management information base.  And in order to make sure

19   that we were -- were able to send information from these

20   remote monitors to a central place, we had to come up

21   with a common way to describe it so that we knew how to

22   read it.

23           And that's -- and that is what we did in the

24   working group was coming up with a common way to

25   describe information.

1      Q.    And how do you know what the working group was

2  doing?

3      A.    I was, as was described earlier today,

4  intimately involved in the RMON Working Group.

5      Q.    And when Mr. Kraeutler said that you joined

6  the RMON group after the RMON1 standard was already in

7  place; is that correct?

8      A.    No, it's actually not correct.  So the RMON

9  Working Group was -- was started in the late '80s or

10 early '90s, and I attended meetings from as early as

11 1991.

12     Q.    A few minutes ago you mentioned the word

13 "standards" or "standardizing" the information.  Can you

14 explain what you mean by standardizing?

15     A.    Yeah.  So -- absolutely, happy to.

16          So if you think about it, today, the simplest

17 analogy I can give is -- is when we plug in an appliance

18 or when we plug in a lamp or whatever, we know that that

19 plug is going to plug in and that the voltage in that

20 plug is going to work, and the light's going to come on

21 or the stereo is going to work.  Well, the only way that

22 that would happen is if there was a standard for that so

23 that all of the different companies that make all the

24 things that plug into those sockets do it the same way.

25 So we had to do the same thing in networking because the

Internet started as a research project.  And in the

early days when it's a research project, there's only a

few people involved, so they can get together and talk

about it, and it's easy.  But as it becomes more of a

commercial product, things that we sell, and there's

lots of competitors involved, you want to make sure that

all of those products work together so that when

consumers buy them they do what they expect them to do.

Q.    Would you please explain to the jury how your

team's invention is different from the RMON Working

Group's standards?

A.    Yeah, absolutely.

The -- the -- the biggest -- the biggest

difference that you would see from -- from the RMON

Working Group's standards is -- is basically some of

those things that we talked about earlier today when I

was describing some of the advantages that it has, okay.

When you think about those advantages, they

come from acquiring traffic across all of the different

elements in your app.  So if you remember that app that

I talked about when we were talking about the ESPN app,

you will see in that ESPN app that there are many

different kinds of connection flows, a variety of

different capabilities, the different kinds of content

that's there, and you have to come up with many

1 different ways to acquire or remove that information.

2          So the biggest thing was being able to

3 actually tie that traffic to the app for sure that

4 you're using when you're using your device in a network.

5     Q.    Does your invention require the use of any

6 RMON tables?

7     A.    No, it does not.

8     Q.    And does using RMON tables require the use of

9 your team's invention?

10    A.    No, it does not.

11    Q.    Did any of the RMON Working Group meetings

12 involve discussion about the techniques on how to tie

13 traffic to application activity?

14    A.    No, we specifically would not have those

15 conversations.

16    Q.    And why would you specifically not have those

17 conversations?

18    A.    Well, it's two reasons, okay.  One is what I

19 talked about earlier when we talked about standards and

20 the evolution of how people use things.  Well, standards

21 have to live forever.  How long have we been plugging

22 lights into light sockets or literally plugging

23 appliances into outlets?  A long time, okay.

24          The same thing was going to be true for what

25 we do with -- with the standards that we developed in

1    the IETF.  So they had to be able to live for very long

2    periods of time.

3            So describing how you acquire information

4    really wasn't going to be relevant at all to how the

5    standard presented it because that's all it was doing,

6    okay.

7            The second thing that's important to -- to

8    bring out was it was a known practice that -- that

9    members of each of the Working Groups would come --

10   would have a variety of different ways to do what they

11   were doing because their systems were at different

12   places in the network.  And when you're in different

13   places in the network, how you acquire the information

14   is, of course, different, okay.  So you want to have a

15   standard way of presenting it, but how you acquire it is

16   not going to be the same.  So those were the two big

17   reasons.

18       Q.   Other than yourself, were any of the other

19   inventors that we looked at on the slide and on the

20   patents, were any of those other inventors involved in

21   the RMON Working Group?

22       A.   No, they were not.

23       Q.   Were you in the courtroom this morning when

24   Mr. Kraeutler gave his opening to the jury?

25       A.   Yes, I was.

1              MS. ABDULLAH:  If we can pull up

2  Defendants' Demonstrative Slide 15.

3      Q.   (By Ms. Abdullah)  Do you remember seeing that

4  slide during the presentation?

5      A.   Yes, I do.

6      Q.   And is this a portion of the '789 patent?

7      A.   Yeah, it appears to be from -- from the slide,

8  yes.

9      Q.   Did NetScout's counsel omit any part of the

10  paragraph that's in this portion?

11      A.   Yes, a very important part.

12              MS. ABDULLAH:  If we can please pull up

13  PTX-9, and, again, that's Tab 3 in the jury notebook.

14      Q.   (By Ms. Abdullah)  Is this the '789 patent?

15      A.   Yes, it is.

16      Q.   And if we look at Column 3 where that quote

17  was taken from that's in Defendants' demonstrative

18  slide.

19              Around Line -- around Line 53 -- 52.

20      A.   Yes, I see that, yep.

21      Q.   Can you read to the jury --

22              MS. ABDULLAH:  If we could blow that up

23  on the screen, please, beginning with "considering."

24      Q.   (By Ms. Abdullah)  Could you read to the jury

25  the part that NetScout's counsel omitted from their

1  slides?

2      A.   Yes.   So it says here:   Considering the

3  previous SAP example again, because one -- one features

4  of the invention is to correctly identify the second

5  exchange as being associated with a print server on --

6  service on that server, such exchange would even be

7  recognized if the clients were not the same.

8      Q.   And can you explain to the jury the

9  significance of what NetScout's Counsel omitted?

10      A.   Yes.   The significance is that in this part of

11  the patent, we are describing existing capability, and

12  we're doing that -- and I'm assuming that there's more

13  to this.   I'm only going by what I'm reading here, and I

14  just happen to know what SAP is.

15          So this is talking about something that was

16  existing, that would have been -- that we would have

17  understood or looked at.   And it's -- it is what's

18  different, okay, from what it is that's mentioned after

19  this, which was the part that was highlighted this

20  morning, okay.

21          And the -- the part that was highlighted this

22  morning, what distinguishes this invention from prior

23  art network monitors is that it has the ability to

24  recognize disjointed flows as belonging to the same

25  conversational flow was a statement we were placing in

1  the ground to try and tie disjointed flows to the same

2  conversational flow.

3          So all we were saying was there was something

4  that was known, and this was something that was new.

5                  MS. ABDULLAH:  If we can have Defendants'

6  Demonstrative Slide 22 on the screen, please?

7     Q.   (By Ms. Abdullah)  Do you remember this slide

8  from this morning?

9     A.   Yes, I do.

10    Q.   And do you remember that NetScout's Counsel

11 focused on the phrase "session tracking"?

12    A.   Yes, I do.

13    Q.   And just to clarify, is session tracking the

14 same thing as the invention of your team?

15    A.   No, it is not.

16    Q.   Can you explain that, please?

17    A.   Sure, absolutely.  If you were to look at what

18 this -- what this says specifically, it says:  Session

19 tracking also is known as -- known as one of the primary

20 processes for tracking applications -- known as one,

21 okay.

22          So every time you see the word "known," okay,

23 that means that this is something that we know.  This

24 was something that we built upon, okay.

25    Q.   And so was it distinct from the actual new

1  parts of your invention?

2       A.   Absolutely.

3       Q.   And why would you have included things that

4  you already knew about in the patent?

5       A.   For the same reason that was described to you

6  this morning that patents are cited, right?  They're

7  referenced.  We're -- we're trying to make a case for --

8  for how -- how we have examples of how things were going

9  on and how things would go on with our invention.

10      Q.   Were you also in the courtroom, Mr. Dietz,

11 this morning when NetScout's Counsel said that you and

12 your team were not the true inventors of the patents?

13      A.   Yes, I was.

14      Q.   Is that a fair characterization?

15      A.   Absolutely not.

16      Q.   Can you explain, please?

17      A.   So as -- as I just previously mentioned,

18 myself -- okay, I was the only individual that was

19 involved in the RMON Working Group, and as I also

20 mentioned earlier, the RMON Working Group was only in

21 existence to create a data structure, okay, to present

22 information.

23          Our invention is -- has to do with being able

24 to monitor traffic anywhere in a network.  It doesn't

25 matter where it is.  I don't care if it's a probe or

 1   whatever.  And those were very significant distinctions.

 2   Monitoring was, you know, a function that was

 3   interesting, but it wasn't required, okay, as I

 4   mentioned earlier.

 5            And quite frankly, it wasn't even something

 6   that was high on our radar screen or very high value to

 7   us at the time.  We were much more interested in those

 8   other use cases, those other areas, and that's really

 9   where the invention was focused.

10       Q.   Has anyone from the RMON Working Group ever

11   said to you before that you took the invention from the

12   group?

13       A.   No.  And that's what's surprising to me.  So

14   my -- my LinkedIn page has been around probably since

15   LinkedIn existed, and ever since then there's been this

16   really neat feature to connect all of your patents to

17   the LinkedIn page.  So it's been up there since at least

18   the patents have been issued and then some.  And until

19   this case, no one has ever come to me and claimed this.

20       Q.   During the time you were in the working group,

21   were you familiar with Mr. Andy Bierman from Cisco?

22       A.   Yes, I was.  Mr. Bierman was the working group

23   chair for a good amount of the time that RMON Working

24   Group was in place.

25       Q.   And has Mr. Bierman ever said to you that you

1    took the inventions from the RMON Working Group?

2        A.    No, he has not.

3        Q.    What was the reaction in the industry to your

4    team's patent portfolio?

5        A.    Let's see, it's been pretty interesting to

6    watch over the years.  Again, it wasn't the reason that

7    we did it.  Even today, you know, we solve problems, and

8    that's the exciting part of it.  Making things better

9    and easier for folks is -- is what it's all about.

10           And what's really amazing to me is I've had

11   the pleasure of -- over the years of working at a

12   variety of different companies and interviewing a lot of

13   people.  And it's always surprising to me how many of

14   them, like when we're almost done with the interview,

15   will bring up with one of the patents and say:  Wow, I

16   can't believe that you thought of how we would use apps

17   like that now as we do today back in, you know, the late

18   1990s, even in 2000, because remember, a lot of the

19   patents reference 2000, 2005 as the issue date.  So

20   they're still astonished that that's what we thought

21   about way back then.

22       Q.    And are you also aware of other companies that

23   have referred to your patents over the years?

24       A.    Yeah.  That's another thing that is kind of

25   surprising to me, you know, is to see, you know, how

```
 1  many times that it's cited and -- and referenced.
 2  Again, it's kind of cool.  I mean, it feels good.  It's
 3  -- it's exciting and fun, you know, as a technologist to
 4  see that, but I never expected it.
 5              MS. ABDULLAH:  We pass the witness.
 6              THE COURT:  All right.  Ladies and
 7  gentlemen, before the Defendant cross-examines the
 8  witness, we're going to take a short recess.  You may
 9  just close and leave your notebooks in your chairs.
10              I remind you not to discuss the case with
11  each other or with anyone else.  Follow all my earlier
12  instructions to you, and we'll be back in here shortly
13  to continue with cross-examination.  Use this
14  opportunity to stretch your legs and get a drink of
15  water.
16              The jury is excused for recess.
17              COURT SECURITY OFFICER:  All rise for the
18  jury.
19              (Jury out.)
20              THE COURT:   The Court stands in recess.
21              Mr. Nance, make sure the witness has that
22  lavalier microphone off his lapel before he goes to the
23  restroom or whatever he wants to do.
24              The Court stands in recess.
25              (Recess.)
```

```
 1                      (Jury out.)

 2                      COURT SECURITY OFFICER:  All rise.

 3                      THE COURT:  Be seated, please.

 4                      All right.  Let's bring the jury back in.

 5                      Mr. Dietz, if you'll return to the

 6    witness stand.

 7                      COURT SECURITY OFFICER:  All rise for the

 8    jury.

 9                      THE COURT:  I don't think he's going to

10    need that, Mr. Nance.  He's making himself heard very

11    clearly.

12                      (Jury in.)

13                      THE COURT:  Please be seated.

14                      All right.  The Plaintiff has passed the

15    witness.  We'll proceed with cross-examination by

16    Defendant.

17                      MR. KRAEUTLER:  Thank you, Your Honor.

18                            CROSS-EXAMINATION

19    BY MR. KRAEUTLER:

20         Q.   Good morning, Mr. Dietz.

21         A.   Good morning.

22         Q.   What did mobile telephones look like in 1996?

23         A.   Wow, 1996.  Good question.  Hard to remember.

24         Q.   Okay.  They -- they didn't look like the

25    smartphone in your demonstrative, would that be fair to
```

1  say?

2      A.    Yeah, that would be fair to say.

3      Q.    Remember the movie Wall Street?

4      A.    I sure do.

5      Q.    And Michael Douglas's phone, it was about that

6  big?

7      A.    Absolutely.

8      Q.    They were a little smaller by -- by 1996, but

9  they didn't have apps, did they?

10     A.    No, they didn't.

11     Q.    And they certainly didn't have ESPN streaming

12 video?

13     A.    No.

14     Q.    Is your financial arrangement with Packet

15 Intelligence and the Skiermont Law Firm, the same as it

16 was when you gave your deposition in this case?

17     A.    Yes, it is.

18     Q.    All right.  No changes in that -- in that

19 arrangement?

20     A.    No changes.

21     Q.    You joined the -- the RMON Working Group, you

22 said, in 1991, that was the same year that the RMON1

23 standard was issued; is that correct?

24     A.    Yes, that's -- that's correct.

25     Q.    So you were not one of the original members of

1  the group?

2      A.   I would -- I -- I started in 1991.

3      Q.   You were very active in the RMON Group during

4  the 1990s, would that be fair to say?

5      A.   Yes.

6      Q.   And you remained active until at least 2004?

7      A.   Yes.

8      Q.   You mentioned one of the members of the RMON

9  Group, Mr. Bierman from Cisco?

10     A.   Yes.

11     Q.   He left Cisco in 2004; isn't that correct?

12     A.   I wouldn't know.

13     Q.   Okay.  He no longer is employed by Cisco; is

14  that correct?

15     A.   Again, I wouldn't know.

16     Q.   During your time with the RMON Working Group,

17  you authored or co-authored 15 different Internet

18  drafts, which are the working documents of the IETF and

19  its working group; is that correct?

20     A.   Sounds about right.

21     Q.   And those documents, those Internet drafts,

22  they are published, and they are available to tens of

23  thousands of people worldwide; is that correct?

24     A.   Yes.

25     Q.   You were a member of the RMON Working Group

1   the entire time that you were working on the patents in

2   this case, is that fair to say?

3       A.   Yes.

4       Q.   Steve Waldbusser was the editor of the

5   standards and draft standards produced by the working

6   group, do you agree with that?

7       A.   Oh, absolutely.

8       Q.   And he was in a unique position to know what

9   was being contributed and what was not being contributed

10  during those proceedings?

11      A.   That, I wouldn't know.

12      Q.   The RMON Working Group met multiple times

13  during the year; is that correct?

14      A.   From what I recall, yes.

15      Q.   There were general meetings of the IETF where

16  the entire organization would meet, and then the working

17  groups would meet during part of the day?

18      A.   Yes, that's true.

19      Q.   And you attended those meetings?

20      A.   Yes, I did.

21      Q.   And then there were also separate meetings of

22  the RMON Working Group where it met by itself for a

23  period of days, and you participated in those meetings;

24  isn't that correct?

25      A.   Yes, absolutely.

1    Q.   There's a binder of documents in front of you,

2   and I'd like to begin with Defendants' Exhibit 58.

3              MR. KRAEUTLER:   Mr. Goodin, could you

4   bring up the first page?   Thank you.

5    Q.   (By Mr. Kraeutler)   Do you recognize this

6   document?

7    A.   Yes, I do.

8    Q.   And what is it?

9    A.   It is the Remote Network Monitoring MIB

10   Protocol Identifiers draft from November 1996.

11    Q.   And do you recognize this as the first

12   published document that discussed TrackSessions?

13    A.   Yes, I do.

14    Q.   And there were additional documents published

15   over a period of years that also included discussion of

16   TrackSessions; is that correct?

17    A.   I don't recall exactly.

18    Q.   But this was -- this was a draft, and it

19   progressed until it became a standard; is that correct?

20    A.   Yes, it did become an IETF standard.

21    Q.   And you were on the mailing list for the RMON

22   Working Group, so you would have received all of the

23   emails commenting on the draft standard and -- and with

24   information being provided by the members of the group?

25    A.   Yes, I would.

1    Q.    And there was discussion around the standard.

2  It wasn't simply -- didn't simply appear out of thin

3  air.  There was discussion among this -- about this

4  standard among all the members of the group over an

5  extended period of time, would that be fair to say?

6    A.    Rigorous discussion.

7    Q.    Now I'd like to direct your attention to the

8  page that is stamped NetScout 015158.

9            MR. KRAEUTLER:  And, Mr. Goodin, could

10  you please enlarge Table 3.1?

11    Q.    (By Mr. Kraeutler)  And do you recognize that

12  passage?

13    A.    I recognize the table.

14    Q.    And can you read the material for

15  TrackSessions, beginning with the word "TrackSessions"

16  and through the parenthetical at the end?

17    A.    Yes.  The -- the material states:

18  TrackSessions correctly attribute all packets of a

19  protocol which starts sessions on well known ports or

20  sockets and then transfers them to dynamically assigned

21  ports or sockets thereafter, example, TFTP.

22    Q.    Now, do you have an understanding of what was

23  meant by the term "well known ports or sockets" as of

24  November 1996?

25    A.    Yes, I do.

1      Q.    And what is your understanding?

2      A.    Well known ports were defined to mean

3   protocols that were known or defined by IETF standards.

4   So an example would be TFTP was always on the same port.

5      Q.    All right.  And -- and am I correct that there

6   were actually 1,023 or 1,024 ports and that companies

7   could register their protocols with those ports through

8   icon, through one of the Internet organizations?

9      A.    There was a registration of the well known

10  ports that was maintained by the icon for the IETF,

11  correct.

12     Q.    And -- and do you have an understanding of

13  what was meant by the term "dynamically assigned ports

14  or sockets" as of November 1996?

15     A.    Yes, I do.

16     Q.    And what is your understanding?

17     A.    Dynamically assigned ports were -- were

18  assigned outside of the well-known range as needed.

19     Q.    And there were tens of thousands of those

20  dynamically assigned ports; is that correct?

21     A.    I believe there were, yeah.  That's the size

22  of an integer less that, so yeah, absolutely.

23     Q.    Okay.  And would it be fair to say that as of

24  this time period, as of 1996, because there were more

25  and more protocols, the -- the dynamically assigned

1  ports were being used to a greater extent than they had

2  before?

3      A.   That would be fair.

4      Q.   And -- and is this draft standard describing a

5  circumstance where an activity may begin on a well -- on

6  a well known port, and then be continued on a

7  dynamically assigned port?

8      A.   Yeah.  The paragraph is stating correctly that

9  the -- that if you report TrackSessions, you're

10 correctly attributing all the packets of a protocol

11 which starts sessions on a well known port or socket and

12 then transfers them to a dynamically assigned port or

13 socket.

14     Q.   And as of November 1996, did this circumstance

15 where an activity might begin on a well known port and

16 continue on a dynamically assigned port, did that create

17 a problem for network monitoring that the RMON committee

18 was attempting to solve?

19     A.   I believe it created a problem for how we

20 reported information in the data structure of the

21 management information base.

22     Q.   And did the draft standard describe a

23 technique that could be used to correctly identify

24 packets belonging to the same computer session?

25     A.   Not that I recall.

1    Q.   Do you recall that in addition to the portion

2  of the document that's in front of us now, that there

3  was a discussion of the specific application of

4  TrackSessions to certain protocols, including remote --

5  RPC, a remote procedure call?

6    A.   Not that I recall.

7         MR. KRAEUTLER:  Mr. Goodin, could you

8  bring up Page 015179?

9    Q.   (By Mr. Kraeutler)  And you can also find

10 that, Mr. Dietz, in the book in front of you.

11        MR. KRAEUTLER:  And, Mr. Goodin, could

12 you blow up the top three lines, please?

13   Q.   (By Mr. Kraeutler)  So, Mr. Dietz, does this

14 refresh your recollection as to whether there was a

15 specific discussion as to how to apply TrackSessions to

16 the RPC protocol?

17   A.   No, it does not.  As a matter of fact, it

18 absolutely affirms that it does not.

19   Q.   And how is it that it affirms that it does

20 not?

21   A.   Because all this says is that the

22 TrackSessions flag will be set by learning port mapping

23 of programs.  Doesn't say anything else.

24   Q.   And a minute ago, you couldn't remember this,

25 and the discussion goes for several pages, and so how

1  are you so sure looking at this document that it doesn't

2  describe a technique?

3       A.   Because it says:  Learn port mapping of

4  programs.

5       Q.   You will agree with me that SunRPC is called

6  out as a specific example of an application of

7  TrackSessions at this point in the document?

8       A.   It says that -- it says here that the

9  description says SUN Remote Procedure Call Protocol is

10  one of the protocol identifiers, okay, and that

11  TrackSessions is used to indicate in the protocol

12  identifier that SunRPC is being properly reported.

13       Q.   Right.  So SunRPC is being used as an example

14  --

15       A.   No.

16       Q.   -- of the technique?

17       A.   No.

18       Q.   This is a specific discussion of SunRPC as it

19  relates to TrackSessions, will you agree with that

20  statement?

21       A.   I would agree with that statement.

22       Q.   All right.  Let me ask you to look at the

23  immediate preceding page, Page 178, and there's another

24  specific example for TFTP.

25            MR. KRAEUTLER:  And, Mr. Goodin, if you

1  would blow up those three lines around -- yes, thank

2  you.

3      Q.   (By Mr. Kraeutler)   And will you agree with me

4  that TFTP is called out as a specific example in this

5  passage of the document?

6      A.   It says here that the TFTP protocol

7  identifier, okay, will have the parameter TrackSessions.

8      Q.   And is it called out as a specific example?

9      A.   An example for a protocol identifier, yes.

10     Q.   Thank you.

11         Now I'd like to look at your invention

12  disclosure form, which is Defendants' Exhibit 517.

13             MR. KRAEUTLER:  Mr. Goodin, if you could

14  put up the first page of the document, please.

15             And if you could just blow up the top

16  portion.

17     Q.   (By Mr. Kraeutler)   Now, this is the document

18  you prepared with Dr. Rosenfeld; is that correct?

19     A.   Yes, that's correct.

20     Q.   And did you write the document together, or

21  did you write the document for him?

22     A.   You know, I don't recall.

23     Q.   Let me direct your attention to Page 8 of the

24  document, Bates No. 8.

25             MR. KRAEUTLER:  And, Mr. Goodin, if you

1 could please pull that up.  And if you could also

2 enlarge from the words "inventor information" down

3 through the end of the section, conception date and

4 records.

5      Q.   (By Mr. Kraeutler)  So as you pointed out in

6 your direct examination, the date of your first

7 conception of the invention was December 1996, even

8 though there was additional activity after that date; is

9 that correct?

10      A.   So what's stated here in these notes is

11 December 1996.

12      Q.   And -- and that is a correct -- that's --

13 that's the date you gave Dr. Rosenfeld?

14      A.   That is the beginning date of the description

15 that follows in the rest of the information related to

16 the invention.

17      Q.   As you gave it to Dr. Rosenfeld?

18      A.   Again, that's the date that begins the

19 information that's listed in the rest of the invention

20 disclosure.

21      Q.   Okay.  I -- I understand your answer.

22           Now, if you look just below the highlighted

23 portion, there's a discussion of written records

24 regarding this conception, including detailed lab

25 notebooks, internal documentation and presentation,

1  personal minutes and journals?

2      A.   Correct.

3      Q.   When is the last time you saw those particular

4  materials?

5      A.   I can't recall.

6      Q.   All right.  Do you know if they exist today?

7      A.   I would not know.

8      Q.   Now, let me direct your attention to Page 3 of

9  the document, PI_3.

10              MR. KRAEUTLER:  And, Mr. Goodin, if you

11  would blow up the paragraph -- the heading and the

12  paragraph below the paragraph:  What specific problem

13  does it solve?

14              And will you highlight the words

15  "well-known connection," the first time they appear,

16  which I think is -- is in the fourth line.

17      Q.   (By Mr. Kraeutler)  And, Mr. Dietz, do you

18  have an understanding of what was meant by the words

19  "well-known connection" at the time this document was

20  prepared?

21      A.   I would -- I -- if -- I would -- off the top

22  of my head, I would -- I would have -- be assuming that

23  it meant what we talked about earlier, well-known ports.

24      Q.   Well-known ports or sockets as stated in

25  the -- in the RMON committee document?

1    A.   No, I said well-known ports.  I didn't say as

2  stated in any document.

3    Q.   Okay.  And I take your point.  But well-known

4  ports or sockets?

5    A.   So I -- I would -- I would assume that

6  well-known connection is well-known ports.

7    Q.   Okay.

8         MR. KRAEUTLER:  Mr. Goodin, if you could

9  blow up the words "dynamically allocated channels or

10  methods."

11    Q.   (By Mr. Kraeutler)  Mr. Dietz, does

12  dynamically allocated channels or methods in this

13  document mean the same thing as dynamically assigned

14  ports or sockets?

15    A.   Not necessarily.

16    Q.   All right.  Do you have an understanding as to

17  what was meant by the words "dynamically allocated

18  channels or methods" at the time this document was

19  prepared by you or your patent agent?

20    A.   You know, I can't recall all the details.

21    Q.   Is it possible that the words "dynamically

22  allocated channels or methods" means the same thing as

23  "dynamically assigned ports"?

24    A.   I would be -- I would be making a supposition.

25    Q.   Does this document describe the same problem

1  for network monitoring, that is sessions that begin on a

2  well-known port and continue on a dynamically assigned

3  port, as was stated in the RMON document?

4        A.   I haven't read the entire document in a very

5  long time, so I could not answer that question.

6              MR. KRAEUTLER:  Mr. Goodin, if you could

7  take down that enlargement.

8              And then if you could enlarge the last

9  two lines of the document -- of the section just above

10 detailed description.

11       Q.   (By Mr. Kraeutler)  So, Mr. Dietz, could you

12 read the sentence that begins on the second -- on the

13 top line, rather?

14       A.   Sure.

15             As client/server networks become more complex,

16 it is imperative that datagrams from different

17 application conversations be able to be clearly

18 identified.

19       Q.   And is that describing the same need to

20 correctly attribute all packets of a protocol that was

21 described in the RMON document?

22       A.   No.

23       Q.   And why not?

24       A.   Because of the word "applications."

25       Q.   Now, protocols are used in order to

1   communicate for applications; is that correct?

2        A.   In some cases.  Not all.

3        Q.   Let's now look at your -- one of your patents,

4   and that's the '725 patent, and it is Defendants'

5   Exhibit 477.

6             MR. KRAEUTLER:  And, Mr. Goodin, if you

7   could please put up the first page of that document.

8        Q.   (By Mr. Kraeutler)  So, Mr. Dietz, leaving

9   aside whatever the particular invention or solution is

10  that you contend you have in this case, based on the

11  last two documents we looked at, do you agree that

12  your -- you -- as of the time you met with Dr. Rosenfeld

13  and prepared this document, that you were trying to

14  solve a problem that was the same or similar to the

15  problem described in the RMON document?

16       A.   No.

17       Q.   So this is the '725 patent, it's one of the

18  patents for which you're the lead inventor?

19       A.   Correct.

20       Q.   Let me direct your attention to Column 25,

21  beginning at Line 40.

22             MR. KRAEUTLER:  And, Mr. Goodin, if you

23  would -- if you would enlarge the heading Operation of

24  this Invention.  And the first three lines or so.

25       Q.   (By Mr. Kraeutler)  Mr. Dietz, is this portion

1  of the patent, operation of the invention, the portion

2  in which you described certain embodiments of the

3  invention, meaning examples of ways in which the

4  invention could operate?

5       A.   So, again, I'm not a patent attorney, okay.

6  And I did not prepare these documents fully, and I

7  haven't reviewed them in quite some time.

8       Q.   Okay.  Are you familiar with the term

9  "preferred embodiment"?

10      A.   I am familiar with that term, yes.

11      Q.   Do you know that it's a requirement that the

12  patent set forth at least one and possibly more

13  preferred embodiments to illustrate potential uses of

14  the invention?

15      A.   I recall that.

16      Q.   Let me now direct your attention to the next

17  column, Column 26.

18                MR. KRAEUTLER:  And, Mr. Goodin, would

19  you please enlarge the -- the portion from Line 45 to

20  Line 52?

21      Q.   (By Mr. Kraeutler)  Was session tracking one

22  of the embodiments in your patent?

23      A.   It would be hard for me to answer that that is

24  one of the embodiments of the patent.

25                MR. KRAEUTLER:  Mr. Goodin, could you

1   enlarge -- take that down, that enlargement, and put up

2   Lines 60 to 63, please?  The three lines beginning with

3   60.

4       Q.   (By Mr. Kraeutler)  And here, Mr. Dietz, it

5   says:  One example of session tracking is TFTP.  And

6   that was one of the examples of session tracking in the

7   RMON document; is that correct?

8       A.   The TrackSessions' bit was set for TFTP in the

9   RMON document, and this says session tracking.

10      Q.   And TFTP was a protocol that was characterized

11  by beginning communications on a well known port and

12  continuing on a dynamically assigned port as of -- as of

13  1999, when you filed your patent application; is that

14  correct?

15      A.   That -- that was one of the ways TFTP would

16  work.

17      Q.   And SunRPC also was a protocol that was

18  characterized by sessions beginning on a well known port

19  and continuing on a dynamically assigned port; is that

20  correct?

21      A.   To the best of my recollection, yes.

22           MR. KRAEUTLER:  Let me now go to Column

23  27 and Lines 40 to 46.

24      Q.   (By Mr. Kraeutler)  And, Mr. Dietz, will you

25  agree with me that SunRPC is shown in your patent as an

1  example of session tracking -- a protocol for which

2  session tracking could be used?

3      A.   So I would agree that SunRPC is shown as an

4  example of a protocol that could be used.

5      Q.   All right.  And it was also shown as an

6  example in the RMON document; is that correct?

7      A.   Again, no, I didn't say that.  I said that the

8  RMON document described a protocol identifier that

9  indicated that you knew how to properly associate the

10 traffic.  It doesn't tell you how.

11     Q.   All right.  I -- I didn't say that.  I said it

12 was -- it was shown as an example of session tracking,

13 which are the words I used when you first answered that

14 question.

15     A.   So, no, I -- I did not say that it was a use

16 of a session tracking.  I've been very consistent in the

17 fact that the RMON protocol identifier document you

18 showed me is nothing other than protocol identifiers

19 that specify the implementer has implemented them

20 properly and is reporting them properly.  It doesn't say

21 how.

22     Q.   I said that it was an example --

23              THE COURT:  Gentlemen, let me interrupt

24 here.  We're not going to have a disagreement back and

25 forth about what I said and what I didn't say.

1          Counsel, if you believe the witness is

2    nonresponsive to your question, you need to raise it

3    with the Court, and I'll address it.

4          MR. KRAEUTLER:  I will, Your Honor, and

5    I'll rely on the testimony that's already been given.

6          Thank you, sir.

7          THE COURT:  All right.  Let's move on.

8    Q.   (By Mr. Kraeutler)  After the TrackSessions'

9    draft standard was issued in November 1996 and the --

10   the standard was issued in January 1997, the RMON2

11   standard, your company, Technically Elite, began to

12   develop products; is that correct?

13   A.   No, that's not correct.

14   Q.   All right.  You began to -- you began to adapt

15   products so they would support those standards of the

16   RMON group?

17   A.   No, I believe we started long before that.

18   Q.   Okay.  But what is the name of the product or

19   products that embodied your invention?  You testified

20   that Technically Elite developed products.  What were

21   those products?  What were they called?

22   A.   Well, I mean, we had -- we had network

23   monitoring probes.

24   Q.   Are you -- are you familiar with the term

25   "MeterWare"?

1    A.    I am familiar with the term "MeterWare."

2    Q.    And what is MeterWare?

3    A.    MeterWare is a -- is a management station that

4  has the ability to -- to show information out of MIBs,

5  one of which is RMON and RMON2.

6    Q.    And are you familiar with the term

7  "MeterWorks"?

8    A.    I am.

9    Q.    And what is MeterWorks?

10    A.    MeterWorks is a package of -- of C code that

11  allows -- that was used to -- to present information on

12  a probe consistent with RMON and RMON2 MIBs.

13    Q.    And MeterWare and MeterWorks were both

14  products of Technically Elite?

15    A.    Yes, they were.

16    Q.    Let me ask you to look at Defendants' Exhibit

17  522.

18            MR. KRAEUTLER:  And, Mr. Goodin, if you

19  could put up the first page of that document.

20    Q.    (By Mr. Kraeutler)  Can you identify this

21  document, please, Mr. Dietz?

22            MS. ABDULLAH:  Your Honor, may we

23  approach?  This document mentions something that we

24  discussed earlier this morning.

25            THE COURT:  Approach the bench, Counsel.

 1          (Bench conference.)

 2               MS. ABDULLAH:   Your Honor, it's my

 3  understanding from the discussion this morning that you

 4  all had in chambers that when they're about to mention

 5  MeterFlow, that they needed to raise that with the Court

 6  so that an instruction could be given.

 7               THE COURT:   That was my instruction this

 8  morning.  Now, the fact that MeterFlow may be in this

 9  document may or may not mean that Counsel's about to go

10  into that.

11               MR. DAVIS:  He's already gone into it,

12  Your Honor.  He asked questions about it already before

13  he got into this document.

14               MR. KRAEUTLER:   Your Honor --

15               THE COURT:   I haven't heard the words

16  "MeterFlow."

17               MR. KRAEUTLER:   Your Honor, I -- I would

18  not object to your giving the instruction at this

19  time -- that is, these products are not being introduced

20  for purposes of anticipation -- and -- and I would not

21  object to that instruction at this time.  I'm not going

22  to get very deep, but I -- I don't -- I don't object to

23  the instruction.

24               THE COURT:   All right.  Then I'll take

25  care of it at this time.

1              MR. KRAEUTLER:  Thank you, Your Honor.

2              (Bench conference concluded.)

3              THE COURT:  Ladies and gentlemen of the

4   jury, as a part of the document you're about to be shown

5   and as other evidence that will come in during the

6   trial, you're going to hear about products referred to

7   as the MeterFlow products.  I'm instructing you that any

8   testimony about MeterFlow or MeterFlow products does not

9   relate to the possibility that the patents-in-suit could

10  be invalid based upon anticipation or obviousness.

11             You are to not apply any testimony about

12  MeterFlow to the issues of anticipation or obviousness

13  as a means of invalidating any of the patents-in-suit.

14  This testimony may apply to other issues in the case,

15  but it does not apply to those issues and you should not

16  consider it for that purpose.

17             All right.  Let's continue, Counsel.

18             MR. KRAEUTLER:  Thank you, Your Honor.

19  Mr. Goodin, could you put the document back up?  Thank

20  you.

21             And could you, first of all, enlarge the

22  paragraph that -- it's the fourth paragraph, I believe.

23  It begins with the words:  MeterWorks Pro 5.0.

24      Q.   (By Mr. Kraeutler)  And, Mr. Dietz, MeterWorks

25  Pro 5.0 is one version of the product you identified a

1    minute ago in your testimony; is that correct?

2       A.   Yes, that's correct.

3       Q.   Would you read, please, the first sentence of

4    the enlarged portion?

5       A.   MeterWorks Pro 5.0 is a new release of

6    Technically Elite's RMON2 software development kit that

7    has been optimized to take advantage of hardware or

8    software implementations of the MeterFlow engine.

9       Q.   Is this the same MeterWorks that embodied your

10   invention?

11      A.   No.

12      Q.   Will you agree with me that -- you -- let me

13   make sure I -- I understand.

14           At some point in time, MeterWorks incorporated

15   your invention; is that correct?

16      A.   No.

17      Q.   All right.  MeterWorks was built to support

18   the RMON2 standard, correct?

19      A.   It was built to support the RMON2 standard.

20      Q.   And it's referred to in this document as

21   Technically -- Technically Elite's RMON2 software

22   development kit; is that correct?

23      A.   Correct.

24      Q.   And do you dispute that MeterWorks ever in any

25   version embodied the invention described in your

1   patents?

2      A.   Yes, to the best of my recollection,

3   MeterWorks never embodied the inventions.

4      Q.   Let me now direct your attention to the second

5   paragraph?

6             MR. KRAEUTLER:   And, Mr. Goodin, if

7   you'll take this one down, and then enlarge the second

8   paragraph.

9      Q.   (By Mr. Kraeutler)   And, Mr. Dietz, would you

10  please read the first sentence of this paragraph?

11     A.   Yes.

12            The MeterFlow application recognition engine

13  is an advanced parallel processing architecture that

14  provides a scalable solution for implementing RMON2,

15  quality of service, policy management, security, and

16  other embedded traffic management applications in 100

17  megabit and gigabit Ethernet products.

18     Q.   If I'd known it went on so long I might not

19  have asked you to do that, but thank you very much, sir.

20     A.   Oh, you're welcome.

21     Q.   Now, your patent application process began

22  with a filing of a provisional application; is that

23  correct?

24     A.   Yes.

25     Q.   And that was in June 1999?

1      A.    Correct.

2      Q.    Let me ask you to look at Exhibit 253.

3            MR. KRAEUTLER:  And, Mr. Goodin, will you

4  please show the -- the first page of that exhibit.

5            And will you please enlarge the portion

6  that shows the title of the invention and the inventors.

7      Q.    (By Mr. Kraeutler)  Mr. Dietz, this is an

8  application that was prepared on your behalf by Dr.

9  Rosenfeld; is that correct?

10      A.    Yes, that is correct.

11      Q.    All right.  Let me ask you to look at Page

12  464.

13            MR. KRAEUTLER:  And, Mr. Goodin, would

14  you please enlarge the title:  Detailed Description of

15  Preferred Embodiments.

16            And the first paragraph.

17            And will you highlight, please, the last

18  sentence.

19      Q.    (By Mr. Kraeutler)  Mr. Dietz, will you read

20  that sentence?

21      A.    Yes.

22            Also, the term "MeterFlow" is to be understood

23  to mean the preferred embodiment of the invention.

24            MR. KRAEUTLER:  Pass the witness.

25            THE COURT:  Is there redirect by the

1  Plaintiff?

2              MS. ABDULLAH:  Yes, Your Honor.

3              THE COURT:  All right.  You may proceed

4  with redirect examination.

5                    REDIRECT EXAMINATION

6  BY MS. ABDULLAH:

7      Q.   Mr. Dietz, what is the financial arrangement

8  between you and Packet Intelligence and -- and Skiermont

9  Derby?

10     A.   So the only financial arrangement that I have

11 is I'm being paid for my time, what I'm usually paid for

12 my time.

13     Q.   And is any of that dependent on whether PI

14 wins or loses in this case?

15     A.   No, it -- it has nothing to do with the

16 outcome of the case.

17     Q.   Mr. Kraeutler asked you about DX-58.

18              MS. ABDULLAH:  So if we could pull that

19 up, please.

20              And I believe it was Page 17 of the --

21 the document.

22              Actually, I think a couple pages earlier.

23     Q.   (By Ms. Abdullah)  And at the top of that page

24 where it says TrackSessions, that's what Mr. Kraeutler

25 asked you about, right?

1    A.   Yes, that's correct.

2    Q.   Is there anywhere else in this document that

3    talks about TrackSessions?

4    A.   Yes, absolutely, there would be.  This is just

5    the table definition, in other words, so that we knew

6    what bit was set for what.

7    Q.   Can you point us to those other portions?

8    A.   I'm actually looking at the document, it's

9    right there at the bottom of the page, 4.2.3.2, where it

10   says:  Mapping of TrackSessions bit.

11   Q.   And can you explain to the jury what that says

12   in that part?

13   A.   So what -- so what this says, basically here,

14   is the TrackSessions bit indicates whether frames, which

15   are part of a remapped-session, and then it uses the

16   example of TFTP download sessions, are correctly counted

17   by the probe.

18        So basically, what this is saying is, is that

19   the MIB, the data -- the data structure I talked about

20   earlier, is representing an item in the MIB.  In other

21   words, think of it as an entry in a database.  And that

22   it properly indicates all of the entry, the -- that

23   single entry in the database properly indicates all of

24   the traffic that it's -- that it's counting.  So it

25   doesn't say how.  It just says that it did it.

1    Q.   And does your team's invention talk about how?

2  In other words, does that describe a technique to gather

3  information about traffic?

4    A.   Our invention has to describe how we gather

5  information.

6    Q.   Now, going back up to the top part where it

7  says TrackSessions in the table, Mr. Kraeutler asked you

8  about this term here that's "well-known ports."  Do you

9  recall that?

10   A.   Yes.

11   Q.   Can you explain to the jury what well-known

12 ports meant at that time?

13   A.   Yes.  As a matter of fact, I don't know if

14 it's possible, but we -- we could -- we could look at

15 the -- the actual slide that I showed earlier with that

16 single, you know, web page, or I think I also have

17 another one that talks about them, as well.

18   Q.   Yeah.  That's --

19             MS. ABDULLAH:   If we could get Slide No.

20 8 on the screen, please.

21   A.   Okay.  If you remember earlier today, we

22 talked about how when things started, when you were on

23 your desktop and you had that browser, that it would go

24 to a single server, that single server that it would go

25 to was based on a well-known port.  We had to have those

1  at the time to deal with protocols, okay.

2          So well-known ports indicated to your computer

3  where to go for a specific protocol so that you would

4  know if you wanted to transfer a file, you went to that

5  port on the server, okay.  So -- so all -- so when we

6  have protocols, we have to have some way to figure out

7  how to go from where we are, right, for -- for

8  transferring a file to get to the place we want to

9  transfer the file from.  So that well-known port defined

10  that protocol.

11          HTTP, which is indicated on here, you see, is

12  -- is a protocol that is part of how you would browse a

13  web.

14          Same thing there, that well-known port, Port

15  80, is what you would use to basically know that you're

16  going to go to a web to basically get to a server that's

17  going to give you a web page, a web page like we talked

18  about earlier this morning.

19      Q.   (By Ms. Abdullah) And how does that differ

20  from your group's invention?

21      A.   So let's put it this way:  H -- HTTP and FTP,

22  which is a file transfer protocol, are protocols, okay.

23  What we talked about this morning were applications,

24  okay.  In other words, things that matter to you and me.

25  And when we talk about applications, we're talking about

1  bringing all of these connections together.  Well-known

2  and many other methods that are used to figure out what

3  the application is so that we can tell you how the app

4  is performing or how to stop it.

5      Q.    And you mentioned application just now, and

6  Mr. Kraeutler also asked you about that term in your

7  information -- in your invention disclosure statement.

8  Is that -- the way you're using application, is that

9  different from how it was defined in the RMON2 standard?

10     A.    Absolutely.

11     Q.    Is there a document that describes the

12 definition in the RMON2 documents of --

13     A.    Yes.

14     Q.    -- of application?

15     A.    The RMON2 standard itself.

16              MS. ABDULLAH:  Can we have DX-89, please?

17     Q.    (By Ms. Abdullah)  What is this document?  Do

18 you recognize it?

19     A.    I'm sorry?

20     Q.    Do you recognize the document?

21     A.    Oh, yes, I'm sorry.  The Remote Network

22 Monitoring Management Information Base Version 2.

23     Q.    And is this part of the RMON2 standard?

24     A.    Yes, it is.

25     Q.    If you would turn to the page that's NetScout

1 253110.  Is that where you would find the definition of

2 -- of application as it's used here?

3      A.   Oh, yeah, here you go.  Right at the bottom

4 there, Section 5.1, usage of the term application level.

5      Q.   And can you tell us in -- in general terms how

6 application is defined here?

7      A.   So basically what is defined here is that any

8 -- any protocol that is higher -- that is a well-known

9 port, okay, or -- or more is considered to be an

10 application level protocol.  Okay.

11          So it's not the same as when I say app or

12 application that you and I care about and how it is that

13 we make things happen.  As a matter of fact, it

14 specifically excludes that by -- by basically saying

15 that rather -- it's the third sentence:  Rather, it is

16 used to identify a class of protocols that is not

17 limited to MAC layer, network layer protocols, but

18 also -- I'm sorry, I'll slow down -- but all -- but can

19 also include transport, session, presentation, and

20 application-layer protocols.  Okay.  So, in other words,

21 the app that we care about.

22      Q.   Why was it written this way in the RMON2

23 standard?

24              MR. KRAEUTLER:  Objection.  Objection,

25 Your Honor.

1                THE COURT:   What's your objection,

2  Counsel?

3                MR. KRAEUTLER:    Your Honor, there's no

4  foundation.

5                MS. ABDULLAH:    Your Honor, he testified

6  he was part of the RMON Working Group during this time

7  period.

8                THE COURT:   I'll overrule the objection.

9     A.   I'm sorry, could you repeat the question?

10    Q.   (By Ms. Abdullah)  Yes.  Why was the

11  definition written this way in the RMON2 standard?

12    A.   Oh, yes, thank you.

13          The definition was written this way very much

14  like what I described this morning when we talked about

15  why are standards written, okay.  Standards have to be

16  written to last for a very long time, okay.  And at the

17  time that this was -- that this document was written,

18  not everybody that was implementing RMON had any

19  capability of really getting to the app or the

20  application.  Some -- and we didn't want to limit the

21  information that we were going to put in the tables to

22  only that application.

23          So just like I mentioned earlier that we don't

24  know how things are going to evolve -- and it was even

25  mentioned when we talked about how cell phones were in

1  1996.  We have no idea where they're going to go.  And

2  because we didn't know, we needed to leave room for how

3  things are going to be in the future because a standard

4  needs to live for a very, very long time.  So that's why

5  it was defined this way.  It couldn't be done then in

6  some cases, and we wanted to leave room for whatever it

7  could become in the future.

8      Q.   And was your invention one of the ones -- one

9  of the ways it became that in the future?

10     A.   Absolutely.

11     Q.   Do you recall some specifically, the

12  discussions, in the RMON Working Group around the

13  definition of application at this time?

14     A.   As I said, we had very aggressive

15  conversations about the term "application" at the time.

16     Q.   Were any of those discussions about that with

17  employees of NetScout?

18     A.   Yes, they were.

19          MS. ABDULLAH:  I'd like to take a look at

20  what's been pre-admitted as PTX-185.  And if we could

21  just go to the first page first.

22     Q.   (By Ms. Abdullah)  Do you recognize this

23  document?  It's also in your binder as PTX-185.

24     A.   Oh, yes.  Yeah, I do.  I recognize it.

25     Q.   And I'd like to begin with the email at the

1   bottom of the second page.

2        A.   Okay.

3        Q.   And who is this email from?

4        A.   Oh, this email is from Mr. Massad who was at

5   NetScout at the time and also active in the RMON Working

6   Group.

7        Q.   And what was the date on this email?

8        A.   October 15th, 1999.

9        Q.   Who was this email directed to?

10       A.   It's actually directed to Mr. Bierman, who was

11  the -- the Working Group chairperson at that time,

12  several other individuals from NetScout, and then the

13  last item at the end where it says RMON MIB at

14  Cisco.com, that was the mail list that all of us as

15  members of the working group would use to share

16  information amongst each other.

17       Q.   Now, in the email below, there's a reference

18  to RFC 2021.  Do you see that?

19       A.   Yes, I do.

20       Q.   Is that the same as the document we were just

21  looking at?

22       A.   Yeah.  I believe so, yes.

23       Q.   And is he quoting a portion of that RFC 2021?

24       A.   Yes.  Mr. -- Mr. Massad is -- is quoting the

25  section we actually just discussed, which is Section

1   5.1, usage of the term "application level."

2                    MS. ABDULLAH:  And if we could turn to

3   the next page of this document.

4        Q.   (By Ms. Abdullah)  At the top, is that the

5   rest of that quote of the definition we were looking at?

6        A.   Yes, that is the rest of the quote that came

7   out of -- of RFC 2021.

8        Q.   And then if you look at the paragraph that's

9   blown up on the screen, would you read to the jury the

10  first sentence of that?

11       A.   This would seem to support the reasonableness

12  of calling TCP-port monitoring application monitoring.

13       Q.   And who was writing that part of it?

14       A.   That was written by Mr. Massad at NetScout.

15       Q.   What did you understand that sentence to mean?

16       A.   To me, what that meant was basically if we

17  could only monitor the transport layer in the network --

18  in other words, things that carry information -- that --

19  that we could call that an application.

20       Q.   Did you respond to this email?

21       A.   I most certainly did.

22                    MS. ABDULLAH:  If we go -- if we go back

23  to the first page, the top.

24       Q.   (By Ms. Abdullah)  Is that the header from the

25  email where you responded?

1      A.   Yes, it is.

2           MS. ABDULLAH:   And if we can go to the

3  next page, the text of the email.

4      Q.   (By Ms. Abdullah)   What did you say in

5  response?

6      A.   It is very clear within the RMON Working Group

7  that the current definition of application level, as

8  stated in the term section of RFC 2021, is clearly out

9  of date.

10      Q.   What did you mean by that?

11      A.   I meant that at the time, okay, calling an

12  application just any layer in the network was not

13  appropriate because it's really not the true application

14  involved in a network.

15           MS. ABDULLAH:   And if we could look at

16  the last paragraph.

17      Q.   (By Ms. Abdullah)   If you could read to the

18  jury the -- the part that begins:  I would.

19      A.   Yes.  I would recommend that NetScout be

20  prepared to discuss this issue toward a proper solution

21  and not attempting to wedge, quote, today's approaches

22  for the next generation of requirements.

23      Q.   And what did you mean when you wrote that?

24      A.   What I meant when I wrote that is, is that we

25  need to be open and honest about what it is that we're

1 presenting, especially when it comes to applications.

2 The Internet was evolving at the time.  And it was

3 inappropriate to call something an application that

4 wasn't.  And I was very concerned that what we were

5 doing was taking what NetScout had at the time, which

6 couldn't do that, and wedging that into the standard we

7 were trying to write.

8          MS. ABDULLAH:  If we could go to PTX-186.

9 Let's begin at the email towards the bottom.

10     Q.   (By Ms. Abdullah)  Who is Mr. Warth, Mr. Albin

11 Warth?

12     A.   Oh, Mr. -- Mr. Warth was one of the members of

13 the RMON Working Group, and he was also with NetScout.

14     Q.   And is that email directed to you?

15     A.   Yes, it is.

16     Q.   What did Mr. Warth suggest to you in this

17 email?

18     A.   I was in the process of co-authoring the

19 transport performance metric MIB, another draft

20 standard, and Mr. Warth stated that he had talked to

21 Mr. Bierman, who was the Working Group chair, about

22 co-authoring the MIB with me.

23          MS. ABDULLAH:  And if we could look at

24 the email up top.

25     Q.   (By Ms. Abdullah)  What was your reaction to

1  that suggestion that Mr. Warth made?

2      A.   Yeah.  So my reaction was to basically send an

3  email to Mr. Bierman and Mr. Waldbusser, who both knew

4  my stance on this, that it would be something I would

5  not consider, that I thought it was a bad idea.

6            MS. ABDULLAH:  And if we can look at the

7  very last paragraph before "regards."

8      Q.   (By Ms. Abdullah)  Would you read the portion

9  that begins "I am not"?

10     A.   Yeah, sure.

11          I am not going to author a MIB with NetScout.

12  No way.  I have a credibility issue on the line.  Sorry.

13     Q.   And when did you write this, this email?

14     A.   I wrote this in February of 2000.

15     Q.   What did you mean when you said you had a

16  credibility issue on the line?

17     A.   At this particular time, the NetScout products

18  were not able to present true applications in their

19  probes.  And at that time, when they were not able to do

20  that, they were marketing the products as being able to

21  do that.  And I was not going to put my credibility on

22  the line of calling things applications that weren't.

23     Q.   Now, during your direct, when you gave that

24  example of the -- the smartphone with the ESPN, what --

25  what was that an example of?

1      A.     So that was -- it's important to understand,

2 and I should have mentioned this earlier, so thanks for

3 giving me the opportunity now.

4          So our smartphones today are nothing other

5 than handheld web browsers, okay.  Every app that you

6 click on on a smartphone today brings up, in most cases,

7 a specific web application, okay, a website.  It's a way

8 to present it so that it fits on your smartphone and

9 works with your smartphone.  Because if you think about

10 it, a smartphone doesn't have a mouse, you have to use

11 your finger or a stylist.  Or in some cases in the early

12 days, you had to scroll around on a little pad.  I know

13 us geeks, when we had those, we'd, you now -- it was a

14 lot of fun to have them.  But at the end, those apps are

15 just web pages.  Just like if you were to go on to

16 Firefox or Chrome or your web browser and enter in a web

17 page.

18          So I'm only using the smartphone because it's

19 something we all have.  But it's nothing other than a

20 pocket web browser.  However, it also includes all the

21 capabilities that we have today on desktop computers and

22 then some, okay.  So being able to stream video, being

23 able to make phone calls digitally, right, a lot of

24 different content can come over the web browser that's

25 in your hand.

1          So the web browser then in the -- in the mid

2    1990s to early 2000s and other applications were

3    starting to emerge to what we have today in our hand as

4    that incredible web browser that's powerful in our hand

5    today.

6         Q.    Now, Mr. Kraeutler also mentioned a product

7    called MeterFlow.  Do you remember that?

8         A.    Yes.

9         Q.    How many versions of MeterFlow were there over

10   the years?

11        A.    Many.

12        Q.    And do they differ in capability from version

13   to version?

14        A.    Absolutely, they did.  In the same that we

15   talked about how the invention went through a series of

16   what I would call capabilities before we actually had

17   our ah-ha moment, okay.  The -- the things that we

18   started to offload and do were in the -- were in

19   different versions of software, just like you would do.

20   But the -- the ah-ha and the delivery of the

21   capabilities, you know, didn't happen until all of those

22   things we talked about, changing the company name and

23   all of that, in -- in that, you know, late 1999 time

24   frame.  '98 when we figured it out, '99 by the time

25   rest -- we told the rest of the world.

1      Q.   And Mr. Kraeutler put up a portion of the

2  provisional that said something about MeterFlow being a

3  preferred embodiment.   Do you remember that?

4      A.   Yes, I do.

5      Q.   And did that change in the final applications?

6      A.   It absolutely did.   It's funny how there are

7  certain things that you always remember.   This is one of

8  those always you remember.

9           I made sure that Dr. Rosenfeld knew that --

10  that that was not to be, you know, used as a preferred

11  embodiment going forward, and it was removed from all of

12  the patents that were actually filed and finally issued.

13      Q.   And why didn't you want it to be used as a

14  preferred embodiment?

15      A.   Because we -- we realize -- said that there

16  were -- that there were going to be other things.   And

17  also, that because it was a piece of software, okay,

18  that evolved, it was going to give the wrong indication

19  that all of those past versions that use that marketing

20  term, MeterFlow, were -- were the current version, and

21  they weren't, okay.   And we didn't want to create that

22  confusion.   We wanted to make sure everybody understood

23  where the invention actually was and what its

24  capabilities were.   And we also wanted it to be able to

25  live beyond whatever else it was used in, you know, much

1  like we're discussing today.

2      Q.   Mr. Dietz, did you and your team get your

3  invention from the RMON Working Group?

4      A.   Absolutely not.

5      Q.   Thank you.

6                MS. ABDULLAH:  No further questions.

7                THE COURT:  You pass the witness?

8                MS. ABDULLAH:  Yes.

9                THE COURT:  Is there additional cross?

10               MR. KRAEUTLER:  Your Honor, may I have

11 some additional cross?

12               THE COURT:  You may.

13               MR. KRAEUTLER:  Thank you, sir.

14                     CROSS-EXAMINATION

15 BY MR. KRAEUTLER:

16     Q.   Mr. Dietz, let's go back to Defendants'

17 Exhibit 58, which is the TrackSessions draft standard

18 dated November 25th, 1996.

19               MR. KRAEUTLER:  And, Mr. Goodin, if you

20 could put up the first page of that document.

21     Q.   (By Mr. Kraeutler)  Now, I'd like to direct

22 your attention to Page 15179 to 180.

23               MR. KRAEUTLER:  Mr. Goodin, if you're

24 able to put up the two pages side-by-side.

25               And, Mr. Goodin, if you're able to enlarge the

1  last three lines on the first page and then put under

2  them the remainder of the paragraph from the -- the

3  second page.

4      Q.   (By Mr. Kraeutler)  And, Mr. Dietz, this is a

5  part of the description of the SunRPC protocol as

6  TrackSessions is being applied to it; is that correct?

7      A.   It's indicating here that this is part of the

8  protocol identifier macro for SunRPC, and it indicates

9  that TrackSessions is on.

10     Q.   You testified on -- well, let me ask --

11          MR. KRAEUTLER:  Mr. Goodin, would you

12  please highlight the first paragraph, so beginning on

13  the Page 79 and then continuing down to RFC1831.

14     Q.   (By Mr. Kraeutler)  You testified on redirect

15  that there was nothing in this document that showed how

16  to apply TrackSessions to SunRPC, in fact, there were a

17  number of pages that are devoted to SunRPC in this

18  document; is that correct?

19     A.   No, there are not.

20     Q.   The discussion -- you have the paper copy in

21  front of you.  The discussion begins at the top of Page

22  15179, and it continues through Page 180; is that

23  correct?

24     A.   I see the text.

25     Q.   Good.  So let me come back to what's on the

1  screen, and will you agree with me that this is a

2  discussion of how TrackSessions would be applied to

3  SunRPC?

4       A.    No, it is not.

5       Q.    All right.  When it says, the first packet of

6  many SunRPC transactions is sent to the port-mapper

7  program, and, therefore, decoded statically by

8  monitoring RFC port map requests, doesn't that tell you

9  how to do something?

10      A.    No.  And let's continue:  Any subsequent

11 packets must be --

12               THE COURT:  Just a minute, Mr. Dietz.

13 It's Counsel's prerogative to ask the questions.

14               THE WITNESS:  Okay.  I'm sorry, Your

15 Honor, you're right.

16      A.    No, it does not.

17               THE COURT:  Ask the next question.

18      Q.    (By Mr. Kraeutler)  And I'll -- I'll continue

19 as Mr. Dietz wishes.  The next sentence says:  Any

20 subsequent packets must be decoded and correctly

21 identified by remembering the port assignments used in

22 each RPC function call.  And then there's a

23 parenthetical.

24               Does that describe how to apply TrackSessions

25 to SunRPC?

1     A.    No, it does not.  It specifically has

2  remembering.

3     Q.    And remembering in your mind does not describe

4  how to do something?

5     A.    Not in quotes.

6     Q.    Is there a concept in computer technology

7  known as storing something in memory?

8     A.    Sure.

9     Q.    You testified regarding Defendants' Exhibit

10  89.

11          MR. KRAEUTLER:  Mr. Goodin, could you

12  bring that up, please?  And if you could enlarge the top

13  portion.

14     Q.    (By Mr. Kraeutler)  This is the document where

15  you requested to say what the RMON committee intended.

16          Did you author this document?

17     A.    No, I did not.

18     Q.    Who did?

19     A.    The author of the document?  Let's see, I

20  believe it was Mr. Waldbusser.

21          MR. KRAEUTLER:  And, Mr. Goodin, could

22  you bring up Plaintiff's Exhibit 186, please?

23     Q.    (By Mr. Kraeutler)  And this is the

24  correspondence in which you were being requested, at the

25  suggestion of the chair of the RMON committee, to

1  collaborate with a NetScout employee on -- on drafting a

2  standard; is that correct?

3       A.   Yes, that's correct.

4       Q.   And you declined to collaborate?

5       A.   Yes, that's correct.

6       Q.   Is this emblematic of your approach towards

7  collaboration on the RMON committee?

8       A.   No, it is not.

9            MR. KRAEUTLER:  Nothing further.

10           THE COURT:  You pass the witness?

11           MR. KRAEUTLER:  Pass the witness, Your

12  Honor.

13           THE COURT:  Is there redirect -- further

14  redirect?

15           MS. ABDULLAH:  No, Your Honor.

16           THE COURT:  Then you may step down, Mr.

17  Dietz.

18           THE WITNESS:  Thank you, Your Honor.

19           THE COURT:  All right.  Ladies and

20  gentlemen, we're going to take this opportunity to

21  recess for lunch.

22           Lunch has been provided for you and

23  should be in the jury room.  If you will, take your

24  notebooks with you over the lunch break.

25           I'm going to remind you again, as you

1  would expect, not to discuss the case among yourselves

2  or with anyone else.  Follow all my other instructions

3  I've given to you.  We'll call it 10 minutes until noon.

4  I'd like to reconvene at 12:30.  So we'll recess until

5  then.  The jury is excused for lunch at this time.

6              COURT SECURITY OFFICER:  All rise for the

7  jury.

8              (Jury out.)

9              THE COURT:  Plaintiff, does Mr. Dietz

10  need to be retained, or is there a motion that he be

11  excused?

12              MS. ABDULLAH:  There's a motion that he

13  be excused, Your Honor.

14              THE COURT:  Is there any objection to

15  the -- Mr. Dietz being excused?

16              MR. KRAEUTLER:  Yes, Your Honor.  Mr.

17  Dietz will be -- is under subpoena and will be requested

18  to testify in the equitable portion of the trial.

19              MS. ABDULLAH:  Your Honor, if -- if we

20  may -- if we may respond, we -- Mr. Dietz is -- you

21  know, obviously has a job, doesn't live here, is here

22  right now and will obviously do whatever the Court

23  orders, but we ask that, if possible, that he, you know,

24  give his testimony as soon as possible this week so that

25  he may be excused and he can make himself available

1   after the jury's dismissed early in the morning.

2                   THE COURT:  All right.  We talked about

3   this in chambers this morning, and I directed the

4   parties to meet and confer to try to give me a precise

5   estimate of the amount of time needed by these

6   witnesses, Mr. Dietz and the other gentleman.

7                   Have you all done that or has that yet to

8   be accomplished?

9                   MR. DAVIS:  It's yet to be accomplished,

10  Your Honor.

11                  THE COURT:  Then you can talk about it

12  over the lunch hour, and we'll figure it out then.

13                  We stand in recess until 12:30.

14                  MR. KRAEUTLER:  Thank you, Your Honor.

15                  (Recess.)

16                  *********************************

17

18

19

20

21

22

23

24

25

1

2

3                        CERTIFICATION

4

5          I HEREBY CERTIFY that the foregoing is a true

6   and correct transcript from the stenographic notes of

7   the proceedings in the above-entitled matter to the best

8   of my ability.

9

10

11  /s/Shelly Holmes_____          _10/10/17_____
    SHELLY HOLMES, CSR, TCRR                        Date
12  OFFICIAL COURT REPORTER
    State of Texas No.:  7804
13  Expiration Date:  12/31/18

14

15

16

17

18

19

20

21

22

23

24

25