```
 1            IN THE UNITED STATES DISTRICT COURT
            FOR THE EASTERN DISTRICT OF TEXAS
 2                   MARSHALL DIVISION

 3
   PACKET INTELLIGENCE LLC     )(      CIVIL DOCKET NO.
 4                             )(
                               )(      2:16-CV-230-JRG
 5                             )(
                               )(
 6 VS.                         )(      MARSHALL, TEXAS
                               )(
 7                             )(
   NETSCOUT SYSTEMS, INC.      )(
 8 TEKTRONIX COMMUNICATIONS,   )(      OCTOBER 11, 2017
   AND TEKTRONIX TEXAS LLC     )(      12:40 P.M.
 9

10                   TRANSCRIPT OF JURY TRIAL

11           BEFORE THE HONORABLE JUDGE RODNEY GILSTRAP

12                 UNITED STATES DISTRICT JUDGE

13 APPEARANCES:

14 FOR THE PLAINTIFF:       Mr. Paul J. Skiermont
                           Ms. Sadaf R. Abdullah
15                         Mr. Steven K. Hartsell
                           Mr. Alexander E. Gasser
16                         Mr. Steve J. Udick
                           SKIERMONT DERBY LLP
17                         2200 Ross Avenue
                           Suite 4800W
18                         Dallas, Texas   75201

19 COURT REPORTER:         Ms. Shelly Holmes, CSR, TCRR
                           Official Court Reporter
20                         United States District Court
                           Eastern District of Texas
21                         Marshall Division
                           100 E. Houston Street
22                         Marshall, Texas   75670
                           (903) 923-7464
23

24

25 (Proceedings recorded by mechanical stenography,
   transcript produced on CAT system.)
```

```
 1   FOR THE PLAINTIFF:      Mr. William E. Davis, III
                             THE DAVIS FIRM, PC
 2                           213 N. Fredonia Street
                             Suite 230
 3                           Longview, Texas    75601

 4   FOR THE DEFENDANTS:     Ms. Melissa Smith
                             GILLAM & SMITH
 5                           303 South Washington Avenue
                             Marshall, Texas    75670
 6
                             Mr. Eric Kraeutler
 7                           MORGAN LEWIS & BOCKIUS
                             1701 Market Street
 8                           Philadelphia, Pennsylvania   19103

 9                           Mr. Michael Lyons
                             Mr. Ahren C. Hsu-Hoffman
10                           Mr. Michael F. Carr
                             Ms. Karon N. Fowler
11                           Mr. Thomas Y. Nolan
                             MORGAN LEWIS & BOCKIUS
12                           1400 Page Mill Road
                             Palo Alto, California    94304
13
                             Mr. Adam A. Allgood
14                           MORGAN LEWIS & BOCKIUS
                             1000 Louisiana Street
15                           Suite 4000
                             Houston, Texas    77002
16
                             Mr. Charles E. Phipps
17                           Mr. Paul D. Lein
                             LOCKE LORD LLP
18                           2200 Ross Avenue
                             Suite 2800
19                           Dallas, Texas    75201

20                           Mr. Scott D. Wofsy
                             LOCKE LORD, LLP
21                           1 Canterbury Green
                             201 Broad Street
22                           Stamford, Connecticut    06901

23

24

25
```

P R O C E E D I N G S

1

2          (Jury out.)

3          COURT SECURITY OFFICER:  All rise.

4          THE COURT:  Be seated, please.

5          All right.  Defendant, are you prepared

6  to call your next witness?

7          MS. SMITH:  We're -- before the jury gets

8  in, Your Honor?

9          THE COURT:  No.

10          MS. SMITH:  Okay.

11          THE COURT:  I want to know what's going

12  on before I bring the jury in.

13          MS. SMITH:  Absolutely, Your Honor.

14  NetScout's next witness will be Ms. -- Ms. Heather

15  Broughton.

16          THE COURT:  All right.  Is --

17          MS. SMITH:  For the Court's information,

18  Ms. Broughton has not been present and has not yet been

19  sworn.

20          THE COURT:  All right.  All right.  And

21  is there a binder for this witness?  I have other

22  binders up here.

23          MS. SMITH:  No, Your Honor.

24          THE COURT:  There's not, okay.

25          All right.  Let's bring in the jury,

1    please, Mr. Elliott.

2                    COURT SECURITY OFFICER:  All rise.

3                    (Jury in.)

4                    THE COURT:  Welcome back, ladies and

5    gentlemen of the jury.  Please have a seat.

6                    All right.  Defendants, call your next

7    witness.

8                    MS. SMITH:  Your Honor, NetScout calls

9    Ms. Heather Broughton.

10                    THE COURT:  All right.  Ms. Broughton, if

11   you'll come forward.  I don't believe you were sworn --

12   been sworn, rather.  If you'll come forward, our

13   courtroom deputy will administer the oath to you.

14   And if you'll come around here to be sworn, then you may

15   have a seat on the witness stand.

16                    (Witness sworn.)

17                    THE COURT:  All right.  Now, if you'll

18   come around and have a seat on the witness stand.

19                    Mr. Elliott, let's just dispense with

20   that additional microphone.  I'm not convinced they help

21   very much anyway.

22                    All right.  Ms. Smith, you may proceed

23   with your direct examination.

24                    MS. SMITH:  Thank you, Your Honor.

25        HEATHER BROUGHTON, DEFENDANTS' WITNESS, SWORN

1                    DIRECT EXAMINATION

2    BY MS. SMITH:

3         Q.   Good afternoon, Ms. Broughton.

4         A.   Good afternoon.

5         Q.   If you would introduce yourself to the jurors?

6         A.   Sure.  My name is Heather Broughton.

7         Q.   Ms. Broughton, where do you work?

8         A.   I work at NetScout.

9         Q.   And how long have you been at NetScout?

10        A.   I've been at NetScout for 17 years.

11        Q.   And I want to visit with you about that work,

12   but prior to doing that, if you would share with the

13   jury a little bit about yourself.  Where did you grow

14   up?

15        A.   Sure.  I grew up in Alvin, Texas, that's about

16   halfway between Houston and Galveston.  And I lived

17   there until I went to school at Texas A&M.  I graduated

18   from Texas A&M in 1996 with a degree in MIS or

19   management information systems.

20        Q.   And what was your first job after graduation

21   from Texas A&M?

22        A.   My first job was to TR3 troubleshooting at

23   MCI, so a long distance carrier.

24        Q.   If you could, tell the jury what

25   troubleshooting involves or what it involved in your

1  work at MCI?

2      A.    Sure.  So troubleshooting for the job that I

3  had was really when you guys are trying to call your mom

4  or your grandma and the call doesn't go through, and

5  you're calling long distance.  So you would call your

6  local telephone carrier, like Southwestern Bell or

7  CenturyLink, and you're going to call them and say, I

8  can't get through to my mom.  And they're going to write

9  a trouble ticket for you.  And they'll tell you, we're

10  going to go fix it.  And that trouble ticket is

11  something that would come to me.  And then it comes to

12  me, and then what I would do is I would typically try to

13  figure out why the call was failing for you.

14      Q.    Now, you said that -- that you now work for

15  NetScout, correct?

16      A.    Uh-huh.

17      Q.    How do you transition from your work at MCI to

18  your work for NetScout?

19      A.    That's a good question.  So what I did I was

20  working in troubleshooting, and as part of my job, I had

21  heard about and got to call some people in Cary, North

22  Carolina to help me do some of my troubleshooting and

23  help me troubleshoot these voice calls, but I couldn't

24  ever use this system, but I heard it was called the Inet

25  box.

1          And one of the things that the -- one of the

2  guys that I always talk to, he joined Inet as a company,

3  and he called me later and said, you know that Inet box

4  that you really like and you would use it for

5  troubleshooting.

6          And I said, yeah.

7          And he goes, why don't you come join the

8  company, so I did.

9     Q.    So you basically loved the product and --

10    A.    I did.

11    Q.    -- followed the product because of it?

12    A.    Yeah, I was a customer, and I wanted to join

13  the company.

14          THE COURT:  Ladies, let me make sure that

15  you both understand the importance of not talking over

16  each other.  You need to make sure you're talking one at

17  a time.

18          MS. SMITH:  Yes, Your Honor.

19          THE COURT:  Let's continue.

20          THE WITNESS:  Yes, Your Honor.

21    Q.    (By Ms. Smith)  Ms. Broughton, what position

22  did you initially hire on at Inet which ultimately

23  became NetScout?

24    A.    I was hired as a product manager.

25    Q.    What did you do as a product manager?

1        A.   As a product manager, we take requirements or

2   requests from our customers, and we build new products

3   or applications based on those requests.

4        Q.   How many years did you work as a product

5   manager?

6        A.   I worked as a product manager for 12 years.

7        Q.   And then what happened at the end of that 12

8   years?

9        A.   I moved to the marketing department.

10        Q.   And is that where you work today?

11        A.   Yes, today I'm the director of marketing.

12        Q.   Now, through your work as director of

13   marketing, you have -- you have knowledge of the

14   products that NetScout offers; is that correct?

15        A.   Yes, absolutely.

16        Q.   What I'd like you to do is share with the

17   jurors who the customers are that you market to and that

18   NetScout services today.

19        A.   The customers are telecom carriers globally.

20   So that would be a telecom carrier in Italy, a

21   telecom -- telecom carrier in Australia, and, of course,

22   the U.S. ones that you guys should be familiar with like

23   AT&T, Verizon, CenturyLink, Cricket, all of these type

24   of carriers.

25        Q.   Now, Ms. Broughton, for your convenience, I'm

1  going to direct you -- direct your attention to the

2  screen in front of you, and I'd ask that Mr. Goodin pull

3  up Defendants' Exhibit 383, which I believe is called

4  Tektronix Communications Corporate Overview.

5          Have you seen this document, Ms. Broughton?

6      A.   Yes, I have.

7      Q.   Something you're familiar with?

8      A.   Yes, I am.

9      Q.   All right.  I'll direct your attention, with

10  Mr. Goodin's help, directly to Page 35203 in this

11  document.

12          MS. SMITH:  Thank you, Mr. Goodin.

13      Q.   (By Ms. Smith)  Ms. Broughton, what -- what

14  information is shown on this page?

15      A.   This is the customers of Tektronix

16  Communications.  It shows really the blanket of

17  customers that I was just talking about, BT, AT&T,

18  T-Mobile, all of the customers that we have.

19      Q.   And are they all phone companies?

20      A.   Yes.

21      Q.   Okay.  Does NetScout Texas have any customers

22  that are not telephone companies?

23      A.   No, they do not.

24      Q.   Do you know of any instance in -- in not only

25  the last few years but in your entire work for NetScout

1  Texas where it sold to anybody other than a telephone

2  company?

3       A.   No, I do not.

4       Q.   Okay.  Now, Ms. Broughton, you're familiar

5  with the GeoProbe family of products?

6       A.   Yes, I am.

7       Q.   When did you first learn about the GeoProbe

8  products?

9       A.   I first learned about them when I joined the

10 company in April 2000.

11      Q.   Okay.  And when were those -- when were

12 those -- you joined in 2000.  When were those products

13 developed?

14      A.   The products were developed before I joined

15 the company.  I just had never really tied in that

16 GeoProbe was an Inet box and things that I was using

17 prior.  I really didn't have that detailed customer

18 knowledge until after I joined the company.

19      Q.   Now, again -- again, looking at all the

20 telephone companies on the screen, what does a probe do

21 in these customer telephone networks?

22      A.   So a probe is a device that you put in your

23 network.  Let's say -- take the U.S., for example,

24 you're going to put it all around the country.  You may

25 put one in Dallas.  You may put one in East Texas.  And

1    what you're going to do is collect information about the

2    phone calls that everybody is making.  And you're doing

3    that not for -- you're doing that in order to gain

4    quality, right?  So you want to understand how good the

5    quality.

6            So you guys have heard the commercials where

7    they say our network is 99 percent quality, we help

8    ensure those kind of things for telecom carriers.

9        Q.   And I see kind of a mix of -- of telecom

10   carriers here.  Are the probes used for both wired and

11   wireless telephone services?

12       A.   Yes, they are.

13       Q.   And NetScout Texas sells the GeoProbe --

14   GeoProbe products today; is that correct?

15       A.   Yes, it is.

16       Q.   And can you explain to the jury what that

17   family of products is?

18       A.   Yes.  So there's a GeoProbe 14U, there's a

19   GeoProbe G10, and a GeoProbe GeoBlade.

20       Q.   And how did the telephone companies use these

21   products?

22       A.   So the products -- the main difference for the

23   products or -- in order that you would get more -- you

24   need a bigger probe in order to get more information

25   through, right, so someone like Verizon may buy a

1  GeoBlade, but someone smaller -- in a smaller area like

2  Japan may not need a big GeoBlade, so they use a G10, or

3  may use -- in a rural area versus a city, they may use

4  different ones.  You use the big one in the city and the

5  smaller one -- the G10 is smaller -- in the more rural

6  area.

7      Q.   Now, Ms. Broughton, are you familiar with a

8  feature known as the web page download KPI?

9      A.   Yes, I am.

10     Q.   What's that?

11     A.   It's a KPI that was thought about in

12  conjunction with a company called Oi, which is on the

13  screen.  It's one of our customers in France.

14     Q.   Now, you mentioned specifically a French

15  customer.  Was the web page download KPI included in any

16  of the base products that Tektronix sells or has sold?

17     A.   No.

18     Q.   Okay.  That French company, did they

19  ultimately either license or -- or even buy the feature?

20     A.   No, they didn't.

21     Q.   Has any customer ever bought or licensed that

22  KPI feature?

23     A.   No.

24     Q.   So your revenue on that feature would be zero;

25  is that correct?

1      A.   Yes, that's correct.

2      Q.   I appreciate your time, Ms. Broughton.

3           MS. SMITH:   Your Honor, I'll pass the

4 witness.

5           THE COURT:  Cross-examination.  Proceed

6 when you're ready, Ms. Abdullah.

7           MS. ABDULLAH:   Thank you.  Your Honor,

8 may I approach to give out a few binders?

9           THE COURT:  Yes, you have leave to pass

10 out your binders.

11                 CROSS-EXAMINATION

12 BY MS. ABDULLAH:

13     Q.   Good afternoon, Ms. Broughton.

14     A.   Good afternoon.

15     Q.   You said that AT&T is one of Tektronix's

16 biggest customers, right?

17     A.   Yes, it is.

18     Q.   And so is Verizon?

19     A.   Yes.

20     Q.   And isn't it true that Comcast is always -- is

21 also a big customer of Tektronix?

22     A.   It depends on your definition of big, but it

23 is a customer.

24     Q.   And -- and Comcast isn't just a telephone

25 company of any sort, right?

1    A.    Comcast that we sell to specifically is on the

2  Comcast cable provider sector of the business, which is

3  a telecom.

4    Q.    But part of the services they might provide

5  are TV, cable, wireless Internet, things like that?

6    A.    Comcast may, correct.

7    Q.    Yes?

8    A.    Uh-huh.

9    Q.    And AT&T and Verizon, their customers might be

10 mobile phone users, right?

11   A.    Correct.

12   Q.    And so, for example, my colleague, Mr. Davis,

13 might have a smartphone that's an AT&T smartphone,

14 right?

15   A.    Yeah.

16   Q.    And Mr. Davis might use that to place some

17 calls through the AT&T network to his family, maybe,

18 right?

19   A.    Yes.

20   Q.    He might decide to FaceTime or make a video

21 call as well, right?

22   A.    Yes.

23   Q.    He might watch a movie on Netflix on that

24 smartphone, right?

25   A.    Uh-huh, yes.

1    Q.    And he might go to the Facebook app and, you

2  know, just see what's going on in the world, right?

3    A.    Yes.

4    Q.    And he can do all those things through the

5  AT&T network, right?

6    A.    Yes.

7    Q.    Now, what are the goals of the products that

8  Tektronix sells, including the G10 and the GeoProbe?

9          One of those goals is to help its customers

10 like AT&T deliver subscribers with the highest quality

11 of service; is that fair?

12   A.    That's fair.

13             MS. ABDULLAH:    If we could pull up

14 DX-383, please.  And if we could go to NS035216.

15   Q.    (By Ms. Abdullah)  And this is a document you

16 were just looking at with your Counsel, right?

17   A.    Correct.

18   Q.    Now, this page talks about conversational

19 video, right?

20   A.    Yes, it does.

21   Q.    And the first bullet point notes that 66

22 percent of mobile traffic will be video by 2014, right?

23   A.    Yes, it does.

24   Q.    And that's the statement that Tektronix made

25 in one of its documents?

1     A.     That's correct.

2     Q.     And one of the things that it says in

3  marketing documents like this is -- is encompassed by

4  that last bullet there which says ensure your video

5  monetization by delivering subscribers with the highest

6  quality of service, right?

7     A.     Yes.

8              MS. ABDULLAH:   And if we can look on Page

9  NetScout 035223 of the same document.

10    Q.     (By Ms. Abdullah)   This shows another of

11  Tektronix's offerings to its customers, right?

12    A.     Yes, it does.

13    Q.     And specifically it shows professional

14  services?

15    A.     Yes, it does.

16    Q.     And if we look at that column in the middle,

17  it says application services, right?

18    A.     Yes, it does.

19    Q.     And that describes the application services

20  that you might provide to, for example, AT&T?

21    A.     It describes our personal applications and the

22  applications that we built, how we would help customers

23  use our own applications.

24    Q.     And part of that is that last item there that

25  says multi-protocol correlation, right?

 1          A.    Yes.

 2          Q.    And it specifically lists the GeoProbe and G10

 3   right under it?

 4          A.    It does.

 5          Q.    And you agree that -- another part of what

 6   Tektronix does and tells its customers that it does is

 7   provide monitoring solutions for network performance,

 8   right?

 9          A.    Yes.

10               MS. ABDULLAH:   So if we could look at the

11   page that is 035229 in this document.

12          Q.    (By Ms. Abdullah)   This is a summary of -- of

13   this document that we've been looking at, right?

14          A.    Yes, it is.

15          Q.    And the first bullet and sub-bullets, they

16   talk about certain solutions for CSP's businesses -- or,

17   I'm sorry, CSP's business, right?

18          A.    Yes.

19          Q.    And a CSP, what is that?

20          A.    It's a carrier service provider.

21          Q.    And some of the items listed under there

22   include subscriber behavior, right?

23          A.    Yes, correct.

24          Q.    And the next one says services and apps

25   consumed, right?

1     A.   Yes, correct.

2     Q.   And then the last two are technologies used

3 and network performance, right?

4     A.   Correct.

5     Q.   Now, you'd also agree that being able to

6 monitor streaming video is important to Tektronix's

7 customers, right?

8     A.   Yes, I would agree that.

9          MS. ABDULLAH:  If we could look at

10 PTX-160.

11     Q.   (By Ms. Abdullah)  This is the TekComms

12 streaming video assurance document.  Do you see that?

13     A.   Yes, I do.

14     Q.   It's dated October 2014, right?

15     A.   Yes, it is.

16     Q.   And this -- this is a document that you would

17 give to your customers, right?

18     A.   Can I -- look through it?

19     Q.   Sure.

20     A.   Typically, we wouldn't give these documents to

21 our customers, but we may present them.

22     Q.   If you could turn to the second page, this is

23 entitled Streaming Video Dominates the Network.  Do you

24 see that?

25     A.   Yes, I do.

1       Q.    And it says on the right under the -- the item

2    that says by 2018, it says:   79 percent of all global

3    consumer Internet traffic will be video.

4             Do you see that?

5       A.    Yes, I see that.

6       Q.    You can turn to Page 30 now, which is the page

7    ending in 05934.

8             Do you see that page?

9       A.    Yes, I do.

10      Q.    This is TekComms's streaming video assurance,

11   right?

12      A.    It is.

13      Q.    And that means that's what you're telling your

14   customers that Tektronix can do for them, right?

15      A.    What we're telling them is that we can do

16   streaming video, and it's to be clear that that's on our

17   TP.

18      Q.    Okay.

19      A.    That's a very specific type of streaming

20   video.

21      Q.    So you're telling them that -- you're giving

22   them an assurance about what Tektronix can do for

23   streaming video?

24      A.    That's correct.

25      Q.    And it says, the third bullet point says:

1    Full streaming video session model, correlating control

2    plane and video media.

3              That's what you're telling your customers,

4    right?

5         A.   In this document, that's what it says.

6         Q.   And that is a document you said you would

7    present to --

8         A.   Yeah.

9         Q.   -- customers?

10        A.   We would present it, yes.

11             THE COURT:   Let me ask again to make sure

12   the question is finished before the answer is given, and

13   make sure the answer is finished before the next

14   question is asked.   The transcript cannot be accurate if

15   two people are talking at once, okay?

16             Let's proceed.

17        Q.   (By Ms. Abdullah)  And if you look at the very

18   bottom, it also has an item that says:   Full end-to-end

19   video quality coverage.

20             Right?

21        A.   Yes, it does.

22        Q.   And, again, that's another thing that you're

23   telling your customers that Tektronix can do, right?

24        A.   Yes, we are.

25        Q.   I'd like to now turn to DX-219.   And this is a

1  data sheet, right?

2      A.    Yes, it is.

3      Q.    It's a data sheet for the GeoProbe G10?

4      A.    That's correct.

5      Q.    And because this says NetScout on top, it's

6  fair to assume that this is after the acquisition,

7  right?

8      A.    Absolutely.

9            MS. ABDULLAH:  I'd like to focus in on

10 the middle paragraph that says designed specifically.

11     Q.    (By Ms. Abdullah)  And here, let me ask you

12 this:  This -- this is also a document that would be

13 available to customers, right?

14     A.    Yes, correct.

15     Q.    It's a marketing document?

16     A.    Yes, it is.

17     Q.    Is that fair?

18           And it says that:  The G10 is designed

19 specifically to address high bandwidth interfaces and

20 data center applications, the NEBS-compliant GeoProbe

21 G10 platform features a distributed architecture

22 optimized to handle high volume --

23           THE COURT:  Slow down Ms. Abdullah,

24 please.

25           MS. ABDULLAH:  I'm sorry.

1    Q.    (By Ms. Abdullah)   -- high volume IP traffic

2  with native support for both IPv4 and IPv6.

3          That's what you're telling your customers

4  about G10, right?

5    A.    That's correct.

6    Q.    Okay.

7          MS. ABDULLAH:   If we could also turn to

8  DX-220.

9    Q.    (By Ms. Abdullah)  And this is a document -- a

10  similar document to what we were looking at, but this is

11  for the GeoBlade product, right?

12    A.    That's correct.

13          MS. ABDULLAH:   And if we could, again,

14  focus on that middle paragraph.

15    Q.    (By Ms. Abdullah)  And it says here that:

16  GeoBlade can help you address massive traffic growth

17  while minimizing the total cost of ownership and

18  physical footprint.

19          Do you see that?

20    A.    Yes, I do.

21    Q.    And that, again, is something that you're

22  telling your customers, right?

23    A.    Yes.

24          MS. ABDULLAH:   I pass the witness.

25          THE COURT:   Is there redirect?

1          MS. SMITH:  No, Your Honor.

2          THE COURT:  Ms. Broughton, you may step

3  down.

4          Defendant, call your next witness.

5          MS. SMITH:  Your Honor, NetScout calls

6  Mr. Anil Singhal.

7          THE COURT:  All right.  He's subject to

8  the Rule, Ms. Smith?

9          MS. SMITH:  Yes, Your Honor.

10         THE COURT:  Okay.  If you'll come

11 forward, sir, our courtroom deputy will swear you in.

12         If you'll -- if you'll come forward.

13         (Witness sworn.)

14         THE COURT:  Please come around, sir, and

15 have a seat here at the witness stand.

16         THE WITNESS:  Thank you.

17         THE COURT:  I see we have binders to pass

18 out.  Let's get that done.

19         MS. SMITH:  May we approach, Your Honor?

20         THE COURT:  Yes.

21         And if you will, sir, please pull that

22 microphone a little closer to you so we can hear you.

23         THE WITNESS:  Thank you, Your Honor.

24         THE COURT:  Mr. Kraeutler, you may

25 proceed.

```
 1              MR. KRAEUTLER:  Thank you, Your Honor.
 2         ANIL SINGHAL, DEFENDANTS' WITNESS, SWORN
 3                    DIRECT EXAMINATION
 4   BY MR. KRAEUTLER:
 5       Q.   Good afternoon, Mr. Singhal.
 6       A.   Good afternoon.
 7       Q.   Would you please introduce yourself to the
 8   jury?
 9       A.   I'm Anil Singhal.  I'm the co-founder and CEO
10   of NetScout.
11       Q.   Where did you grow up?
12       A.   I grew up in New Delhi, India.
13       Q.   And how did you come to live and work in the
14   United States?
15       A.   I did my graduation -- Bachelor of Science in
16   electrical engineering in India.
17            And then soon after that, in '76, I came here
18   for higher studies.  And I was fascinated by computer
19   science, and I had just taken one or two courses, and I
20   wanted to go to the best school.  And obviously, all the
21   best schools were in U.S.  And my father was for it,
22   even though he's from the middle class, he had to take
23   mortgage on his house to send me here.
24       Q.   And why did you choose to come to the United
25   States?
```

1      A.    For -- for higher studies in computer science.

2   In a way, I was changing my career from electrical

3   engineering to software, and computers were just up and

4   coming, very early stage.  And like I said earlier, I

5   was fascinated by that field.

6      Q.    Are you a U.S. citizen?

7      A.    Yes.

8      Q.    When did you become a U.S. citizen?

9      A.    Late '90s.

10      Q.    And -- and are you married?

11      A.    Yes.  For 37 years.  And I have two daughters

12   age 27 and 25.

13      Q.    Great.

14            And -- and where do you live?

15      A.    I live in Carlisle, Massachusetts, it's a

16   suburb of Boston.

17      Q.    Please describe your educational background.

18      A.    Like I said earlier, I have a Bachelor's

19   degree in computer -- in electrical engineering from

20   India.  And I have a Master's in computer science from

21   University of Illinois in Urbana-Champaign.

22      Q.    Please tell the jury when and how NetScout was

23   created.

24      A.    So after my graduation from University of

25   Illinois in '79, I went to work for a minicomputer

1  company in Boston for about six years.  And then I met

2  the other co-founder who also worked there, but I didn't

3  know him before, and we had some thoughts about doing

4  something interesting in the networking area, and that's

5  how the NetScout was started as -- originally was

6  Frontier Software in 1984.

7      Q.   Did the name of the company change at some

8  point?

9      A.   Yes, it changed to NetScout some time in -- I

10  would say mid to late '90s.

11      Q.   And why did the name change to NetScout?

12      A.   We were thinking of going public on NASDAQ,

13  and a lot of companies named Frontier -- there was

14  Frontier Communication and Frontier Airlines, and on the

15  advisor side it's very confusing -- Frontier name is

16  very confusing.  It just so happened that our product

17  name was called NetScout, and we were fairly well known

18  by that time.  So it was very convenient to use the name

19  NetScout for the company, also.

20      Q.   How did you fund the company in the beginning?

21      A.   We were less than 10 people.  We were -- most

22  of the funding came from -- the idea which we had was

23  very new, and -- and people didn't believe in, so it was

24  very hard to get funding.  So we basically were

25  consulting and putting about half of our income into the

1  company to fund the side projects, sometimes working in

2  the evenings and in the early stages for at least I

3  would say seven, eight years, and that's how the company

4  was funded.

5       Q.   And what was the idea you had for products?

6       A.   We wanted to do something in the networking

7  space which was upcoming at that time, and -- and we had

8  heard about a product called protocol analyzer, which

9  was used to troubleshoot network problems.  But you

10  always have to carry a -- a machine to the problem.  So

11  if you are in Boston as a company and you have a problem

12  in Texas, somebody will have to come to Texas, bring

13  that machine with them, hook up to the network, and then

14  try to troubleshoot the problem.  But the problem had

15  been gone already, and so now you have to wait for

16  solving the problem.

17            So we said why don't we put a permanent device

18  which we created the word "probe" in the industry, and

19  -- and why don't we put the permanent device on the

20  network, let the customer see the screens in Boston and

21  so you don't have to draw -- go to the place.  And plus,

22  this can be a 7 by 24 device.  So the idea was to create

23  a Next-Generation protocol analyzer which we called

24  network -- network monitoring probe.

25       Q.   Okay.  So just to -- just to fill this out a

1    little bit, at the time that you decided to begin to

2    develop a product, there were analyzers that were being

3    sold?

4         A.    Yeah, that's when they were called protocol

5    analyzers.

6         Q.    And the analyzer is what you described as the

7    machine that would have to be carried to the particular

8    spot on the network that you wanted to analyze; is that

9    correct?

10        A.    Yes.  And that -- that's why they were, in

11   fact, called portable protocol analyzers.  They were

12   portable.

13        Q.    And what was the size of these devices?

14        A.    In the early days, they used to be hundred

15   pounds.  And they were really not portable.  But slowly,

16   when Dell came around and many other companies came

17   around, you got down to about 15-pound type boxes, not

18   as small as laptops are today, but in those days, 15

19   pounds was a very small machine.

20             MR. KRAEUTLER:   Your Honor, may I just

21   ask a question of my co-counsel?

22             THE COURT:  You may consult with the

23   co-counsel.

24        Q.    (By Mr. Kraeutler)  And, Mr. Singhal, at the

25   time that you and Mr. Popat began to develop what you

1  described as a remote monitoring probe, were -- were

2  other companies either developing or selling probes, as

3  opposed to the analyzers that had to be carried to the

4  place of the problem?

5      A.   Unbeknownst to us, it seems there are other

6  companies who were working on similar things.  As

7  happened with any innovation, multiple people are

8  thinking about good ideas at the same time.  But at the

9  time we came up with this idea, we didn't know anyone

10  who was -- was developing the monitoring probes.

11      Q.   And what is the business of NetScout today?

12      A.   It's basically using -- monitoring the

13  NetScout, using deep packet classification, deep packet

14  inspection, but end up we have come long way along to

15  how do we use this information.  We use this information

16  initially for network monitoring troubleshooting

17  problems, but networks became stable, we used this

18  information to create billing records, and that was in

19  2001.  But now fast forward right now, everyone is using

20  networks, even the phone companies are using networks.

21  There's the Internet.  So now the use cases have evolved

22  to cyber security, big data analytics, even -- even IBM

23  work group is thinking of utilizing some of the things

24  we do as the data.

25      Q.   You referred to deep packet inspection and

1  deep packet classification.  What is deep packet

2  inspection?

3      A.    So this is a word which is around in the

4  industry for almost 30 years.  And when you send an

5  email to somebody else or when you send a file to

6  somebody else, that information is sent in segments --

7  small segments, and those are called packets.

8          So in order for somebody to say did the file

9  reach on the other side or what are the size of the

10  file, what kind of file it was, or who was sending that

11  file, that all the act of doing that is to read a packet

12  and one-by-one and then do deep packet classification or

13  deep packet inspection.  You inspect the packet for the

14  purpose of classification to find out all these things.

15          And there are hundreds and thousands of

16  protocols like that.  So that's what deep packet

17  inspection and deep packet classification was.

18          This was there in the protocol analyzer world

19  before even NetScout thought of the idea of probes.

20  Then we were the first one who applied -- or we thought

21  we were the one to apply deep packet classification and

22  deep packet inspection to probes, which as I mentioned,

23  7 by 24 devices.  And then it officially became RMON

24  standard.  And sometime in the later on, companies like

25  Cisco and Ericsson, they also started using as a

1  part-time job, but the field network monitoring part,

2  protocol analyzing part, DPC and DPI have been around

3  for 30 years.

4      Q.   All right.  When you say 30 years, would that

5  be since the mid-1980s?

6      A.   Yes.

7      Q.   Does NetScout have a company motto?

8      A.   Yes.  The model has changed without

9  necessarily changing our mission.  Initially, we started

10  at network is the business.  So we exist -- you are

11  going to conduct your business on your network.  So if

12  you're not able to -- if you are going to have network

13  problem, then you'll have business problem.  That was in

14  the '90s.

15         But four years ago, as the company got bigger,

16  we had created a new tag line called guardians of the

17  connected world.  And people have often asked me, even

18  sometime inside NetScout and our employees and

19  investors, what does that mean.  And I -- they think

20  that it's just about our leadership being the No. 1

21  player in this space.  I said:  No, it's not just about

22  that.  It's -- at NetScout, it's about solving some of

23  the toughest problem, taking responsibility for this

24  industry.  If you're a leader, you can't be just

25  responsible for your company.  You have to be

1   responsible for the industry.  And we are going to come

2   up with new ways of -- of solving this problems.  And

3   sometime I say we are not a charity.  We are not a

4   non-profit, but we are still a public service

5   organization, meaning we're going to do the service and

6   then get paid.

7          So that's the NetScout story.  But there's a

8   second part to you, if you'll allow me to mention, which

9   is personal for me, is a lot of people say we came to

10  the best place.  In fact, I have talked about doing some

11  of the award ceremonies that only in America you can

12  achieve the American dream, and other people may have

13  said that, too.  So they say, oh, so you really achieved

14  the American dream.  And I say, yes and no.  I have

15  achieved American dream, but that's only Part 1.  Part 2

16  is giving back to America.

17         So personally, I'm on that mission for last

18  six, seven years.  So guardian of the connected world,

19  meaning everything is connected and if something goes

20  wrong, nothing works, is the team which has a bigger

21  meaning, both for NetScout as a company and personally

22  for me.

23     Q.   Now, prior to 2015, who were NetScout's

24  customers for net -- for remote monitoring probes?

25     A.   Prior to 2015?

1      Q.   Yes.

2      A.    Yeah.  So we don't call a product anymore

3   monitoring probe for last 15 years, but if you -- if you

4   look at the first remote monitoring probe from NetScout

5   was in '92.  At that time, bulk of the customers were

6   banks.  And then we became pharmaceutical, then it

7   became railroad companies.  We had oil companies.  And

8   we have over thousand customers, big IT organizations.

9   They all run different applications, but they're all

10  required us to monitor them.

11          Then after 2005 or 2006, we also started

12  selling to phone company, but that was a small portion

13  of the business.

14          After 2015, we have started using our solution

15  for cyber security, also.  So, basically, network data

16  is called gold.  It's ultimate source of rich

17  information.  You can solve a lot of interesting

18  problem, but you have to make the solution affordable.

19  You have to make -- get the results fast.  And -- and

20  sometime I say a blood test results are going to take

21  long time.  Nobody's going to use it for DNA evidence.

22  So this is how I feel strongly about it.

23          So the mission of the company of using network

24  monitoring to solve different problems, next generation

25  problem, keeps change -- it stays the same, but what you

1  do with the mission has evolved over the last 25 years.

2      Q.   So the -- the organizations you mentioned,

3  railroads and banks and so forth, would it be fair to

4  call them enterprise data system customers?

5      A.   That's right.  We call enterprise organization

6  or carrier organization, those are the phone companies

7  versus enterprise.  But as time is passing by the

8  differentiation with the cloud and other things, it's

9  sort of disappearing.  And there are more -- we have the

10 unique advantage that we can bring in expertise from one

11 side to another.

12         And -- but you're right, if I go back 10 years

13 ago, then that was a very clear distinction that

14 NetScout was more on the enterprise side.  And later on

15 I can talk about that Tektronix, which we bought, was

16 mainly on the phone company side.

17     Q.   And prior to 2015, was the United States

18 Government also a customer?

19     A.   Yes, almost all the civil -- civilian

20 department, our product was used even in Iraq war in

21 tanks.  We were -- we sell to DOD, we sell to Homeland

22 Security, we sell to the weather service.  So anybody

23 who has a big IT organization has -- has a reason to use

24 our product.

25     Q.   And prior to 2015, was the United States

1  Government a customer?

2       A.   Yes.

3       Q.   I'm sorry, the United States Armed Forces a

4  customer?

5       A.   Yes.

6       Q.   Approximately how many enterprise data network

7  customers does NetScout have today?

8       A.   I think it's over 1,000.

9       Q.   And where are they located?

10      A.   80 percent of business comes from United

11 States, and mostly -- almost all states have one or two

12 customers.  And then -- but we sell into 50 countries.

13 So we have customers all over the place, even the UK --

14 UK federal government and Defense Department use our

15 product.  NATO uses our product.

16      Q.   During your time at NetScout, have you

17 personally been involved in developing products?

18      A.   Yes.

19      Q.   And describe your involvement, please.

20      A.   Since -- from -- in the early days, like I

21 said, first three, four years were doing consulting from

22 '84 to '87 and '88, then we created the first

23 proprietary probe.

24           And then for the next 10 years, we were very

25 actively developing the RMON probe, and I was involved

1   in every single aspect.  We were very small, including

2   writing all the code, all the software for RMON1 and

3   RMON2.

4          And then after '98, I've been mostly involved

5   in the -- in the design of the -- the product.  I am

6   not -- obviously, since we went public, I have other

7   responsibility, but I'm very particularly involved with

8   all the engineers and design.  Obviously, I don't do any

9   programming now since '98.

10       Q.   Who decided to acquire Tektronix Texas?

11       A.   I recommended this to the NetScout board of

12  directors, and that's how it happened.

13       Q.   Why did you recommend acquiring Tektronix?

14       A.   We thought that their solution and expertise

15  was very complementary to NetScout.  They were the

16  expert in the voice area, and NetScout was the expert in

17  the data area.  These worlds were coming together.  If

18  you look at the MPE, Voice over IP, I don't know that

19  that many people had heard about it now to cut down the

20  cost, people are trying to use IP network for voice,

21  also.

22         So they had the expertise since mid '90s in

23  that area through the GeoProbe product line, and

24  NetScout had the expertise on the data side.

25         And second thing was they were actually had a

1  very good application for tracing somebody's calls.  So

2  Verizon makes the -- if you call -- make a call on

3  Verizon, you can't get through, then you will call

4  Verizon customer support, and they will be using the

5  Tektronix product to trace the call.

6          NetScout was doing different things with the

7  data.  We were looking at how many calls people were

8  making per hour, about five minutes and all that.  And

9  customer had to choose should I buy product A or product

10  B when they couldn't afford both of them.

11          So we said if you combine them together, we

12  can actually provide great service to the customer, and

13  -- and then use the carrier relationship with Tektronix

14  have to grow faster.

15          And so we -- it looked very complementary.

16  But we didn't just buy Tektronix, we bought a group of

17  company which included Tektronix called the Danaher

18  Communication Business which was seven, eight companies.

19  So other things they do was WiFi monitoring, you have

20  WiFi in your environment.  How you monitor if WiFi is

21  working.  There was a cyber security company -- they're

22  the number one player in the denial-of-service attack.

23  So it was a group of companies, they basically -- the

24  parent company exited the business, and we bought all of

25  them, Tektronix being the biggest part of that.  And --

1  and that's -- that's the reason we acquired them.

2      Q.   All right.  So you referenced the GeoProbe

3  products.  Those were products of Tektronix prior to the

4  acquisition?

5      A.   Yes, GeoProbe was the generic name of line of

6  products, different model numbers which was --

7      Q.   And what was the functionality of those

8  products?

9      A.   They were basically used for voice networks by

10  phone company.  They were also used for data network,

11  but most of the time data network portion was leveraged

12  by a firm by a customer through NetScout.  And they were

13  using it for call tracing, tracing a call end-to-end,

14  all the way from cell tower -- they were doing some

15  other things like in the radio access network if there's

16  a problem then you have to -- you have to diagnose the

17  problem.  So they were -- but they're all tied to the

18  phone company customers, hundred percent of the business

19  was in that area.

20      Q.   Have the GeoProbe products been changed at all

21  since 2015?

22      A.   Yes.

23      Q.   How?

24      A.   We no longer use that as a platform.  We

25  have -- it's called push and pull.  Push means this is

1  what we're going to sell, but if a customer demands the

2  old product, we'll still sell to.  The majority of our

3  products now includes the NetScout platform in which we

4  have taken some of the software from the GeoProbe and

5  included that.

6          As I mentioned earlier, people didn't want to

7  buy two boxes.  Imagine having two black boxes in the

8  plane.  It's going to be very expensive.  And -- and if

9  you can do with one, so that's what we have done.

10          So we have created a new platform called ISNG

11  InfiniStream Next-Generation.  This is what we are

12  selling.  Some old customers still for community reasons

13  for voice here and there do buy the GeoProbe, and but

14  that -- so there's a big change since 2015.

15      Q.   All right.  So one of the products in this

16  case is the G10 probe.  That -- if I understand your

17  testimony, that probe remains unchanged, but it's only

18  sold if a customer asks for it?

19      A.   That's right.

20      Q.   Is that also true of the GeoBlade?

21      A.   Yes.

22      Q.   And are new products being delivered --

23  developed for the future?

24      A.   Yeah, that's the ISGN product which includes

25  the software from GeoProbe and GeoBlade, but not the

1  software which was already there in the NetScout probe.

2  That had been removed from the combined solution.

3      Q.   Mr. Singhal, at the time that you formed

4  Frontier in 1984, did the Internet exist?

5      A.   Yes, it was in infancy stage.

6      Q.   What were computer networks like at that time?

7      A.   They were very low speed.  Everything was not

8  connected to everything.  There were a lot of problems,

9  not everyone using network computers.  There were many

10 different ways to connect.  Today, there is something

11 called TCP/IP protocol which is the standard which is

12 used 95 percent of the time or probably hundred percent

13 of the time.  In those days, there were 10 different

14 competing way to communicate.  There were no standards,

15 big standards, and so I would say sort of chaos which

16 happens in the early stages of any new market.

17     Q.   And -- and had the -- had network

18 communications changed significantly by 1989 when you

19 introduced your first product?

20     A.   Not significantly, but, yes, it has matured

21 somewhat in the five-year period.

22     Q.   What was the first product that you and

23 Mr. Popat developed?

24     A.   We developed a -- a probe.  In fact, we used

25 to call it remote monitoring probe, and it was called

1  LAN Vista.

2      Q.   All right.  And when you say LAN Vista, that

3  is capital A -- L, capital A, capital N, local area

4  network?

5      A.   Yeah, local area network.

6      Q.   And what made -- what type of product was the

7  LAN Vista?

8      A.   It was a remote monitoring probe using

9  proprietary technology then and some creative idea,

10  innovation NetScout had.

11      Q.   Did Frontier sell the LAN Vista probe?

12      A.   No.  We sold it to a third party because we

13  didn't have money or resources to sell.  So we were just

14  a group of engineers.  So we partnered with a company

15  which privately label our product and sold it in the

16  market.

17      Q.   What kinds of customers bought the LAN Vista?

18      A.   Similar customers, banks and other IT

19  organizations.

20      Q.   Was the product commercially successful?

21      A.   No, it was not because it was -- looks like a

22  great solution to a problem people didn't appreciate.

23      Q.   What do you mean by that?

24      A.   Well, it looks like this was a -- this was a

25  very new idea, creative idea, but maybe industry was not

1    aware of it, so there were a lot of marketing required

2    to create awareness about -- not only do you have to

3    provide a good car, but you have to tell people, hey,

4    this car is very useful.  It gets you -- so awareness

5    about -- about why you need this was -- was beyond the

6    scope of -- of a small company, including the partner we

7    had.

8         Q.   Who wrote the code for the LAN Vista?

9         A.   So basically, there is a classification code

10   and inspection -- deep packet inspection code and remote

11   monitoring code, that -- all of it was written by me.

12   But there are other code which it makes up a probe, and

13   that was written by three or four other engineers.

14        Q.   How many employees did NetScout or Frontier

15   have at the time?

16        A.   Less than 10.

17        Q.   Sometime after Frontier began to sell the LAN

18   Vista probe, did you become involved in an organization

19   known as the Internet Engineering Task Force?

20        A.   Yes, in 1990.

21        Q.   And is that also known as the IETF?

22        A.   Yes.

23        Q.   What is the IETF?

24        A.   IETF as -- as spelled out, Internet

25   Engineering Task Force.  It's goal is to develop open

1    standards for the community so that Product A can work

2    with Product B.  For example, one of the standard is

3    TCP/IP, so I can use it -- Oracle server -- I can use --

4                    (Phone ringing.)

5                    THE COURT:  Just a minute.  Let's take it

6    back to the jury room.

7                    THE JUROR:  I meant to give it to him

8    earlier.  I swear it was inadvertent.

9                    THE COURT:  Not a problem.

10                   THE JUROR:  I hate the thing.

11                   THE COURT:  Not a problem.

12                   All right.  Let's continue.  Go ahead.

13       Q.   (By Mr. Kraeutler)  Mr. Singhal, you mentioned

14   that the IETF developed standards.  What -- what

15   standards -- what is a standard in the context of the

16   IETF's activities?

17       A.   So -- so I was about to mention that as an

18   example of the standard is if you buy a sailboat from

19   Oracle, and you buy a desktop from Dell, if they don't

20   talk to each other, then you cannot transfer files.  So

21   standards is a way to implement something in both

22   machine by different vendor, even potential competitor,

23   so that this communication can happen.

24                   So there are literally hundreds of standards

25   and -- which is -- which is basically a way of doing

 1    things, and standardizing.  And then there is a

 2    compliance happen -- if a task happens between the

 3    community of -- of vendors where basically they make

 4    sure that they're compliant before they're put into the

 5    market.

 6            So that was -- so the host of standard like

 7    that is a community of thousands of people worldwide,

 8    and it's -- it's truly public service organization.  So

 9    at that time, there was a new standard Google was

10    starting from somebody, a professor at MIT -- I think

11    it's in '91, Jeff Davin, and called RMON.  And my

12    partner, Narendra Popat, he happened to hear about it.

13    He said:  That's a great thing.  We are having trouble

14    getting awareness about what we do.  And, in fact, the

15    name of the standard is what you are calling of a

16    product, the RMON thing.  So why don't we join that and

17    -- and so that's how I got involved.

18        Q.    How long has the IETF been around?

19        A.    Maybe 40 plus years.

20        Q.    And you mentioned an RMON Working Group.  Is

21    the technical work of the IETF done through working

22    groups?

23        A.    Yes.  There is working group for each

24    standard, and there's a working group committee, which

25    is a group of members for both academy and -- and

1  commercial side.

2      Q.    And at the time that you were -- you

3  considered joining the RMON Working Group, how many

4  people were involved in that particular working group?

5      A.    I would say about six or seven companies and

6  maybe total of 10 people or so because sometimes there

7  were a couple of people from one company.

8      Q.    You mentioned a Chuck Davin from MIT.  Was

9  Mr. Davin a professor at MIT?

10     A.    I believe so.

11     Q.    And were there other people from higher

12  educational institutions, or was everyone from

13  companies?

14     A.    No.   There was Steve Waldbusser who was from

15  Carnegie-Mellon University.

16     Q.    When did you become involved in the RMON

17  Working Group in relation to the formation of the

18  working group?

19     A.    I think it was very early stage, maybe just a

20  few months afterwards.

21     Q.    Why did you become involved?

22     A.    Well, it was -- it was a very interesting

23  decision, and as I mentioned earlier, the problem we

24  face with LAN Vista was we were a small fish in a small

25  pond, maybe not even a pond.  And so we said how -- how

1  can we be at least a small fish in a big pond?  And --

2  so that everyone is aware -- if everyone is looking for

3  RMON products, remote monitoring probe products, then

4  the best product will win.  And so we said it's better

5  to contribute our proprietary technology, which we had

6  put in LAN Vista to the community and learn from other

7  people.  And so people like Novell, HP, Hewlett-Packard,

8  and some other companies felt the same way.  And -- and

9  that's how this group was born.

10         It was amazing competitors forming and

11  contributing their -- their innovations for proprietary

12  solution, because they all wanted to increase the market

13  size, increase the size of the pot.

14     Q.   All right.  So they were all interested in the

15  size of the pond?

16     A.   Yes, they were very interested in bringing

17  this new way of doing things to the market.  That was

18  the biggest most important thing for everyone.

19     Q.   And I assume that HP, for example, didn't want

20  to be a small fish in a big pond?

21     A.   Well, HP has had lot of small fishes.  HP does

22  50 different things.  So even they were in a small --

23  small fish in this pond for this kind of business.

24     Q.   What was Mr. Waldbusser's role in the RMON

25  Working Group at the time you became involved?

1       A.    For every committee -- working group

2  committee, there is a working group, and there is an

3  author and a moderator.  And so Steve's role was very

4  important.  He was the author and moderator and -- which

5  was very important.  He was probably the only

6  independent person in the room, truly independent.  He

7  was not a vendor.  He belonged to Carnegie-Mellon

8  University, and he was associated with the IT

9  organization prior to that.

10              THE COURT:  Mr. Singhal, if I could, let

11  me ask you not to refer to Mr. Waldbusser by Steve, not

12  by first name only.  Please use complete names.

13              THE WITNESS:  Okay.  Sorry.

14              THE COURT:  Let's continue.

15      Q.    (By Mr. Kraeutler)  Was the RMON Working Group

16  trying to solve a particular problem?

17      A.    Yes, it was trying to move from a reactive

18  protocol analyzer, which I described earlier to 7 by 24

19  monitoring.  And so that you can be most proactive about

20  solving the problem, not always chasing the problem of

21  yesterday, but solving the problem, which is about to

22  come in and perhaps even prevent those problems.

23      Q.    So when you say 7 by 24, you mean 24 hours a

24  day, seven days a week?

25      A.    Yes, permanently connecting a device to the

1  network which listens, then does deep packet

2  classification, deep packet inspection, look at the

3  traffic, all the stuff which was described in RMON

4  standard.

5     Q.   Over what period of time did you participate

6  in the RMON Working Group?

7     A.   For -- for the entire time, '91 -- I would say

8  '90 to -- all the way to '97.

9     Q.   What did you do as a member of the working

10  group?

11     A.   That almost became 50 percent of my job.  I

12  would attend all the meetings, which sometimes it will

13  be two or three -- at least once a year, but most likely

14  two and three in the early days.  I'll be on the emails.

15  I'll be on calls.  I'll be participating in the meetings

16  and developing code, participating in -- in the

17  compliance testing, some of it which happened at

18  Carnegie-Mellon University.

19     Q.   Did you contribute anything to the working

20  group?

21     A.   Yeah.  Almost the entire thing which we

22  developed for LAN Vista, we gave it to the committee.

23     Q.   Why?

24     A.   Like I said, to be -- if other people are

25  contributing voluntarily then we have to do that, too.

1  So RMON was not just a one-person effort.  We

2  contributed some part, other people contributed other

3  part, and -- and I think there was really -- it was

4  really -- I mean, very good collaboration, and I didn't

5  feel that people were hiding.  They were all trying to

6  create a standard which is a super set of the technology

7  from all the vendors which are proprietary and -- and --

8  but preventing the market to grow.

9      Q.   And was the idea that that super set would

10 become a blueprint for products for the future?

11     A.   Yes.

12     Q.   Where did your meetings take place?

13     A.   It was some time in hotels, sometimes in

14 Carnegie Mellon University.  The IETF holds a yearly

15 meeting in different countries.  I believe there was one

16 in Sweden.  And so it was in different locations.

17     Q.   Did the working group produce a standard at

18 some point?

19     A.   Yes, it produced two standard, one in '91

20 and -- called RMON1, and then second one in -- I would

21 say around '96, '97 called RMON2.

22     Q.   Let me direct your attention to Defendants'

23 Exhibit 83.

24          MR. KRAEUTLER:  Mr. Goodin, if you could

25 put up the first page on the screen.

1          And if you could blow up, please, the top

2 part that shows the title and so forth.

3     Q.   (By Mr. Kraeutler)  And, Mr. Singhal, can you

4 identify this particular document?

5     A.   Yeah.  This was the RMON -- the product of the

6 RMON1 -- with the working group called the RMON1

7 standard.

8     Q.   And when was this standard issued?

9     A.   It says here November '91.

10     Q.   And when a standard was issued, was it

11 published?

12     A.   Yes.

13     Q.   How was it published?

14     A.   It was in various IETF websites, through

15 emails, many different ways to distribute.  It was open

16 access to anyone in the world.

17     Q.   Were there multiple IETF websites?

18     A.   I'm -- now there are.  But I'm not sure

19 whether it was at that time.

20     Q.   And you mentioned email communication.  During

21 the period of time that you were developing the

22 standard, were there communications among the various

23 members of the working group?

24     A.   Yes, very active and sometime phone calls,

25 sometime peer-to-peer communications, sometimes group

1  communication.

2      Q.   What kinds of information were communicated by

3  email?

4      A.   This draft had many different versions,

5  this -- this document had many different versions.  So

6  these were added comments.  I mean, not everyone agreed

7  to everything.  So there was a process of discussion and

8  everything.  So those are the -- basically, anything

9  which could be harder to discuss, we would get together

10  to meet.  Anything which could be done, basic editing

11  and all those, was done via email.

12      Q.   Referring to the portion of the document

13  that's been enlarged, who was the author of the RMON1

14  standard?

15      A.   Yeah, Steve Waldbusser.

16          MR. KRAEUTLER:  And, Mr. Goodin, let me

17  ask you to put up Page 4104 of the same document.

18          And could you enlarge the portion at the

19  bottom that says author's address?

20      Q.   (By Mr. Kraeutler)  And, Mr. Singhal, does

21  this also show that Steve Waldbusser was the author of

22  the RMON1 standard?

23      A.   Yes.

24          MR. KRAEUTLER:  And, Mr. Goodin, could

25  you please now put up the preceding page, Page 4103.

1          And could you enlarge Section 7,

2    acknowledgments?

3          Q.    (By Mr. Kraeutler)   Mr. Singhal, what

4    information is shown in Section 7?

5          A.    This shows all the committee members who

6    actively participated in development of the standard.

7          Q.    And is anyone from Frontier acknowledged?

8          A.    Yeah, myself.

9          Q.    Is Mr. Dietz acknowledged in this document?

10         A.    No.

11         Q.    After Defendants' Exhibit 83, the RMON1

12   standard issued, what, if anything, did NetScout do?

13         A.    We were actually developing the product while

14   the standard was being developed.   So very soon after

15   that, I would say within six months after that, in maybe

16   early '92 or late '91, we actually released the

17   commercial product for RMON, RMON1, the remote

18   monitoring probe.

19         Q.    What was the name of that product?

20         A.    It was NetScout Model No. 6010.

21              MR. KRAEUTLER:   Your Honor, may I

22   approach the witness?

23              THE COURT:   You may.

24              MR. KRAEUTLER:   May I ask the assistance

25   of the court officer?

1              Thank you very much.

2              And, Mr. Goodin, could you put up,

3  please, the photograph of Defendants' Exhibit 189.

4      Q.    (By Mr. Kraeutler)  Mr. Singhal, I've placed

5  before you or asked to have placed before you a physical

6  exhibit that has been marked Defendants' Exhibit 189.

7              Can you identify that particular physical

8  exhibit?

9      A.    Yes.

10     Q.    And what is it?

11     A.    It is the first probe released to the market,

12  first RMON probe in late '91, early '92.

13     Q.    How was the NetScout probe 6010 different than

14  the LAN Vista probe?

15     A.    It included all the features of LAN Vista,

16  plus it included other versions which were not in LAN

17  Vista but in the RMON standard.

18              But more importantly, this -- this box would

19  be used to communicate with other people in the market,

20  whereas LAN -- LAN Vista was completely proprietary, it

21  only worked with NetScout application, but this could

22  supply data over something called SNMP protocol to other

23  third party, even competitors, and which was one of the

24  goal of RMON.  So it was a super set of LAN Vista

25  functionality, maybe few things were not actually

1 included but bulk of it, contribution from other people,

2 but more importantly it was a standard based

3 implementation open -- open implement rather than a

4 proprietary.

5    Q.    What role did you play in the version of -- in

6 the original version of the NetScout 6010 Probe that was

7 introduced to the market in 1992?

8    A.    All the RMON-related code, software was

9 actually written by me, every single line.

10    Q.    And so did you use the RMON1 standard as a

11 blueprint?

12    A.    Yes.

13    Q.    Did the NetScout 6010 Probe perform deep

14 packet inspection?

15    A.    Yes.

16    Q.    Did it perform deep packet classification?

17    A.    Yes.

18    Q.    In 1992?

19    A.    It did that, but not to the extent of RMON2.

20 For example, there is a group called packet capture, and

21 that portion came from the protocol analyzer world, and

22 that did that.  But the full scale deep packet

23 classification/inspection, even though it was there in

24 LAN Vista didn't come into RMON2.  So it did basic DPI

25 classification.

1          So as an example that it could tell a machine

2   1 is talking to machine 2.  But it couldn't tell whether

3   who was the user of machine 1.  It couldn't tell Joey is

4   talking to Mary.  It could tell some machine in -- in

5   this building 1 talk to machine 2.  So even to do that

6   you had to do deep packet classification.  So it was

7   deep versus deeper packet classification.

8        Q.   So when the RMON1 standard was published, did

9   other manufacturers begin to develop RMON1 devices?

10       A.   Yes, almost all the people who were there in

11  the committee, they had their own versions, but very

12  interestingly, we started getting contacts from other

13  companies to use -- they found out that I was involved,

14  NetScout was prominently involved, and so this was the

15  power of awareness.  They started calling us -- an

16  update -- Cisco -- some people started calling us saying

17  we'd like to use your technology in our box and started

18  developing from scratch.

19       Q.   What, if anything, did the RMON Working Group

20  do after issuing the RMON1 standard?

21       A.   Actually, RMON1 as published was actually

22  smaller than what was already developed, but Steve

23  Waldbusser and all the committee member thought there's

24  too big of a standard to get approved in the first

25  draft.  So we artificially split it to RMON1 and

1   immediately started working on RMON2.

2       Q.    Did the membership of the group change after

3   RMON1 was published?

4       A.    Yes, because it was creating such a big

5   awareness and grew -- the -- the group probably went all

6   the way from maybe 10 or so people to about 30-plus

7   people at different times.

8       Q.    And I already mentioned Mr. Dietz's name, but

9   I -- I didn't ask you the foundation I should have.  Do

10  you know someone named Russell Dietz?

11      A.    Yes.

12      Q.    When did you first meet Mr. Dietz?

13      A.    I think sometime during the RMON2 standard

14  development.

15      Q.    Did Mr. Dietz join the RMON Working Group?

16      A.    RMON2 Working Group, yes.

17      Q.    When?

18      A.    Maybe '93, '94.

19      Q.    And did he remain involved until the RMON2

20  standard was published?

21      A.    Yes.

22      Q.    Did Mr. Dietz participate in the RMON Working

23  Group meetings?

24      A.    As far as I know, yes.

25      Q.    What was discussed during the meetings?

1     A.   It was all forms of deep packet classification

2  and deep packet inspection, how to convert metrics to

3  collect, why we should collect them, what applications

4  are important, and in particular, a feature called

5  TrackSessions which -- which was very complicated,

6  applied to some of the applications, and all that was

7  discussed in all kinds of details and with some intense

8  discussion because different people have different

9  ideas, but ultimately we did reach consensus and

10  published the RMON2 standard.

11     Q.   Have you read the Court's construction of the

12  terms "conversational flow" and "conversational flow

13  sequence" from the patents?

14     A.   Yes.

15     Q.   And how, if at all, do those terms and their

16  constructions relate to TrackSessions?

17          MR. SKIERMONT:   I'm going to object, Your

18  Honor.  If I can approach?

19          THE COURT:   Approach the bench.

20          (Bench conference.)

21          MR. SKIERMONT:   I think -- the objection

22  is he's soliciting expert testimony from a fact witness.

23          THE COURT:   The witness is not going to

24  explain the Court's claim construction to the jury.

25          MR. KRAEUTLER:   No.

1          THE COURT:   Or apply it as an expert

2    would.   Unless you have some response otherwise, I'm

3    going to sustain the objection.

4          MR. KRAEUTLER:   Okay, Your Honor.   I can

5    move on.

6          MR. SKIERMONT:   Thank you.

7          (Bench conference concluded.)

8          THE COURT:   Objection sustained.   Let's

9    proceed.

10     Q.   (By Mr. Kraeutler)  Did you, in the RMON

11   Working Group, discuss the need for devices that would

12   have the ability to recognize multiple connections or

13   exchanges of packets between a client and a server?

14     A.   Yes.

15     Q.   And did you discuss in particular the need to

16   be able to identify flows that involved more than one

17   well-known port and dynamically assigned port?

18     A.   Yeah, one well-known port and one dynamically

19   assigned port.

20     Q.   Did the working group produce a publication

21   that addressed the issue of multiple connections and

22   being able to monitor them?

23     A.   Yes.

24     Q.   And what was that?

25     A.   It was called protocol identifier document,

1   which was a companion document to the RMON2 standard.

2        Q.   And what information was contained in that

3   document?

4        A.   It described what -- just maybe for a minute

5   just to describe, when you do deep packet inspection,

6   one of the purpose is -- and deep packet classification

7   is to see what was running on the network and how many

8   people were using it -- for example, how many people

9   were using email, how many people were doing file

10  transfers, things like that.

11        So to detect certain application, which we --

12  I refer to as complicated application, you had to do

13  more deeper analysis.  You have to remember things

14  across multiple packets and traffic, and that feature

15  was called TrackSessions, but it didn't apply to every

16  application.  It applied to certain protocols.

17        So this protocol identifier document explains

18  which application required this additional work in deep

19  packet classification to arrive at the right conclusion.

20        Q.   Let me ask you to look at Defendants' Exhibit

21  58, which is in the book in front of you.

22             MR. KRAEUTLER:  And, Mr. Goodin, if you

23  could bring up the first page of Defendants' Exhibit 58.

24             And if you could blow up, please, the top

25  portion down through the names.  Thank you.

1      Q.    (By Mr. Kraeutler)   Mr. Singhal, I've placed

2   before you or caused to be placed before you a document

3   that has been marked Defendants' Exhibit 58, and do you

4   recognize that document?

5      A.    Yes.

6      Q.    What is that document?

7      A.    That's the remote -- this is the RMON MIB

8   protocol identifier document I was talking about just a

9   minute ago.

10     Q.    And was this document published?

11     A.    Yes.

12     Q.    When?

13     A.    November '96.

14     Q.    Was it published in the same manner as the

15  RMON1 standard?

16     A.    Yes.

17     Q.    So it was made available by email and through

18  distribution through multiple websites?

19     A.    Yes.

20     Q.    Let me direct your attention to Page 15158 of

21  the document.

22           MR. KRAEUTLER:   And, Mr. Goodin, could

23  you enlarge Table 3.1 down to -- or that's -- that's

24  fine.  And could you highlight, please, TrackSessions

25  and the lines that are adjacent to it?

    Q.   (By Mr. Kraeutler)  Mr. Singhal, what
information is shown on this page of the document?

    A.   It describes a TrackSession feature which we
talk about earlier.  If you read it, it says a correctly
attributes a -- a protocol or application which starts
on a well-known port but then all the transfer and rest
of the stuff is happening on a dynamically assigned
port.  And if you don't implement this feature, for
example, for TFTP here, then you will wrongly identify
the amount of traffic, and -- in your probe.

    Q.   And did the RMON protocol identifiers'
document, Defendants' Exhibit 58, did it describe how
the TrackSessions' technique could be applied to
specific protocols?

    A.   Yes.  This talks -- I mean, not the technique.
I mean, those were discussed.  It was very well
understood.  But it talks about at a very high level
that you have to remember multi-information from
multiple conversation flows to -- in order to be able to
correlate them.

    Q.   All right.  And could I direct your attention
now to Page 015179?

              MR. KRAEUTLER:  And, Mr. Goodin, could
you -- well, let's begin by blowing up the -- the top of
the last -- the top four or five lines of the document.

1            And could you highlight SunRPC protocol

2  identifier?

3       Q.   (By Mr. Kraeutler)  And, Mr. Singhal, what --

4  what information -- what is -- do you recognize the term

5  "SunRPC protocol identifier"?

6       A.   Yeah.  This was an application or a protocol

7  developed by Sun Microsystem which is now part of

8  Oracle, and it is describing that this is one of those

9  special applications which requires the TrackSession

10 treatment.

11      Q.   What does RPC stand for?

12      A.   Remote procedure call.

13      Q.   And how does it work?

14      A.   It basically starts on a port mapper.  It

15 starts --  basically, in order for you to talk to X, you

16 have to go and get the address of X from somewhere else.

17 And that's the two conversation flows.  So you will go

18 to a well-known port place and say I want to do this,

19 who should I talk to.  And those people will then

20 provide you that information.  And by using the

21 TrackSession feature in the probe, you are able to

22 dynamically associate them and report the information

23 correctly to -- to the users.

24      Q.   I should have been more specific in my

25 question.  I'm not interested in how the functionality

1  of TrackSessions works.  I'm interested in the Sun

2  remote procedure call.  How would that be used by as a

3  person who -- by a person who was at a computer monitor?

4       A.   Oh, there are applications using SunRPC.  All

5  of these protocols are part of some software, and this

6  was the software from Sun Microsystem.  And they have

7  something called NFS.  They have ways to transfer files.

8  So the remote procedure call was something developed by

9  Sun Microsystem.  And it was implemented in such a way

10  that in order for me to listen to the traffic and tell

11  you properly, I'll have to implement the TrackSession

12  feature.

13       Q.   All right.  And was it a means by which a

14  person at a computer terminal could perform an actual

15  function or operation on another computer at another

16  location?

17       A.   Yes, I mean, it's basically the software on

18  one computer which utilizes this -- the end user is not

19  really aware that this is happening.

20       Q.   All right.

21            MR. KRAEUTLER:  And, Mr. Goodin, could

22  you put down that enlargement, and now show Pages 179 to

23  180.

24            And if you're able to enlarge that bottom

25  portion, decoding, and the continuation of the

1   paragraph.

2        Q.   (By Mr. Kraeutler)  Mr. Singhal, what -- I

3   have directed your attention to a section of the

4   document that bears the heading Decoding that begins at

5   the page -- bottom of Page 179 and continuous on the top

6   of Page 180.

7             What information is shown in that passage of

8   the document?

9        A.   This says that the first packet of SunRPC,

10  which is the first one and it's called port mapper

11  program.  And it's decoded statistically.  And RFC1831

12  is Internet standard where Sun Microsystem said how RPC

13  works.

14            So they're asking us if you want to read it,

15  go ahead and read how it works.

16            But then it says any subsequent packet must be

17  decoded and correctly identified by remembering, and

18  that's what -- remembering is calling TrackSessions.  So

19  remembering, you have to have a memory, you have to have

20  some session table, you need to have some flow-entries,

21  you have to do multiple things for the act of

22  remembering.

23            And once you see the second one, and then you

24  can correlate the two.  And if you didn't do that, then

25  it will be called a bug in the RMON probe.

1    Q.    And was all that functionality discussed by

2 the working group?

3    A.    Yes, in -- I mean, all kinds of detail because

4 it was, I think, a -- a big amount of time was devoted

5 to this -- this aspect.

6              MR. KRAEUTLER:  So let me now ask Mr.

7 Goodin to put down these pages and to put up the first

8 page of the document, 015144 and enlarge the first part

9 of the document again.

10    Q.    (By Mr. Kraeutler)  And Mr. Singhal, who are

11 the authors of the -- the -- of Defendants' Exhibit 58,

12 the -- the standard that includes TrackSessions?

13    A.    Andy Bierman from Cisco Systems, Chris Bucci

14 from Network General, and Robin Iddon from 3Com.

15    Q.    And now let me direct your attention to Page

16 15211?

17              MR. KRAEUTLER:  And, Mr. Goodin, would

18 you please enlarge the acknowledgment section at the

19 bottom?

20    Q.    (By Mr. Kraeutler)  And, Mr. Singhal, what is

21 shown in this portion of the document?

22    A.    At the end, the author is recognizing even

23 though all the committee member contributed to the

24 development, they special -- recognizing the special

25 contribution of three people who maybe went beyond the

1  call of duty to contribute to this document.

2      Q.   And what were your contributions to this --

3  this draft standard -- standard that includes

4  TrackSessions?

5      A.   We were doing some -- we had some ideas like

6  this in the LAN Vista product, and so we contributed to

7  that.  As I mentioned on the RMON2 effort.  I reviewed

8  all the drafts, by line-by-line, every single thing,

9  commented on them, made -- made suggestions, had calls.

10 I think that's what they're talking about here in the

11 acknowledgment.

12     Q.   Let me ask you now to look at Defendants'

13 Exhibit 89 in your binder.

14          MR. KRAEUTLER:  And, Mr. Goodin, if you

15 could put up the first Page of Defendants' Exhibit 89.

16          And if you could enlarge the top of the

17 page, please.

18     Q.   (By Mr. Kraeutler)  Mr. Singhal, do you

19 recognize this document?

20     A.   Yes, this -- this is the parent document of

21 the protocol directory identified, which we saw earlier.

22 It's called the RMON2 standard document.

23     Q.   When you say it's the parent document of

24 the -- of the earlier document, do you mean Defendants'

25 Exhibit 58, the Remote Network Monitoring MIB Protocol

1  Identifiers document?

2       A.    That's right.

3               MR. SKIERMONT:   Your Honor -- Your Honor,

4  I'm going to object as leading.  Prior to highlighting

5  the dates and authors and whatnot, Counsel should lay a

6  foundation with the witness first so he's familiar with

7  the particular document he's putting on the screen.

8               THE COURT:   Well, that's two different

9  objections.  I'll certainly sustain it as to leading.

10              MR. SKIERMONT:   Thank you.

11              THE COURT:   Avoid leading questions,

12 Counsel, on direct.

13              MR. KRAEUTLER:   I will, Your Honor.

14              THE COURT:   Let's proceed.

15      Q.    (By Mr. Kraeutler)  So what did you mean when

16 you said that this was the parent document of

17 Defendants' Exhibit 58?

18      A.    So remote monitoring RMON2 document says what

19 information you should collect on behalf of applications

20 or protocols.  But the protocol identifier document

21 defines what application you should be looking at.  So

22 they go hand-in-hand.

23              RMON2 defined what information you want to

24 collect, after you have done the deep packet

25 classification or inspection or TrackSessions.  And the

1  protocol identifier say what other relevant application

2  you should be doing classification for.  So it's almost

3  like appendix of the RMON2 document.

4      Q.   And were both of these documents ultimately

5  adopted as standards by the IETF?

6      A.   Yes, but most of the implementation started --

7  started coming around soon after '97.

8      Q.   And how do you refer to these two documents?

9      A.   I generally talk about RMON2.  I don't

10 especially differentiate the -- the internal stuff.

11     Q.   After RMON2 was published as standards or

12 draft standards but in late 1996 through January 1997,

13 what, if anything, did NetScout do?

14     A.   I think we are constantly enhancing and

15 implementing part of this, including the development --

16 the standard development process.  We're actually --

17 also, by that time we have quite a few customers on Wall

18 Street, and they were also asking us questions, hey, how

19 is this going.  There was a lot of activity around this,

20 this was the height of the activity period.  So -- so if

21 you were very involved either at engineering level or at

22 the committee level or -- or with the customers.

23     Q.   Did you produce a product that would support

24 the standard?

25     A.   Yes.

1    Q.    And when was that product made available to

2  customers?

3    A.    The unofficial version, it was available to

4  existing customers who were already using the RMON1

5  probe in early '98.  But for the worldwide announcement

6  and everything, it was late '98.

7    Q.    Okay.  And when you say "existing customers

8  who had an RMON1 probe," was it possible to adapt the

9  physical Model 6010 that is in front of the jury

10  currently in order it have all the functionality of

11  RMON2?

12    A.    Yes, people who were on support contract, they

13  got a free upgrade, and you could just download that

14  from a website or through a -- or a CD, and -- and

15  upgrade the software in the field.

16    Q.    All right.  So the same physical hardware

17  could be supported by revised software?

18    A.    Yeah, that's true, but I wanted to mention

19  that by that time, we have 10 different models of the

20  product, for 10 megabits, hundred megabits, wide area

21  network.  And so all of them use RMON2.  But you're

22  right that anything which was sold, customer had a free

23  upgrade to RMON2.

24    Q.    And how did they get that upgrade?

25    A.    Either -- I don't remember exactly, but,

1  certainly, it was available on -- on disc and -- and --

2  or they could download it from a website.

3      Q.   Did the -- I don't remember the revision

4  number of the software that fully implemented RMON2?

5      A.   I think it was 4.5, NSP 4.5.  NSP stands for

6  NetScout probe.

7      Q.   Did -- did the NSP 4.5 probe perform deep

8  packet inspection?

9      A.   Yes.

10     Q.   Did it perform deep packet classification?

11     A.   Yes.

12     Q.   Did it contain the TrackSessions

13  functionality?

14     A.   Yes.

15     Q.   When you wrote this code, did you have the

16  benefit of any input from Mr. Dietz outside of any

17  discussions that occurred in the working group?

18     A.   No, the development was all inside NetScout.

19     Q.   And did you copy what anyone else was doing?

20     A.   No.  This implementation was all proprietary.

21  Everyone was implementing their own way, and obviously

22  there was no exchange of information about

23  implementation.

24     Q.   Do you have any recollection of Mr. Dietz

25  contributing to the discussion regarding TrackSessions?

1    A.    I don't remember, but I'm sure he was involved

2  in various discussion related to RMON2.

3    Q.    Let me now ask you to look at Defendants'

4  Exhibit 92.

5              MR. KRAEUTLER:  Mr. Goodin, if you could

6  put up the first page of that document.

7    Q.    (By Mr. Kraeutler)  Mr. Singhal, do you

8  recognize this document?

9    A.    Yes.

10    Q.    And what is it?

11    A.    It's basically the information would we -- we

12  will share with the customer to say what is coming out

13  in the latest release of the software and what is the

14  future direction.  So, typically, a product manager for

15  the -- any company will present this to the customer

16  saying this is what is coming out soon.

17    Q.    And what is the date of the document?

18    A.    October 26, 1998.

19    Q.    I'm sorry.  Let me direct your attention to

20  Page 253699.  What information is shown on that

21  particular page?

22    A.    It is showing all the -- these were the ones I

23  was talking about that NetScout had many more probes at

24  that time.  Not just 6010.  So this shows which release

25  which will support RMON2 at what time.  And it is

1   showing -- I mean, out of here it should be saying Q1

2   99.  So it's saying the most important model, including

3   6010, will support 4.5 which is RMON2 -- RMON2 will be

4   supported in -- in Q4 of '98, and then in the following

5   -- following quarter, it will support in all of the

6   models.

7               MR. KRAEUTLER:  Mr. Goodin, could you

8   please take that portion that is over Q4 '98 and enlarge

9   it?

10      Q.   (By Mr. Kraeutler)  Again, the date of this

11  document was October 26, 1998?

12      A.   Yes.

13      Q.   And -- and what -- what does it indicate to

14  you that NSP 4.5 has shown over Q4 '98?

15      A.   This says in Q4 '98 we'll be releasing three

16  things in the roadmap:  Two new probe model numbers

17  called ClearChannel and Multiport Fast Ethernet and a

18  new software release called NSP 4.5, which includes

19  RMON2 functionality.

20              THE COURT:  Counsel, approach the bench,

21  please.

22              MR. KRAEUTLER:  Yes.

23              (Bench conference.)

24              THE COURT:  How much more direct do you

25  have with this witness?

1                   MR. KRAEUTLER:  Just a few minutes.

2                   THE COURT:  Okay.  We need to -- the jury

3    needs a recess, but if you're a few minutes away, we'll

4    finish that.

5                   MR. KRAEUTLER:  Okay.  Thank you, Your

6    Honor.

7                   (Bench conference concluded.)

8                   THE COURT:  Let's proceed.

9        Q.   (By Mr. Kraeutler)  Mr. Singhal, you've

10   mentioned all these model numbers.  Would it be fair to

11   say that there had been some significant development

12   within the company between 1992, when the first RMON1

13   probe was introduced to the market, and 1998, when

14   the -- these new products were being introduced to the

15   market?

16       A.   Yeah.  I don't know -- if you mean by

17   significant like we had lot more engineers, we had

18   gotten some funding by that time, and so we had a much

19   bigger development effort than in '91.

20                  MR. KRAEUTLER:   Your Honor, I hope you

21   won't mind this clarification.

22       Q.   (By Mr. Kraeutler)  But when you pronounce

23   engineers, it sounds like -- almost like geniuses, and I

24   just want to make clear, you're just saying engineers?

25       A.   Software engineers.

1      Q.    Okay.  Thank you.

2            And can you please now look at Exhibit 94?

3            MR. KRAEUTLER:  Mr. Goodin, if you could

4  put up the first page.

5      Q.    (By Mr. Kraeutler)  Mr. Singhal, do you

6  recognize this document?

7      A.    Yes.

8      Q.    And what is it?

9      A.    It's a training material which we will do

10  before -- to -- to our sales team at the start of any

11  major release before it goes out to the customers.

12      Q.    What does AE stand for?

13      A.    AE stands for application sales engineers.

14      Q.    And were they part of your sales effort?

15      A.    Yes.  Every -- every sales team had one

16  salesperson and one sales engineer.

17      Q.    Let me direct your attention to Page 253652.

18  And what information is shown on this particular page?

19      A.    It's showing that -- that session tracking

20  feature is part of 4.5 release, NSP 4.5 release, and

21  supported application which use the session tracking

22  feature are TFTP, Passive FTP, Xwindows, and RPC.

23      Q.    And RPC is remote procedure call?

24      A.    Yeah, it's same as SunRPC.

25      Q.    And what did it mean that session tracking

1    allows the probe to automatically track applications

2    that use multiple ports?

3         A.    This means that we have implemented the

4    session -- special session tracking feature described

5    RMON2 and the protocol identified document in order for

6    us to currently identify complicated flows associated

7    with these four applications.

8                    MR. KRAEUTLER:    Your Honor, I have no

9    other questions at this time, and we'll pass the

10   witness.

11                   THE COURT:    All right.   Ladies and

12   gentlemen, before the Plaintiff cross-examines this

13   witness, we're going to take a short recess.   You may

14   simply close and leave your notebooks in your chairs.

15                   Don't discuss the case, and we'll be back

16   here shortly to continue.   The jury's excused for a

17   recess at this time.

18                   COURT SECURITY OFFICER:   All rise.

19                   (Jury out.)

20                   THE COURT:   The Court stands in recess.

21                   (Recess.)

22                   (Jury out.)

23                   COURT SECURITY OFFICER:   All rise.

24                   THE COURT:   Be seated, please.

25                   Are we ready for cross-examination,

1    Mr. Skiermont?

2                   MR. SKIERMONT:  Yes, Your Honor.

3                   THE COURT:  You may go to the podium.

4                   MR. SKIERMONT:  May we pass out some

5    binders, Your Honor?

6                   THE COURT:  Let's do that.

7                   Let me mention this while we're waiting

8    on the courtroom deputy to return.

9                   There seems to be an excessive amount of

10   whispering and moving around in the gallery.  I've

11   noticed that the jury hasn't turned their heads as being

12   disruptive at this point, but if it seems that way to me

13   it's probably higher than it should be.

14                  Let me just ask those of you in the

15   gallery to try to minimize any disruptions or whispering

16   or moving around except where absolutely necessary.

17                  All right.  Let's bring in the jury,

18   please, Mr. Elliott.

19                  (Jury in.)

20                  THE COURT:  Please be seated.

21                  All right.  The Defendant having passed

22   the witness, we'll proceed with Plaintiff's

23   cross-examination of the witness.

24                  You may proceed, Mr. Skiermont.

25                  MR. SKIERMONT:  Thank you, Your Honor.

1        <u>CROSS-EXAMINATION</u>

2    <u>BY MR. SKIERMONT:</u>

3        Q.   Mr. Singhal, you'll agree with me that RMON1

4    does not talk about the application level, it only

5    addresses the network level of the standard, correct?

6        A.   Except that it define new -- the packet

7    capture group implements the -- part of the

8    classification, which was there in protocol analyzer.

9    So it doesn't say that, but the packet capture group

10   requires you to decode things, and so -- so that's what

11   I was referencing to earlier.

12            MR. SKIERMONT:  Ms. Vogtman, can you put

13   up the -- not yet, but it's starting at 335.

14       Q.   (By Mr. Skiermont)  Mr. Singhal, you were

15   deposed by Packet Intelligence in this case, correct?

16       A.   Yes.

17       Q.   And that was in May of this year?

18       A.   I think so.

19       Q.   And when your -- when you were giving your

20   testimony by deposition, you were under oath, weren't

21   you?

22       A.   Yes.

23            MR. SKIERMONT:  Ms. Vogtman, can you

24   please put the clip up?

25       Q.   (By Mr. Skiermont)  At your deposition,

1  Mr. Singhal, you were posed a question:  But it's either

2  RMON1 or RMON2, right?

3  ANSWER:  It does make a difference because

4  RMON2 -- RMON1 doesn't talk about application level,

5  it's only network level, where RMON2 talks about that.

6  Were you asked that question, and did you give

7  that answer under oath?

8  A.  Yes, I think so, yeah.

9  Q.  Now, Mr. Singhal, you will also agree with me,

10  won't you, that the RMON standard covered organization

11  of packet information after that information was

12  collected at the network level?

13  A.  Could you repeat it, please?

14  Q.  Do you agree that the RMON standard covers

15  organization of packet information after that

16  information is collected, correct?

17  A.  Yes.

18  Q.  The RMON standard itself did not specify the

19  technique for collecting the data information, did it?

20  A.  No, it was very well understood by everyone

21  because everyone has products before RMON -- RMON1.

22  MR. SKIERMONT:  Ms. Vogtman, will you put

23  up the clip starting at 79?

24  Q.  (By Mr. Skiermont)  Mr. Singhal, at your

25  deposition where you were under oath, you were asked the

1   question:  So the RMON standard itself did not specify

2   the technique, correct?

3          ANSWER:  RMON standard assumed that you cannot

4   do any of the stuff without any DPI or DPC.

5          Were you asked that question, and did you give

6   that answer under oath?

7                MR. KRAEUTLER:  Objection.

8                THE COURT:  Just a minute.  What's the

9   objection, counsel?

10               MR. KRAEUTLER:  Improper impeachment.

11               THE COURT:  Overruled.

12               Answer the question, Mr. Singhal.

13      A.   Can you put it on the screen?  Somehow it

14   disappeared on my screen.

15      Q.   (By Mr. Skiermont)  Certainly.

16               MR. SKIERMONT:  Ms. Vogtman, can you help

17   us?  Same clip, starting at 79 -- 79 -- Page 79,

18   Column -- Line 6 to 9.

19      A.   Yes.  And it's essentially the answer just --

20   I just gave right now, and understood -- it

21   was understood by everyone.

22               THE COURT:  Just a minute, Mr. Singhal.

23               THE WITNESS:  Sorry.

24               THE COURT:  The question is -- restate

25   your question, Mr. Skiermont.

1    Q.    (By Mr. Skiermont)   Mr. Singhal, you were

2  asked at your deposition when you were under oath:

3         QUESTION:   So the RMON standard itself did not

4  specify the technique, correct?

5         ANSWER:   RMON standard assumed that you cannot

6  do any of the stuff without any DPI or DPC.

7         Did you -- were you asked that question, and

8  did you give that answer under oath?

9    A.    Yes.

10    Q.    And, in fact, on direct examination, you

11  actually corrected your lawyer on this point during

12  direct, didn't you, because he had suggested that it was

13  a technique.   And you corrected him on direct and said

14  it did not specify the technique, right?

15    A.    I don't remember that interaction.

16    Q.    RMON2 is similar to the first RMON in that it

17  tells you how to present statistics after you collect

18  information, correct?

19    A.    No.   What RMON1 -- you can't do any

20  information -- RMON1 and RMON2 collect different level

21  of information.   They do both after collection.   You

22  can't -- you can count things without collecting.

23    Q.    And so is your answer to my question yes?

24    A.    Yes, but for both RMON1 and RMON2.

25              THE COURT:   All right.   Let me just stop

1    a minute.

2              Counsel, if you believe the witness is

3    nonresponsive, you don't need to ask him if that's a yes

4    or no.  You need to tell me or raise it with the Court,

5    and I'll deal with any nonresponsiveness.

6              And, Mr. Singhal, you need to limit your

7    answers to the questions asked.  Your Counsel is going

8    to have another opportunity to get back up and ask you

9    any follow-up questions he thinks are appropriate.

10             Therefore, you are to limit your answers

11   to the questions asked, all right?

12             THE WITNESS:  Yes, Your Honor.

13             THE COURT:   Okay.  Let's proceed on that

14   basis.

15             MR. SKIERMONT:  Thank you, Your Honor.

16        Q.   (By Mr. Skiermont)  Mr. Singhal, RMON2, like

17   RMON, the original, are similar in that both tell you

18   how to present statistics after you collect information,

19   correct?

20        A.   Yes.

21        Q.   And on direct examination, Mr. Singhal, I

22   believe I heard you say that during the IETF RMON

23   Working Group, you testified on direct there was no

24   exchange of information about implementation, correct?

25        A.   Yes.

1    Q.   And you also said on direct examination under

2    oath different companies implemented it in their own

3    way, correct?

4    A.   Yes.

5    Q.   Mr. Singhal, members of the RMON Working

6    Groups did not have to disclose technology to the group

7    that they were working on if they did not want their

8    work to be part of the standard, correct?

9    A.   No.   It was understood that if you want -- if

10   you want to contribute your stuff, then it cannot be

11   proprietary.   So either you don't provide any

12   information, or it becomes public information.

13            MR. SKIERMONT:   Ms. Vogtman, can you put

14   up the clip starting at 170?

15   Q.   (By Mr. Skiermont)  Mr. Singhal, at your

16   deposition where you were under oath, you were asked

17   question at Line 13 -- QUESTION:   What if they don't

18   want to make it part of the standard?

19            ANSWER:   Then they won't disclose it.

20            QUESTION:   They don't have to disclose it?

21            ANSWER:   No, they don't have to.

22            Were you asked those questions, and did you

23   give those answers under oath?

24   A.   Yes.

25   Q.   You personally -- your personal involvement

1  and role in the RMON Working Group ended in 1997,

2  correct?

3      A.   But somebody else was representing NetScout

4  after that.

5              MR. SKIERMONT:   Your Honor, could I

6  direct you to -- ask your help to have the witness

7  answer --

8              THE COURT:   Are you objecting that the

9  witness is nonresponsive?

10             MR. SKIERMONT:   I'd move to strike it as

11 nonresponsive.

12             THE COURT:   I'll sustain the objection

13 that the answer is nonresponsive.

14             The question, Mr. Singhal, was:   When

15 your personal involvement ended, was that 1997?

16             Your answer was:   Somebody else took over

17 after I quit.

18             So you didn't really answer the question.

19             You need to answer the question:   Did

20 your involvement with the RMON Working Group end in

21 approximately 1997?   Did it or did it not?

22     A.   Yes.

23             THE COURT:   Okay.   Try to limit your

24 answers to the questions asked.

25             THE WITNESS:   Thank you, sir.

1          THE COURT:  Let's proceed, Counsel.

2          MR. SKIERMONT:  Thank you, Your Honor.

3     Q.   (By Mr. Skiermont)  There were other

4  individuals from NetScout who were involved -- who were

5  involved beyond that point, correct?

6     A.   Yes.

7     Q.   And those individuals included a Mr. Warth,

8  W-a-r-t-h?

9     A.   Yes.

10    Q.   And it included a Mr. Lester D'Souza?

11    A.   Yes.

12    Q.   And it included a Mr. Massad, M-a-s-s-a-d,

13  correct?

14    A.   Yes.

15    Q.   All three of those individuals were NetScout

16  employees on the RMON Working Group after you left in

17  1997, correct?

18    A.   Yes.

19    Q.   On direct, you testified that NetScout

20  contributed its proprietary technology to the RMON

21  Working Group, correct?

22    A.   Yes.

23    Q.   And so, Mr. Singhal, if the standard evolved

24  or departed or changed in some way from what it was --

25  from the technology that you had contributed to the

1  Working Group, NetScout would be the biggest loser,

2  right?

3       A.   No, because we'll be the net gainer.

4       Q.   How is that?

5       A.   Because, as I mentioned in my direct, that we

6  were in a small fish in a small pond.  And we didn't

7  mind being a small fish in a bigger pond.  So the RMON

8  will increase the market size.  All boats will rise.

9  And that will include NetScout.  So we made all the

10 players in the RMON community make that -- had to make

11 that judgment.  Do I want to be part of one way of

12 growing or the other way of growing?  And we picked the

13 part, and it seemed to have worked for us.

14      Q.   You -- NetScout contributed -- contributed its

15 proprietary technology to the working group, right?

16      A.   Yes.

17      Q.   And then NetScout used the RMON1 standard as a

18 blueprint for the 6010 Probe, correct?

19      A.   Yes.

20      Q.   Was the RMON Working Group disbanded when you

21 stopped in 1997?

22      A.   No.  In fact, it expanded, and a few people

23 left and a few new people joined, but basically

24 continued the RMON2 work.

25              MR. SKIERMONT:  Ms. Vogtman, can you put

1    up the clip starting at 188?  Actually, take it down.  I

2    need to -- I'm going to come back.  I'm sorry.  Thank

3    you.

4         Q.   (By Mr. Skiermont)  Mr. Singhal, the

5    Mr. Waldbusser who was the author of some of the

6    documents we saw on direct, do you know him?

7         A.   Yes.

8         Q.   And, in fact, NetScout has hired

9    Mr. Waldbusser as a technical consultant in this case,

10   correct?

11        A.   Yes.

12        Q.   And the way that came about is that

13   Mr. Waldbusser contacted NetScout after Packet

14   Intelligence filed this lawsuit, right?

15        A.   I'm not sure how it happened.

16        Q.   NetScout did not contact Mr. Waldbusser, did

17   he?

18        A.   Like I said, I don't know how this came about.

19        Q.   And is -- and are you aware that NetScout is

20   compensating Mr. Waldbusser for his technical consulting

21   in this case at $450 an hour?

22        A.   No.

23        Q.   You didn't -- you did not know that?

24        A.   No, our general counsel handles that.

25        Q.   So did you know that when we took his

1 deposition a few months ago, that he had spent by that

2 time 500 hours working on the case?

3       A.   No.

4       Q.   Did you know that Cisco retained

5 Mr. Waldbusser in -- during the litigation that resulted

6 in Cisco licensing the Packet Intelligence patents?

7       A.   I vaguely heard about it, but I was not sure

8 whether he was officially involved with that.

9       Q.   Did you ask him?

10       A.   No.

11       Q.   Mr. Singhal, have you -- you have not read the

12 patents that are at issue -- the three patents that are

13 at issue in this trial, have you?

14       A.   I have not read the patents from cover to

15 cover, but I have -- I've read it at a high level and

16 enough to have a good discussion with my Counsel.

17       Q.   You just read a summary or an abstract of one

18 of the patents; is that right?

19       A.   I don't remember exactly.

20       Q.   You don't remember one way or the other?

21       A.   Yeah, I don't remember.

22       Q.   You may have read the patent -- the three

23 patents in this case, you may not have read them?

24       A.   I don't remember how many of them I read.   And

25 -- but I know the general idea about -- it's about

1    classification and monitoring of networks.

2         Q.    The fact is, you haven't -- you haven't read

3    one of them cover to cover, right?

4         A.    Yes.

5              MR. SKIERMONT:  I don't have anything

6    further, Your Honor.

7              THE COURT:  You pass the witness?

8              MR. SKIERMONT:  Pass the witness.

9              THE COURT:  Redirect.

10                   REDIRECT EXAMINATION

11   BY MR. KRAEUTLER:

12        Q.    Mr. Singhal, did the LAN Vista probe include a

13   packet acquisition device coupled to a connection point

14   on the network where it could receive packets passing

15   through the network?

16        A.    Yes.

17        Q.    Did the RMON1 device, the Model 6010, include

18   a packet acquisition device coupled to a connection

19   point where it could receive packets passing through the

20   network?

21              MR. SKIERMONT:  I'm going to object, Your

22   Honor, and ask for a sidebar.

23              THE COURT:  Approach the bench.

24              (Bench conference.)

25              MR. SKIERMONT:  This is similar to

1  this -- this is expert testimony again.  He's -- he's

2  reading -- that was the preamble of one of the claims.

3  And he's -- what I -- what I'm hearing is that he's

4  going to walk Mr. Singhal through -- through each

5  element of the claim and ask him if those words are

6  in -- contained in these NetScout products.  That's

7  not -- he's not an expert, it's not a disclosed opinion,

8  and it's improper.

9           MR. KRAEUTLER:  It's not the purpose,

10 Your Honor.  On cross-examination, it was suggested that

11 the standard did not provide how to acquire packets from

12 a network.  That technology hasn't changed since the

13 1980s.  That's the purpose of this examination.

14          MR. SKIERMONT:  Respectfully, the -- the

15 cross point was not that specific.  It was about

16 implementation, not about capturing packets at a --

17 at --

18          THE COURT:  All right.  At this point,

19 I'm going to overrule the objection.  He can certainly

20 answer some basic questions about how things work and

21 how they don't work having been a part of the RMON

22 Working Group.  But he is not an expert.  He's not going

23 to offer opinion testimony.  And if it gets beyond the

24 level I've described, I'll reconsider the same

25 objection.

```
 1                    MR. KRAEUTLER:  Thank you, Your Honor.

 2                    MR. SKIERMONT:  Thank you, Your Honor.

 3                    THE COURT:  Also, while I have you

 4  gentlemen up here, I'm happy to talk with you at the

 5  bench, but every time there's an objection we don't need

 6  to beat a pathway to the bench or wear a hole in the

 7  carpet.

 8                    MR. KRAEUTLER:  Thank you, Judge.

 9                    THE COURT:  You can just stand up and

10  tell me what it is.

11                    MR. SKIERMONT:  Thank you, Your Honor.

12                    THE COURT:  Let's proceed.

13                    (Bench conference concluded.)

14                    THE COURT:  Let's proceed.

15       Q.   (By Mr. Kraeutler)  Mr. Singhal, did the RMON1

16  Model 6010 include a packet acquisition device coupled

17  to a connection point where it could receive packets

18  passing through the network?

19       A.   Yes.  And, in fact, it was exactly the same as

20  in LAN Vista.

21       Q.   And -- and when the Model 6010 was made

22  compliant with RMON2 in the form of the 4.5 software,

23  did that device contain the same packet acquisition

24  device connected to the network?

25       A.   Yes.
```

1      Q.    Has that technology changed significantly

2    since the 1980s?

3      A.    It has changed in terms of speed, and that's

4    called the LAN acquisition -- LAN speeds have changed

5    from 10 megabits to hundred mega -- hundred gigabits

6    Ethernet, so that thing has evolved, and different

7    hardware is required to do the acquisition, but basic

8    idea has not changed dramatically.

9                    MR. KRAEUTLER:  Thank you.  Pass the

10   witness.

11                   MR. SKIERMONT:  Nothing further, Your

12   Honor.

13                   THE COURT:  No additional

14   cross-examination?

15                   MR. SKIERMONT:  No.

16                   THE COURT:  All right.  Mr. Singhal, you

17   may step down.

18                   THE WITNESS:  Thank you, Your Honor.

19                   THE COURT:  Counsel, is there a reason

20   this witness should not be excused?

21                   MR. KRAEUTLER:  No, Your Honor -- oh, I'm

22   sorry.

23                   MR. SKIERMONT:  No, Your Honor.

24                   THE COURT:  Mr. Singhal, you're excused,

25   which means you're welcome to stay with us, you're also

1   free to leave.

2                   THE WITNESS:  Thank you.

3                   THE COURT:  Call your next witness,

4   Defendants.

5                   MS. SMITH:  Your Honor, I believe I

6   failed to ask that Ms. Broughton also be excused.  May

7   she be excused?

8                   THE COURT:  Is there objection?

9                   MR. SKIERMONT:  No objection, Your Honor.

10                  THE COURT:  Ms. Broughton is also

11  excused.

12                  MS. SMITH:  Thank you, Your Honor.

13                  NetScout's next witness is Mr. Rajeev

14  Nadkarni.

15                  THE COURT:  All right.  If you'll come

16  forward, sir.  Have you previously been sworn?

17                  THE WITNESS:  No.

18                  THE COURT:  Please come forward and be

19  sworn.

20                  (Witness sworn.)

21                  THE COURT:  Please come around and have a

22  seat here at the witness stand.

23                  All right.  Counsel, you may proceed with

24  your direct examination.

25        RAJEEV NADKARNI, DEFENDANTS' WITNESS, SWORN

1              DIRECT EXAMINATION

2    BY MR. HSU-HOFFMAN:

3         Q.   Good afternoon, Mr. Nadkarni.

4         A.   Good afternoon.

5         Q.   You are the area vice president of engineering

6    at NetScout?

7         A.   Yes, yeah, I'm the vice president of -- at

8    NetScout right now.

9                   THE COURT:   Just a minute.

10                  Let's adjust the microphone.  Get it a

11   little closer.

12        Q.   (By Mr. Hsu-Hoffman)  Can you tell us where

13   you grew up?

14        A.   I grew up in Mumbai.  It used to be Bombay.

15        Q.   And are you a U.S. citizen?

16        A.   Yes, I've been a U.S. citizen since 2001.

17        Q.   And if you would, please give us a brief

18   overview of your educational background?

19        A.   I did my Bachelor's in engineering,

20   electronics and communication engineering in India in

21   Meghalaya University and then I come here and got my

22   Master's in computer science from University of

23   Massachusetts Lowell.

24                  THE REPORTER:   I'm sorry?

25                  THE WITNESS:   University of Massachusetts

1  in Lowell.

2      Q.   (By Mr. Hsu-Hoffman)   Did your Master's work

3  focus on any particular area?

4      A.   Yes, I did my major in computer networking.

5      Q.   And when did you join NetScout?

6      A.   I joined NetScout in 1989.

7      Q.   So you've been with the company for about 28

8  years?

9      A.   That is correct.  I've been with NetScout for

10  last 28 years now.

11      Q.   Was it called NetScout at the time you joined?

12      A.   No, but back then it was called Frontier

13  Software.  And then the company changed its name to

14  become NetScout in 1997.

15      Q.   When you joined NetScout, then Frontier in

16  '89, what was your position?

17      A.   I joined as a software engineer back then.

18  And then, you know, in 1998, I was promoted to become

19  engineering manager.

20          After that in 2001, I was promoted to the

21  director of engineering.

22          And in 2014, I'm now the area vice president.

23      Q.   Was -- as a software engineer starting off at

24  NetScout, what were your job responsibilities?

25      A.   I used to handle both the hardware and the

1  software.   The hardware which goes into the probe.   We

2  called it -- we called it as a probe then, and this is

3  the device which actually sits on the network and

4  monitors the network traffic.   So I used to -- I used to

5  develop the software as part of the hardware.

6        Q.   And when -- I believe you mentioned you were

7  eventually promoted to engineering manager -- manager;

8  is that right?

9        A.   That's correct.

10        Q.   And how did your job responsibilities change

11  when you were promoted to an engineering manager?

12        A.   So as the company was growing, I was promoted

13  to become the manager, and I had a team of about five

14  engineers working with me.

15        Q.   And were you working on anything in

16  particular?

17        A.   We used to do the same job, which is

18  developing the software for our NetScout probes.

19        Q.   How long -- what was the time period in which

20  you were an engineering manager at NetScout?

21        A.   From 1998 until 2001, I was engineering

22  manager.

23        Q.   Did you work on probes for NetScout throughout

24  the 1990s?

25        A.   That's correct, yes.

1      Q.   And were you familiar in the 1990s with the

2  probes that NetScout was selling to customers?

3      A.   Absolutely.

4      Q.   I'd like to introduce -- it's the probe there,

5  DX-0189.

6                MR. HSU-HOFFMAN:  If I could --

7  permission to approach and employ the assistance of the

8  --

9                THE COURT:  You have a tangible exhibit

10  to hand up to the witness?

11                MR. HSU-HOFFMAN:  It's sitting right

12  there, Your Honor.

13                THE COURT:  All right.

14      A.   Yes, I'm familiar with this.

15      Q.   (By Mr. Hsu-Hoffman)  Could you explain what

16  it is?

17      A.   This was the first of our NetScout probes.

18  It's a model -- Ethernet Model 6010, which actually

19  monitors the Internet traffic.

20      Q.   And is this -- this particular device, is this

21  something you found recently?

22      A.   That's correct, yes.

23      Q.   Where did you locate it?

24      A.   We have in NetScout a lot of people,

25  colleagues who are long tenure.  And one of my

1  colleagues who works with me, he had it in his queue.

2       Q.    Now, is this 6010 Probe, is this a probe that

3  you wrote software for?

4       A.    That's correct, yes.

5       Q.    Do you know when NetScout started selling the

6  6010 Probe?

7       A.    The first -- this particular model was the

8  first one which was sold in 1992.

9       Q.    And do you know if NetScout publicly offered

10 this 6010 Probe for sale in 1992?

11      A.    Yes, it -- it was featured in trade shows, as

12 well as magazines -- trade magazines, as well as we

13 advertised.

14      Q.    What do you mean it was featured at trade

15 shows?

16      A.    We used to carry them and showcase them in

17 trade shows, like Interop was one of the big ones.

18      Q.    Do you recall --

19      A.    Interop -- Interop.

20      Q.    And where was Interop usually held?

21      A.    Interop in those days was held at Las Vegas.

22      Q.    And do you recall the time period in which you

23 were attending Interop shows with the 6010 Probe?

24      A.    Yes.  I was attending Interop shows in '93,

25 '95, also in '98.

1    Q.   So in the early 1990s, were customers -- fair

2  to say that customers were using the 6010 Probe?

3    A.   Oh, absolutely.

4    Q.   And were customers required to keep their use

5  of 6010 probes confidential?

6    A.   Oh, no, actually we wanted them to speak about

7  it so we could sell more.

8    Q.   Now, did the 6010 Probe, did that comply with

9  any RMON standards?

10    A.   So when we started with this probe, first it

11  complied with the RMON1 standard.

12    Q.   And did NetScout ever introduce any RMON2

13  functionality for the 6010 Probe?

14    A.   Yes.  Actually, in 1997, when the RMON2

15  standard came about, we developed the software for it

16  which in '98 was released as a complement to RMON2, and

17  that's what was -- I was offered on this probe.

18    Q.   How did NetScout introduce RMON2 functionality

19  for the 6010 Probe?

20    A.   All of our probes are upgradable in the field

21  which is they can actually download the software from

22  our website and put it on to this probe, upgrade them in

23  the field using what's called TFTP.  And with that, they

24  can get the new features on the probe.

25    Q.   Did NetScout routinely update and release new

1  versions of software for 6010 probes?

2       A.   Oh, yes, ever since it was released.

3       Q.   Are you familiar with the TrackSessions

4  functionality defined in the RMON2 standard?

5       A.   Yes, I am.

6       Q.   Do you know if NetScout ever released a

7  version of software for the 6010 Probe that implemented

8  RMON2 TrackSessions functionality?

9       A.   Yes.   The Release 4.5 which is -- which was

10  done in 1998 has the full RMON2 functionality, which

11  offered in that.

12            THE COURT:   Let me -- let me interrupt

13  just a minute.   Mr. Nadkarni, you have a pretty good

14  accent.   If you could slow down and speak slower, it

15  would help, I think, both the Court and the jury follow

16  and understand your testimony better.

17            THE WITNESS:   Sure.

18            THE COURT:   Thank you very much.

19  Continue, Counsel.

20       Q.   (By Mr. Hsu-Hoffman)   Was there a version of

21  software in which RMON2 TrackSessions' functionality was

22  introduced for the 6010 Probe?

23       A.   The Release 4.5, which was offered in 1998,

24  has the full feature of RMON2.

25       Q.   Do you recall when in 1998 the Software

1  Version 4.5 was released to customers?

2      A.   It was in October of 1998.

3      Q.   And do you recall the ways in which Software

4  Version 4.5 would have been released to customers?

5      A.   We used to offer them by putting it onto our

6  FTP servers and then sending out the mail to all the

7  customers and then they would download it from our FTP

8  site.

9      Q.   Would a customer who had bought a 6010 Probe

10 in 1992 upgrade that probe with Software Version 4.5?

11     A.   Yes.   Every one of our probes was upgradeable

12 in the field, much like, you know -- you have your cell

13 phones which can be updated.   Similarly, we used to be

14 able to upgrade them.

15     Q.   And once a customer loaded 4.5 onto his or her

16 6010 Probe, would that probe then have the RMON2

17 TrackSessions functionality?

18     A.   Yes.   Once you upgrade them, they will get the

19 new features.

20              MR. HSU-HOFFMAN:   I'd like to introduce

21 DX-59, Mr. Goodin, if we can have that on the screen.

22     Q.   (By Mr. Hsu-Hoffman)   Mr. Nadkarni, do you

23 recognize this?

24     A.   Yes.   This is the NetScout Probe Agent

25 Administrator Guide.

1            MR. HSU-HOFFMAN:  If we could go to the

2  page ending in 164.  If we could blow up the top portion

3  of the right-hand page.

4        Q.   (By Mr. Hsu-Hoffman)  Now, Mr. Nadkarni, can

5  you tell us if this manual pertains to a particular

6  version of software?

7        A.   Yeah.  It -- it is Release Version 4.5 which

8  was released in October of 1998.

9        Q.   Now, was this a -- this was a version of

10  software that you had worked on?

11        A.   That's correct.

12        Q.   And did your -- did you or your team make any

13  contributions to the administrator guide that we're

14  seeing on the screen?

15        A.   Yes, we did.  Because we used to always fill

16  in the information through our documentation team who --

17  who wrote these guides, and they would then, you know,

18  put it into the administrator guide or the user's guide.

19        Q.   Does this administrator guide pertain to the

20  6010 Probe?

21        A.   It put into all the probes we offered in that

22  time.  Between '92 to '98 we had many more probes, not

23  just the 6010, so this administrator guide was common to

24  all the probes.

25            MR. HSU-HOFFMAN:  Mr. Goodin, if we could

1  put up the page that ends in 217, please?  And so we can

2  see a particular course, and could you highlight the

3  bottom right-hand corner of the last paragraph, please?

4      Q.   (By Mr. Hsu-Hoffman)  Now, Mr. Nadkarni, are

5  you familiar with this reference to TrackSessions shown

6  here on the screen?

7      A.   Yes, I am familiar.

8      Q.   Can you explain what it's referring to?

9      A.   TrackSessions is one of the features within

10 the RMON2 standard, and this particular thing refers

11 to -- refers to the TrackSessions feature we did in

12 RMON2 that was implemented on the probes.

13     Q.   Now, did you or your team contribute to the

14 description of TrackSessions as found in this manual?

15     A.   No.  The description comes from the RMON2

16 standard actually.

17     Q.   The last sentence says:  All NetScout probes

18 have TrackSessions capability.

19     A.   That is correct.  So all our probes which has

20 now the 4.5 feature of the -- of the release will get

21 this track -- TrackSessions feature.

22             MR. HSU-HOFFMAN:  Your Honor, we have a

23 physical I'd like to refer to.  This would be DX-377.

24             Permission to approach the witness?

25             THE COURT:  You may approach the witness.

1    Q.   (By Mr. Hsu-Hoffman)   Now, Mr. Nadkarni, do

2 you recognize the manual that's just been handed to you?

3    A.   Yes, I do.

4    Q.   Is that a physical copy of the manual that

5 we've been looking at on the screen?

6    A.   That is correct.

7    Q.   And this is the -- the manual for the 4.5

8 software?

9    A.   That is correct.

10    Q.   You're welcome to set that aside for a minute.

11 But we've been talking about 4.5 software.  Did you find

12 a copy of the 4.5 software?

13    A.   Yes.

14    Q.   And can you explain how you located a copy of

15 the 4.5 software?

16    A.   Actually, we located the 4.5.3 version which

17 is a batch release on top of 4.5.  The reason being, we

18 had in those days what's called -- you know, on our

19 server we used to maintain the software.  And that

20 particular server died in the early 2000s.  However, in

21 1999, we went to -- from the CCR, the CVS version, or

22 the ClearCase version which is now the version which we

23 use.  And this is the source control system which we use

24 now, and that has with the -- with the 4.5.3, and that's

25 the first copy we have.

1              MR. HSU-HOFFMAN:  I'd like to introduce

2    DX-310 which is a native production of source code

3    files.  Mr. Goodin, if you could pull up the file folder

4    for DX-310.

5              And if we can please click on the folder

6    DX-0310 so we can see what's in there.

7         Q.   (By Mr. Hsu-Hoffman)  Now, Mr. Nadkarni, do

8    you recognize what's shown on the screen here?

9         A.   That's correct.  It's actually director

10   structure which has -- which has -- we call it NS agent,

11   this is the code, which is the source code we maintain.

12        Q.   And what would we find in the NS agent folder?

13        A.   All the directories which contribute towards

14   the source files are the source code which we bring to

15   the software.

16             MR. HSU-HOFFMAN:  Mr. Goodin, if you can

17   open NS agent.

18        Q.   (By Mr. Hsu-Hoffman)  Can you explain what

19   we're seeing on the screen here?

20        A.   So this is the directory structure which has

21   all the directories for different components within --

22   which goes on making that release.

23             THE COURT:  Let me ask you to slow down

24   again, please, sir.

25             THE WITNESS:  Sure.

1    Q.   (By Mr. Hsu-Hoffman)  Now, were these the

2 source code files that you had found in the ClearCase

3 system?

4    A.   Yes.

5    Q.   Could you explain what ClearCase is?

6    A.   ClearCase is a software repository system,

7 it's basically -- it maintains all the track of all the

8 software which you can check in and check out.  So every

9 developer when they, you know, write a code it's

10 checking into what is called the ClearCase.

11         And then if you want to add anything code --

12 more code then we check it.  And make this trail of all

13 the things we check in and check out similar to your

14 bank transactions.  So if you have your passbook it

15 maintains like your credit entries and debit entries.

16         So similarly in -- in ClearCase, it maintains

17 all the bank versions of all the transactions of the

18 files which are checked in and checked out.  So this way

19 we can actually track it to exactly the files which are

20 going towards a release.

21    Q.   So you said you found Version 4.5.3 in

22 ClearCase?

23    A.   That is correct.

24    Q.   And what did Version 4.5.3 look like when you

25 took it out of ClearCase?

1      A.    This is the directory structure which actually

2   has all the source files labeled with 4.5.3.

3      Q.    You're referring to what's been pulled up here

4   in DX-310?

5      A.    That is correct.

6      Q.    Now, can you explain does software Version

7   4.5.3 relate to software Version 4.5?

8      A.    Yes.  It was always our practice that how we

9   made the releases, Version 4, which is a major version,

10  the .5 is a minor version, and all features we had tied

11  towards a major or minor version; however, the third

12  digit was always a batch version, so whenever you say

13  4.5.3, the .3 means it's a batch release.

14     Q.    And what was NetScout's practice in the '89 to

15  '99 time frame with respect to batch releases of

16  software?

17     A.    For all the releases which are major releases,

18  or even minor releases that go -- go to customer, every

19  other month we used to release batch releases with all

20  the bug fixes that we had found in the field for

21  customers so if the customers report any issues, we used

22  to fix them and send them out as batches.

23     Q.    Was it Net -- was if NetScout's practice to

24  use patch versions such as 4.5.3 to introduce any major

25  functional changes in the software?

1    A.    No, if there were any major functional

2 changes, then it will change the release version.

3    Q.    And I think you've explained it, but just so

4 everyone's clear, could you explain what a patch version

5 of software is?

6    A.    Okay.  So when we release a 4.5, okay, and

7 then we send it out, let's say a customer -- we have a

8 lot of customers who may say that, okay, this feature is

9 not working as exactly it's supposed to, and they report

10 some issue with it.  So we have with them look at it,

11 and we fix the issue.  Once we fix the issue, we release

12 what is called a patch release to them.  And that's what

13 is the patch version which is a 4.5.1, or 4.5.2, or

14 4.5.3, so .3 will be a third patch release.

15    Q.    So a patch fixes a small problem, is that fair

16 to say?

17    A.    That is correct, yes.

18    Q.    Would Version 4.5.3 change the way

19 TrackSessions had been implemented in 4.5?

20    A.    No, it won't change the actual feature or

21 functionality for it.  It may fix some issues which may

22 be for TrackSessions or for some other feature that, you

23 know, we had introduced in that particular piece.

24         MR. HSU-HOFFMAN:  I'd like to introduce

25 DX-61, Mr. Goodin, if we could have that on the screen,

1    please.

2        Q.    (By Mr. Hsu-Hoffman)   Now, Mr. Nadkarni, do

3    you recognize what I've marked as DX-61?

4        A.    Yes.

5              MR. HSU-HOFFMAN:   If you could zoom in on

6    just the top half of the -- of the page.

7              Thank you.

8        Q.    (By Mr. Hsu-Hoffman)   Could you identify this

9    document for us?

10       A.    This is one of the source code files, it's a

11   header file we call it in our code.   Basically, all the

12   code is written in C language, and it has source file

13   and a header file.

14             The header file is used for all the data

15   structures or the, you know, variables which are used

16   within the code.   So this particular one is for

17   TrackSessions, this header file.

18       Q.    And is this referring to RMON2 TrackSessions's

19   functionality?

20       A.    Yes, that's correct.

21       Q.    So looking at this source code module, does

22   this tell you that Version 4.5.3 of the source code

23   implemented RMON2 TrackSessions's functionality?

24       A.    This was introduced originally in 4.5 and

25   4.5.3 actually was just a patch on top of that.

1    Q.   Do you know if the source code for Version

2 4.5.3 was ever compiled into a format that could be

3 installed on a 6010 probe?

4    A.   Yes, it does.

5    Q.   How do you know this?

6    A.   Because we actually give a label in ClearCase

7 whenever we release it to the customers so we can

8 backtrack it to issues which are found in the field.  So

9 when we give a label, we know this particular version

10 has gone to the customer.

11    Q.   And what information is included on the label?

12    A.   The label has the -- all the files that are

13 associated with that particular label.  And also, it

14 tells me the date on which this release was made.

15    Q.   Do you -- the data on which the source code is

16 made, what is -- what is that referring to?

17    A.   For this particular file?  Or you're talking

18 about for 4.5.3?

19    Q.   Let's talk about with respect to this

20 particular version, 4.5.3.

21    A.   So 4. -- 4.5.3 release has a label which was

22 dated to be March 15, 1999, which is when this label was

23 put, and that's the time when this release was made.

24    Q.   Let's --

25                MR. HSU-HOFFMAN:  If we could, Mr.

1  Goodin, could we zoom in on the file name at the top

2  here on DX-61.

3      Q.   (By Mr. Hsu-Hoffman)  There's a reference to

4  build number, what is that?

5      A.   That's the build number which is pertaining --

6  which is labeled to this particular file.  So this file

7  also was part of that 4.5.3 release.

8      Q.   And does this have a build number of 101?

9      A.   That is correct.

10      Q.   What, if anything, does build No. 101 tell us?

11      A.   So it was our engineering practice all along,

12  ever since -- and we follow it today as well.  Well,

13  build numbers from zero to hundred were also engineering

14  briefs, and they -- they were maintained for us to test

15  out the software.  Once the software is tested and about

16  to be released we will give them a build number which is

17  101 and above.

18      Q.   Was it your -- NetScout's practice to assign

19  build numbers of 100 or higher to software versions that

20  would be released to customers?

21      A.   That is correct.  It was always the case.

22      Q.   That would have been true in the 1998 to '99

23  time frame?

24      A.   Yes.

25      Q.   You mentioned there was a date that you found

1   in the label.  Can you explain what the date was that

2   you found?

3       A.    The date refers to the actual release when it

4   was done, and that date is 15th of March 1999.

5       Q.    And what does the date of March 15th, 1999

6   signify?

7       A.    That's the date on which this particular whole

8   package was built and created for the release to the

9   customers.

10      Q.    Now, by creation, what do you mean "by

11  creation"?

12      A.    So we compiled this source code into -- it

13  compiles into what is called the machine language that

14  is the image that is put on to these probes.  So once we

15  make that image it's downloaded into these probes by the

16  customers.  And now when they -- you know, they get that

17  probe, it gets that new version.

18      Q.    Now, is the software released as -- to

19  customers as soon as it was created?

20      A.    It's within a week that there would be

21  located.

22      Q.    Was it NetScout's practice in the 1998 to '99

23  time frame to release software within seven days after

24  its date of creation?

25      A.    It's always been the practice for us all

1 throughout, yes.

2      Q.    So in accordance with that practice, can you

3 tell us when Software Version 4.5.3, Build 101, would

4 have been released to customers?

5      A.    It would have been released by March 22nd,

6 latest.

7      Q.    And can you tell us how this software version

8 would have been released on March -- by March 22nd,

9 1999?

10      A.    So once the package is created by us, it's

11 actually put on to our -- what's called FTP servers, and

12 FTP servers are like web servers where customers can

13 come and download software and then put it onto the

14 hardware device that -- that's used.

15      Q.    Do you recall there being any delays

16 associated with the release of Software Version 4.5.3,

17 Build 101?

18      A.    Not that I recall.

19                MR. HSU-HOFFMAN:  I pass the witness.

20                THE COURT:  All right.

21                Cross-examination.

22                MR. HARTSELL:  We have no questions for

23 this witness, Your Honor.

24                THE COURT:  All right.  Then you may step

25 down, Mr. Nadkarni.

```
 1                    THE WITNESS:  Thank you.

 2                    THE COURT:  Defendants, call your next

 3  witness.

 4                    MS. SMITH:   Your Honor, NetScout calls

 5  Mr. Steven Waldbusser.

 6                    THE COURT:  Mr. Waldbusser, have you been

 7  sworn, sir?

 8                    THE WITNESS:   Yes, I have, sir.

 9                    THE COURT:  Please come have a seat at

10  the witness stand.

11                    Mr. Lyons, you may proceed with your

12  direct when you're ready.

13                    MR. LYONS:  Thank you, Your Honor.

14          STEVEN WALDBUSSER, DEFENDANTS' WITNESS,

15                     PREVIOUSLY SWORN

16                     DIRECT EXAMINATION

17  BY MR. LYONS:

18      Q.   And good afternoon, Mr. Waldbusser.

19      A.   Good afternoon.

20      Q.   Can you please introduce yourself to the jury?

21      A.   Yes.  My name is Steve Waldbusser.

22      Q.   And did you prepare anything to assist you in

23  your presentation today?

24      A.   Yes, I prepared demonstratives to -- for my

25  presentation today.
```

1    MR. LYONS:  Could we have those on the

2  screen, please?

3    Q.   (By Mr. Lyons)  Mr. Waldbusser, could you --

4    MR. LYONS:  Why don't we advance.

5    Q.   (By Mr. Lyons)  Could you please describe your

6  education and -- and your professional history for the

7  jury?

8    A.   Sure.  When I graduated high school, I went to

9  Carnegie-Mellon University in Pittsburgh, Pennsylvania.

10  It was one of the top research and engineering colleges

11  in the United States, in particular in the area of

12  computer science.  I majored in computer engineering.

13  This is a blend of computer science and electrical

14  engineering.

15    Q.   And did you work at all while you were a

16  student at Carnegie-Mellon?

17    A.   Yeah, I had -- I had had a lot of coursework

18  in networking in -- in some of these courses, and I

19  really enjoyed it.  And so I started working part-time

20  at a job with network -- with a networking IT group.

21  And ultimately, that -- I guess I was doing a good job,

22  and they offered me a full-time job as a network

23  architect as part of that group.

24    Now, a network architect is somebody who --

25  well, my job was to help design and -- and a very large

1 network which meant choosing equipment from the network

2 companies who sold equipment like Cisco and

3 Hewlett-Packard and Bay Networks.  So choosing

4 equipment, designing the network, and -- and then hoping

5 that things would work well, but from time to time, they

6 didn't.  Oftentimes, users would have problems with when

7 their files would take too long, if -- if students

8 were -- would submit a paper or -- or look at somebody

9 else's paper, it might take too long or it might fail.

10         And sometimes in cases like that, we had to --

11 we had to solve those problems, potentially

12 re-engineering the whole network.

13         One situation in particular that was

14 noteworthy for me that early in my career was that I

15 realized that we needed something called a probe to

16 examine all the traffic that was traveling through the

17 network and analyze it and figure out what -- what was

18 going on.  Without getting into the details, this was

19 going to help solve this problem of why user's problems

20 -- why user's files weren't transferring.

21         And so ultimately, because I couldn't buy --

22 on the market I had to build this thing myself kind of

23 by scratch, and that was --

24     Q.   When you said you had to build this thing,

25 what -- what exactly are you -- what are you talking

1  about?

2      A.   This was a probe, much like the -- the device

3  you've seen here -- well, that was built by a probe

4  company, but there were no probe companies that I knew

5  of at the time, and so I -- I built something like that

6  myself.

7      Q.   And what time period are we talking about?

8      A.   That was 1987.  It was a time when there

9  really wasn't any Internet.  So one of the things we had

10 to do was to hook ourselves up to the Internet which it

11 was kind of an undefined job.  There was no such thing.

12 So we had to learn a lot, build a lot ourselves, and

13 it -- well, it was -- it was a lot of work, but it was

14 very exciting.

15     Q.   In that period in the late '80s, did you get

16 involved with the development of the Internet?

17     A.   Yes.  I was -- I -- I got involved with a

18 group called the Internet Engineering Task Force.  And

19 you've heard about it before.  This was the group that

20 was -- that was creating standards that helped to solve

21 some of the problems that kept the Internet from

22 expanding.

23          And ultimately, when people -- these -- it was

24 academics and networking vendors or companies would get

25 together, and they would work out solutions to problems,

and then codify that into a standard that somebody would

write a document, which was a standard.  It was kind of

a blueprint for how computers should communicate, and

these things would help solve some of the problems.

Q.   Now, did you develop any technology that was

used in the early Internet days?

A.   I did.  I created -- well, me and my -- my

co-authors created something called the simple network

management protocol.  We -- it was techies that create

academics for everything.  This was SNMP.  And this

became one of the foundational protocols that the

Internet is built on.  It's still in use today.  It is

responsible for making sure that the Internet is -- is

more reliable and performs what people want to do when

they want to.

Q.   Did you receive any recognition for your

contributions?

A.   Yes, I did.

THE WITNESS:  Could you go to the next

slide, please?

A.   For -- for example, this Network World

issue -- this was the premier newspaper for -- for

networking professionals, and they named me as one of

the top 20 network inventors of all time, partially

based on this work that my co-authors and I did on SNMP.

1    Q.   (By Mr. Lyons)  Now, you indicated you were

2  working with the Internet Engineering Task Force at this

3  time.  Did you continue to -- to work with that group?

4    A.   Yes, I did.  I -- it became a large focus of

5  my job at Carnegie-Mellon to -- to continue with that.

6  And I, over time, wrote many different standards or

7  blueprints alongside the various networking companies

8  who were -- who were working with me on these -- on

9  these new standards.

10    Q.   Over what period of your career were you

11  involved in that effort?

12    A.   A large portion of my career.  I mean, I've --

13  you know, the ones on this screen stands -- stand from

14  '91 through 2006.

15    Q.   Now, have you published in your field?

16    A.   Yes.  Because these -- because these standards

17  were so important, they -- there was a lot of need to

18  get the word out, to educate people on what they were.

19  So I was frequently asked to publish articles and white

20  papers and also to speak at industry conferences

21  about -- about these things.  So it was -- it was a very

22  exciting time.

23    Q.   Are you an inventor of any patents?

24    A.   Yes, I am.  I -- just last year, I got a

25  patent for management of a new technology called

1  OpenFlow.

2      Q.   And --

3      A.   OpenFlow is a -- kind of the -- probably will

4  be the foundation of the Next-Generation Internet.  And

5  it's not something that I invented.  I invented a way to

6  make -- to help it to work better.

7      Q.   Have you received any other recognitions for

8  your contributions to the field?

9      A.   I have.  Network World named me as one of the

10  -- the power players.  They were compiling a list of

11  powerful individuals, people who had contributed a lot

12  to the foundation of the Internet.

13           MR. LYONS:  Your Honor, I'd like to

14  offer Mr. Waldbusser as an expert in the field of

15  network monitoring.

16           THE COURT:  Is there objection?

17           MR. SKIERMONT:  No objection.

18           THE COURT:  Without objection, the Court

19  will recognize the witness as an expert in the

20  designated fields.

21           Continue.

22      Q.   (By Mr. Lyons)  Now, Mr. Waldbusser, how did

23  you get involved in this case?

24      A.   Well, I -- I -- I called -- well, first of

25  all, I learned about the case because I had been aware

1 of the -- aware of the -- aware of this case, and I knew

2 I had some expertise in this area.

3     Q.   How did you first learn about the existence of

4 this case?

5     A.   Be -- because I had been involved in a

6 previous case for -- for -- I had worked for about 10

7 hours for a case for Cisco Systems that was similar --

8 that was based on these patents.

9     Q.   And what, if any, analysis did you get an

10 opportunity to do in that earlier work on the patents?

11    A.   Very little.  It was just about 10 hours, and

12 they had me focused on a different area than -- than

13 what I worked on in this case.

14    Q.   Now, what have you been asked to do in -- in

15 this litigation?

16    A.    In this litigation, I was asked to do three

17 things.  One was to determine the true inventors of

18 these patents.  The second was to figure out whether

19 the -- this invention, as of the time that it was filed,

20 was -- was truly first, so one of the requirements for

21 getting a patent.  And the third was to -- to determine

22 whether the accused Tektronix products actually infringe

23 this invention.

24    Q.   Now, in -- in going about doing what you were

25 asked to do, what did you analyze?

A.    I analyzed the three patents associated with this case, as well as the communications between the -- the inventors and the -- the Patent Office.  But that wasn't all, there was quite a lot of information to review.

Q.    What else did you review?

A.    I looked at source code for both the -- both the accused products, as well as a product that -- that I had found that seemed to have been invented earlier than -- than the patents that were filed for.

I also talked with a lot of -- of the Tektronix and NetScout engineers who were kind of architects for these products.  They were the people who -- who knew how it worked inside and could answer questions for me about what the features were and also how things worked.  So I talked a lot about it with them and also read -- read their testimony in the case.

There was also a lot of manuals and internal documents available to me that also helped to explain features, as well as kind of the internal workings of the products.

Q.    Did you get any information from the Court about how to interpret the patents?

A.    Yes, I did.  The Court had a number of what are called claim constructions, and these I used as

1  guidance for some of the terms to tell me how to

2  interpret the patents.

3      Q.   And did you review any materials from the

4  litigation?

5      A.   I did.   There was -- there was a lot of -- a

6  lot of material to review, such as the complaint and

7  various -- various back and forth information that was

8  provided between the parties.

9      Q.   Have you considered any testimony that was

10  given in this case?

11      A.   Yes, a lot of testimony was -- was available

12  to me, and a lot of -- in fact, a lot of technical

13  testimony, so I -- I -- I looked at that.

14      Q.   Did you consider the positions that PI has

15  taken in this case in your analysis?

16      A.   I did.

17      Q.   Can you explain?

18      A.   Well, Dr. Almeroth, who you saw yesterday,

19  produced two reports in this case.   And I examined both

20  of them carefully to -- to -- so that my analysis could

21  reflect some of the ideas that he had.

22      Q.   Based on your review and analysis, did you

23  arrive at any opinions?

24      A.   Yes, I did.

25      Q.   Can you summarize those for the jury?

1    A.   Well, I found that these -- these patents are

2  each invalid for two reasons.  One is that the inventors

3  that are listed on the patents are not the true

4  inventors of the technology.  And the second is that

5  this -- this invention was already in public use before

6  the -- before the patents were filed for.  And those --

7  and that's a -- that's a key way of -- of understanding

8  whether a patent should or shouldn't be valid.

9    Q.   Did you reach any opinions about infringement?

10   A.   Yes.  I examined in quite some detail both the

11 G10 product and the GeoBlade product, the -- the -- and

12 I found that neither of them infringed the -- the

13 patents.

14   Q.   Now, can you go through in a little more

15 detail some background on the patents specifically and

16 identify for the jury the patents that you focused on,

17 please?

18   A.   Sure.

19        So this is the front page of the '725 patent.

20 And next we have the front page of the '751 patent.  And

21 also the '789 patent.

22        And the front page is -- has all of the most

23 important information on it, like the title.  This one

24 the -- is the method and apparatus for monitoring

25 traffic on a network.  But a key piece of information

1  for my work was to know what the -- what the filing date

2  was.  And -- and here I find it on the front page.  It's

3  June 30th of 1999.

4       Now, this is key because all of my analysis

5  regarding invalidity has to be accurate on this date.

6  The -- the -- the issue before the Court is whether

7  there were -- whether there was technology before this

8  date available publicly, and that was -- that was my

9  task.

10      MR. LYONS:  Could we turn to the patents.

11      Q.  (By Mr. Lyons)  And if you could just explain

12  to the jury, what were these patents all about?

13      A.  Well, yes, I'd -- I'd like to do that.  And --

14  and a lot of my testimony today, I'd like to put

15  things -- express things in the way that the inventors

16  did, use their language, use their figures.

17      And what you see in front of the -- or on your

18  screens is one of the figures.  It's -- it's Figure 1,

19  and this describes the environment in which a -- one of

20  the -- their invention would live.

21      And it starts with the shaded blue here is a

22  data communications network.  This is a combination of

23  wires and switches.  The switches -- the switches are

24  interconnected by the -- interconnected by the wires.

25  And the actual arrangement of that isn't important to

1  their invention, but the -- but the role is, is simply

2  that this cloud moves messages from -- from computers --

3  from one computer to another.

4  　　　　　Now, the computers here are -- are -- we have

5  client shaded in green.  These are computers that would

6  have a user attached to them, user in front of them, so

7  it could be a PC that's sitting in front of a user.  And

8  they're attached to servers, which are highlighted in

9  purple here, and the network will move information from

10 clients to servers.

11 　　　　　To show an example, imagine if a user wanted

12 to perform an activity, like to send an email, they

13 would take -- an email message would -- would be

14 transferred from the client computer to the server

15 computer, and a return packet -- a return message would

16 go back to the client.  If the activity was to get the

17 time of day to set your clock, a -- the client would

18 send a message to the server, and the answer would be

19 returned.  If the activity was to send a chat message,

20 client 4 could send a message to server 2 and get a

21 message and response.

22 　　　Q.   Now, Mr. Waldbusser, could you explain what

23 information is really being transferred on the network?

24 What does it look like?

25 　　　A.   Well, the information that's being transferred

1  on the network, is -- is -- is -- is a little bit more

2  complex than this.  It's divided into packets, and

3  that's a term that we've -- we've -- we've talked about

4  before.  And it just -- it's done because the network

5  can't handle any just random size message.

6           So what we do is we chop up an email into

7  multiple constituent packets.  It's chopped up and

8  divided into each of those.  And I've denoted it as an

9  envelope here, a letter, because this is a great analogy

10  for understanding what a packet is like, because just

11  like an envelope, a packet has a -- an address that it's

12  being sent to, and it has a from address.

13           I'll want to go through each of these in --

14  in -- in turn because they're important.

15           Imagine that we're sending a message to

16  google.com, so the first packet of that message would be

17  sent to a server -- this might be a very, very large

18  machine at Google, and every computer attached to the

19  network has its own address approximate, and like most

20  things computer-related involve some -- some cryptic

21  numbers.  And so Internet addresses look like this,

22  253.253.11.1.

23           So that's -- that's enough information to get

24  the letter to the server.  But these large servers, as

25  you can imagine, run more than a single application.

1  They run many applications.

2          And the next question the server has is which

3  application should this go to?  And so we created

4  something called a port number.  And in this case, since

5  it's an email message destined for Gmail, it has a port

6  number that's designated Port 25.

7          Now, Port 25 is a special -- is amongst a

8  special class of port numbers that we call well-known

9  ports.  And the thing about well-known ports is that

10  they're all agreed up.  Everybody knows that if you look

11  at Port 25, that it's an email message.  Everyone

12  similarly knows that if you look at Port 80 it is a

13  web -- a message that's part of a web transaction.

14          So this is an important process for

15  classifying traffic so that you know which application

16  it's -- is in use.

17      Q.   Mr. Waldbusser, are -- all the ports fall into

18  one of these well-known port categories?

19      A.   No, not all of them.  There's another type of

20  arrangement where we have dynamically assigned ports

21  where the port numbers are more random.  And this --

22  this port number in my example, 35673 truly means --

23  doesn't mean anything to anybody.

24          In this case, if we're talking about traffic

25  to Skype, Skype is an application of the 10 -- that --

1  that might use random ports.  There's no way to look at

2  that and know that it's Skype because it's dynamically

3  assigned.  You can't just look it up in the table.  And

4  -- and that -- that caused -- causes problems for

5  classification.

6      Q.    And this -- in addition to the destination

7  information, what -- what other information is in the

8  packet?

9      A.    Well, as I alluded to before, there's a from

10  address, and this is helpful for -- for sending the

11  response packets.  The -- the server knows where to send

12  it, and so Bob's computer, we're using in the example

13  here, it has an -- it has a network address.  And it has

14  -- it also has a port number that identifies the

15  application on -- on the -- on the client.

16      Q.    Is there any other essential information about

17  a packet?

18      A.    Yeah.  Fifth piece of information called the

19  protocol.  And this -- this describes the contents of

20  the envelope.  So there's data inside the envelope.

21  Much like a letter, we need to understand what language

22  is, and this is to avoid a computer reading an English

23  letter as if it was a French letter or vice versa.  And

24  this -- this tells the computer what to expect when it

25  opens up the envelope.

1    Q.   Does this collection of information have a

2 name?

3    A.   It does.  It has a very geeky computer science

4 name called a 5-Tuple.  We -- we -- in computer science,

5 you run across 3-Tuples, 4-Tuples, 5-Tuples.  That just

6 means three -- a collection of three things, a

7 collection of four things, a collection of five things.

8 This is a collection of five things.  And in computer

9 networking, though, if you say 5-Tuple to a network

10 engineer, they're going to know exactly what you're

11 talking about.  They're going to know that you're

12 talking about these five things, the source and

13 destination network address, the source and destination

14 port, and the protocol.

15    Q.   And how is this 5-Tuple used?

16    A.   Well, it's used to identify all of the packets

17 that are involved in a particular connection, typically

18 involved for one activity.  So when I send an email, if

19 it's chopped up into four packets, every one of those

20 four packets are going to have the same information for

21 their 5-Tuple.

22         So just looking at the top line here, this --

23 the 5-Tuple that includes Port 25 is for email, and --

24 and all the packets for sending that email will have the

25 same -- will share the same 5-Tuple.

1    In other words, this 5-Tuple forms a key

2  that's unique and identifies everything that will be

3  sent.

4    The second key down there is -- is for the

5  time of day protocol.  And no matter how many packets

6  are sent on that connection, they will all share the

7  5-Tuple.

8    And finally a chat application would -- would

9  have this green key on the bottom.

10    Q.   Now, can you explain in more detail exactly

11  how these keys or 5-Tuples would be used in the

12  networking situation?

13    A.   Sure.  Let's -- let's use an example.  And

14  this is going to become familiar because I'm going to

15  use -- I'm going to do a lot of examples like this with

16  the client on the left and the server on the right.  The

17  client was Bob's computer.  The server is maybe perhaps

18  a large computer at -- at Google.

19    In this case, Bob's computer wants to send a

20  message to the server, and a package is inside an

21  envelope, and then it addresses the envelope.  The

22  address is the 5-Tuple or key.  And then it sends the

23  message from the client port to the server port.

24    Now, the server is going to do -- in this

25  case, it's going to send the email.  Then it's going to

1    send the packet back with that same key.

2            So when I -- and I'm denoting that by showing

3    that the colors of the keys are the same.

4        Q.   And is there a term that this flow of packets

5    is referred to as?

6        A.   The flow of packets is called a connection, or

7    alternately a connection flow.

8        Q.   Now, there was another element in Figure 1

9    that you haven't mentioned yet called the analyzer 108.

10       A.   Yeah, this -- this part is very important.

11   This is the actual invention.

12           The analyzer coded in -- in red here is -- is

13   the actual invention that's monitoring the network.

14   Sometimes it's called a monitor, as in the -- the

15   inventor's own words up top here, and also sometimes

16   it's called a probe.  Analyzer and monitor and probe

17   really all refer to the same things in -- in the patent

18   and in this technology world that we live in.

19       Q.   So could you explain how this probe would

20   operate in a network?

21       A.   Sure.  So think of the packets that are going

22   back and forth between the client and the server.  The

23   probe has a way of connecting to that wire and getting a

24   copy of all the traffic that's -- that's -- that's

25   passing it.  And you just saw a packet go to the server,

1  and a copy was captured by the probe and it sits in

2  memory so the probe has a chance to examine it.  It can

3  look at things like the 5-Tuple and try to figure out

4  information about this -- about this probe.  And one in

5  -- one piece of information is which flow or connection

6  flow this packet is a part of.

7      Q.   And what -- and how would a -- a network probe

8  organize the information, typically?

9      A.   Well, it's going to put them in a table.  It's

10  going -- it's -- it's -- think of something like an

11  Excel spreadsheet where each row means -- has some

12  meaning, but the columns of the spreadsheet tell you the

13  various things about -- perhaps it's a purchase order or

14  -- or a check number.  The columns of this table tell

15  you the various attributes of it, and so we keep track

16  of this in -- in tables in the probe.

17      Q.   Well, can you just describe the -- how this

18  was done before the -- the patent was filed?

19      A.   Before -- yes, yes.  Let's go into and

20  describe -- we'll show you an actual example.  And

21  referring back to the -- the figure that that we're

22  looking at before.

23          Now, the patent itself -- in its own language,

24  this is the inventors talking.  They said that some

25  prior art packet monitors -- in other words, before

1  they -- before their invention, they classify packets

2  into connection flows.  I alluded to that before.

3  That's the -- that's a stream of packets between a

4  client and a server that all shares the same key.

5  They say the term "connection flow" is commonly ever

6  used to describe all packets involved with a single

7  connection.

8        Q.   And do you agree with -- with those

9  statements?

10       A.   I do, I do.

11       Q.   Can you explain how that information is

12 gathered by a probe?

13       A.   Sure.  The -- the patent describes a method.

14 It's saying that the method -- it stores a new

15 flow-entry for the new flow in the flow-entry database.

16 It looks a lot like a spreadsheet you'll see -- you'll

17 see momentarily.  And this flow-entry database includes

18 identifying information for future packets to be -- to

19 be identified with this new flow-entry.  And the

20 identifying information, they go on at length saying the

21 identifying information are the keys or -- or 5-Tuples

22 of the packet and --

23       Q.   So could you show how -- kind of put all this

24 together.  How would this work in practice?

25       A.   Yeah.  Well, what's highlighted here is

1  that -- is that column in this table where the key is

2  stored.  So what we're about to do is grab the key from

3  a packet.  And the first thing that we're going to do is

4  look for that key in the table.  We're going to find --

5  try to find the existing key in the table.

6          Now, that didn't happen because this -- there

7  was no existing flow.  So we created a new entry in this

8  table.  But now the next step is going to be more

9  interesting, and that's where the second packet with the

10  blue key is matched to the first one.  And you'll see

11  that we've kept some statistics in the right-hand column

12  where it shows the two packets have been transmitted on

13  this connection.

14          Now, the other thing that's happened, and

15  that's -- this is very important, is that the

16  application has been classified.  One of the members of

17  the key was the port number.  Port 25 is known by

18  everybody to mean email.  And so that -- that well-known

19  port strategy allowed the -- the probe to figure out

20  that this is an email application.  And it noted that in

21  the table because that's really important.

22          Now, any good network has a lot of good things

23  going on at once.  If a second connection was created

24  between the client and server, like -- like to get --

25  like to figure out the time of day, we'd address an

envelope.  And we have a red key because it's a separate

connection.  The probe looks for the red key.  Finding

none, it creates a new entry in the table.

And a third packet -- a third connection, for

the green -- for the green connection, creates another

connection.  But as more packets are transmitted on

these connections, by looking at the key and matching

up -- in this case colors, we can see which connection

the -- the packet should be associated with.

So we've collected two packets for the email

connection, two packets for the -- for the time of day

application, and three packets for the chat application.

We're also keeping track of other statistics, like when

was -- what time was the last of these packets received.

This -- the chat application was -- the last one was 12

seconds after 10:00 a.m.

Q.   Now, we -- the connections that you've

illustrated here, what -- what are they referred to as?

A.   Each of these are called connections or

connection flows.  And this is going to be a key concept

for understanding the different technologies available.

So these connections -- this probe -- what

this probe has done is it's watched these three

connections actually travel across the wire, and it has

created three entries in the table below.  These are

1    three separate flow entries.

2          And this all describes the prior art.  This is

3    stuff -- stuff that existed before the patents were

4    applied for, and that's something that I believe that

5    everybody in this case agrees.  The inventors themselves

6    have said that.

7       Q.   Do the patents describe a problem that they're

8    trying to solve?

9       A.   They do.

10      Q.   And can you describe that, please?

11      A.   Well, the problem they -- they coined a term

12   called the "disjointed flow problem."  Now, in the

13   industry, we all knew about the problem.  We used

14   different words for it.  They called it the disjointed

15   flow problem.  And I'll use those words because they --

16   they're perfectly good words to describe the problem.

17      Q.   Well, can you describe what -- what that

18   problem was?

19      A.   Yes.  Referring back to our -- to our example,

20   if the client starts an activity by sending a packet

21   from -- from a port in the client to a port in the

22   server, and just like before we do -- we do the

23   operation that we've been describing and the server is

24   going to respond back, just like before, it's correlated

25   together using the red key.

1          But here's -- here's where the problem occurs.
2    What if for some reason the application wanted to use a
3    second connection for something else related to this
4    activity.  It could be any reason, it doesn't matter --
5    it doesn't matter why.  But what would happen is that
6    the second purple color connection that the packet sent
7    on that don't end up in the same -- in the same row of
8    the table because they're purple.  They don't match the
9    red key.
10         Now, a couple of problems occur here.  The
11   biggest one is that this application was not -- was not
12   classified correctly.  It was sent to a random port.
13   Not Port 25.  We don't know how to interpret that.  And
14   so it results in accumulated traffic being classified
15   unknown.  And this was happening more and more at that
16   time.
17       Q.   So how many connections are involved in -- in
18   what you've shown here this time of day example?
19       A.   What we've seen is that there were two
20   connections, then real world on -- on the top.  And
21   these separate connections were recorded as two
22   connection flows on the bottom.  But because these
23   connection flows really relate to the same activity,
24   they are -- they are termed a disjointed flow.  And this
25   is the problem that the inventors were trying to solve.

1    Q.   And how did the inventors indicate they were

2 going to solve this problem?

3              THE WITNESS:   Next slide, please.

4    A.   They created something called the

5 conversational flow solution.   They coined it -- the

6 term "conversational flow" --

7              THE WITNESS:   Next slide, please?

8    A.   They said that a conversational flow is the

9 sequence of packets that are exchanged in any direction

10 as a result of inactivity.   For instance, the running of

11 an application on a server as requested by a client.

12 And the key -- one key word here to concentrate on is

13 we're talking about an activity.   It's -- two things

14 that are related, in real life we need to make sure that

15 they're going to be related in our -- in our packet

16 monitor.

17    Q.   (By Mr. Lyons)   And what does the patent say

18 about classifying that information?

19    A.   They say that it's desirable to be able to

20 identify and classify conversational flows rather than

21 just connection flows.   Some conversational flows

22 involve more than one connection, and some involve even

23 more than one exchange of packets.

24    Q.   And does the patent describe how you would

25 identify and classify different connections into a

1  conversational flow?

2       A.   Yes, it does.

3       Q.   And what -- what does it say about that?

4       A.   Well, they said that it's desirable to link or

5  join the flows together into one so that what you result

6  in is a single conversational flow rather than a

7  problematic two -- two flows.

8       Q.   And what are you allowed to -- what can you

9  accomplish by -- by doing that?

10      A.   Well, if they're the same, these two packet

11 exchanges are going to be correctly identified as a

12 conversational flow.  Again, this -- these are, again,

13 the words of the inventors.  They're trying to link or

14 join these two things together into one thing so that

15 they can be tracked correctly.

16      Q.   Mr. Waldbusser, we go back to your graphics,

17 can you explain how this shows, if it does, the problem

18 and the solution?

19      A.   Yeah, so the -- the disjointed flow problem,

20 which resulted in two flows, gets -- is solved when we

21 can join them together into a single one.

22      Q.   Now, does the patent suggest that this

23 conversational flow idea was a significant part of the

24 patent?

25      A.   Yeah, they were clear that it was very

1   significant.  They said that what distinguishes this

2   invention from the prior art, in other words, what's --

3   what's unique here over what's already been invented, is

4   that it has the ability to recognize disjointed flows as

5   belonging to the same conversational flow.  In other

6   words, to solve the problem that I just described.

7        Q.   Does the patent give any examples of this

8   occurring in the real world?

9        A.   Yes, it does.

10       Q.   What -- what examples?

11       A.   Well, it talks about this in terms of the --

12   the RPC protocol.

13       Q.   What -- what is RPC?

14       A.   Well, RPC stands for remote procedure call.

15   And it's a -- it's a protocol invented by Sun

16   Microsystems, which was -- which is an important company

17   at the time.  It doesn't -- Sun Microsystems isn't --

18   isn't around anymore by that name, but this was designed

19   in the '80s, and it was becoming very, very popular in

20   the mid '90s.  And it -- the problem was that as it

21   became more popular there was more and more traffic that

22   wasn't classified.  And that was because the server was

23   randomly assigning ports using the SunRPC protocol, and

24   there was no way to look them up in the well-known port

25   table.

1    Q.   Now, you just mentioned the well-known port

2  table, can you explain, again, what exactly you're

3  talking about?

4    A.   Yeah, so the simplest method, and this worked

5  with -- when you weren't doing SunRPC, was to look up

6  one of the ports, and if you found it in this table,

7  you -- if it was 25, for example, you'd know it was

8  email, if it's Port 80 you'd know it's web.  Picking

9  another one, if it's 123, you know it's NTP.

10        So it -- that was simple, but if you're going

11  to randomly assign the ports like SunRPC did, then

12  you'd -- then you'd run into trouble.

13    Q.   Now, does the -- the patent talk about this

14  RPC protocol?

15    A.   It does, it does at some length.  It used it

16  as what's called the exemplar protocol, and -- and it

17  spends many pages describing the invention showing how

18  it solved -- solved the SunRPC problem.

19        In the inventor's language, they said

20  something conversational flows involved more than one

21  connection, which is particularly true when using client

22  server protocols such as RPC.  When they say this,

23  they're referring to SunR -- the same SunRPC I just

24  described.

25    Q.   Do they identify RPC as having this disjointed

1  flow issue?

2      A.   They do.

3           THE WITNESS:  Next slide, please.

4      A.   They say that other protocols that may lead to

5  disjointed flows may include RPC and, again, referring

6  to Sun Microsystems's remote procedure protocol.

7      Q.   (By Mr. Lyons)  Now, can you illustrate how

8  this becomes a problem using the -- the graphics that

9  you created?

10     A.   Yes, yes.  So let's perform some of the same

11 type of packet operations we did before but with RPC in

12 this case.

13          So if -- the first thing that has to happen in

14 the SunRPC connection because -- is -- is that we need

15 to find out the name -- the number of the random port

16 that's going to be used.  And so the first thing we need

17 to do is to -- is to ask the server what port it's

18 currently using, which random number port it's using.

19          Now, the example I'm going to use here is time

20 of day application.  All we simply want to know from the

21 server is what time it is.  And so we send a message to

22 the server asking exactly that -- or -- or, sorry,

23 asking for the port number for the time of day port.

24          That is sent in an -- in an envelope to a

25 special port called Port 111.  This is the single

1 well-known port in this system.  It's the only thing

2 that is -- that is able to be classified in the RPC

3 system.

4     Q.  Now, you'd mentioned that the patent discusses

5 RPC.  Does it give the details of how this might happen?

6     A.  Yeah, it does in -- in a lot of detail, not

7 just the -- it gives details about the RPC solution but

8 also for their -- their solution to the problem.

9         So they say that -- that the RPC request is

10 sent to Port 111, just like in my example here.  Port 11

11 (sic) is always associated with SunRPC.

12        This first request specifies a program.  And

13 up top in my graphic, I've specified that it's the

14 program we're looking for or application is the time of

15 day application.  So that packet is sent.  It's

16 classified as a time of day request.  The --

17     Q.  So what happens at the server after that --

18 that happens?

19     A.  The -- the -- the inventors themselves say

20 that once the port mapper processes on this -- RPC

21 server receive the request, the specific mapping is

22 returned in a directed reply to the client.  Mapping is

23 another computer sciency word that just means a

24 relationship.  Port 111 is -- I'm sorry, some port is

25 related to that time of day application, and it's going

1    to tell us which port.

2           Now, in this example, the port is Port 43951.

3    And by that, I just mean some random number the server

4    has assigned to this.  And so that's going to be the

5    answer to this question.

6           The envelope is prepared.  The envelope is

7    going to be sending this answer in the -- in the

8    inventor's language.  They say this reply contains the

9    specific port number for the specific RPC program.

10          The envelope is then -- the Port 43951 is

11   added to the envelope and now it's ready to be sent.

12   It's sent across.  The probe gets a copy of it.  It

13   classifies it -- remember, the -- that's part of the

14   same connection so far and, therefore is classified with

15   the red key.  But now the --

16                THE WITNESS:  Go to the next slide,

17   please.

18        A.    Now, the client is going to respond.  Now it

19   knows that it wants to send 43951, and it creates and

20   sends that packet.  It's a purple key now because it's

21   different.  And when that -- when that RPC request is

22   sent and the reply is sent, they don't match the first

23   connection and go into the second connection and are

24   misclassified as unknown.

25          What we really wanted to see here was that

1  this was part of a time of day app.

2      Q.   (By Mr. Lyons)  So how does this illustrate

3  the problem that the patent is talking about?

4      A.   Well, what -- what we saw in the real world

5  were two real-world connections on the top.  And the

6  probe interpreted them as two connections on the bottom.

7  It didn't do the extra work of realizing that they're

8  really part of the same activity, joining them together,

9  and -- and presenting them as one single activity, that,

10 in fact, had four packets associated with it.  And four

11 packets that were regarding the time of day protocol.

12     Q.   So do the patents propose a solution to this

13 problem?

14     A.   Yes, they did.

15     Q.   What is that?

16     A.   That is the conversational flow solution.

17     Q.   Well, can you explain how that's described for

18 this particular protocol?

19     A.   Yeah.  Well, the linchpin of their invention

20 is the technique of remembering the port number.  In my

21 previous example it's the 43951.  If they were to

22 realize -- if the probe was to realize that 43951 was --

23 was the answer to the first question, then it would have

24 the missing ingredient to capture and classify all the

25 packets that happened after that to Port -- to Port

1  43951.

2      Q.   And is there an example in the patent that

3  shows it putting this into practice?

4      A.   There is.  It's -- it's called Figure 2, and

5  this Figure 2 is an example of the -- of the invention.

6              THE WITNESS:  And if you can go to the

7  next slide.

8      Q.   (By Mr. Lyons)  How does the patent describe

9  the example, which protocol?

10     A.   Oh, with -- with respect to SunRPC, it spends

11 quite a lot of time talking about the patent in terms of

12 SunRPC.

13     Q.   So if we refer to Figure 2, can you explain

14 what this shows?

15     A.   Yes.  Now, first of all, Mr. Maixner yesterday

16 described this figure as impenetrable, and I agree, but

17 I think we can simplify it.  It's going to look a lot --

18 you know, in a minute, I'm going to hopefully make it

19 look a lot like the other figures.

20             First of all, in -- in green, I've colored the

21 client just like before.  We have client on the left and

22 server on the right.  The server is in purple.  The

23 probe in this case is represented in the middle in red.

24 And what's left is, well, it's still complicated, but

25 what it really is, is four packets.  One -- a packet

exchange on the top going to and from the server, and a

second packet exchange on the bottom going to and from

the server.

Q.   And describe this packet exchange, if you

could, please.

A.   Sure.  Again, I'm going to keep referring back

to the patent language because the -- the inventors were

quite specific about showing this invention work with

the SunRPC protocol.

So first -- a first packet is -- is sent from

the client to the server.  It's sent to Port 111 because

SunRPC packets are sent to Port 111.

And the client -- or sorry, the patent

language shows how these -- the first boxes on the -- on

the left, and they're -- they're going to color in red,

they are the components of the 5-Tuple.  That's the

source and destination network addresses.

And the fourth and fifth field are the source

and destination ports.  So the -- the inventors are

describing exactly the same SunRPC problem.

Q.   And what have you described that 5-Tuple as?

A.   Well, the 5-Tuple is the key -- in this case,

a red key that is -- that describes this.  And the

patent tells us to store the key in the probe as key --

Q.   Can you explain how -- explain how -- how that

1  works?

2      A.   Well, the -- the packet is received by the

3  probe.  It's examined.  The fields are pulled apart.

4  And those particular 5-Tuple fields are placed in the --

5  in the table.  And there's -- there's -- and the -- the

6  text talks about the RPC by look-up request to server 2,

7  it's a well known format, and it's sent to Port 111.

8  You can see this cross-hatched area that's highlighted

9  in red is the way the inventors identified the Port 111,

10  this first destination port.

11      Q.   And what's the significance of Port 111 again?

12      A.   That is the single well-known port for SunRPC.

13  It's the single place you go to ask questions about

14  where to find other port assignments.

15      Q.   So this request packet sent to the -- and what

16  -- what program is associated with Port 111?

17      A.   It's called port mapper, again, mapping ports

18  to numbers.

19      Q.   And what information does the port mapper

20  request include?

21      A.   Well, you also have to tell it which

22  application you're asking about.  So there's a specific

23  field in there.  The patent says that this field -- they

24  called it s1a -- is the service requested by the client

25  from the server.

1          So that -- that continues on to the server.

2   Now the server is ready to answer the question by

3   sending a packet back to the client.  The patent

4   describes what to do with this.

5          First -- the first fields are the Tuple, and

6   they contain the red key.  And that is matched up with

7   the -- with the red key already stored there.

8      Q.   So what other information is in the response

9   from the port mapper program?

10     A.   Well, the -- in the response is the response

11  port that -- that -- that refers to the time of day

12  application on the server.  And this has vertical bars

13  in it.  That's how the inventors described it.  That --

14  that port number is now the -- that key information we

15  want to remember is part of this technique.

16                  THE WITNESS:  Next slide, please.

17     A.   So what we're doing here is we are creating a

18  new key that has the same information as that red key,

19  except for swapping in this -- that vertical bar field

20  that has the Port 43951.

21     Q.   (By Mr. Lyons)  You quoted earlier some

22  language in the patent that refers to remembering the

23  port.

24     A.   Oh, yes.

25     Q.   Can you explain what, if any, significance

1 that has to the figure we're looking at?

2     A.   So that KEY-2 there, that's -- that's where

3 you remember the port.  That swapping in of the vertical

4 bar piece was the answer for the port assignment.

5 That's the act of remembering the port.  And that's what

6 makes this all work because now this KEY-2 is going to

7 be able to recognize those other packets.

8     Q.   So what's the difference between these two

9 keys?

10     A.   They're the same, except for that port number.

11 We know that the second -- the second connection has all

12 the same information except for the ports have been

13 swapped with the -- with this new time of day port.

14     Q.   And what is this KEY-2 or what's the second

15 key for?

16     A.   It's for recognizing every single packet

17 that's about to be transferred between these two.  The

18 -- the inventors say it's now used to recognize packets

19 that are in any way associated with the application.

20     Q.   And what application are they talking about

21 there?

22     A.   Time of day.

23     Q.   And that's in your example?

24     A.   Yes, that is -- that's copied in the -- the

25 field A2.  So at this point, by the way, the KEY-1 isn't

1  used anymore.  KEY-1 was only used for that first packet

2  exchange.

3     Q.   So what does the client do when it gets this

4  response back with the port number?

5     A.   Well, the client now knows the information it

6  needs to complete the transaction.  It's -- it's going

7  to send a packet to Port 43951 finally asking its

8  question.  So it creates a packet with the new key, with

9  43951 in the -- in the Tuple, and it sends it to the

10  server.

11         Now, because that new key is the purple key

12  and we're already -- we've already remembered the port

13  for the -- for these other packets, we're already set up

14  to recognize this thing, and along with any other

15  packets that happen in -- in the -- in the rest of

16  the -- the connection.

17         So what we've done is we've remembered the

18  port from the original transaction and put it in the --

19  in as a separate key, and that enables us to correctly

20  correlate these flows into a conversational flow.

21     Q.   You said that's described in the -- in the

22  patent?

23     A.   Yes, very simply the -- the inventors

24  described it as remembering the port number.

25     Q.   Now, when we -- why don't we go back to the

1  graphics we used before.  Can you just illustrate how

2  this -- this process would -- would work?

3      A.    Sure.  So now in -- with using more familiar

4  graphics, we're going to walk through the problem and

5  the solution applied to RPC.

6          So, again, we're sending the RPC requests for

7  time of day to server 2, we're sending a Port 111

8  because the first question is what port should we

9  continue on.

10         The envelope is addressed with the right key,

11 and it's -- it's -- creates a flow-entry marked with a

12 red key in the table.

13         Now, the server can send the response back.

14 It places 43951 in the -- in the envelope.  It now sends

15 this response back.  The probe gets a copy of it.

16         Now, it's going to do two things here.  First

17 of all, the -- the -- the envelope in which the

18 information was described is -- does have a red key.  So

19 we're going to -- it's going to end up going into that

20 first entry.  But since it contains the purple port, it

21 also tells us enough information to create the purple

22 key.  So let's do that.

23         The -- the patent says to build and store a

24 new flow signature, and then there we do it there.

25 That's the purple key being added to the -- the first

1  flow-entry.

2        What have we done?  We've just remembered the

3  port number.  We've stored that port number in the

4  purple key, and it's associated with the first

5  connection.  So now all the packets that happen after

6  this can be associated into the same conversation.

7        In the language of the inventors, KEY-2 may

8  now be used to recognize packets that are in any way

9  associated with the application A2.  In other words,

10 time of day.

11       So when Bob's computer sends a time of day

12 request on the new -- on the new port numbers, instead

13 of going to a separate flow-entry, they are correctly

14 correlated to this first one.  And the statistics are

15 correct.  This is three packets that's classified as

16 time of day because of the -- remember the port

17 technique.

18    Q.    Now, how many connections are involved in this

19 example?

20    A.    Well, in this case, with the solution, we had

21 two connections in the real world that were associated

22 with that one activity, but because we've solved the

23 problem, we've reduced them down to a single

24 conversational flow that has all four packets of those

25 two connections related together.

1       Q.   Now, if you could just compare this to the

2  problems, disjointed flow problem?

3       A.   Yes.  On the top of this slide we're sort of

4  working back a little bit in time showing if the

5  solution looks like two flow-entries that are unrelated

6  with unknown packets, that's a characteristic of the

7  unknown flow problem.  But if the solution involves

8  joining them together into one entry that correctly

9  characterizes everything, that's -- that's a

10 characteristic of the conversational flow solution.

11      Q.   And can you explain again whether the patent

12 identifies this as a significant aspect of the

13 invention?

14      A.   Yes, it -- it identifies it as the

15 distinguishing aspect.  What distinguishes this

16 invention from prior art network monitors is it has the

17 ability to recognize this disjointed flows as belonging

18 to the same conversational flow.  This was the key --

19 sometimes we call it the point of novelty, the -- the

20 special thing that makes this invention special.

21      Q.   Now, when you started your testimony, you

22 indicated you were investigating who the true inventors

23 of the patent were?

24      A.   Yes.

25      Q.   Did -- did you consider the question of who

invented this -- this idea of solving the disjointed

flow problem with conversational flow?

    A.   I did.

    Q.   And can you explain what you concluded?

    A.   Well, I concluded that this invention shown

here on the -- by its filing date on this timeline

was -- was not invented at that time, that it had been

invented earlier.  This technique of remembering the

port number had already been known and it was already

been described in public in 1996 as something called

RMON2 TrackSessions.

    Q.   Now, you're referring to -- let's refer to

Defendants' Exhibit 58, please.

    And can you identify what this document is?

    A.   This is a document called the Remote Network

Monitoring MIB Protocol Identifiers.  That's a mouthful.

I like to call it the TrackSessions document.  It was

published on November 25th, 1996.  And -- and I've been

calling it the TrackSessions's document because inside

of it, it described the -- the TrackSessions's

technique.

    Q.   Why don't we refer to page ending in 158.

    Could you explain what we're looking at on

this page?

    A.   Yes, this is a description of the

1    TrackSessions technique, which says that:  It correct --

2    it correctly attributes all packet was a protocol which

3    starts sessions on well-known ports and then transfers

4    them to dynamically assigned ports.

5         Q.   What -- what does that mean?

6         A.   Well, it means that it has -- links together,

7    join together connections starting on well-known ports

8    with second connections that -- that are on dynamically

9    assigned ports.

10        Q.   Does it describe doing that in the context of

11   this -- this RPC protocol that we've been discussing?

12        A.   Yes, it does.

13        Q.   Can you explain?

14        A.   So further in the document, there is a section

15   that -- that is dedicated to SunRPC and dedicated to

16   showing how this applies to SunRPC.

17        Q.   And what does it say about SunRPC?

18        A.   Well, it says that -- that it learns the port

19   mapping of programs, that TrackSessions is used to learn

20   the port mapping of programs.  Again, it's remembering

21   the port.

22        Q.   Well, does the document describe how to do

23   this?

24        A.   It does.

25        Q.   Can you show the jury that, please?

1      A.   So this is -- on the next page of the

2 document, in the same section for SunRPC, what's

3 highlighted here is -- is the RMON group's text which

4 says remembering the port assignments.  This is -- this

5 is exactly the same thing as -- as the technique that I

6 just described from the patent.

7      Q.   And what does this portion of the standard say

8 about how you would implement TrackSessions?

9      A.   Well, the first part is instructions for the

10 method for -- that you follow for decoding the first

11 request and response, and -- and then --

12      Q.   What program is involved in that initial

13 response?

14      A.   SunRPC.  And it talks about RPC port mapper

15 requests.

16      Q.   And once it decodes that first port mapper

17 request, what happens next?

18      A.   Well, then the next slide talks about what to

19 do with the -- with the information that's been

20 remembered.  It says that -- well, I'm going to say it a

21 little bit out of order here, but because you've

22 remembered the port assignments, any subsequent packets

23 must be decoded and correctly identified in each RPC

24 function call.  And that's showing -- it's telling the

25 implementer how to do the second step of the method.

Q.   Using the graphics you've -- you've created or
we just walked through how the patent dealt with this
SunRPC, can you now show us how the TrackSessions
standard describes dealing with the exact same protocol?

A.   Sure.  Sure.  Again, back to this same figure,
so if -- if Bob's computer wants to send a request for
time of day, first, it needs to get the port number.
And it's going to ask for it on Port 111 which involves
a first connection and this first connection involves a
well-known port.

Now, in this case, we're talking about an RMON
probe solving the problem.

Q.   Now, why did you choose an RMON probe to
illustrate this point?

A.   Well, because TrackSessions is a part of the
RMON solution -- the RMON2 solution.

Q.   So what would -- what would happen next in
your example?

A.   So the packet is addressed and the client
given -- given a key because the -- the packet will have
all the fields filled in.  And we in the RMON group
wrote the first packet of many SunRPC transactions is
sent by the -- sent to the port mapper program and,
therefore, decoded statically by monitoring RPC port map
requests.

1          So the packet is sent and decoded just as --

2     like I just described, and the red key is created, which

3     is the first step.

4          So now -- now we're going to go through the

5     second step, and this should be familiar by now, but

6     it's -- the response is going to tell the client that

7     it's going to Port 43951, and that we're going to place

8     that in the envelope.  And when we send that and the

9     RMON probe receives it, there's two -- there's two

10    pieces of information in that envelope.

11         One is the red key that's going to be used to

12    associate with the connection that's already in the

13    table.

14         And the second is that Port 43951.  That's the

15    piece of information we're going to remember by creating

16    the second key.

17         The description.  Now we're talking about from

18    the RMON TrackSessions document, it says:  We need to

19    learn the port mapping in the program.  The probe can

20    and should monitor port mapper activity to correctly

21    track SunRPC transactions.  Any -- then any subsequent

22    packets must be decoded and correctly identified by

23    remembering the port assignments.

24         So with remembering port assignments in mind,

25    the probe does -- can -- can -- can now do this

1  operation.  Creates this new purple key based on the

2  information in that packet.  It correctly counts the

3  second packet of the first transaction, but now Bob's

4  computer now knowing the -- what port number to use, it

5  can send the real time of day request.  It sends it on a

6  second connection, which is a dynamic connection, and

7  because it -- we already have that purple key set up,

8  packets 3 and 4 are correctly identified.

9       Q.   So how many connections do we have in this

10  TrackSessions example?

11      A.   Well, so even though two connections went over

12  the wire, in the probe, we were able to record it as one

13  single joined conversation that had all the

14  characteristics we were looking for, all the packets

15  were correctly characterized.

16      Q.   Now, how does what you just described relate

17  to what's, you know, the TrackSessions' purpose is?

18      A.   The TrackSessions was described as correctly

19  attributing all packets of a particular protocol which

20  starts on a well-known port and then transfers to

21  dynamically assigned ports.  That's exactly what we've

22  seen here and done here.

23      Q.   So that first underlined port where it talks

24  about packets of a protocol which starts session on

25  well-known ports, where is that?

1    A.   That's the top connection.  That's the --

2  that's where it started the session on the well-known

3  port.  And then it transferred it to the second

4  connection on the dynamically assigned port.

5    Q.   And if you use TrackSessions, what are you

6  able to do?

7    A.   You're able to correctly attribute all these

8  packets to -- to the same conversation.

9    Q.   Now, are there any similarities between this

10  TrackSessions described by the RMON group and the

11  asserted patents?

12    A.   Yeah, there's -- there's a lot of

13  similarities.  And what I have here is -- and this and

14  like a few other pages.  On the left is the

15  TrackSessions document from 1996.  And on the right

16  is -- will be some citations from the -- the patents in

17  this case.

18        So first of all, we -- in -- in the RMON

19  group, we call this technique TrackSessions.  And in the

20  patents, there's -- there are a few references to --

21  to -- that they've used called session tracking or

22  tracking sessions.

23        Other similarities are that it's applied to

24  the same -- to the same protocol -- to the same SunRPC

25  protocol that was causing trouble, and that it was

regarding packets being sent to port mapper, which is an

important part of SunRPC.  But even when you get down to

the technique, there's a lot of -- there's a lot of

similarities.  The SunRP -- sorry, the TrackSessions

document talks about decoding the first packet of many

SunRPC transactions.  And the -- and the language on the

right talks about decoding the SunRPC packet.  It talks

about initial requests from the client.

Actually up at the top, tracking sessions

requires an initial connection to a predefined socket or

port number.  This is very similar ways of describing

the same solution to the problem.

The RMON group said that any subsequent

packets must be decoded and correctly identified by

remembering the port assignments.  And you can find a

few similarities in -- on the right.  For instance, that

signature now may be used to identify packets associated

with the server.

But the key part is that this remembering the

port number or remembering the port assignments, the

linchpin part of this, that's -- they're really

describing the same thing in -- in very -- very similar

language.

Q.   So who came up with this idea of combining

connection flows into a conversation using this

1 TrackSessions?

2     A.    Well, this was the -- this was something that

3 was created by the RMON Working Group, which was a -- a

4 group of people who created a standard.  A standard is a

5 blueprint for how to communicate.

6          But this -- this TrackSessions document, in

7 fact, lists three important people.  These authors of

8 the standard are Andy Bierman, who was at Cisco Systems

9 until 2004; Chris Bucci of Network General, and Robin

10 Iddon of 3Com.

11     Q.    Now, in this document, in addition to the

12 authors, does it indicate who -- who else was a

13 significant contributor?

14     A.    Yeah.    These guys wanted to acknowledge the

15 work of others involved in the process, so they had an

16 acknowledgement section at the end.  And first thing

17 they did is they acknowledged the entire working group.

18          You know, a lot of people got together and sat

19 around the table and spent -- spent time away from their

20 families to -- to create this.  So we wanted to -- to

21 acknowledge everybody about -- he, in particular, wanted

22 to acknowledge three people who had contributed a lot.

23 Anil Singhal, who you've seen testify here earlier;

24 Jeanne Haney of Bay Networks; and Dan Hansen of Network

25 General.

1    Q.   I want to go back and take a look at the face

2  of one of the patents that lists the names of the

3  inventors on the patents.   Were any of the gentlemen who

4  are listed here, were they recognized in connection with

5  the TrackSessions standards?

6    A.   No.

7    Q.   And what -- what is the significance of that,

8  if any, in your opinion?

9    A.   None of them were -- had a significant impact

10  or a significant contribution to the development of

11  TrackSessions.

12    Q.   Well, let's -- let's go back, and can you ?

13  explain for the jury, you know, how -- how did this

14  group come together to develop this TrackSessions's

15  idea?

16    A.   Yeah.   Well, TrackSessions was invented in a

17  group called the Internet Engineering Task Force, and

18  this is where I -- I had -- I had gotten involved early

19  in my career and created that SNMP, simple network

20  management protocol, that I was -- I was well-regarded

21  for.

22         And, in fact, I created a lot of protocols

23  there, but the -- the IETF was -- was responsible for

24  doing work like that.   It was a -- it was a group of

25  academics and engineers from networking companies who

1  would get together and -- and solve problems,

2  essentially, that were keeping the Internet from

3  growing.  I mean, we were kind of -- we were all kind of

4  zealots about -- about the Internet and -- and helping

5  it grow.  And the time here was 19 -- well, the that I

6  joined was '87, and so I saw it grow from its formative

7  years.  But what was true throughout was that it was

8  a -- it -- it fostered a collaborative environment

9  between everybody, and it was really -- it was really a

10 great thing to see over the years.

11     Q.   How did the IETF do its work, how did it

12 organize itself?

13     A.   Well, we -- we -- we separated into working

14 groups.  Each working group was assigned a particular

15 topic.  The RMON Working Group was one of those topics.

16 This was a group of people that were interested in

17 solving -- solving the problem of probes or how to -- or

18 creating probes so that the probes could -- could solve

19 problems.

20     Q.   And how did the -- was there a group formed

21 relating to remote monitor?

22     A.   Yeah, there was.  It was -- it was called the

23 RMON Group, and --

24               THE WITNESS:  Next slide, please.

25     Q.   (By Mr. Lyons)  But what is -- so what does

1  RMON stand for?  Can you remind the jury about that?

2      A.    Yeah, it's -- it's not the best acronym in the

3  world, but it stands for remote network monitoring,

4  RMON, we prefer to call it.  And we -- we were writing

5  problems that created -- or creating standards that were

6  blueprints for solving problems with RMON, making better

7  and better RMON probes that could communicate together.

8      Q.    Well, what was the -- the goal for this RMON

9  Working Group?

10     A.    Well, we wanted to create standards so that

11 probes could communicate together, even if they were

12 from different companies, the -- the -- the founding

13 members were companies like NetScout and HP, and -- and

14 Axon was another company.  And they -- they all wanted

15 to make the market bigger.  There was no standard.

16 There were a couple of probe companies at the time, but

17 it was a really small market.  People sensed that they

18 lot of people wanted to buy them if there was a standard

19 so we got together to create that first standard.

20     Q.    What was your role in this group?

21     A.    I was the author of many of the standards that

22 came out of that group.

23     Q.    When did you become involved with the group?

24     A.    I was in the founding meeting in 1990, and

25 became very involved -- became part of my job to -- to

1  go to the meetings and work with these people.

2          And I remember the time fondly because it was

3  a -- it was a -- it was a great -- it was a great

4  problem to solve, and I was working with some great

5  people to help solve it.  It was a very collaborative

6  environment where we'd -- we'd sit around a meeting

7  table and people contribute solutions to problems, maybe

8  it's something they had developed together, but they all

9  got -- they got it about this collaboration thing and

10  wanted to work together, and that's what we did.

11     Q.   Well, let's put this on your -- your timeline.

12  You got the patent filed in June 30, 1999.  When -- when

13  was RMON founded?

14     A.   Well, originally founded in 1990.

15     Q.   And who was involved back then?

16     A.   Well, a number of people.  Myself and Anil

17  Singhal were -- were among the -- among the founding

18  members.

19     Q.   I'd like to you take a look at DX-83.  Can you

20  explain what this document is?

21     A.   Yeah, this is the RMON MIB.

22     Q.   What's -- what's that mean?

23     A.   That is a standard for allowing probes to

24  communicate with each other, and it was the first one we

25  created.

1      Q.   Does this standard have a -- a name by which

2  it's commonly referred?

3      A.   We -- we call it RMON for short.  Just if

4  you -- if you wanted to say that a probe used RMON,

5  you'd just call it an RMON probe, and we'd call it the

6  standard RMON.

7      Q.   And who was the author of this document?

8      A.   I was the author of the document.

9      Q.   And when did you create it?

10     A.   November of 1991.

11     Q.   Is this -- are these all your ideas?

12     A.   No, no.  The --

13     Q.   Where -- where did the content of this

14  document come from?

15     A.   Well, I contributed some ideas, but the --

16  many of the members would contribute some idea they had

17  for -- for some feature or some solution to a problem.

18  And they'd -- they'd present that to the group, and

19  maybe it'd be tweaked or maybe people would say, hey,

20  that's a great way, but the -- the result of the

21  collaboration was that we knew we were done when we had

22  a general consensus that we had -- we had gotten to a --

23  to a solution.

24     Q.   Now --

25                THE COURT:  Counsel, approach the bench,

1   please.

2                       (Bench conference.)

3                       MR. LYONS:  Yes, Your Honor?

4                       THE COURT:  Mr. Lyons, he's been on the

5   witness stand two hours.  Do you have any idea how much

6   longer your direct is going to go?

7                       MR. LYONS:  We were timing out at three

8   hours.  That's my goal.  Total.

9                       THE COURT:  If you've got another hour to

10  go then I'm going to take a recess at this time.

11                      MR. LYONS:  Okay.

12                      THE COURT:  If you're a few minutes away

13  from finishing --

14                      MR. LYONS:  No, I'm not.  I'm definitely

15  not.

16                      THE COURT:  Okay.  We'll take a recess

17  and come back.

18                      MR. LYONS:  Okay.  Thank you.

19                      (Bench conference concluded.)

20                      THE COURT:  Ladies and gentlemen, we're

21  going to take a short recess at this time.  You may

22  leave your notebooks closed and in your chairs.  Don't

23  discuss the case.  We'll continue with the Defendants'

24  direct examination after this recess.

25                      The jury's excused for recess.

```
 1                    COURT SECURITY OFFICER:  Rise for the
 2  jury.
 3                    (Jury out.)
 4                    THE COURT:  The Court stands in recess.
 5                    (Recess.)
 6                    (Jury out.)
 7                    COURT SECURITY OFFICER:  All rise.
 8                    THE COURT:  Be seated, please.
 9                    MR. LYONS:  Your Honor, just one minute,
10  if I may?
11                    THE COURT:  Go ahead.
12                    MR. LYONS:  Mr. Nadkarni has not yet been
13  dismissed, and we'd ask if there'd be any objection to
14  him doing so?
15                    THE COURT:  Is there any objection?
16                    MR. SKIERMONT:  No objection.
17                    THE COURT:  Mr. Nadkarni is excused.
18  He's free to leave, he's free to stay.
19                    MR. LYONS:  I'd also like -- there's one
20  issue I'd like to -- to raise about the scope of my
21  examination, and -- and an issue of where we believe
22  that the door has been opened.  But if you want me to
23  approach now and discuss that?
24                    THE COURT:  Well, the jury's outside the
25  courtroom, so just go ahead and tell me what your
```

1   position is.

2               MR. LYONS:  Yeah, so we believe that

3   in -- in the course of cross-examination, the door has

4   been opened as to what the RMON Working Group knew about

5   these patents.  The suggestion was that they -- they

6   knew all about Mr. Dietz's patents and didn't raise any

7   concerns about them until now.  And the -- the facts are

8   that he did not disclose them to the group and that

9   people in the group relied upon those disclosures, and

10  they were hidden from the group.  And that's one of the

11  reasons why there weren't objections.

12              And Counsel for PI very forcefully argued

13  on cross that that suggested that there was a belief in

14  the industry that these patents may not have

15  transgressed this public standard.

16              THE COURT:  All right.  What's the

17  Plaintiff's response?

18              MR. SKIERMONT:  What -- what

19  cross-examination are you referring to?

20              MR. LYONS:  Mr. Davis' cross-examination

21  of Mr. Kenedi.  He went down the list of companies, that

22  this company complained, that the RMON Working Group

23  complained.  Went down -- he had a whole list on -- on

24  the board.  And he indicated all these people didn't

25  raise any concerns about whether this patent had any

implications for the standard when -- when, as

Mr. Waldbusser could explain, as he was there, you know,

there was a disclosure obligation, which he didn't meet.

That's why these issues didn't come up sooner.

        MR. SKIERMONT:  Well, I think the cross

point was that until the lawsuit -- I mean, the patents

were publicly -- the cross was about patents that --

        THE COURT:  Are you gentlemen having a

conversation, or do you want to direct your comments to

me, gentlemen?

        MR. SKIERMONT:  I want to direct my

comments to you, Your Honor.

        THE COURT:  Go to the podium, please.

        MR. SKIERMONT:  Yes, sir.

        The cross-examination was about how no

one has raised an issue with these patents until the --

the NetScout lawsuit was filed which covers years and

years where they were published, publicly available

documents.  And so I don't think the cross-examination

opened the door to a suggestion that we've suggested

that the working group knew all about them at the time

they were disclosed.

        THE COURT:  I -- I remember the

demonstrative, Mr. Lyons.  You don't need to show it to

me.

1           I wondered throughout that entire series

2   of questions by Mr. Davis why the Defendants sat on

3   their seats and did not stand up and object that every

4   one of those questions called for the witness to

5   speculate about the state of mind of third parties that

6   they had no knowledge of.

7           And the answers repetitively were not no,

8   we didn't know about it; the answers were, I don't know.

9   Because the questions all asked the witness to answer

10  what each of these companies was thinking.  And you all

11  never objected to the purely speculative nature of the

12  question.  You just let Mr. Davis go through company A

13  to Z just about.  But the witness never said absolutely

14  they knew or they didn't know.  The witness said the

15  witness didn't know because the witness had no way of

16  knowing the mental state or the mindset of the companies

17  that were identified in the questions.

18          Long story short, I don't find that the

19  door has been opened.

20          MR. LYONS:  Thank you.

21          THE COURT:  All right.  Anything else we

22  need to do before we bring the jury back in?

23          MR. LYONS:  No, Your Honor.

24          THE COURT:  Let's bring the jury back in.

25          COURT SECURITY OFFICER:  Rise for the

1    jury.

2              THE COURT:  Oh, before we bring the jury

3    back in, I need to remind counsel the Court communicated

4    with you by email before 9:00 o'clock this morning

5    directing updated versions of the charge and verdict

6    form be submitted by 5:00 o'clock.  We're not at 5:00

7    o'clock, but we're close to it.  I assume you have had

8    people working behind the scenes on it during the day

9    and it will be forthcoming.

10             I see heads nodding up and down, that's

11   what I need to know.  Okay.  Thank you.

12             Let's bring the jury in.

13             (Jury in.)

14             THE COURT:  Welcome back, ladies and

15   gentlemen.  Please have a seat.

16             We'll continue with the Defendants'

17   direct examination of Mr. Waldbusser.

18             Go ahead, Mr. Lyons.

19             MR. LYONS:  Thank you, Your Honor.

20        Q.   (By Mr. Lyons)  Mr. Waldbusser, you recall we

21   were talking about the RMON standard, which is DX-83.

22        Now, you testified earlier that you were the

23   author of this document?

24        A.   Yes.

25        Q.   And did you recognize contributions that were

1  made by others to this -- this -- this standard?

2      A.   I did.

3      Q.   And can you identify that group?

4      A.   Well, I had acknowledgment section that --

5  that acknowledged the entire group as a whole but then

6  recognized the special contribution of a number of

7  people who were at the founding -- generally, these were

8  the founding members of the group who would help so

9  much.  And on that list is Anil Singhal who -- who

10  testified earlier.

11      Q.   Is Mr. Dietz in the group of people that you

12  acknowledged?

13      A.   No.

14      Q.   Does -- what, if any, significance does that

15  have to you?

16      A.   Well, that he wasn't a -- an important

17  contributor to RMON1.

18      Q.   So let's go back to our timeline.

19           And in November 1991, after this RMON standard

20  published, what was the impact, if any?

21      A.   Well, the -- there was an immediate impact in

22  that a lot of the probe vendors who -- probe companies

23  who were involved with the -- with the process started

24  engineering probes and then selling probes, and they

25  ended up becoming very popular.  And, in fact, NetScout

1  produced their own probe between '91 and '92.

2      Q.   And is that the probe that is just over your

3  right shoulder?

4      A.   Yes, that is.

5      Q.   And can you identify that -- that probe?

6      A.   Yes, this is a NetScout 6010 Ethernet probe.

7      Q.   Thank you.  You can set it down.  We'll talk

8  about that more later.

9           Now, what -- what was going on in the industry

10  as these new RMON probes were getting introduced?

11      A.   Well, we -- there was a lot of success.

12  The -- the probe market started to grow a lot, and then

13  the working group started to -- started work on a new

14  standard, which we called RMON2.

15      Q.   And when did -- did that ultimately publish as

16  a standard?

17      A.   Yeah, that ultimately published in 1997.

18      Q.   Let's take a look at DX-89.  Can you identify

19  this exhibit?

20      A.   This is RMON2.

21      Q.   Who is the author of this standard?

22      A.   I am.

23      Q.   And is that indicated on the face of the

24  document?

25      A.   Yeah, on the top right, S. Waldbusser is -- is

1    me -- well, and also, there's an author's address later

2    on in the document.

3          Q.   So let's add that to the timeline.

4               And so from this period when you authored the

5    standard in 1991 to the time when you authored the

6    second standard in 1997, what was your role in the RMON

7    working group?

8          A.   I authored a number of the -- well, my -- my

9    official role is I was listed as the working group

10   editor.  And as such, I authored lot of the -- a lot of

11   the standards that we published during that time.

12         Q.   When you had meetings, what -- did you have

13   any role in those meetings?

14         A.   Yes, I was present at every -- every one of

15   the meetings, and I would take notes about what was

16   going on.  So they were kind of my working notes because

17   I would have -- when -- when the group reached a

18   consensus, I would have to have a good idea of what the

19   consensus was about.  I would back to my office, back at

20   Carnegie Mellon, and I would type the -- this --

21   descriptions of the computer structures that were needed

22   to accomplish what the working group had -- had asked

23   for.

24         Q.   How did you end up in that role?

25         A.   Well, I was -- first of all, I was one of the

1 co-authors of SNMP, which was a related protocol to

2 RMON.  It was -- RMON was related to and based on R --

3 on SNMP.  And so I was one of the most expert people in

4 the room for that protocol.  So that helped a lot in --

5 in writing RMON and the other protocols.

6     Q.  In terms of the group that ended up

7 volunteering, how did you get identified as the person

8 who would have the -- sort of this editor role?

9     A.  Well, another aspect was that amongst this

10 group of network probe vendors, I was the -- I was -- I

11 was an academic.  I was kind of a neutral third party.

12 So I had warm relations with -- with all these engineers

13 who were -- had come together.  And -- and so I was a --

14 a natural go-to for that -- for that role.

15     Q.  Now, can you describe how TrackSessions, that

16 specific feature, how did -- how did that develop?

17     A.  Well, that was developed in the -- in the --

18 in the group in about the '95 to '96 time frame.  And,

19 again, it was a collaborative effort of the folks who --

20 some of whom were listed on -- on that -- on that

21 document.

22           MR. LYONS:  Well, let's look at DX-58

23 again.

24     Q.  (By Mr. Lyons)  And can you remind the jury

25 what this document is?

1    A.   This is the protocol identifiers document that
2 I've referred to as the TrackSessions document.
3    Q.   And -- and what is -- what about this
4 document -- can you just describe what -- what, if any,
5 significance this has to your sense of when this idea
6 was developed?
7    A.   Well, this -- because this was in a document
8 that was published worldwide in November of 1996, I knew
9 that this idea had taken form by that time.
10    Q.   And, again, can you identify who were the
11 significant contributors to -- to that idea?
12    A.   That was Andy Bierman, Chris Bucci, and Robin
13 Iddon, and other individuals who also had been
14 acknowledged.
15    Q.   Is there anyone who stands out as making any
16 particular contribution?
17    A.   Actually Robin Iddon was somebody who had --
18 who I remember making the most contributions to this
19 area.  It was kind of a pet project of his.  He -- he
20 really had some strong ideas here and helped to help
21 this to grow.
22    Q.   And of the people who are acknowledged, does
23 that inform your views on who were the significant
24 contributors to this TrackSessions' idea?
25    A.   Yeah.  I mean, various elements of -- of both

1  groups, but I think that Robin Iddon in particular.

2      Q.    So referring to this, can you just explain

3  relative to the patents when the TrackSessions'

4  technology was developed?

5      A.    Well, this was published in November of '96,

6  which was -- which was well before when the patents

7  were -- were applied for.

8      Q.    Now, did the -- did any of the inventors of

9  the patents in this suit have knowledge of this

10 TrackSessions before they filed their patent

11 applications?

12     A.    Yes, they did.  Two of them did.

13     Q.    Who is that?

14     A.    Mr. Dietz did and Mr. Koppenhaver.

15     Q.    And how did -- how do you know they had

16 knowledge of the standard?

17     A.    Well, for Mr. Dietz --

18                THE WITNESS:  Can you go to the next

19 slide, please?

20                MR. LYONS:  Sure.  Can we look at DX-84?

21     Q.    (By Mr. Lyons)  Can you identify this

22 document?

23     A.    Yeah, this is a -- this is a -- a set of

24 meeting minutes that Mr. Dietz wrote.  So we had an

25 in-person meeting in December of '94.  And this -- in

1  this meeting Mr. Dietz took the minutes for the meeting,

2  which meant that he had to pay attention to everything

3  to a high enough level of detail that he could write it

4  all up.  He -- he couldn't be nodding off.  He needed to

5  be -- he had a role to play, and that's -- that's what

6  it was.

7          And this was -- I remember him joining the

8  group as a regular member sometime in '94, so that's --

9  this is consistent with that.

10              MR. LYONS:  Let me look at DX-661.

11      Q.   (By Mr. Lyons)  And can you identify what this

12  document is?

13      A.   This is an email from Skip Koppenhaver to the

14  RMON Working Group list.

15      Q.   And could you just remind the jury, who is

16  Skip Koppenhaver?

17      A.   He's a Technically Elite engineer who I

18  believe worked for Russell Dietz at the time.

19      Q.   And what is his relationships to the

20  patents-in-suit?

21      A.   He's one of the co-authors -- co-inventors.

22      Q.   And what -- what is this document?

23      A.   Well, it's -- the subject is:  Comments on

24  draft IETF RMON MIB - RMONprot-v2.  That's a mouthful,

25  but it -- really that's the technical name for the

1 document that I've called TrackSessions.

2     Q.    And what does he -- the subject line says

3 comments on this TrackSessions standard.   What -- what

4 is he -- what is the content of this message?

5     A.    Well, Mr. Koppenhaver had been asked to write

6 software that would read the -- the TrackSessions

7 document using software and convert that into a database

8 form.   And he did that.   And along the -- along the way,

9 he learned certain things about the document, things

10 that would -- that would help the authors streamline the

11 document and make it more error free.   And so he

12 communicated everything he learned from that process in

13 this email.   That's why he wrote it to the working group

14 list so that the authors and everyone could see that.

15     Q.    Okay.   Why don't we add that to your -- your

16 timeline.   And then let's look at DX-657.   Can you

17 identify this document, please?

18     A.    This is an email from Mr. Dietz to the RMON

19 list, and a person named Chris Wellens.

20     Q.    When you say the RMON list, can you explain

21 what that is?

22     A.    Well, the -- the RMON group did a lot of its

23 work in in-person meetings where we sat with each other

24 -- you know, sat across the table from each other, but

25 we also -- in between meetings, we accomplished a lot of

1  things by sending emails to one another.  Instead of

2  person-to-person emails -- and there were some

3  person-to-person emails -- but most of the time we tried

4  to have everybody together.  So it was one email list

5  with many people on it.  If you sent email to the list,

6  all of those people would get it.

7       And so when you sent it, you knew that you --

8  you were getting everybody who was interested.  And when

9  I see the -- this -- I see an email from Mr. Dietz to

10  the mailing list, I know that he was on the list and

11  also is receiving these emails.

12      Q.   Let's add that to your timeline.  Let's look

13  at DTX-128.  Can you identify this document?

14      A.   This is another set of meeting minutes.  This

15  is prepared in part by Mr. Bierman and in part by Mr.

16  Dietz.  And this is from an in-person meeting on

17  October -- I'm sorry, August 27th of 1998.  And one of

18  the -- one of the first things that the minutes talk

19  about is the -- the documents that were discussed during

20  the meeting.  And the one that I've highlighted here is

21  -- is called -- is the TrackSessions' document.  So that

22  was the subject -- and the minutes continue to show that

23  there were -- there was a lot of discussion about that

24  document at the meeting.

25      Q.   So what, if anything, do you conclude, based

1    on this document, about Mr. Dietz's learning about

2    TrackSessions before he filed his patent?

3        A.    Well, it shows me two things.  When he was

4    present at the meeting, and, therefore, the -- the --

5    the TrackSessions was assessable to him, but also that

6    he was -- since he was writing the minutes, he was

7    playing close attention to what was going on.  He

8    couldn't have been nodding off in the back of the

9    meeting.

10       Q.    So why don't we add that to our timeline.

11             Now, do you -- you were in the courtroom when

12   Mr. Dietz testified earlier this week?

13       A.    Yes.

14       Q.    And you recall -- this is DX-43 -- an email

15   exchange that was discussed?

16       A.    Yes.

17       Q.    And can you explain your understanding of this

18   email?

19       A.    Well, Russell Dietz had forwarded a message to

20   Andy Bierman and myself.

21             And -- and first, I'm going to show the -- the

22   message that he forwarded.  That's on the right here.

23   This is a message from Albin Warth, a NetScout employee,

24   to Mr. Dietz.

25             And in this message, Albin is proposing that

1  the two of them collaborate on a standard call TPM, and

2  this was -- this was typical of -- of such

3  collaborations.

4       Q.   And can you explain what -- your understanding

5  of what Mr. Dietz was emailing to you at this time?

6       A.   Well, so Mr. Dietz had forwarded that letter

7  to Andy Bierman and myself.  Andy Bierman was the chair

8  of the RMON group at the time, and I was the working

9  group editor.  The two of us were pretty influential on

10 the process.

11          And he -- he told us:  This makes no sense.

12 Please tell me that he is kidding.  So please tell me

13 this is a joke.  I am not going to author a MIB with

14 NetScout.  No way.  I have a credibility issue on the

15 line.  Sorry.

16      Q.   Was this typical behavior of members of the

17 RMON group, in your experience?

18      A.   No, it was not.

19      Q.   In what way was it not typical?

20      A.   Well, I -- I had -- I had earlier described a

21 collaborative environment.  I -- you know, we -- we -- I

22 think many of us had warm relations with one other, and

23 it was about contributing these ideas and resulting in

24 something that was going to benefit the community.  I

25 mean, we made -- I mean, we made everything available to

1 the public for free.  And so collaboration was the

2 nature of the game.  And this was not what we had -- the

3 type of thing we expected.

4     Q.   So going back to your timeline, how does the

5 timeline that we see before us of events, can you

6 explain, what, if any, impact that has on your thinking

7 regarding the inventorship of the patents-in-suit?

8     A.   Well, I see the same idea being made -- being

9 invented in November of '96 in the red-flagged date.

10 And a group of people who had access to that idea in the

11 -- in the years that passed ultimately claimed that as

12 their own on June 30th of 1999.

13     Q.   Now, in doing your analysis in this case, one

14 of the things you were asked was to identify the true

15 inventors.  Did you -- were you -- did you follow some

16 legal guidance on how you -- what you were examining?

17     A.   Yes, I did.

18     Q.   Can you just explain what -- what that is?

19     A.   Well, there's a section of the U.S. Code that

20 speaks to this issue, and what it says is that a person

21 shall be entitled to a patent unless he did not himself

22 invent the subject matter sought to be patented.

23         In other words, if the inventors -- named

24 inventors did not actually invent the patent, that

25 patent should not be issued.  It should be invalid.

1    Q.   Well, let's go through the patents.  Let's

2   start with the '789 patent.

3        First of all, does this patent -- do the

4   asserted claims of this patent require the

5   conversational flow concept?

6    A.   Yes, they do require the conversational flow

7   concept, and that's important because that's the --

8   that's the thing that was the TrackSessions invention

9   that we're speaking about.

10    Q.   And where does that appear in Claim 19?

11    A.   That's part of Limitation (d), which mentions

12   conversational flows.

13    Q.   And what about the Dependent Claim 20 that's

14   also asserted from that patent?

15    A.   Yes.  So Claim 20, because it -- it contains

16   all of the limitations from limitation -- from Claim 19,

17   therefore, also, requires conversational flows.

18    Q.   And let's go back to the cover of the patent.

19   When you see the list of inventors, are these the

20   inventors of the subject matter that includes a

21   conception of this conversational flow concept?

22    A.   No, they are not.

23    Q.   Who did come up with that idea?

24    A.   The RMON Working Group.

25    Q.   And based on your opinion in that regard, do

1    you have a view about whether this patent is valid?

2         A.    Therefore, it's invalid.

3         Q.    Let's take a look at the '751 patent.  Do the

4    asserted claims of this patent include conversational

5    flows?

6         A.    They do.

7         Q.    Can you explain where that is in Claim 1,

8    please?

9         A.    Well, Limitation (b) of Claim 1, it requires

10   conversational flows, the thing that was invented by the

11   RMON group in '96.

12        Q.    The other asserted claim from the '751 patent

13   is Claim 5?

14        A.    Yeah.

15        Q.    Does that include the conversational flow

16   requirement?

17        A.    Yes, since Claim 5 is a dependent claim of

18   Claim 1, it also includes conversational flows.

19        Q.    Let's go back to the cover page, and you can

20   see the inventors listed on the cover of the patent, are

21   those the true inventors of the '751 patent?

22        A.    No, they are not.

23        Q.    Who is?

24        A.    The RMON Working Group.

25        Q.    And do you have an opinion about whether this

1   patent is valid?

2       A.   Well, therefore, this patent is invalid, as

3   well.

4       Q.   All right.  Let's go to the third patent.

5   This is the '725 patent?

6       A.   Yes.

7       Q.   Do the asserted claims of this patent require

8   this conversational flow idea?

9       A.   Yes, they each do.

10      Q.   Let's take a look at Claim 10.  Where is that

11  within Claim 10?

12      A.   Claim 10 in the wherein clause, it requires

13  the conversational flow.

14      Q.   And then Claim 17?

15      A.   Also in the wherein clause of Claim 17

16  requires the conversational flow.

17      Q.   Let's look at the face of the patent.  Is

18  this -- in the '725 patent are the inventors listed the

19  true inventors of the asserted claims?

20      A.   No, these are not the true inventors.

21      Q.   Who is the inventors?

22      A.   The RMON Working Group.

23      Q.   And do you have an opinion about whether this

24  patent is valid?

25      A.   Yeah, therefore, this patent is invalid.

1    Q.   Now, did you reach any other opinions in this

2 case regarding the validity of the asserted patent?

3    A.   I did.  I also looked at this patent to see

4 whether it was invalid based on having been anticipated

5 by previous technology.  In other words, whether there

6 was technology that -- that had been available to the

7 public prior to the filing date of the patent.

8         And this is described in a statute called

9 102(a) which says that:  A person shall be entitled to a

10 patent unless the invention was known or used by others

11 in this country before the invention thereof by the

12 applicant for a patent.

13    Q.   Well, let's go back to our timeline.

14         And are you aware of -- of a known -- a use of

15 this patent before -- or a use of the technology covered

16 in this patent before the filing date?

17    A.   Yes, in particular, I found it in the NetScout

18 6010 RMON2 probe that had TrackSessions.

19    Q.   And what --

20    A.   And that -- that was -- that was available to

21 the public in October of 1998.

22    Q.   Now, the -- you referenced earlier the

23 physical exhibit DX-189.  That's to your -- to your

24 right.

25    A.   Yes.

 1     Q.   Is -- is that the NetScout probe that you're

 2  talking about?

 3     A.   It is.

 4     Q.   And can you -- why don't you take a look at

 5  that and show that to the jury.

 6     A.   So the -- the front panel of these is -- is --

 7  is pretty simple.  It has a power switch and some LED

 8  lights.  Remember, this is --

 9              MR. LYONS:  Your Honor, may I -- may I

10  ask if the witness may approach the jury box to very

11  briefly show them the -- the prior art product?

12              THE COURT:  I'll allow the witness to

13  stand beside the jury box, but he doesn't need to get

14  any closer than he is.  If it would help for you to

15  stand up and hold that while you talk about it, that's

16  fine.

17              THE WITNESS:  From here, Your Honor?

18              THE COURT:  From right there, sure.

19              THE WITNESS:  Okay.  Thank you, Your

20  Honor.

21     A.   This --

22              THE COURT:  You will need to speak up.

23              THE WITNESS:  Yes.

24     A.   This front panel is -- is pretty simple

25  because remember these are remote probes.  They're

1  placed throughout the network often in a dark room that

2  nobody ever goes in.  It's a room that stores

3  communications equipment.  So there's nothing special

4  there.

5        On the back panel, this is a little bit more

6  special to me.  This has the network interfaces that are

7  connected to the connection points in the network.  In

8  other words, a wire will plug into one or more of these.

9  The packets come in on the wire, and then the probe can

10  examine those packets and do -- do the stuff that --

11  that we've talked about.

12        When I look at this, this has significance to

13  me because a few of the interfaces on the back here, a

14  few of the connectors are the types of connectors

15  that -- that I've never seen used for almost 20 years.

16  So it tells me that this is the type of box that was

17  available at that time.  These are older, slower network

18  connections that -- they were typical at that time, and

19  not typical at all today.

20     Q.   (By Mr. Lyons)  Thank you, Mr. Waldbusser.

21  Yeah, you can put the exhibit down.

22        You referred to DX-377.  I think somewhere

23  there's a -- a manual -- yes, and maybe you can hold

24  that up for the jury so they can see it, what you're

25  looking at.

1  A.   This is the NetScout Probe Agent Guide, and in

2 the inside front cover is the -- the designation that

3 it's for the Version 4.5 of the product and was released

4 in October of 1998.

5  Q.   And what do you know about the capabilities of

6 this probe?

7  A.   Well, if you turn to the -- this -- the first

8 slide here, this -- this slide tells me that it's an

9 RMON2 probe, which means that it implements the -- the

10 RMON standard that -- that I had authored in 1997.

11 Sorry -- get that right, yeah, 1997.

12      And then -- and then also I have highlighted

13 that it implements SunRPC, which is one of the protocols

14 that TrackSessions is useful for.

15  Q.   Now, did this -- was this product capable of

16 TrackSessions?

17  A.   It was, yes.  If you go to the next page, we

18 see a part of the user manual that talks about how you

19 configure TrackSessions on the probe, and it describes

20 it as the ability to count packets to and from these

21 alternative ports is known as TrackSession capability.

22      And one of the things I noticed in the manual

23 is that these configuration things let you change --

24 remember, the -- TrackSessions is about remembering the

25 port.  Well, this is how you tell it how many ports it

1  will remember and for how long it will remember them.

2  And that's -- those -- those are the types of things

3  that showed me, you know, that -- that this was the port

4  implementation that I was talking about.

5          Also point out that it says that all NetScout

6  probes have TrackSession capability, and as you heard

7  Mr. Nadkarni and Mr. Singhal testify, the -- this

8  referenced the fact that there was one software build --

9  one software -- one piece of software could be used

10 across any of the probes, that it had been shipped

11 across all their customers.

12     Q.   Have you seen any other documentation that

13 helps you date when this product was available?

14     A.   Yes.

15               THE WITNESS:  If you go to the next

16 slide, please?

17     A.   This is a -- a couple of pages from a training

18 presentation that was -- it was given to their

19 application engineers.  These are the guys who would go

20 out and help train customers on -- on new -- new

21 products.

22          So application engineers wanted -- needed to

23 know about the new features, and this was an important

24 release that was upcoming.  And so this September '98

25 document contained in the next page -- it contained

1 information about the -- the 4.5 release.

2       So the top says -- stands for -- NSP is

3 NetScout probe.  This is the 4.5 release they're talking

4 about.  And it describes the session tracking

5 capability, which is another -- another name for

6 TrackSessions.

7       And this says that it allows the probe to

8 automatically track applications that use multiple

9 ports, and talks about TFTP as one example.  RPC is

10 another example.  That's the same SunRPC as we've --

11 we've been talking about.

12   Q.   Now, in your -- forming your opinion, did you

13 consider any other information about this NetScout

14 probe?

15   A.   Well, I see on the -- the bottom of this page,

16 there's a diagram.  And it looks a little like the

17 diagrams I've been using.  It's -- with a client on the

18 left and the server on the right.  And it shows how the

19 TrackSessions technique could be used to -- to monitor a

20 connection to well-known port, Port 69 on the bottom.

21 And then a response that goes back on a dynamic port.

22       It's listed here as Port x that's -- that

23 represents a dynamic port, and that it is tracking the

24 application even though it switches ports.

25   Q.   Other than what we've -- we've looked at here,

1  did you consider any other information about this

2  NetScout prior art probe?

3       A.    Yes.

4       Q.    Can you describe for the jury what that is?

5       A.    I had a lot of information available to me to

6  analyze in -- in forming my opinion.  I had the probe

7  itself.  I had manuals for the probe.  And you saw one

8  of them.  I had marketing materials that described

9  the -- generally the features, although a little bit

10 about the internals, but I also had other technical

11 documents that told me more about internals.  I had

12 testimony of Anil Singhal, and you also heard testimony

13 from Mr. Nadkarni who -- who also talked about the --

14 the probes and their capabilities.

15            I also talked to NetScout engineers who

16 were -- who had worked on the probe at the time, and

17 these are the people who knew the features of the probe,

18 but then also the internal stuff that made it all work.

19 And that was really helpful for me to understand the --

20 the -- the function of the product.

21            And I'm going to go back to them in a second,

22 because the last thing on the list is source code.

23            Source code is the -- are the files that

24 computer programmers write in language like C.  They

25 write these files, and these files tell the -- tell the

1  probe what to do.  And I had all that -- all that code

2  for the 4.5 code available to me.  And I could look at

3  that to see what -- what things it did.

4          But then those engineers were also helpful for

5  me in -- in finding and understanding the structures and

6  things that I found inside.

7      Q.   Now, did you -- once you gathered all this

8  information on the product, did you do an analysis with

9  respect to the asserted patents?

10     A.   I did.

11     Q.   Now, one question I wanted to clarify, did the

12 patent examiners who issued these patents, did they

13 issue these patents after evaluating this product?

14     A.   No.  They did not have access to, they did not

15 know about it.  It just simply wasn't disclosed to them.

16     Q.   But the patent does mention RMON, doesn't it?

17     A.   Well, roundabout.  Some of the patents have a

18 few references to RMON.  The one reference in particular

19 just kind of --

20              MR. LYONS:  Why don't we pull up -- could

21 we switch to DX-475, and I would ask that we pull up

22 Column 2, and specifically, if you could blow up Lines

23 32 through about 40.

24     Q.   (By Mr. Lyons)  Now, Mr. Waldbusser, this --

25 doesn't this -- isn't this a disclosure to the patent

1  examiner about RMON2?

2      A.   No, no.   This -- what this says is:   Though

3  Netflow, RMON2, and other network monitors are available

4  for the real-time monitoring of networks, they lack

5  visibility into application content and are typically

6  limited as to providing network layer level information.

7          Now, first of all, this is false.   It -- they

8  are not limited to providing network layer information.

9  In fact, they specifically provide visibility into the

10 application content.   That's -- that's why they were

11 created.

12         So when I see this in the context of a

13 disclosure of a -- of a patent application, I'm thinking

14 that the patent examiner is sort of being distracted

15 away from this, that they -- why would they look at RMON

16 after reading this, after reading, the inventors say

17 that this -- this isn't interesting.   And I -- I find it

18 a disturbing mischaracterization of the technology.

19     Q.   And is there a -- did the patent examiners

20 have before them, for example, that TrackSessions

21 standard that we've been talking about or other

22 information on -- on TrackSessions?

23     A.   No, it was not disclosed to them.

24             MR. LYONS:   If you could go back to his

25 presentation.

1    Q.    (By Mr. Lyons)   Mr. Waldbusser, could you walk

2  us through your analysis on an element-by-element basis

3  and explain your -- your opinion?

4    A.    Yeah, I'd be happy to.   So this is Claim 19 of

5  the '789 patent.   And the --

6    Q.    You know, actually, Mr. Waldbusser, this is

7  the first time we're seeing the claim.   And what I would

8  ask you to do is if you could just provide a brief

9  explanation of the elements?

10    A.    Sure.

11    Q.    And then you can come back and do your

12  analysis?

13    A.    That's a good idea.

14              THE COURT:   Approach the bench, Counsel.

15              (Bench conference.)

16              THE COURT:   That's not permitted.   You

17  can't instruct the witness on how to answer.   I'm -- I'm

18  going to give you some latitude, but he's not going to

19  enter into a narrative lecture.   I'm telling you this

20  outside the presence of the jury, but it's not your job

21  to explain to the witness how he's going to testify.

22              You're to ask him questions, and he'll

23  answer them.

24              MR. LYONS:   Understood.

25              THE COURT:   The other thing, Mr. Lyons,

1  I've said throughout pre-trial the one thing I don't

2  like are surprises.  If you had any intention of asking

3  this witness to get up with a big plastic box and walk

4  over into the jury box or adjacent to the jury box, that

5  is something that we could have easily talked about.

6  You asked me just to turn him loose.  I had no idea if

7  he was going to get into those jurors' faces, was he

8  going to remain a respectable distance.  You asked me

9  about releasing the witness before I brought the jury

10 in, but you never mentioned this.  I'm not about to turn

11 a witness loose without some idea of what he's going to

12 do and how he's going to do it.

13            So when you acted rather incredulous that

14 I said no, he could stand up, it's because you didn't

15 give me any idea you were about to pull that out of thin

16 air.  That is exactly the kind of thing that if we had

17 talked about it in advance and we had a clear

18 understanding of what he was going to do and how he was

19 going to do it, he might have had much more latitude

20 than merely standing next to the witness stand.

21            So going forward, if you have ideas about

22 things you want to do that involve movement around the

23 courtroom or anything of a similar nature, if you will

24 raise them with me outside the jury's presence, we can

25 probably get a clear understanding, and you'll get a

1  much better result than if you pull something out of

2  left field like that again.

3                    MR. LYONS:  I understand.

4                    THE COURT:  Understand?

5                    MR. LYONS:   Yeah, I got it.  Thank you.

6                    THE COURT:  Let's continue.

7                    MR. LYONS:  Thank you, Your Honor.

8                    (Bench conference concluded.)

9                    THE COURT:  Let's proceed.

10     Q.   (By Mr. Lyons)  Can you explain your

11  understanding of this element, please?

12     A.   Yes, this element describes a packet monitor

13  for examining packets.  That is -- basically, an RMON

14  probe is a packet monitor for examining packets.

15     Q.   And Element A, a packet acquisition device,

16  can you explain to the jury your understanding of -- of

17  this location.

18     A.   This is a portion of a device that's

19  configured to receive packets.  Before I pointed to the

20  back panel that showed the interfaces on the probe,

21  that's what those were.

22     Q.   Next, Element B is an input buffer memory.

23  Can you explain your understanding of this element,

24  please?

25     A.   Well, standard operating procedure for network

1  probes is to take the packet and place it into a buffer

2  memory so that it can be examined in -- in the -- in the

3  fields understood.

4     Q.   And the next element is a parser subsystem,

5  can you please explain your understanding?

6     A.   Well, this talks about the examination I

7  referred to.  So the -- the probe knows the protocol in

8  use, and it finds all the fields of the protocol,

9  separates them apart or slices them, and then extracts

10  portions from some of those fields.

11     Q.   The next element, D, is a memory, can you

12  explain what this element is?

13     A.   So we want to create those flow-entries to

14  store the -- the connections and the conversations, and

15  so this -- this is the memory for that.

16     Q.   Now, this limitation also refers to

17  conversational flows?

18     A.   It does.

19     Q.   And did -- I put the Court's claim

20  construction.  Can you explain how you used this,

21  please?

22     A.   Yeah, this is the sequence of packets that are

23  exchanged in any direction as a result of an activity,

24  and that's a key word, they have to be the result of an

25  activity.  An activity, for instance, the result -- the

1  running of an application on a server as requested by a

2  client and where some conversational flows involve more

3  than one connection and some even involve more than one

4  exchange of packets between a client and a server.

5          So what this is basically saying is that it is

6  a sequence of packets based on -- based on an activity

7  that involves more than one connection.  That is a

8  conversational flow.

9      Q.   Now, Element E is a look-up engine.  Can you

10  explain your understanding of this element?

11      A.   A look-up engine is the part of the system

12  that -- that matches a key, looks up the key and

13  finds -- looks for a resulting match in the table.

14      Q.   And F is a flow insertion engine.  What is

15  your understanding of this element?

16      A.   Now, if a key is not found, we need to create

17  a new flow.  And that's done by the flow insertion

18  engine.

19      Q.   Now, finally, there's a wherein clause at the

20  end.  What is your understanding of this element?

21      A.   Well, this says that the -- the device must

22  depend on the protocols that are -- to which the packets

23  conforms.  And that's typical and necessary of any

24  probe.  It has to depend on the protocols.  Without --

25  without knowing the protocols you're just going to get

1  gibberish out of the whole recognition process.

2      Q.   Now, in doing your analysis of Claim 19, did

3  Dr. Almeroth dispute all of the positions you've taken

4  in this case?

5      A.   No, he did not.

6      Q.   And can you identify which parts of the claim

7  you don't believe are disputed by Dr. Almeroth?

8      A.   Well, the preamble to Claim 19 is undisputed,

9  Limitations (b) and (c) are undisputed, and finally, the

10  wherein clause, he did not have any reason to dispute

11  those.

12      Q.   So why don't we walk through your analysis

13  of -- of this claim, and using your -- the example that

14  you had, can you just explain your -- your opinion about

15  whether this element is met?

16      A.   Sure.  So we're going to walk through the

17  diagram and -- and match up some of the steps with

18  what's happening in the NetScout probe.

19          So we're talking about SunRPC where Bob's

20  computer sends an RPC request, and we find that a packet

21  monitor for examining packets is met by the probe

22  itself.

23      Q.   And that -- where is that shown on this

24  diagram?

25      A.   Well, it's the -- both the red box and the

1    picture of the -- of the NetScout probe.

2        Q.    So that's the -- the first element you believe

3    that is met by the prior art probe?

4        A.    That's right.  That's its fundamental purpose.

5        Q.    And what other evidence did you find for that?

6        A.    Well, the -- the manual says that the probe

7    agents gather this information by examining each and

8    every packet that is passed in the network segment that

9    is attached to the probe's monitor interfaces.  So that

10   shows me that it is performing the preamble.

11       Q.    So in your opinion, is this element met?

12       A.    It is met.

13       Q.    So I will check that.

14             Let me go to the next element of this claim, a

15   packet acquisition device.  Is that element met by the

16   NetScout probe?

17       A.    Yes, it is.

18       Q.    Could you explain your opinion?

19       A.    Well, the packet acquisition device is -- are

20   the interfaces on the back.  And I've -- when I was

21   examining the source code, I also found elements of the

22   source code that -- that showed me that these were

23   interfaces -- that these interfaces were packet

24   acquisition devices.

25       Q.    Did you find other evidence?

1      A.   In the manual, the -- that same section of the

2  manual talked about examining each and every packet

3  passed on the network segment.

4      Q.   So based on the evidence that you've seen,

5  does the prior art probe meet this element?

6      A.   It does.

7      Q.   Check that box.

8           Let me go to the next element, an input buffer

9  memory.   Is this element met by the NetScout probe?

10     A.   Yes, the NetScout probe has an input buffer

11 memory, and I found this in the source code.  The input

12 buffer memory is the place where the packet is stored so

13 that it can be examined.  And this shows the source code

14 that I found that is -- that implements that, that that

15 buffer memory, that it refers to allocating the next

16 received buffer.  That's where the packets are received

17 into.

18     Q.   Now, can you just explain what the jury is

19 seeing at the bottom of this slide?

20     A.   This is --

21     Q.   By the way, an excerpt from DX-67.

22     A.   Yeah, this is an example of programming

23 language source code.  So this -- these are instructions

24 written by a programmer to tell a computer what to do.

25 Though in -- in -- intermixed in the -- in the computer

1  code, the programmer can write English comments just in

2  their own freehand that describes what the code is going

3  to do, and that's what I've highlighted here.

4      Q.   And so based on the evidence you've seen, is

5  the input buffer memory element met by the NetScout

6  probe?

7      A.   It is met.

8      Q.   Check that.

9          Let's go to -- the next element is a parser

10  subsystem.  Is this element met by the NetScout probe?

11      A.   Yes, it is.

12      Q.   And what is your -- the basis for that

13  opinion?

14      A.   Well, first of all, the -- this -- the first

15  thing I'd like to show you is the top of a file called

16  the pp.c.  And this is -- where pp stands for protocol

17  parser.  And this is -- the description of it is that

18  it's a protocol parsing and configuration function.  And

19  this was written by Mr. Singhal.

20      Q.   Is there other evidence that you considered in

21  connection with this element?

22      A.   Yes.  This -- this source code that I have

23  highlighted here meets the elements of the claim that --

24  that --

25                  THE WITNESS:  Can you go to the next

1  slide, please?

2      A.   The -- the -- the -- this part that says

3  src_port is -- is parsing -- is first of all, slicing

4  and then -- and then extracting that -- that piece of

5  the packet.  And then it is -- there we go -- it's

6  parsing it -- it's -- it includes a slicer, which is

7  what divides it up and pulls -- pulls the pieces out.

8  It extracts the pieces in this -- in Lines 1890 and

9  1891, and then in the combination of the four lines is

10 what accomplishing -- accomplishes the outputting of a

11 parser record.

12     Q.   (By Mr. Lyons)  And so in your opinion, is

13 this element met by the NetScout probe?

14     A.   Yes, it is.

15     Q.   Go to the next Element (D):  A memory for

16 storing a database comprising none or more flow-entries

17 for previously encountered conversational flows.

18          Is this element met?

19     A.   Yes, it is.

20     Q.   Could you explain your opinion?

21          THE WITNESS:   Could you go to the next

22 slide, please?

23     A.   This is -- the step we're speaking of where

24 the -- the key from the packet is -- is added -- looked

25 up and then added to the table.

 1              THE WITNESS:   So next slide, please.

 2      A.    And this is the code that implements that

 3 table.  So first of all, the title of the file is

 4 trackses.h, which is short for TrackSessions.  And the

 5 -- the lines that are highlighted at the top right now

 6 represents the key that is the portion of the database

 7 that stores the key.

 8           And then the next line that was just

 9 highlighted, program number, this is where the

10 application field of the table is stored.

11           And then finally, the last_activity_time is we

12 -- where we store some statistical information about

13 the -- about this connection, and that says, for

14 instance, if we were to record seven seconds past 10:00

15 a.m.

16      Q.    (By Mr. Lyons) Can you continue with your

17 example?

18      A.    Well, this limitation also required that --

19 evidence of conversational flows, and remember that's

20 where we're going to remember the port number and join

21 the connections together and so --

22              THE WITNESS:  Keep going with the

23 animation, please.

24      A.    So here we remember the port number.  We -- we

25 put the port number in this port mapper packet, examine

1  that packet, correlate the red key to the new purple key

2  where we're -- where we're remembering the port number.

3  That's the process that I'm about to show you.  So it --

4  part of it is unsurprisingly in trackses.h with -- for

5  TrackSessions.

6          Then also part of it is in the --

7                  THE WITNESS:  Can you go back one slide,

8  please?

9      A.  The pp.c has the -- has the code that

10  remembers the port.  That Line 1817 actually remembers

11  the port, and the highlighted comment above it tells a

12  little bit about what it's doing.  It's assigning the

13  new port for the previously asked program, and then

14  assigning the port.

15          And then on the next slide it shows the -- the

16  code that swaps the hash bucket.  And then it --

17      Q.  What does that mean?

18      A.  Well, it means that we're -- it essentially

19  means we're adding this new entry to the table.

20      Q.  What's -- what's --

21      A.  In other words, adding the purple key to

22  the -- to the -- to the hash table.

23                  THE COURT:  Gentlemen, please don't talk

24  over each other.

25                  THE WITNESS:  Sorry, Your Honor.

1       Q.    (By Mr. Lyons)  So can you explain how that

2  informs your decision about -- opinion about whether

3  this element is met?

4       A.    Oh, when I found those things, I realized that

5  I found all the elements for the conversational flow.

6       Q.    And so is this element met?

7       A.    Yes, it is.

8       Q.    Let's go to Element (E).  And can you explain

9  whether you have concluded that the look-up engine

10  element is met?

11      A.    Sure.  I think -- I think we have an animation

12  on the look-up engine, or maybe not.  We've seen that

13  already.

14            But this is the code for the look-up engine,

15  and it starts with a comment by the programmer, and --

16  which says check the port number, protocol, interface

17  number, and source and destination address.  You might

18  recognize those as the fields of the 5-Tuple.  Those are

19  the -- those are the important parts of the key.  And

20  checking means matching.  And the code underneath is the

21  code that's actually doing the matching and -- and

22  forming it into the key.

23      Q.    So based on -- on that evidence, do you have

24  an opinion about whether this element is met?

25      A.    Yes, this element is met.

1    Q.   Let's go to Element (F), a flow insertion

2 engine.   Is this element of the claim met?

3    A.   Yes, it is.

4    Q.   Can you explain your -- your analysis?

5    A.   Well, when the -- when we look for a key and

6 don't find it, we need to add it to the table.   And the

7 code for that is here -- in Line 1092, it says to add it

8 at the -- at the new -- the new entry.   And the code

9 from 1102 to 1116 is the code that actually creates this

10 new -- initializes this new entry.

11    Q.   Now, can you explain what happens after the --

12 that sequence of steps?

13    A.   Well, what's -- what's happened there is that

14 the -- the new key has been added.

15             THE WITNESS:   And then can you go to the

16 next slide?

17    A.   This is the code that -- that's looking --

18 that's -- that's had -- classifying the -- the

19 packet-based on the flow that it was just added to,

20 based on the fact that the port information was

21 matching.

22    Q.   (By Mr. Lyons)  So based on -- on that, have

23 you determined whether the flow insertion engine is

24 present in the NetScout probe?

25    A.   Yes, that -- I found that it was there.

1      Q.    And, now, lastly, there's a wherein clause.

2  Is this element met?

3      A.    It is.   This is the one that says that the --

4  that the probe needs to depend on the protocols of the

5  packet.

6      Q.    And do you have an opinion about whether this

7  element is met?

8      A.    Yeah.   There are many examples of code that

9  meets this.   This is just one of them.   In fact, the

10  protocol parser is littered with code that meets the

11  element of -- of being dependent on protocols.   But this

12  one is the code that -- that runs when -- when it's --

13  when you can't discover the protocol.

14      Q.    So based on that, do you have an opinion of

15  whether this element is met?

16      A.    Yes, this element is met.

17      Q.    Check that off.

18          So could you just sort of sum up your opinions

19  about this claim, please?

20      A.    Well, in order to show invalidity through

21  anticipation, I need to show that each of the

22  limitations of a claim are met.   And -- and I've just

23  walked through that process.   And those are the steps

24  that link two connection flows together into one

25  conversational flows -- one conversational flow.

1        Q.   Now, if we look at the claim as a whole with

2   all the elements assembled together, can you explain

3   your overall opinion, please?

4        A.   That Claim 19 is invalid.

5        Q.   Now, did you also consider Claim 20 of the --

6   of this patent?

7        A.   I did.

8        Q.   And is this element met?

9        A.   Well, Claim 20 is a lot easier because it

10  depends on all the claims -- all the limitations that I

11  just showed you.

12           In addition, I need to show one more, which is

13  that it's accepted by the packet buffer memory and

14  examined by the monitor in real-time.  And the key part

15  there is that it happens in real-time.

16       Q.   And do you have an opinion about whether that

17  -- that occurs?

18       A.   Yes, it does.

19                THE WITNESS:  Go to the next slide,

20  please.

21       A.   First of all, we'll show that it's examining,

22  accepted by packet buffer memory and examined by the

23  monitor in this manual section here.

24           Put in the memory and the next received

25  buffer.

1              And then with regards to the real-time

2  component, this is Mr. Singhal's software code in a --

3  in a -- in a file called rtproc.c where rt stands for

4  real-time.  And the description says that it contains

5  the top level real-time procedure.

6       Q.   (By Mr. Lyons)  Based on this evidence, do you

7  have an opinion about whether this element is met?

8       A.   This element is met.

9       Q.   So if we go back to -- to both claims for --

10  both asserted claims in the '789 patent, do you have an

11  opinion about whether these are valid?

12      A.   Both of these are invalid.

13      Q.   Let's go to the -- the next asserted patent,

14  the '751.

15             Once again, was the Patent Office aware of the

16  NetScout probe when they were evaluating whether to

17  grant this patent?

18      A.   No, it was not amongst the disclosure for this

19  patent.

20      Q.   So let's turn to Claim 1 and go through these

21  elements.

22             The first element is a method of analyzing a

23  flow of packets.  Is this element met by the -- the

24  NetScout probe?

25      A.   Yes, it is.

1    Q.    And why do you -- why did you conclude that?

2    A.    Well, this is a fundamental activity of any

3 probe.

4    Q.    So your opinion is this element is met?

5    A.    Yes, it's -- probes analyze flows of packets.

6    Q.    And why don't we go to the next element of the

7 claim, receiving a packet from a packet acquisition

8 device, is this element met?

9    A.    Yes, this is standard procedure for a probe.

10    Q.    And did you see any evidence to support your

11 conclusion?

12    A.    Yeah, the probe manual says that it does

13 exactly that.

14    Q.    So is this element met?

15    A.    Yes.

16    Q.    Let's look at the next element of the claim,

17 Element (B) for each received packet, looking up a

18 flow-entry database, is this element of the claim met?

19    A.    Yes, it is.

20    Q.    And first of all, did you consider the Court's

21 construction in analyzing this element?

22    A.    Yeah, this element has a definition that was

23 decided by the Court that says that a flow-entry

24 database is a database configured to store entries where

25 each entry describes a flow.  And so when I analyzed

1    this, I used this definition as -- as part of the

2    analysis.

3        Q.   And what did you conclude?

4        A.   That I found this flow-entry database.

5        Q.   And what was that based upon?

6        A.   Well, this code here, which we just saw

7    earlier, you know, showed matching the keys with -- and,

8    there -- therefore, looking up the entries in the flow

9    table.

10       Q.   Now, what opinion did you reach regarding the

11   highlighted portion of the claim, a set of one or more

12   states, including an initial state?

13       A.   The code that I have highlighted here on the

14   very bottom we have a comment that talks about

15   initializing the port info fields.  And right below it

16   is a section of code where we're doing the actual

17   initialization to a variable called curr_state.  In

18   other words, current state.  The state is -- it says

19   what's the state of this flow.  And we're initializing

20   it in this code.

21       Q.   Now, this limitation also has the

22   conversational flow element.  Did you have an opinion

23   about whether that's met in this claim?

24       A.   Yes, I -- I found the conversational flow

25   limitation here.

1      Q.   And can you explain, again, what that was

2  based on?

3      A.   Yeah, this is, like before, the references to

4  tracksession.h.   The -- the remembering the port code

5  that is on Line 1817 and describe -- described up above.

6           And then finally, the -- the code on 1835 and

7  1836 that takes the remembered port and adds it to the

8  table.

9      Q.   And based on this evidence, have you concluded

10 whether this element is met?

11     A.   Yes, it is met.

12     Q.   So let's go to the next element, (C).  Do you

13 have an opinion about whether this element is met?

14     A.   I found that it is met.

15     Q.   Can you explain your analysis?

16     A.   Sure.

17          Now, this has -- this one has several

18 components, but they're grouped in the same section of

19 code.

20          The first step is to find the code that

21 identifies the last encountered state, and that's where

22 we find that last encountered state in the variable

23 well-known port.  That's the state that was remembered

24 from the well-known connection, the first connection.

25          Then in green we perform the state operation

1  specified for the state, and that state operation is to

2  assign the old well-known port into the -- into the

3  subid and hash_id variables.

4          And then finally, we want to store a

5  statistical measure, and that is done in the orange

6  highlighted text at the bottom.  This code is just

7  writing down the current time of day.  Marking this

8  connection with the last time of day so that we can keep

9  track of the time of the packets.

10     Q.   And what part of this matches the requirement

11  to show the statistical measure?

12     A.   Well, the last -- the last two lines.  The --

13  the updating the last activity time meets the patent's

14  definition of a statistical measure.

15     Q.   Does the patent give any indication whether

16  the time is related to statistical measures?

17     A.   Yeah, it does.  And that was a pop-up here.

18  It says that each flow-entry includes one or more

19  statistical measures.  For example, the packet count

20  related to the flow, we've seen that, the time of

21  arrival of a packet, and that's exactly what this is, or

22  the time differential.  Time differential is something

23  that we've seen also in the packet -- in the -- in

24  the -- in the code.

25     Q.   And so based on all of this analysis do you

1 have an opinion about whether this element is met?

2      A.   This element is met.

3      Q.   Let me go to the next element in the claim,

4 and is this element met?

5      A.   Yes, Limitation (D) is met.

6      Q.   And could you explain your analysis, please?

7      A.   Yeah.

8                THE WITNESS:   Can you go to the next

9 slide, please?

10     A.   So this is also separated by color.  Now, the

11 code comes from that protocol parser file, and so the

12 green text says to -- that we want to perform state

13 operations required for the initial state of the flow.

14 And you can see that I've highlighted 1102 and 1103

15 where we're initializing the port_info fields, in

16 particular the curr_state field.

17          Then where in yellow we get to store new

18 flow-entry for the new flow in the flow-entry database.

19 And this ADD_TO_HASH function is the -- is the code that

20 adds the -- the flow-entry to what's called a hash

21 table.  That's why it says ADD_TO_HASH.

22     Q.   (By Mr. Lyons)  And based on that analysis,

23 did you consider any other code in your analysis?

24     A.   Well, this one also required storing one or

25 more statistical measures in this new flow.  And so the

1  code snippet below, I point out that it's a new flow.

2  And we're actually initializing the statistical measures

3  on 887.

4      Q.   So based on that evidence and this additional

5  information, did you -- can you explain what other

6  evidence you considered for this element?

7      A.   This -- these were more statistical measures.

8  The frame time is another timer.  And also, the request

9  count where we're updating the counter, it's how many

10  packets were received.

11     Q.   And this code is from DX-48.  And based on

12  your analysis of this, did you include -- what did you

13  conclude about this element?

14     A.   I found that this element -- this limitation

15  was met.

16     Q.   And why don't we go to the next one.

17          The element wherein every packet passing

18  through the connection point is received by the packet

19  acquisition device, is that element met?

20     A.   It is.

21     Q.   And can you explain why you concluded that?

22     A.   And this one simply meant by showing that it

23  is -- has an interface -- a packet acquisition device

24  that is receiving packets.

25     Q.   And so based on that, is this element met?

1    A.    Yeah, the manual shows that.

2    Q.    The next element is wherein at least one step

3 of the set consisting of, and it lists a step (a) and a

4 step (b)?

5    A.    Uh-huh.

6    Q.    Is it your opinion this element is met?

7    A.    Yes.

8    Q.    Can you explain your analysis?

9    A.    Where the text below or the source code below

10 shows a -- a protocol being used in the case -- in this

11 case, it's the well-known port from the first connection

12 is -- does identify a protocol -- for example, email --

13 and it's -- it's part of a plurality of protocols.

14 Plurality means more than one.  And it means that it is

15 selected from many protocols.  It could be email.  It

16 could be port mapper.  So this limitation is met.

17    Q.    Let's go to the next element or the last

18 element.  Such that the flow-entry database is to store

19 flow-entries for a plurality of conversational flows.

20          Is this element met?

21    A.    Yes, it is.

22    Q.    And can you explain your analysis?

23    A.    Yeah.  There are two key parts here.  In

24 yellow, we need to store flow entries.  And I've pointed

25 to this ADD_TO_HASH function because we're storing flow

1  entries in this hash table.  And then the

2  disc_rpc_children here is an example of -- of the

3  plurality of layer levels because RPC refers to the RPC

4  protocol that's part of SunRPC that's a part of a

5  protocol called TCP which is part of IP.  So it's --

6  there are many protocols involved in -- in that -- in

7  that protocol.

8         And finally, that it's above the network

9  layer.

10    Q.    And you also analyzed the limitation requiring

11 conversational flows?

12    A.    I did.  And this was met by the same code that

13 I showed earlier from tracksessions.h, the one that --

14 the -- the part that's remembering the port, adding it

15 to the assigned port variable, and then adding the key

16 to the table in -- which is the hash table variable.

17    Q.    And so do you have an opinion about whether

18 this element is met?

19    A.    This one is met.

20    Q.    Check that off.

21         And in light of -- we'll assemble all the

22 checkmarks here on one page.  Can you just give a

23 summary of your opinion for Claim 1 of the '751 patent,

24 please?

25    A.    In -- yeah.  In light of the fact that there

1 are -- that each of the limitations is met, I found that

2 this claim is invalid.

3     Q.   Let's go to Claim 5 of the '751 patent.  Do

4 you have an opinion about whether this element is met?

5     A.   This element is met.  It's a dependent claim,

6 so it only -- it incorporates all the limitations from

7 before which I've already shown are met, but then we

8 have the one new limitation.

9     Q.   Now, first of all, is there any dispute

10 between you and Dr. Almeroth about whether this element

11 is met by the NetScout probe?

12     A.   There is not any dispute.

13     Q.   And can you explain your analysis for this

14 claim?

15     A.   Well, this claim element -- element adds the

16 need to report one or more metrics and that these

17 metrics be related to one or more statistical measures

18 in the flow-entry.  And the -- the reporting, as well as

19 the statistical metrics, are found in Line 991 and 992,

20 which performs -- it actually keeps track of the

21 difference in time between two packets, and that is an

22 example of a time differential.

23        And then that -- that's reported through a

24 subsystem that's going to send them to SNMP.

25     Q.   So is this element met?

1      A.    Yes.

2      Q.    And going back to -- looking at both of the

3  asserted claims for the '751 patent, based on your

4  analysis, do you have opinion about whether Claim 5 is

5  valid?

6      A.    Claim 5 is -- I found that to be invalid.

7      Q.    And so both -- and what is your opinion about

8  both claims?

9      A.    Well, both -- both claims -- asserted claims

10  from this patent are invalid.

11      Q.    So why don't we go to the last patent, the

12  '725.  And once again, when you reviewed the file

13  history, did you see any indication that the NetScout

14  probe had been considered by the Patent Office before it

15  issued this patent?

16      A.    No, there was no record of that.

17      Q.    And so let's turn to Claim 10.  First of all,

18  are there any areas where you and Dr. Almeroth are not

19  in dispute with regard to this claim?

20      A.    Yeah.  For this claim there's a lot where

21  we're not in dispute, a lot where -- well -- Limitations

22  (B) and it's sub-limitations, as well as (C), which

23  together account for a lot of this claim, are not

24  disputed.

25      Q.    All right.  Let's start with the preamble

1    here.   A method of performing protocol specific

2    operations.   Is this preamble met by the prior art

3    NetScout probe?

4         A.    It is met.

5         Q.    And can you explain your analysis?

6         A.    Well, it's -- this is a standard thing that an

7    RMON probe does, performing protocol specific operations

8    on a packet passing through a connection point.

9         Q.    And so this element is met?

10        A.    It is.

11        Q.    And let's look at the next element, receiving

12   the packet.   Is that element met?

13        A.    Yes, it is.

14        Q.    What's the basis for this patent?

15        A.    Well, once again, the manual shows it, and

16   it's -- and I also know it to be a standard part of a

17   probe.   This is something that -- that is typical.

18        Q.    So this element is met?

19        A.    Yes.

20        Q.    And let's go to the next element in the claim,

21   Claim (B) -- Element (B), receiving a set of protocol

22   descriptions.   Is this element met?

23        A.    It is.

24        Q.    Please explain your analysis.

25        A.    Well, this -- this part is a little bit

1  different.  So we need to show that -- that the -- that

2  there's a set of protocol descriptions following a

3  layered model, and nearly all the protocols do follow

4  later -- layered model.

5       What I show here is that PP_ID_TCP, which

6  refers to the TCP protocol on Line 295 -- I'm told I can

7  mark these.  And PP_ID_IP, this shows the layered model.

8  It says:  The TCP is a child of IP.  That's the

9  relationship there.

10      And -- and we also have another -- another

11  entry for IP here.  So this is a layered model, and a

12  plurality -- plurality of protocols, because there's

13  more than one.  There's both TCP, and there's IP.

14      Q.   And did you consider any other evidence with

15  regard to this element?

16      A.   Yes.

17      Q.   Can you explain?

18      A.   Well, the other part of the element requires

19  that these be received by the -- by the device.  And the

20  protocol descriptions I showed you on the previous page,

21  they're compiled into firmware.  And the firmware can be

22  loaded into the probe through the TFTP protocol.

23      And this -- the manual talks about how that's

24  done.  The highlighted part says that it loads the new

25  agent code from a TFTP server into the probe.  So that

1   agent code includes the firmware that includes those

2   protocol descriptions I just showed you.  And this TFTP

3   process is loading it into -- or receiving it into the

4   probe.

5        Q.   And based on your analysis of this evidence,

6   is this element met?

7        A.   Yes.

8        Q.   Go to this next section of the claim.  And can

9   you -- do you have an opinion about whether this element

10  is met?

11       A.   Yes, it is.

12       Q.   And can you explain, please?

13       A.   So here, there was a -- a Court's claim

14  construction to -- to take into account.  The child

15  protocol was construed to be a protocol that is

16  encapsulated within another protocol.  And I took that

17  into account in this analysis.

18       Q.   Can you explain your opinion on this element?

19       A.   Well, essentially there were two things I

20  needed to show.  One was the protocol layering, like I

21  had shown earlier, where TCP is a child of IP.  And that

22  shows child protocols.

23            And then that -- there's in blue information

24  at one or more locations.  And the information is the

25  value 0, 0, 0, 6.

1    Q.    Based on that analysis, did you conclude this

2   element was met?

3    A.    I did.

4    Q.    So let's check that box.

5          And go to the next element, (ii), the one or

6   more locations in the packet.  Is this element met?

7    A.    It is.

8    Q.    And can you explain your analysis?

9          Mr. Waldbusser, I think you may be able to

10  clear your screen.

11   A.    Oh, yes.

12         Okay.  So the -- so the code here needs to

13  show the one or more locations in the packet.  And the

14  -- the blue-colored section in the code below in Line

15  1871 is code that actually reaches into a packet and

16  pulls out a particular location of the packet, it's a

17  particular port of the packet, the destination port.

18  That's a location in the packet just like the limitation

19  is looking for.  And it's related to a child protocol

20  because this code is part of the code that looks at

21  tcp_children -- children of the TCP_PROTOCOL and,

22  therefore, it meets both of these limitations.

23   Q.    So we'll check that box.

24         Why don't we go to the next element?  If there

25  is at least one protocol specific operation to be

1  performed, is this element met?

2       A.   It is.

3       Q.   And please explain your analysis.

4       A.   Well, the -- the protocol specific operation

5  in this case is to extract the -- the destination port

6  and then to put it into the subid variable in -- in Line

7  1870.  And this is dependent on a particular protocol or

8  it's for a particular protocol because it's for the

9  TCP_PROTOCOL.  It's an activity for the TCP_PROTOCOL.

10      Q.   So is this element met?

11      A.   Yes, it is.

12      Q.   Let's go to Element (C), performing the

13 protocol specific operations.  Is -- is this element

14 met?

15      A.   Yes, it is.

16      Q.   Can you explain your analysis, please?

17      A.   Well, this is the same code because the -- the

18 first one was to show that the -- that we have a list of

19 protocol specific operations.  And then Claim (C) says

20 to do it, to perform them.  And this is -- this code

21 does both.  It actually -- this is code that shows the

22 protocol specific operation and then also includes it --

23 or -- or, I'm sorry, performs it.

24      Q.   So is this element met?

25      A.   Yes.

1      Q.   Go to the back to the claim, go to the wherein

2   clause, wherein the protocol specific operations

3   include, is this element met?

4      A.   It is.

5      Q.   Can you please explain your analysis?

6      A.   Okay.  So there's -- there's three important

7   things going on here.  This limitation requires that

8   we're parsing the packet, that we're extracting things

9   from the packet, and that we're forming a function of

10  the -- of the selected portions.

11         So the -- the parsing is the -- are the source

12  port and the destination port references on the right.

13  We're pulling the -- parsing those -- actually, that's

14  the extracting part, we're extracting those out.  We're

15  parsing them on those same lines and GET_PORT

16  information and the GET_PORT function call.

17         And then finally, all of these together form a

18  function, Lines 1889 through 1892.  When we call the

19  track_session_check, that's -- that's what's called

20  forming a function of these -- of this information.

21  And that meets each of these three limitations, or these

22  sub-elements of this limitation.

23     Q.   This limitation also requires conversational

24  flow; is that right?

25     A.   Right.  This is the same type of -- same code

1  before that referenced the tracksession.h, the -- the

2  remembering the port portion of -- of where we -- we're

3  putting it in the assigned port.  And then we're storing

4  the new purple key by the ADD_TO_HASH function in 1835.

5      Q.   So in your opinion is this element met?

6      A.   Yes.

7      Q.   So if we go back to the claim as a whole, what

8  is your opinion about whether Claim 10 is -- whether

9  Claim 10 is valid?

10      A.   I found that Claim 10 is not valid because

11  each of the limitations has been found.

12      Q.   In the NetScout probe?

13      A.   In the NetScout probe.

14      Q.   So why don't we go to the last claim, Claim

15  17.

16          And --

17              THE COURT:  Counsel, approach the bench,

18  please.

19              (Bench conference.)

20              THE COURT:  How much longer do you think

21  you're going to be, Mr. Lyons?

22              MR. LYONS:  Almost done with validity.

23  And then infringement should go a lot faster.  I would

24  say 15 or 20 minutes.

25              THE COURT:  Okay.  I think we'll recess

1  for the day and let you finish up in the morning.  The

2  jury's beginning to get tired, at least they appear to

3  be.

4              MR. LYONS:  Yes, this is the tough part

5  of the claims.

6              THE COURT:  While I have both of you

7  here, let me remind you that whatever time you intend to

8  spend on the portion of the trial that is before the

9  Court only needs to be reserved out of your trial time.

10             MR. LYONS:  Understood.

11             THE COURT:  Factor that into your

12  calculations, as I'm sure you have been.

13             MR. SKIERMONT:  Yes, Your Honor.

14             THE COURT:  Okay.  We'll recess for the

15  day.

16             MR. LYONS:  Thank you, Your Honor.

17             (Bench conference concluded.)

18             THE COURT:  Ladies and gentlemen, I'm not

19  prepared to keep you any later today, and this witness

20  still has some additional testimony to get through.  So

21  it may not be the perfect juncture, but we're going to

22  recess for the day at this time, and we'll pick back up

23  with the remainder of Mr. Waldbusser's direct testimony

24  tomorrow morning.

25             As you leave to go home, if you will make

1  sure you leave your notebooks closed on the table in the

2  jury room.

3              If you will repeat the same drill that we

4  had this morning, that will be great.  Be here prepared

5  to go by 8:30.

6              Follow all the instructions I've given

7  you, and as you would expect me to remind you, don't

8  discuss the case with anyone, including yourselves, and

9  we'll see you tomorrow morning prepared to go forward

10 about 8:30.

11             The jury's excused for the evening at

12 this time.

13             COURT SECURITY OFFICER:  All rise for the

14 jury.

15             (Jury out.)

16             THE COURT:  Be seated, please.

17             Are there any questions from either

18 Plaintiff or Defendant before we recess for the evening?

19             MR. SKIERMONT:  None from Plaintiff, Your

20 Honor.

21             THE COURT:  Anything from Defendants?

22             MR. KRAEUTLER:  No, sir.

23             THE COURT:  All right.  We stand in

24 recess until tomorrow morning.

25             COURT SECURITY OFFICER:  All rise.

```
 1              (Recess.)

 2              ***********************************

 3

 4

 5

 6                      CERTIFICATION

 7

 8         I HEREBY CERTIFY that the foregoing is a true

 9  and correct transcript from the stenographic notes of

10  the proceedings in the above-entitled matter to the best

11  of my ability.

12

13

14  /s/Shelly Holmes_____          _10/11/17_____
    SHELLY HOLMES, CSR, TCRR                   Date
15  OFFICIAL COURT REPORTER
    State of Texas No.:  7804
16  Expiration Date:  12/31/18

17

18

19

20

21

22

23

24

25
```