REDACTED BY ORDER OF THE COURT

```
 1          IN THE UNITED STATES DISTRICT COURT
              FOR THE EASTERN DISTRICT OF TEXAS
 2                    MARSHALL DIVISION

 3
    PACKET INTELLIGENCE LLC      )(      CIVIL DOCKET NO.
 4                               )(
                                 )(      2:16-CV-230-JRG
 5                               )(
                                 )(
 6  VS.                          )(      MARSHALL, TEXAS
                                 )(
 7                               )(
    NETSCOUT SYSTEMS, INC.       )(
 8  TEKTRONIX COMMUNICATIONS,    )(      OCTOBER 11, 2017
    AND TEKTRONIX TEXAS LLC      )(      8:40 A.M.
 9

10               TRANSCRIPT OF JURY TRIAL

11       BEFORE THE HONORABLE JUDGE RODNEY GILSTRAP

12             UNITED STATES DISTRICT JUDGE

13  APPEARANCES:

14  FOR THE PLAINTIFF:        Mr. Paul J. Skiermont
                              Ms. Sadaf R. Abdullah
15                            Mr. Steven K. Hartsell
                              Mr. Alexander E. Gasser
16                            Mr. Steve J. Udick
                              SKIERMONT DERBY LLP
17                            2200 Ross Avenue
                              Suite 4800W
18                            Dallas, Texas   75201

19  COURT REPORTER:          Ms. Shelly Holmes, CSR, TCRR
                              Official Court Reporter
20                            United States District Court
                              Eastern District of Texas
21                            Marshall Division
                              100 E. Houston Street
22                            Marshall, Texas   75670
                              (903) 923-7464
23

24

25  (Proceedings recorded by mechanical stenography,
    transcript produced on CAT system.)
```

```
 1   FOR THE PLAINTIFF:      Mr. William E. Davis, III
                             THE DAVIS FIRM, PC
 2                           213 N. Fredonia Street
                             Suite 230
 3                           Longview, Texas    75601

 4   FOR THE DEFENDANTS:     Ms. Melissa Smith
                             GILLAM & SMITH
 5                           303 South Washington Avenue
                             Marshall, Texas    75670
 6
                             Mr. Eric Kraeutler
 7                           MORGAN LEWIS & BOCKIUS
                             1701 Market Street
 8                           Philadelphia, Pennsylvania   19103

 9                           Mr. Michael Lyons
                             Mr. Ahren C. Hsu-Hoffman
10                           Mr. Michael F. Carr
                             Ms. Karon N. Fowler
11                           Mr. Thomas Y. Nolan
                             MORGAN LEWIS & BOCKIUS
12                           1400 Page Mill Road
                             Palo Alto, California    94304
13
                             Mr. Adam A. Allgood
14                           MORGAN LEWIS & BOCKIUS
                             1000 Louisiana Street
15                           Suite 4000
                             Houston, Texas    77002
16
                             Mr. Charles E. Phipps
17                           Mr. Paul D. Lein
                             LOCKE LORD LLP
18                           2200 Ross Avenue
                             Suite 2800
19                           Dallas, Texas    75201

20                           Mr. Scott D. Wofsy
                             LOCKE LORD, LLP
21                           1 Canterbury Green
                             201 Broad Street
22                           Stamford, Connecticut    06901

23

24

25
```

                    P R O C E E D I N G S

1              (Jury out.)

2              COURT SECURITY OFFICER:  All rise.

3              THE COURT:  Be seated, please.

4              All right.  Counsel, I've been advised by

5  the parties that with regard to Mr. Maixner and his

6  testimony concerning the issue before the Court of

7  inequitable conduct, the parties have agreed that he

8  should be released, and his testimony with regard to

9  inequitable conduct by agreement will be submitted in

10  the form of deposition excerpts to be provided to the

11  Court outside the presence of the jury.

12              The same agreement does not apply with

13  regard to Mr. Dietz, and Mr. Dietz remains in attendance

14  and has not been released.

15              Is that the parties' agreement?

16              MR. DAVIS:  Yes, Your Honor.

17              MR. KRAEUTLER:  Yes, Your Honor.

18              THE COURT:  Okay.  Then Mr. Maixner is

19  released and is free to stay, he's also free to leave.

20  Mr. Dietz remains with the Court until he's released at

21  a later time.

22              All right.  Are the -- are the parties

23  prepared to read into the record the items from the list

24  of pre-admitted exhibits used during yesterday's portion

1  of the trial before the jury?

2              MR. DAVIS:  We are, Your Honor.

3              THE COURT:  Let's proceed to do that.

4              MR. HARTSELL:  Good morning, Your Honor.

5              THE COURT:  Good morning.

6              MR. HARTSELL:  Our list are Plaintiff's

7  Exhibit Nos. 3, 7, 9, 163, 166, 168, 169, 170, 173, 185,

8  186, 189, 190, 191, 198, 201, 202, 203, 210, 212, 213,

9  215, 223, 226, 228, 230, 234, 248, 267, 274, 278, 279,

10  280, 282, 301, 315, 320, 412, 413, and 414.

11              And from Defendants' Exhibits, Nos. 58,

12  89, 253, 475, 477, 517, 522, and 650.

13              THE COURT:  Does Defendant concur in that

14  rendition?

15              MS. SMITH:  I have one -- Your Honor, I

16  believe Defendants also introduced Defense Exhibit 266.

17  But otherwise, we're agreed.

18              THE COURT:  All right.  Plaintiff agree

19  with that addition?

20              MR. HARTSELL:  Yes, Your Honor.

21              THE COURT:  Okay.  And it's my

22  understanding that the remaining deposition witnesses

23  Plaintiff had intended to call, they've elected at this

24  point not to call.

25              Who is Plaintiff's next witness?

```
 1                    MR. DAVIS:  Mr. Bergman, Your Honor, our
 2  damages expert.
 3                    THE COURT:  All right.  Let's bring in
 4  the jury, Mr. Elliott.
 5                    COURT SECURITY OFFICER:  All rise for the
 6  jury.
 7                    (Jury in.)
 8                    THE COURT:  Good morning, ladies and
 9  gentlemen.  Please be seated.
10                    We'll now proceed with the Plaintiff's
11  next witness.
12                    Plaintiff, call your next witness.
13                    MR. DAVIS:  Thank you, Your Honor.
14                    Plaintiffs call Mr. Jim Bergman to the
15  stand.
16                    THE COURT:  If you'll come forward, Mr.
17  Bergman.  And you've been previously sworn, correct?
18                    THE WITNESS:  Yes, Your Honor.
19                    THE COURT:  Okay.  Please have a seat.
20                    Mr. Davis, you may proceed with your
21  direct examination when you're ready.
22                    MR. DAVIS:  Thank you, Your Honor.
23      JIM BERGMAN, PLAINTIFF'S WITNESS, PREVIOUSLY SWORN
24                       DIRECT EXAMINATION
25  BY MR. DAVIS:
```

1     Q.   Good morning, Mr. Bergman.

2     A.   Good morning, Mr. Davis.

3     Q.   Could you please introduce yourself to the

4 jury?

5     A.   Good morning.  My name is Jim Bergman.

6     Q.   What do you do for a living, Mr. Bergman?

7     A.   I'm an economist specializing in the valuation

8 of intellectual property such as patents and trade

9 secrets.

10     Q.   And do you ever do this in the context of

11 litigation?

12     A.   I do, yes.

13     Q.   Are you married?

14     A.   I am.

15     Q.   Do you have any children?

16     A.   I have two children.  I have a 15-year-old

17 daughter and a 10-year-old son.

18     Q.   And did Packet Intelligence contact you about

19 this case?

20     A.   Yes, they did.

21     Q.   And why did they contact you?

22     A.   They asked me to perform an investigation to

23 determine the amount that Packet Intelligence would be

24 due if NetScout was found to infringe the

25 patents-in-suit.

1       Q.   Now, before Packet Intelligence contacted you,

2  had you ever heard of Packet Intelligence?

3       A.   I had not.

4       Q.   Did you know any of the lawyers in this case?

5       A.   I did not.

6       Q.   Did you know Mr. Brunell or Mr. Vachon?

7       A.   No, sir.

8       Q.   Had you ever heard of the patents or any of

9  the inventors on the patents in this case?

10       A.   No, sir.

11       Q.   How are you being compensated for your time

12  and the work that you've done for this case?

13       A.   I'm being compensated on an hourly basis.

14       Q.   And does your compensation in any way depend

15  on the outcome of this case or the opinions you gave?

16       A.   No, sir.

17       Q.   What is your hourly rate?

18       A.   $580 an hour.

19       Q.   Now, prior to PI retaining you -- retaining

20  you for your services in this case -- well, we've

21  already established, you -- you didn't know anybody

22  involved in this case prior to coming here, right?

23       A.   That's correct.

24       Q.   Okay.  Now, did you prepare a set of slides to

25  help you with your testimony today?

1      A.    I did.

2      Q.    And before we discuss your opinions, can you

3 tell us a little bit about your employment background?

4      A.    Yes.   I am currently the founder and president

5 of Bergman Consulting which is a firm that I started

6 earlier this year.

7            Prior to that, I was the former head of the

8 intellectual property group and a managing director at

9 Conway MacKenzie which is a global financial consulting

10 firm.

11           Prior to that, I spent 10 years as an in-house

12 economist for various national and global law firms,

13 including McKool Smith.

14           And prior to that, I spent 10 years in

15 information technology primarily as a network engineer.

16      Q.    Now, you -- you said you worked for McKool

17 Smith.   Is that a law firm?

18      A.    Yes, sir.

19      Q.    So you have worked in-house for some law

20 firms?

21      A.    That's correct.

22      Q.    And what did you do working in-house for some

23 law firms?

24      A.    I mostly provided economic analysis on

25 intellectual property, complex litigation cases.

1    Q.   Would you describe your qualifications that
2  you believe suit you to render an opinion in this case?

3    A.   Yes, I have a Bachelor's of arts in economics
4  from the University of the California in Irvine.  I also
5  have a Master's in business administration from the
6  University of California at Irvine.  And I'm currently
7  in the process of pursuing a Master's in computer
8  science from Georgia Tech.

9    Q.   Do you hold any professional designations?

10    A.   Yes.  I'm also a certified financial analyst,
11  which is a certification that requires four years of
12  experience and 18 hours of testing on economics,
13  accounting, finance, and asset valuation.

14    Q.   And what about professional organizations, are
15  you members of any of those?

16    A.   Yeah, I'm a member of a few organizations.
17  The one that's probably most relevant is the Licensing
18  Executives Society.

19    Q.   What is the Licensing Executive Society?

20    A.   They're an organization made up of
21  professionals that focus on licensing intellectual
22  property.

23    Q.   How many years have you worked as an economist
24  analyzing and valuing business transactions with a focus
25  on intellectual property?

1       A.    It's been about 13 years now.

2       Q.    And in your more than 13 years of experience,

3   about how many would -- I guess valuations or

4   transactions would you say that you've been involved in?

5       A.    Similar to this, at least 50.

6       Q.    I'm sorry, what?

7       A.    At least 50.

8       Q.    And how many -- how many patent licensing --

9   patent licenses would you say that you've evaluated in

10  the context of those projects?

11      A.    Several hundred.

12      Q.    And how are your education and your work

13  experience relevant to your testimony today?

14      A.    With the type of investigation that I

15  performed in this case, it requires a knowledge of

16  economics, accounting, statistics, and finance.  And my

17  overall experience in working on cases like this has

18  helped guide me in an understanding of the methodologies

19  necessary to perform this type of investigation.

20      Q.    Now, you've -- you've done this a lot in -- in

21  various litigations.  Do you typically work more for the

22  Plaintiffs or the Defendants in your valuations?

23      A.    I've done work on both sides, but to date,

24  most of the work has been for Plaintiffs.

25      Q.    And if you had to break that into a

1  percentage, what would you just roughly estimate that

2  percentage to be?

3      A.    In the work that I've provided testimony on,

4  it's about 75 percent Plaintiff, 25 percent defense.

5      Q.    Okay.  Have you ever testified in U.S.

6  District Court before?

7      A.    Yes.

8      Q.    What information did you review as part of

9  your investigation and as part of the assignment that

10  you had in this case?

11      A.    I looked at a lot of information in this case

12  in performing my investigation, including NetScout's own

13  internal documents, the patents, Court filings,

14  deposition testimony of NetScout and Packet Intelligence

15  employees, financial information, industry research,

16  various licensing agreements, and the expert reports in

17  this case.

18      Q.    How many documents have you reviewed in this

19  case?

20      A.    Many thousands.

21      Q.    How much total time have you spent reviewing

22  the materials, preparing your report, and preparing to

23  come in here and present your opinions to the jury?

24      A.    I'd say probably 350 hours.

25      Q.    I'm sorry?

1      A.    Probably 350 hours.

2      Q.    If you don't mind, would you pull that

3  microphone close?   Thank you.

4      A.    Sure.

5      Q.    And of those 350 hours, how much of that time

6  did you personally spend working on this case?

7      A.    I did have some people working under my

8  direction help me on the case, but probably 90 percent

9  of that time is my time.

10      Q.    How does -- how does the analysis that you

11  performed in this case compare to the analysis that you

12  would typically perform when you are determining patent

13  infringement damages in a lawsuit?

14      A.    I follow the same methodology that I typically

15  follow.

16      Q.    What is your overall opinion in this case with

17  regard to damages for patent infringement?

18      A.    So I applied two separate methodologies in my

19  determination of reasonable royalty damages in this

20  case.   I -- the first approach which we'll talk about is

21  the income approach.   And based on that approach, I came

22  to a reasonable royalty in this case of $15.6 million

23  from the point of first infringement effectively to

24  today.

25            And using the market approach, which is a

1  completely separate approach, I determined that a

2  reasonable royalty would be $14.3 million, similarly

3  from the beginning of infringement to today.

4      Q.   Now, you mentioned in -- when you were

5  describing both of those approaches that you performed

6  your analysis from the beginning of infringement to

7  today.  Why did you add that qualification?

8      A.   Because the investigation that I was asked to

9  perform is really to determine a reasonable royalty for

10  infringement.  So the analysis would begin at the

11  beginning of infringement up until the date we know that

12  they're continuing to infringe.

13      Q.   Do these valuations apply to any infringement

14  on a going forward basis?

15      A.   They do not.

16      Q.   Or let me say that a little differently.  Do

17  they account for any future infringement of the patents?

18      A.   They don't account for any future

19  infringement.

20      Q.   So this is just from beginning of infringement

21  until today, this is your opinion as to the amount of

22  damages for infringement?

23      A.   That's correct.

24      Q.   Now, of these two approaches that you

25  provided, which do you believe is the most appropriate

1  methodology for the jury to rely on?

2      A.    I believe that both are -- are reasonable in

3  the context of this case.  The income approach is the

4  only approach that actually looks at the -- the revenue

5  and profit that's directly attributable to these

6  patents.

7      Q.    Why did you apply two approaches?

8      A.    Because as part of the analysis in performing

9  a valuation, you want to attempt to sort of tackle this

10  problem from multiple angles.  The income approach is

11  one way to look at things.  The market approach is a

12  completely separate analysis.

13         So by performing two separate methodologies,

14  you can get comfort that the -- that each analysis is --

15  is appropriate and reasonable.

16      Q.    If you could put these two approaches in a

17  little context for us, what is the -- do you have any

18  analogies that -- that might apply to these various

19  approaches?

20      A.    Yes.  So probably the -- maybe the best

21  example is -- is if you're attempting to -- to value a

22  small business, for example, you can do this in a couple

23  of different ways.

24         What the income approach for valuation says is

25  can I look at the revenue and profitability that that

1  small business has generated, look at that over time,

2  and determine the value of that company simply based on

3  its cash flows, simply based on the revenue and

4  profitability.

5          The market approach is a completely different

6  angle to that where it says can I find other small

7  businesses out in the marketplace that do something

8  similar to what this company does, and if there is a

9  known value for that business, to take that value and

10 then to adjust it based on the individual facts and

11 circumstances of the business you're trying to value?

12         So using a comparable transaction or

13 comparable company in the market versus solely looking

14 at the company itself and the cash flows generated from

15 that company.  Those are the -- that's the example of

16 the two approaches.

17    Q.   How many claims are at issue in this case?

18    A.   It's my understanding that there are six

19 claims, two from each patent.

20    Q.   And does your opinion on damages change

21 depending on whether the jury finds that one of the six

22 claims is infringed or all six?

23    A.   My opinion doesn't change dependent upon which

24 claims are found to infringe.

25    Q.   Why does your opinion not change if less than

1   all six claims are infringed?

2       A.   It's my understanding from discussions with

3   Dr. Almeroth that the -- the value attributable to each

4   individual claim covers the NetScout's infringement, so

5   it would be -- it's unnecessary to make any adjustments.

6       Q.   And the slide that you've got on the screen

7   here, these are the asserted -- asserted claims of the

8   patents?

9       A.   Yes, sir.

10       Q.   What is the law on patent damages?

11       A.   The law on patent damages states that a

12   Plaintiff is due damages on -- upon a finding of

13   infringement.  A Plaintiff is due damages adequate to

14   compensate for that infringement but in no event less

15   than a reasonable royalty for the use made of the

16   invention by the infringer.

17       Q.   What is a reasonable royalty?

18       A.   A reasonable royalty is a royalty that would

19   be due based, as it states here, for the use made of the

20   invention by the infringer.  So -- so you're not only

21   looking at simply the value of the patent in isolation.

22   You're looking at the value of the patent to the

23   infringer.

24       Q.   Can you give us an example of a royalty?

25       A.   I think Mr. Brunell in his testimony yesterday

1  gave the example of oil.  If you're a landowner and a

2  company comes to you and says we want to pay you to take

3  oil off your land or mineral rights, that payment is a

4  royalty.

5      Q.    Is Packet Intelligence entitled to a

6  reasonable royalty in this case if the jury finds

7  infringement?

8      A.    Yes, sir.

9      Q.    Now, in a reasonable royalty calculation, is

10 the royalty required to be calculated down to the penny?

11     A.    No.

12     Q.    Why not?

13     A.    The ultimate royalty at the end of the day

14 needs to be a reasonable royalty.  And part of the

15 challenge in -- challenges in cases like this is not

16 only are you -- or am I in my investigation attempting

17 to value a unique asset, this asset doesn't exist

18 anywhere else in the world, I am attempting to perform

19 that valuation for a particular company.  So that adds

20 an extra layer of complication.

21         So some -- ultimately some estimation is

22 required in determining the value of this unique asset

23 for this particular company.

24         I would say that -- that not even NetScout has

25 attempted to value this functionality itself within its

1  own system.  It doesn't do that as part of its normal

2  operation.  So nobody other than the two experts in this

3  case has probably ever attempted to value this patent,

4  this technology for this company.

5      Q.   Now, I see on the slide here you've

6  highlighted -- you've highlighted, you've bolded

7  reasonable royalty language, but you've also underlined

8  a portion of -- of that phrase.  Why have you done that?

9      A.   Because I think it's a key part of the --

10  of -- of ultimately of damages, which is I'm not just

11  attempting to determine the value of this patent in the

12  marketplace.  I'm attempting to determine the amount of

13  use that NetScout -- or the amount of benefit that

14  NetScout has achieved from its use of the patent and

15  determine a reasonable royalty based on that use.

16      Q.   What is the framework that you used to perform

17  this reasonable royalty analysis?

18      A.   The framework that's set up for reasonable

19  royalty damages is something called the hypothetical

20  negotiation.

21      Q.   What is a hypothetical negotiation?

22      A.   A hypothetical negotiation sort of imagines

23  that the infringer and a patentholder would have gotten

24  together -- would have sat in a room prior to the date

25  of first infringement and would have come to an

1  agreement as to what a reasonable royalty would have

2  been for use of the patented technology.

3  MR. DAVIS:  All right.  And before I move

4  on, I've just been reminded, Your Honor, I -- I forgot

5  to tender Mr. Bergman, so at this time I'd like to

6  tender Mr. Bergman as an expert in economics and the

7  valuation of patent damages.

8  THE COURT:  Is there objection?

9  MR. CARR:  No objection, Your Honor.

10  THE COURT:  Then the Court will recognize

11  the witness as an expert in those designated fields.

12  Continue, Counsel.

13  MR. DAVIS:  Thank you, Your Honor.

14  Q.   (By Mr. Davis)  So you just described the

15  hypothetical negotiation.  How is a hypothetical

16  negotiation that you've laid out here different from the

17  real world or a real-world notion?

18  A.   There are probably three key differences

19  between what you would imagine a real-world negotiation

20  would be and the -- and the context of determining

21  real -- reasonable royalty damages using a hypothetical

22  negotiation.

23  The first distinction is that in this

24  hypothetical negotiation, the parties agree that the

25  patents are valid and infringed.  And then as you would

1   imagine in a real-world negotiation, validity and

2   infringement are contested and frequently hotly

3   contested.  So there's a big difference there between

4   the hypothetical negotiation and the real-world.

5          The second one is that in the hypothetical

6   negotiation, both parties are assumed to have all

7   knowledge about all relevant facts, not only the

8   relevant facts as of that negotiation, but even the

9   relevant facts going into the future.

10         Where -- whereas in a real-world negotiation,

11  parties frequently don't have access to all the relevant

12  information.  One party may be hiding relevant

13  information or want -- not want the other party to know

14  all the information in that negotiation.

15         And finally, in a hypothetical negotiation,

16  the parties have to agree.  They have to come to some

17  kind of an agreement as to what a reasonable royalty

18  would be.  In a real world, obviously, parties can just

19  get up and walk away from the table and say, I'm not

20  going to come to an agreement.

21     Q.   And so in the hypothetical negotiation, can

22  NetScout say to Packet Intelligence as part of their

23  negotiating position, we don't think your patents are

24  infringed, and we don't think your patents are valid?

25     A.   No, walking in the door, in this hypothetical

1  negotiation, both parties would have agreed that the

2  patents are valid and infringed.

3       Q.   Now, you mentioned the book of wisdom.  Can

4  you tell us what the importance of that is?

5       A.   Yeah, the book of wisdom is what's been dis --

6  what's been called in the law the -- the ability for the

7  parties to kind of look into the future, to see how much

8  profitability has been received by the infringer as an

9  example.

10      Q.   So you mentioned that the hypothetical

11 negotiation occurs when?

12      A.   December of 2010.

13      Q.   And so in December of 2010, at that time, had

14 NetScout made any money yet using the technology?

15      A.   They had not.

16      Q.   So what does the book of wisdom do with

17 respect to the amount of money that NetScout will make

18 over the few years, six or seven years on these products

19 or on this technology?

20      A.   So we know based on NetScout's financials that

21 over the infringement period, they made 4 -- $408.3

22 million.  So as part of this hypothetical negotiation,

23 the parties, even though this negotiation is occurring

24 back in December of 2010, the parties would have been

25 aware of that 408.3 million-dollar revenue number and

1 all the profitability associated with that.

2    Q.    So when Packet Intelligence sits down at the

3 table to negotiate with NetScout it gets to tell

4 NetScout, hey, I know that you will make $400 million

5 using these -- using this technology?

6    A.    Over that period of time, yes.

7    Q.    Is the book of wisdom kind of like a crystal

8 ball that let's you see into the future?

9    A.    Yeah, sort of.

10    Q.    Okay.  And so what does the -- what does the

11 hypothetical negotiation look like in this case?

12    A.    In this case, as I said, you would imagine

13 that a -- an executive from Packet Intelligence, an

14 executive from NetScout would have sat around a table in

15 December of 2010 to negotiate the reasonable royalty for

16 NetScout's use of these patents.

17    Q.    Now, in 2010, though, Packet Intelligence

18 didn't own the patents, right?

19    A.    They did not.

20    Q.    And so how does that work?

21    A.    Again, using the book of wisdom, we know that

22 in 2010, Exar was actually the holder of these patents.

23 So we know that using the book of wisdom, that the

24 patents would have been sold to Packet Intelligence,

25 and, therefore, negotiating effectively on behalf of

1  Packet Intelligence.

2      Q.   All right.   We -- so we have the hypothetical

3  negotiation.   What factors do you consider in

4  determining what the outcome of the hypothetical

5  negotiation would be in terms of a reasonable royalty?

6      A.   So there are effectively 15 different

7  reasonable royalty factors that come into play that need

8  to be considered.   And this comes from a particular case

9  that has sort of laid out these individual factors that

10  need to be considered as part of a reasonable royalty

11  analysis.

12      Q.   Will the jury be instructed on these factors?

13      A.   It's my understanding that Judge Gilstrap will

14  provide these factors in -- in the jury instructions.

15      Q.   Now, there's a lot of factors here, but

16  briefly can you -- can you walk us through them or

17  explain them?

18      A.   Yeah, so what -- what I typically do is I

19  will -- I break these factors into two buckets.   And we

20  already discussed a little bit sort of this income

21  approach and market approach.   But effectively these

22  factors can fall into either one or -- or both of the

23  individual approaches.

24          So my analysis takes those factors and looks

25  at them either when I perform my income-based approach

1  methodology or my market-based approach methodology.

2      Q.   Are all of these factors equally important in

3  every case?

4      A.   No.  Some are not relevant to a case that --

5  that maybe would be relevant to another case.

6      Q.   Now, one thing that -- that I know you've

7  done, there's -- there are reasonable -- but there are

8  different types of royalty payments.  What are the

9  different types of royalty payments that you considered

10 might be agreed to in the hypothetical negotiation?

11     A.   So there's two different types of royalties.

12 There's either a running royalty, which is a royalty

13 based on periodic payments based on actual sales.  So if

14 we go back to the -- the example of a landowner getting

15 paid for the extraction of oil off their land, it could

16 be based on the number of barrels that are extracted.

17 So if you get, you know, $20 per barrel, they extract a

18 thousand barrels, you'd get paid $20,000.

19         The second type is a lump-sum payment, which

20 is just a single payment at the time the license is

21 executed.  It could be for a small period of time, it

22 could be into perpetuity, it depends.  But in that case,

23 to use the same example, a company would come to you and

24 say, I will pay you $300,000 to extract as much oil as I

25 can off the land, and if there's nothing there, that's

1  my risk.

2      Q.   And what type of royalty did you find or

3  conclude was appropriate in this case?

4      A.   Based on the methodologies that I employed, I

5  found that those methodologies resulted in a running

6  royalty.

7      Q.   So in a running royalty, what are the

8  components of a running royalty that comprise it?

9      A.   So as we described, there are two basic

10  components to a running royalty.  There is the royalty

11  base, which is the -- either total revenue or profit or

12  number of units.  And then the royalty rate, which is

13  what portion of that would be applied to come to the

14  total amount of the reasonable royalty.

15      Q.   Do you have an understanding of the technical

16  benefits of the -- provided by the patents-in-suit?

17      A.   I do.

18      Q.   And what is -- what sources of information do

19  you rely on to understand the technical benefits of

20  these patents?

21      A.   Primarily with my discussions with Dr.

22  Almeroth.

23      Q.   Okay.  And could you tie the technical

24  benefits of the patents back to the patent statute?

25      A.   Yeah.  As -- you know, in the determination of

1 a reasonable royalty for the infringer's use of those

2 patents, the technical benefits are the benefits that

3 are being provided to the Defendant or provided to the

4 infringer.  And based on that, we can determine a

5 reasonable royalty.

6     Q.   Okay.  And in the language of the statute, it

7 says:  The value for the use.  Is that what you mean by

8 the technical benefits?

9     A.   Yes.

10     Q.   And what are the technical benefits that the

11 patent -- that the patents provide and that NetScout has

12 used?

13     A.   I think some of this was covered yesterday,

14 but specifically with regard to NetScout, it's my

15 understanding that the benefits provided by the patent

16 include increased traffic recognition rates, a greater

17 overall understanding of the traffic that's flowing

18 through the network, and increased quality of service

19 metrics.

20     Q.   Now, did you hear Mr. Brunell's testimony

21 yesterday regarding forward citations?

22     A.   I did.

23     Q.   And what that meant to him?  What do the

24 forward citations to these patents indicate to you?

25     A.   They indicate that they're valuable.

1          Q.     And what are the forward citations to the

2    asserted patents in this case?

3          A.     Sorry.   The -- for the '725 patent, that

4    patent has been cited 291 times.   And -- and what's

5    interesting is when I issued my report, the patent had

6    been cited 280 --

7                         MR. CARR:   Objection, Your Honor.

8                         THE COURT:   What's your objection?

9                         MR. CARR:   May I -- may I approach?

10                        THE COURT:    Approach the bench.

11                        (Bench conference.)

12                        MR. CARR:   I had agreed with Mr. Gasser

13   that there will not be a mention of Tektronix on this

14   slide or Fluke or Network General on the following

15   slides.   Those were not in his report.

16                        MR. GASSER:   We apologize.   There was a

17   glitch.

18                        THE COURT:   Just a minute.   Y'all are

19   going to have to speak into the microphone.

20                        MR. GASSER:   We --

21                        THE COURT:   My understanding is there was

22   a dispute as to this demonstrative, and you all

23   negotiated a resolution of that dispute which was to

24   remove some of these logos and that that's the basis of

25   the objection, that some of the agreed upon removals

1  haven't taken place; is that right?

2              MR. GASSER:  That is correct, Your Honor,

3  yes.

4              THE COURT:  Okay.  Well, we either need

5  to pull this down and move on or you need to put up the

6  right one and move on.

7              MR. GASSER:  Okay.  We can pull this one

8  down, and I can just -- I can verify -- she can just

9  load the correct version.

10              THE COURT:  Get it pulled down --

11              MR. GASSER:  Okay.

12              THE COURT:  -- and y'all take a second to

13  talk to your tech person.

14              MR. GASSER:  Okay.

15              THE COURT:  And let opposing counsel know

16  whether you're going to put the right one up or you're

17  going to move on.

18              MR. GASSER:  All right.  Thank you.

19              MR. CARR:  Thank you.

20              (Bench conference concluded.)

21              THE COURT:  Do you need a moment to

22  consult with your technical assistant, Mr. Davis?

23              MR. DAVIS:  Yes, Your Honor, if I may,

24  please.

25              THE COURT:  Take a moment.

```
 1              MR. DAVIS:  I think we've got that worked

 2  out, Your Honor.

 3              THE COURT:  All right.  Let's proceed.

 4              MR. DAVIS:  Okay.

 5       Q.   (By Mr. Davis)  I believe we're -- yes, here

 6  we go.  This is the correct slide.

 7              You were saying, Dr. -- Mr. Bergman about

 8  forward citations.

 9       A.   Yes.  So looking at the '725 patent, that

10  patent has been cited 291 times as of -- effectively as

11  of today.  When I issued my report back in June, the

12  patent had been cited 281 times.  So just over the last

13  three or four months, it's been cited an additional 10

14  times.  But it's been cited by obviously major companies

15  here like Intel, Cisco, Amazon.

16       Q.   Now, are you aware that NetScout purchased a

17  company called Tektronix?

18       A.   Yes, sir.

19       Q.   Are you aware that they purchased a number of

20  companies together as part of an acquisition?

21       A.   Yes.

22       Q.   What -- what do you know about that

23  acquisition?

24       A.   That was an acquisition that occurred in 2015

25  where NetScout acquired four companies from Danaher,
```

 1   including Tektronix.  The total purchase price was $2.3

 2   billion.

 3       Q.    And of the multiple companies purchased by

 4   NetScout, together with Tektronix, what percentage of

 5   the revenue did Tektronix have relevant to the entire

 6   group of those companies that were purchased?

 7       A.    From the data that I saw as of 2014, the year

 8   prior to that acquisition, Tektronix's revenue consisted

 9   of 61 percent of the total revenue of that

10   2.3-billion-dollar acquisition.

11       Q.    Okay.  And --

12               THE COURT:  You're going to -- just a

13   minute.  You're going to need to speak up, Mr. Bergman.

14               THE WITNESS:  Sorry.

15               THE COURT:  Your voice seems to trail off

16   at the end of your sentences, so --

17               THE WITNESS:  Okay.

18               THE COURT:  -- please be mindful that

19   it's important for everyone to hear you.

20               THE WITNESS:  Yes, sir.

21               THE COURT:  Continue, Counsel.

22               MR. DAVIS:  Thank you, Your Honor.

23       Q.    (By Mr. Davis)  And do you have a slide on

24   that?

25       A.    I believe I do.  Jump back here for a second.

1  There we go.

2      Q.   Oh, okay.

3      A.   There's a slide.

4      Q.   Okay.  Now, have you ever heard of a company

5  called Fluke Corporation?

6      A.   Yes, I have.

7      Q.   Who is Fluke?

8      A.   Fluke is another company that was acquired

9  with those same four companies as part of the 2015

10 acquisition.

11     Q.   Now, did you consider all of the information

12 we've just discussed -- been discussing based on forward

13 citations when you performed your valuation of the

14 reasonable royalty in this case?

15     A.   Yes, it was part of my consideration.

16     Q.   Okay.  And how did you use that information?

17     A.   Really just to get an understanding of the

18 overall value of the patents.

19     Q.   What is the income approach that you used in

20 this case?

21     A.   Let me get to my slide.

22          So the income approach, like we discussed, was

23 the -- the investigation that I performed was to

24 determine the amount of profitability that was directly

25 attributable to the patents-in-suit.

1    Q.   Now, can you give the jury a high level

2 preview of the steps that you used to -- to apply the

3 income approach to this case?

4    A.   Yeah.  I took three separate steps.  The first

5 was really just to get an understanding of the

6 incremental benefit provided by the patents over the

7 prior art.

8         The second step was to evaluate the accused

9 products based on that -- on the incremental benefit.

10        And the third step was to then go about

11 allocating the revenue and profit of the company to that

12 incremental benefit.

13    Q.   Now, with respect to the first step, how did

14 you determine the incremental benefit provided by the

15 patents at issue in this case?

16    A.   Well, when you perform these kind of

17 investigations, and specifically when you're attempting

18 to value a patent, what's important to do is to get an

19 understanding as to what -- what we call the next best

20 alternative to non-infringement.

21    Q.   What do you mean by "next best alternative to

22 infringement"?

23    A.   That basically means that in order to

24 determine the value of the patent, you have to figure

25 out what other alternatives are out in the marketplace

1  that provide other maybe similar functionality, not up

2  to the -- to what you get with the patent, and then

3  determine the benefit between those two -- between those

4  two options.

5          And -- and maybe a good example is to say that

6  if I've got a luggage company that has a -- that has a

7  patent on a four-wheel suitcase, all right, if I was

8  asked to determine what's the value of that patent, I

9  would have to look into the marketplace and say, well,

10 what else is out there.  If there's a two-wheel suitcase

11 out there, then I have to determine the benefit of going

12 from a two-wheeled suitcase to a four-wheeled suitcase,

13 and say how -- what's the ultimate benefit between those

14 different suitcases.

15         If there are no two-wheeled suitcases out

16 there, there are just suitcases without wheels, then I

17 have to perform a similar type valuation between those

18 two alternatives.  What's the benefit of having wheels

19 at all versus a suitcase without any wheels.

20         So that's a key component is to understand

21 what else is in the market that would serve as an

22 alternative to the patented technology.

23     Q.   And does the -- does there always have to be

24 an alternative?  I mean, is there required to be an

25 alternative?

1       A.    There's not required to be a commercially

2   acceptable alternative.   There's typically prior art or

3   typically some other baseline-type alternative out

4   there.   So to use the suitcase example, you know, there

5   are suitcases, right, if I have a -- if I have a patent

6   on a four-wheeled suitcase, I'm -- I'm not inventing a

7   suitcase, I'm inventing a better functionality of a

8   suitcase.   So there's typically something to measure

9   against.

10      Q.    Now, what -- where did you learn about the

11  state of the art and whether or not there was an

12  acceptable non-infringing alternative in this case?

13      A.    Based on discussions with Dr. Almeroth.

14      Q.    And what did Dr. Almeroth tell you as to

15  whether or not there is an acceptable non-infringing

16  alternative to infringing the patents?

17      A.    Because this is really a key component of the

18  analysis that I performed -- really, to do a valuation

19  of this type you have to really understand what your

20  alternatives are.   And so I speak with Dr. Almeroth, and

21  based on his analysis, and I believe he said this in

22  Court yesterday, that there are no non-acceptable -- no

23  acceptable non-infringing alternatives out in the

24  marketplace for this particular technology.

25             And I also looked at NetScout's own expert

1  reports, both their technical expert and their damages

2  expert to see what they were saying was the next best

3  alternative to non-infringement.  And neither of them

4  had an opinion with regard to alternatives.

5      Q.   So what does the -- the lack of an alternative

6  mean for your analysis?

7      A.   It basically means that I need to go back and

8  value these patents based on the prior art.  Even though

9  they may not be commercially acceptable in the

10 marketplace, I need to say what's the benefit provided

11 by these patents over the prior art systems.

12     Q.   And what do you understand to have been the

13 prior art technology at the time of infringement?

14     A.   My understanding of the prior art at the time

15 of infringement was the well-known port methodology of

16 classifying traffic.

17     Q.   Now, with respect to your suitcase example, if

18 your analysis assumes based on Dr. Almeroth that there

19 is no non-infringing alternative, does that mean that

20 your analysis assumes the entire benefit of the suitcase

21 is due to the patents?

22     A.   It does not.

23     Q.   Okay.

24     A.   Again, as I stated before, I do have to assume

25 that, you know, maybe people wouldn't buy a suitcase

without wheels anymore, but it doesn't mean there are --
there's no value to the non-infringing aspects of that
patent.  So I do need to provide credit for those
non-infringing aspects in my analysis.

Q.   And what NetScout products are using the
technical benefits provided by the patents?

A.   NetScout is using the GeoProbe G10 and the
Geo -- GeoBlade systems, those are the accused products
in this -- in this case.

Q.   How does NetScout describe the importance of
the accused GeoProbe G10 product?

A.   I think a lot of this was discussed in
testimony yesterday, and some of these same documents
were -- were shown yesterday.  But for the -- for the
GeoProbe G10, NetScout, and -- and previously Tektronix
had described this particular product as the center of
their network monitoring portfolio, and that it served
as the primary collection and correlation agent for
their solutions.

Q.   What about the GeoBlade, does NetScout think
the GeoBlade is an important product?

A.   Yes.  And -- and I think this document was
shown yesterday, as well.  This is a GeoBlade document,
PTX-168, that describes the features and functionalities
of the GeoBlade, and describes how the GeoBlade

1  leverages highly customized configurations for the

2  tightest control over how network data is processed by

3  protocol and the desired granularity, and describes it

4  as a solution for high traffic volumes.

5      Q.   What other NetScout products rely on

6  information being collected and processed by the accused

7  products?

8      A.   So there are a lot of other products that

9  NetScout provides that utilizes the data that is

10  processed by the accused products, one of which is --

11  there was a little bit of discussion about this

12  yesterday, as well, which is these Iris applications.

13          And as shown in this document, the GeoProbe

14  G10 is used by those Iris applications that the -- the

15  G10 feeds those applications its data as part of its

16  overall process.

17      Q.   So what is the -- what is the next step in

18  your income approach now that we've looked at the

19  importance of the accused products?

20      A.   So the next step is to now go through the

21  process.  Once I've understood the incremental benefits,

22  once I've understood the importance of the accused

23  products, to go about the process of allocating the

24  revenue and profit to the patents themselves.

25      Q.   And can you give us a high-level overview of

1  what this entails?

2     A.   I can.   I'm going to apologize ahead of time

3  because there's a lot going on in this slide.

4          But basically, this is a summary of the

5  analysis that I performed.   And because the law

6  requires, and -- and -- and an economic valuation

7  requires an understanding of what the footprint of the

8  invention is, I have to go about the process of giving

9  credit to NetScout for all of its costs and all of the

10  benefit that is provided to NetScout for its

11  non-infringing -- for the non-infringing aspects of that

12  product.   So that's what this process here walks

13  through.

14          And -- and we'll go through this.

15     Q.   So what is the first step in the process?

16     A.   So the first step in the process is to get an

17  understanding of the overall accused product revenue and

18  direct costs associated with that.

19     Q.   And what are direct costs?

20     A.   Direct costs are those costs that are directly

21  attributable to the production of the accused products.

22          So the hardware costs, for example, that

23  NetScout has to acquire to put the box together would be

24  a direct cost.

25     Q.   And where did you get these figures from?

1      A.   So this slide here shows all the revenue and

2  the direct costs associated with the accused products.

3  This information came directly from NetScout.  NetScout

4  prepared a document -- prepared financial information

5  specifically for this case.  And -- and based on the

6  document, I came to a total accused product revenue of

7  $408.3 million.  And when you take out the direct costs

8  that are associated with that, the gross profit is $225

9  million.

10     Q.   Okay.  Now, do the revenue figures on this

11 slide include financial information from the sale of any

12 products that are not at issue in this case?

13     A.   They do not.  And as I think there was

14 testimony -- video testimony yesterday from Mr. Lindahl

15 from NetScout, he is the one who sort of went about

16 determining which hardware and software was considered

17 to be essential for the product and which products

18 weren't considered to be essential.

19          This analysis only takes into account the

20 revenue based on Mr. Lindahl and NetScout's

21 representation as to the essential hardware and software

22 necessary for the box.  I didn't include anything other

23 than that.

24     Q.   So are you referring to the series of

25 questions Mr. Lindahl was asked where he was asked

1  whether he included certain things or excluded things?

2      A.   That's correct.

3      Q.   So what's the next step in the process?

4      A.   So after performing this first step, just to

5  summarize it, you'll see that of the $408.3 million,

6  roughly 45 percent of that gets credited to NetScout for

7  their direct costs.  And so we're left with a gross

8  profit of $224.9 million.

9      Q.   So Packet Intelligence is not trying to take

10 credit for the standard cost of sales or the other costs

11 of sales, right?

12     A.   That's correct.

13     Q.   Okay.  So what's the next thing you do in your

14 analysis?

15     A.   So the next step in the analysis is to

16 recognize that these accused products are made up of

17 both hardware and software and that there's value to

18 both of those aspects.  And because the accused

19 functionality primarily resides in the software, I

20 needed to give NetScout credit for the value of its

21 hardware.  This is separate from giving them the costs

22 or -- or giving them credit for the costs they expend

23 for that hardware.  They do receive some value from

24 selling that hardware out into the marketplace, so I

25 needed to give them some credit for that.

1    Q.   So how did you figure out -- or how did you

2  determine how much credit to give them for hardware?

3    A.   Well, NetScout itself doesn't break down or

4  provide financial information as to how much value they

5  get from hardware versus how much value they get from

6  software.

7        So in looking at their internal documents, I

8  did find reference to the fact that NetScout treated its

9  hardware as a commodity.  Basically that means that

10 there's no real differentiation in the marketplace

11 between its hardware and other types of hardware out in

12 the market.

13       And then also there was testimony yesterday

14 from Mr. Lindahl who stated that, you know, the value in

15 these products is in the software.  They put their money

16 in the software, and that's where primarily this value

17 lives.

18   Q.   Okay.  So how did you perform this -- how did

19 you come up with the numbers and perform this

20 allocation?

21   A.   So because NetScout itself doesn't break this

22 down, I had to look outside of NetScout to see are there

23 any other companies that are out in the marketplace that

24 I could consider to be comparable to a -- a

25 commodity-based hardware manufacturer.

1          And so looking out in the market, I found two

2    examples.  So Hewlett-Packard is one, Dell is another,

3    that are considered to be commodity hardware products.

4    They make computer systems, and then they sell those

5    computer systems out into the market.

6          They don't do a lot with customized software.

7    They really just manufacture computers and sell them

8    into the marketplace.

9          So I looked at Dell and HP's financial

10   statements and figured out what their gross margins

11   were, what profit they're receiving from the sale of

12   their hardware.  And on average, taking into account

13   both of those companies, the -- the weighted average

14   gross margin for those two companies was 20.7 percent.

15        Q.   So what -- what did you do with that 20.7

16   percent?

17        A.   So I took that 20.7 percent, and I gave credit

18   to NetScout for that 20.7 percent and deducted that

19   amount from its overall gross profit.

20        Q.   And what did you do next?

21        A.   So the next step was to recognize that

22   NetScout has what I'll call -- what are called indirect

23   costs.  So these are costs that you can't pin directly

24   on any one product but they are necessary in helping to

25   drive revenue.

1         So a good example of that would be sales and

2   marketing.  NetScout is going to expend the money to

3   market its products, and because of that, they'll

4   generate additional revenue from that.  So I credited

5   NetScout for its overall sales marketing operating

6   expenses.

7       Q.   So just to -- just to clarify, what you're

8   saying is NetScout spends money on sales and marketing

9   which generates revenue, and we're not trying to take

10  credit for the revenue they generate -- generate from

11  sales and marketing; is that right?

12           MR. CARR:  Objection, Your Honor,

13  leading.

14           THE COURT:  Sustained.

15           MR. DAVIS:  I'll move on.

16      Q.   (By Mr. Davis)  So how did you determine the

17  appropriate amount to allocate for sales and marketing?

18      A.   So because over the damage period -- over the

19  period of infringement that we're looking at, Tektronix

20  was the manufacturer of these products up until the

21  acquisition in 2015, I went back and looked at

22  Tektronix's overall sales, marketing, and general

23  administrative expenses, analyzed those, and found that

24  on average, Tektronix was spending 28 percent of its

25  revenue on sales, marketing, general, and administrative

1  expenses.  So I credited NetScout that 28 percent.

2      Q.   Okay.  And what does that look like now in

3  terms of the amount of credits or deductions you're

4  giving back to NetScout?

5      A.   So as part of that allocation, I credited

6  NetScout 28 percent or 114.5 million for sales,

7  marketing, and operating expenses.

8      Q.   Okay.  What's next?

9      A.   So after I've completed that step, I've now

10 gotten to the point where I have determined the value

11 that's directly attributable to the base software that

12 sits in the accused products.  I was -- I've given them

13 all their direct costs, their indirect costs, and the

14 value of the hardware.  Now I know what the software is

15 worth.

16         So the next step is to allocate or give credit

17 to NetScout for the non-infringing aspects of the

18 software.

19     Q.   How did you go about determining how much

20 credit to give NetScout for the non-infringing aspects

21 of the software?

22     A.   So the next step in the process is to figure

23 out exactly where the infringing software lives in the

24 totality of the overall software.

25         And based on the testimony yesterday, my

1  discussions with Dr. Almeroth, the infringing -- the

2  patented technology and NetScout's use of the patented

3  technology is within the overall traffic classification

4  portion of the accused products.

5       So the first thing I did is I looked and I

6  said, can I determine what the value of the traffic

7  classification as a whole is to NetScout?

8       Q.   And how did you -- how did you go about doing

9  that?

10      A.   First, I looked at a number of NetScout's own

11 documents to see how they described the traffic

12 classification functionality within their products.  And

13 as shown here, this is PTX-168.  This document describes

14 the GeoBlade as providing control over network data by

15 protocol and desired granularity.

16      I also saw some additional documents which

17 described the -- that the multi -- multi-protocol

18 correlation engine performs advanced correlation of

19 multiple protocols and related traffic to display the

20 results as complete sessions.  So seeing how some of

21 these products were described.

22      And finally, I relied on some deposition

23 testimony from the CEO of NetScout, Anil Singhal, who in

24 his testimony, when -- when talking about DPI and DPC

25 functionality as a whole, he stated that everyone knows

1  that -- or he says:  There's no business for people to

2  buy our products without these features being there.

3          And then subsequently says:  Everyone knows

4  that's the reason they are buying our products.

5          So NetScout's CEO has stated that while

6  there's functionality in these devices, the reason

7  people are buying them is because of the classification

8  features.

9      Q.   Now, can you go back to the two documents you

10 discussed just before this deposition testimony and tell

11 the jury what those PTX numbers were?

12     A.   Sure.  Sorry about that.

13         This document here is PTX-168, which is the

14 GeoProbe/GeoBlade document.

15         And this document talking about Iris Session

16 Analyzer is PTX-239.

17     Q.   Now, how -- how were you able to confirm that

18 these documents and -- and Mr. Singhal's deposition

19 testimony described NetScout's traffic characterization

20 features?

21     A.   I had a discussion with Dr. Almeroth where we

22 talked about these particular documents, and he

23 confirmed that these -- the references in these

24 documents was talking about the traffic classification

25 features within these products.

1     Q.   So based upon your review of these documents,

2 Mr. Singhal's testimony, and Dr. Almeroth, what did you

3 conclude with regard to the value of traffic

4 characterization to the base software?

5     A.   Based on those documents, as well as

6 Mr. Singhal's testimony that this is the reason why

7 people are buying these products, I assigned a 50

8 percent value to traffic classification as a whole.

9     Q.   Now, I didn't see 50 percent in any of those

10 documents.  Why did you use that number?

11    A.   I used that number because of the overall

12 importance of traffic classification to these probes.

13 As Mr. Singhal stated that -- that these are the reason

14 people are buying them.  This is what they do.  They

15 provide traffic classification.

16    Q.   And so what did you use to come to the number

17 of 50 percent?

18    A.   I used the facts in evidence of this case and

19 the deposition testimony.

20    Q.   What about your own personal experience?

21    A.   Yes, I used that, as well.

22    Q.   What was the next step in your analysis?

23    A.   So now that we've allocated not only to the

24 software itself, but now down to the individual traffic

25 classification features, we now have to say what portion

of those traffic classification features are directly

attributable to these patents, so a further allocation

beyond the one just to traffic classification to really

get to the patents themselves.

Q.   So what information did you take into account

in -- in this portion of your analysis?

A.   So as we talked about earlier, a key aspect of

this is -- is determining, well, what could have been

done without these patents?  What would the alternative

have been without these patents?  And as I stated

earlier, it's my understanding that the alternative to

these patents is the well-known port methodology.

So I looked at various documents and academic

papers to determine how does traffic classification

work?  How effective is -- is traffic classification

using a well-known port methodology.  And I spoke about

this with Dr. Almeroth, as well.

And so the first thing I looked at was a

Tektronix document from 2008, which stated that

classifying by port numbers, which is the well-known

port methodology, is no longer considered adequate to

classify contemporary protocols.  So this confirms what

I had stated before in that this really isn't an

acceptable non-infringing alternative.  It is an

alternative.  And you can go back to this, but it's not

1   an acceptable one.

2         I also looked at a -- an academic research

3   paper that described their testing with well-known port

4   methodologies.  And they found using that methodology,

5   that 30 percent of all traffic was unable to be

6   classified using the well-known port methodology.  So

7   looking at all the packets that are streaming across the

8   network, 30 percent of them using the well-known port

9   methodology, they had no idea what it was.

10        Q.   And if you could go back to the prior slide, I

11  see there's not a PTX number on this slide, could you

12  read what the number is at the bottom, please?

13        A.   Sure.  It's NetScout_197184.

14        Q.   Okay.  And okay, please continue with -- go

15  back to the document you were on and do the same thing,

16  please.

17        A.   So for this document, it's Bergman 00000489.

18  So in addition to this academic paper, I also found an

19  additional one, this paper is Bergman 00000505, which

20  also did a study of well-known port methodologies and

21  found that 30 to 70 percent of all Internet traffic was

22  unable to be classified using the well-known port

23  methodology.

24        Q.   So then what did you do based on that

25  information to perform your analysis?

1    A.    So based on that -- so based on getting an

2  understanding of what does the alternative to

3  non-infringement look like, I had to then say, well,

4  what does a NetScout product -- how much traffic is it

5  classifying?

6         And I was unable to find any NetScout-specific

7  documents that described their overall traffic

8  classification, how much they recognized.  But I think

9  as we heard yesterday from Dr. Almeroth, he described

10 best of breed solutions, classifying traffic between 90

11 and 95 percent.

12        There's a document from a company called

13 Sandvine, which provides similar-type classification

14 functionality, which also stated that best of breed

15 solutions recognize at least 90 percent of traffic.

16 This document is SANDVINE0004311.

17        And then I also -- to confirm this idea that

18 NetScout would be considered best of breed, I spoke with

19 Dr. Almeroth, and he said based on his understanding of

20 the company and his understanding of the technology, he

21 considered it to be a best of breed solution.

22        But I also looked and saw that in 2011, for

23 the probe market, so the same market that these accused

24 products live in, Tektronix had a 25 percent market

25 share in the industry, second highest only to -- well,

1  second highest only to NetScout at 28 percent, which

2  leads me to believe that this company is a best of breed

3  solution, you don't get a 25 percent market share in an

4  industry without having a quality product.

5      Q.   So what portion of that is attributed to

6  the -- the asserted patents?

7      A.   So based on conversations that I had with Dr.

8  Almeroth, looking at the well-known port methodology and

9  the percentage of traffic that can be classified using

10  that methodology, and then looking at what the best of

11  breed solutions provide, Dr. Almeroth told me that the

12  vast majority of that increase, based on his analysis,

13  was due to these individual patents.

14      And then he also said that beyond just simply

15  being able to classify traffic, there are additional

16  benefits to the patents such as having a better

17  understanding of the context of the traffic, greater

18  insight into the overall traffic, and increased quality

19  of service metrics.

20      Q.   So based on all of this evidence and your

21  discussions with Dr. Almeroth, what was your

22  conclusion -- what was your conclusion as far as the

23  next step in your analysis?

24      A.   Again, because of -- of my discussions with

25  Dr. Almeroth where he stated that the vast majority of

1 this increase, going from -- anywhere from 30 to 70

2 percent all the way up to 90 to 95 percent, was due to

3 the patents-in-suit, I determined that the value of the

4 patents to the traffic characterization functionality

5 was 50 percent.

6     Q.   So where are we now in this incremental

7 benefit analysis that you've been performing?

8     A.   So after giving credit to NetScout, starting

9 with their revenue, giving them credit for their costs,

10 giving them credit for their -- the non-infringing

11 functionality, that's in the base software, and not

12 including any of the products and services that are --

13 are given benefit to from these patents that weren't

14 part of the $408.3 million, I determined that the

15 allocation in the patents-in-suit would be 15.6 million.

16        And if you were to say, well, what does that

17 mean on a percentage basis, 15.6 million over 403.8

18 (sic) million is a 3.8 percent rate.

19     Q.   Let's -- can you tell the jury now about the

20 other approach that you -- that you applied?  Oh, well,

21 what -- what are you showing here in this slide?

22     A.   So this is an overall summary slide of the

23 allocation from the accused product revenue of 408.3

24 million and where all of the deductions occurred so that

25 at the end of the day, we have a rate of 3.8 percent or

1  that $15.6 million.

2      Q.   Now, you also applied the market-based

3  approach.  And you had -- you used these two approaches.

4          Can you explain, again, why you used the two

5  approaches?

6      A.   Yes.  So as I -- as I stated earlier, the

7  income approach determines value based on the revenue

8  and profitability of the company and ultimately the

9  infringing features.

10          The market-based approach is a completely

11  separate type analysis, doesn't include any of the data

12  that we looked at under the income approach and says is

13  there a way that I can find a comparable transaction in

14  the marketplace to help me determine what a reasonable

15  royalty would be in this case?

16      Q.   And what did you conclude under the market

17  approach?

18      A.   Based on a comparable transaction in the

19  marketplace, I determined that a reasonable royalty

20  based on that comparable transaction would be 3.5

21  percent.  And if you apply that to the $408.3 million of

22  the total accused product revenue, you get to $14.3

23  million.

24      Q.   Okay.  So how do you apply -- if you can now

25  take us through your -- the specifics of your analysis,

1  how did you apply the market approach in this case?

2      A.    Well, I looked at the facts and evidence of

3  the case and tried to find either comparable licensing

4  agreements or other types of transactions that -- that

5  determine -- that that did a similar type valuation to

6  come to a reasonable royalty.  And I think it's been

7  discussed a number of times in trial that in 2009, Exar

8  acquired Hi/Fn, which was the owners of the patents in

9  2009 for $59 million.  That acquisition included 43 U.S.

10 patents and foreign patents, including the patents in

11 this case.

12          And as part of that process, and this is

13 typical for these types of valuations, a financial

14 advisory firm will come in and attempt to allocate that

15 purchase price to the books and records of the acquiring

16 company.

17          And as part of that process, they -- they

18 attempted to determine the value of the patents to Hi/Fn

19 and hired a company named Duff & Phelps to perform this

20 valuation.

21     Q.    Okay.  Who is Duff & Phelps?

22     A.    Duff & Phelps is an investment advisory firm

23 that typically performs these types of valuations.

24     Q.    What is their reputation?

25     A.    They have a very strong reputation in the

1  market.

2      Q.   How do you calculate a reasonable royalty

3  based upon this Hi/Fn/Exar transaction?

4      A.   Well, as part of Duff & Phelps' valuation,

5  they -- they performed what they called a relief from

6  royalty-type valuation in order to determine the value

7  of the patents.  And as part of that process, they spoke

8  with management, they looked at other transactions that

9  occurred in the market, and they determined that under

10  the relief from royalty approach, a 2 percent royalty

11  should be attributable to the patents.

12         And then following -- once that was done,

13  following the acquisition, Exar recorded on its books an

14  intangible asset.

15      Q.   What else did you review as part of your

16  market approach?

17      A.   So taking that information into account, the

18  next step is really to determine, well, based on that

19  information, can I come to some kind of indication of

20  comparability?  And knowing that the transaction

21  included the patents-in-suit, that immediately jumps out

22  to me as something that can be considered comparable.

23         So next step is to say, well, what other

24  factors are there that I need to take into account?  And

25  so I recognized that there were foreign patents, as well

as U.S.-based patents in that transaction.  But the way

that Duff & Phelps applied the 2 percent royalty, they

applied it equally to U.S.-based revenue as they did to

foreign revenue.  So that, to me, says that there's no

distinction between the U.S. patents and the foreign

patents when it comes to the 2 percent.

Secondly, I need -- I need to look at the

other U.S.-based patents that were there, so Packet

Intelligence acquired 10 U.S.-based patents, so there

were 3 U.S.-based patents and patent applications left.

One of the applications that was left was

abandoned.

The second application was expired because

they didn't pay their -- Exar didn't pay the fees on

them.

The third patent is still held by Exar, but we

know from testimony yesterday that Exar is not really

doing anything with these patents.

And then, finally, I had to look at the

non-asserted patents in this case to say is there value

I need to ascribe to those non-asserted patents, and

based on discussions that I had with Packet Intelligence

when I issued my report, as well as an understanding

from Mr. Brunell's testimony yesterday, that there was

really no incremental benefit to -- to asserting any

1  additional patents in this case.

2       So with all that, I determined that the

3  2 percent royalty rate was comparable in this case.

4       Q.   And so -- but what adjustments did you make,

5  if any, to the 2 percent royalty rate from the Duff &

6  Phelps -- the Duff & Phelps valuation?

7       A.   So once we have the 2 percent, we now need to

8  go through the process of saying, well, how do we apply

9  that in this case?  And this sort of goes back to our

10 discussion as to a real-world negotiation versus a

11 hypothetical negotiation.  And the 2 percent number was

12 derived in sort of that real-world negotiation.  So we

13 now have to take into account all those factors that

14 would come into play in a hypothetical negotiation.

15      And one of those factors is knowing that the

16 patents in this case are assumed to be infringed and

17 valid.  The Duff & Phelps' valuation, if it was based on

18 discussions with management and existing transactions,

19 those transactions wouldn't have occurred with the

20 assumption of infringement and validity.  So there needs

21 to be some kind of adjustment there.

22      Secondly, knowing that the parties to the

23 hypothetical negotiation have full knowledge of the

24 benefits that are being provided by the patents-in-suit,

25 there are a tremendous amount of benefits being provided

1 to the non -- some -- there is non-accused products in

2 this case, so the parties to that hypothetical

3 negotiation would know that Packet Intelligence would

4 know that not only is NetScout benefiting from the sales

5 of these individual products but there are products that

6 rely on the accused products that are also generating

7 benefits and that some adjustment to the royalty rate

8 would be required based on that.

9      Q.   And so can you explain a little bit further

10 what you mean about the benefit to the non-accused

11 products?

12      A.   Yeah.  So I had a discussion with Dr.

13 Almeroth, and he stated that a number of non-accused

14 products that NetScout provides would be severely

15 degraded if NetScout didn't have access to these

16 patents.

17           And what's shown on your screen here is the

18 list of those products that have been identified as

19 being something that would be degraded without use of

20 these patents.

21           So taking those and looking at the financial

22 aspects of those individual products -- and this is

23 separate and distinct from the $408.3 million.  This is

24 revenue outside of the accused products.  Taking all of

25 those products together and looking at the revenue and

1  gross profit attributable to those non-accused products,

2  NetScout received $325.4 million for those products and

3  earned a gross profit of $173 million, which is roughly

4  equivalent, a little bit less, than the amount of

5  revenue and profit they received on the accused

6  products.

7      Q.   So based on -- on those factors and that

8  information, what did you conclude?

9      A.   So based on those factors, I -- I concluded

10 that a -- that the reasonable royalty in this case,

11 using the hypothetical negotiation, would be three and a

12 half percent.

13     Q.   Now, did you find any other indicators of

14 value using the market approach that would inform you

15 or -- or assist you as to what a reasonable royalty rate

16 in the hypothetical negotiation would be under the

17 market approach?

18     A.   I did.  I found two other indicators of value.

19 The first is the Cisco settlement agreement.  That

   REDACTED BY ORDER OF THE COURT

20 agreement, the -- ▆▆▆ ▆▆▆ ▆▆▆▆ ▆▆▆▆▆▆ There's a lot

21 of comparabilities to this agreement.  For one, Packet

22 Intelligence was a party to that agreement, so -- just

23 as is -- as is the hypothetical negotiation, Packet

24 Intelligence would have been a party to that.

25         The litigation included the asserted patents,

1  so similar to the hypothetical negotiation, that

2  settlement agreement included the asserted patents.

3          And we know from NetScout's public financial

4  statements that in the probe market, NetScout considers

5  Cisco to be a competitor.  So that also led to -- and

6  some belief that there is some comparability to this

7  agreement.

8      Q.   Based on those factors, what did you conclude?

9      A.   So unfortunately, I was unable to really take

10  this agreement and come to a quantitative solution to a

11  reasonable royalty in this case because there wasn't a

12  clear understanding of exactly how much revenue Cisco

13  was earning from the -- from the products in that case

14  and how to compare that to what NetScout was doing.  But

15  overall, this does give me an indication that Cisco

16  believed that these patents were valuable.

17          So -- and then, secondly, I also looked at the

18  Huawei licensing discussions that occurred as part of

19  the Huawei settlement agreement.  And we heard Mr.

20  Brunell's testimony that as part of that discussion,

21  Packet Intelligence made it clear that they wouldn't

22  accept anything less than a 2 -- 2.5 percent royalty,

23  and ultimately, received that 2.5 percent royalty.

24      Q.   Who is Mr. David Yurkerwich?

25      A.   Mr. Yurkerwich is NetScout's damages expert in

1  this case.

2     Q.   And what was Mr. Yurkerwich's conclusion with

3  regard to the appropriate reasonable royalty rate in

4  this case?

5     A.   So based on Mr. Yurkerwich's report that was

6  issued in this case, as shown here on this screen at

7  Page 51 of his report, he's concluded that he agrees

8  with a 3.5 percent royalty rate.

9     Q.   Now, Mr. Yurkerwich did not agree with you as

10  to the base, correct?

11     A.   That's correct.

12     Q.   Okay.  But as far as the royalty rates in this

13  case, what did the two experts determine to be,

14  including yourself and Dr. Yurkerwich -- Mr. Yurkerwich,

15  what did you determine to be the appropriate royalty

16  rates based on three different methodologies?

17     A.   So based on the three different methodologies,

18  based on my income approach, I came to an effective

19  royalty of 3.8 percent.  Under the market approach, a

20  running royalty rate of 3.5 percent.  And Mr. Yurkerwich

21  came to a royalty rate also of 3.5 percent.

22     Q.   Now, what is your opinion with regard to the

23  appropriate royalty base to be applied in this case?

24     A.   So as we've already discussed, because it's my

25  understanding that the accused functionality and that

1 the -- the patents themselves, the benefit to the

2 patents themselves is within every GeoBlade and GeoProbe

3 G10, and as part of the core classification

4 functionality, in my opinion, the total base is the --

5 is the overall revenue associated with the accused G10

6 and GeoBlade products, which is the $408.3 million.

7     Q.   Now, earlier we discussed the factors that you

8 need to take in account in the determination of the

9 royalty, the reasonable royalty.  As part of your

10 investigation, did you analyze and consider all of those

11 factors?

12     A.   Yes.  While we didn't talk about them

13 individually today, based on my performing both the

14 income approach and the market approach, all of the

15 factors here have been analyzed and taken into account

16 in my opinions.

17     Q.   Now, based on the totality of the analysis

18 that you performed in this case, can you please

19 summarize your opinions for the jury as to what a

20 reasonable royalty in this case is?

21     A.   I can.  So, again, under the income approach,

22 a reasonable royalty in this case, I came to a -- an

23 amount of 15.6 million.

24        Under the market approach, using the 3.5

25 percent running royalty, I came to an amount of $14.3

1  million.

2       Q.   Okay.

3            MR. DAVIS:   No further questions at this

4  time, Your Honor.   I pass the witness.

5            THE COURT:   All right.   Ladies and

6  gentlemen, before we proceed with the Defendants'

7  cross-examination of Mr. Bergman, we're going to take a

8  short recess.

9            You may close and leave your notebooks in

10 your chairs.   Don't discuss the case among yourselves.

11 Follow my instructions, and we'll be back shortly to

12 continue with the cross-examination.

13           The jury's excused for recess at this

14 time.

15           COURT SECURITY OFFICER:   All rise for the

16 jury.

17           (Jury out.)

18           THE COURT:   The Court stands in recess.

19           COURT SECURITY OFFICER:   All rise.

20           (Recess.)

21           (Jury out.)

22           COURT SECURITY OFFICER:   All rise.

23           THE COURT:   Be seated, please.

24           All right.   Mr. Bergman, if you want to

25 return to the witness stand.

```
 1                    And, Mr. Carr, you're going to conduct
 2   the cross-examination?
 3                    MR. CARR:  Correct, Your Honor.
 4                    THE COURT:  If you'd like to go to the
 5   podium, you can do that now.
 6                    MR. CARR:  Thank you.
 7                    THE COURT:  Are there binders to pass out
 8   here, Counsel?
 9                    MR. CARR:  I've already passed them out,
10   Your Honor.
11                    THE COURT:  Good.
12                    All right.  Mr. Elliott, let's bring in
13   the jury.
14                    COURT SECURITY OFFICER:  Rise for the
15   jury.
16                    (Jury in.)
17                    THE COURT:  Welcome back, ladies and
18   gentlemen.  Please have a seat.
19                    We'll proceed with cross-examination of
20   Mr. Bergman by defense counsel.
21                    Mr. Carr, you may proceed.
22                         CROSS-EXAMINATION
23   BY MR. CARR:
24        Q.   Good morning, Mr. Bergman.
25        A.   Good morning.
```

1    Q.   In your testimony this morning, you referred

2  to multiple conversations with Dr. Almeroth, right?

3    A.   I referred to a conversation with Dr.

4  Almeroth.

5    Q.   So did you only have one conversation with Dr.

6  Almeroth?

7    A.   I had one conversation, yes.

8    Q.   So prior to submitting your report, you only

9  had one conversation with Dr. Almeroth, right?

10    A.   That's correct.

11    Q.   And that conversation lasted approximately one

12  hour?

13    A.   I believe that's right.

14    Q.   And that was the day your report was due, June

15  5th, 2017, correct?

16    A.   It was on the morning my report was due, I

17  filed my report that evening.

18    Q.   And you did not talk to him before that date,

19  did you?

20    A.   I did not.

21    Q.   You relied upon Dr. Almeroth's -- your

22  conversation with Dr. Almeroth to assume that the core

23  traffic characterization feature of all G10 and GeoBlade

24  products infringe, correct?

25    A.   Can you repeat that question, please?

Q.   Your damages estimates that the core traffic
characterization feature of the G10 and GeoBlade
products accused of infringement here infringe the
patents, correct?

A.   That's correct.

Q.   And that is based upon your discussion with
Dr. Almeroth, right?

A.   It's based on the discussion with Dr. Almeroth
and the review of the NetScout/Tektronix documents.

THE COURT:   Please speak up, Mr. Bergman.

THE WITNESS:   I apologize.

Q.   (By Mr. Carr)  And you did not perform an
independent analysis as to whether there was any
infringement of the Tektronix products, right?

A.   I did not perform an infringement analysis,
no.

Q.   Nor did you perform an analysis as to
whether -- whether any of the three asserted patents are
valid, correct?

A.   That's correct.

Q.   Do you recall yesterday Dr. Almeroth testified
about a feature called web page download time?

A.   I remember hearing discussion about web page
downloads.

Q.   You did not mention the web page download time

1  feature in your expert report, correct?

2      A.   That's correct.

3      Q.   And you did not analyze the web page download

4  time feature preparing your damages estimate, right?

5      A.   I didn't specifically discuss it.  It may be

6  one of the features listed in one of the schedules in my

7  report, but I don't know for sure.

8      Q.   Are you referring to a schedule of non-accused

9  products?

10     A.   Yes.

11     Q.   You did not discuss the web page download time

12  feature with Dr. Almeroth, correct?

13     A.   That's correct.

14     Q.   And you did not include sales of the web page

15  download time feature in your royalty base, correct?

16     A.   That's correct.  Again, unless it's part of

17  the essential features that comprised my royalty base,

18  but I don't know that sitting here.

19     Q.   Is it your understanding that there are no

20  sales of the web page download time feature in the

21  United States?

22     A.   I have no knowledge of that.

23     Q.   Mr. Bergman, the asserted patents in Court

24  today this week, they were acquired by Exar when they

25  acquired a company, Hi/Fn, correct?

1    A.   Yes, sir.

2    Q.   And you testified this morning about a

3  valuation that an independent corporate advisor

4  performed in connection with that valuation.   Their name

5  is Duff & Phelps, right?

6    A.   They performed an accounting exercise to

7  determine how to allocate the value of the patents on

8  the books and records of Exar.

9    Q.   And they valued more than just the Hi/Fn

10  patents, didn't they?

11    A.   They acquired -- they valued the Hi/Fn

12  portfolio of patents, yes.

13    Q.   And they also valued Hi/Fn's core technology,

14  correct?

15    A.   The core technology was listed as part of the

16  Duff & Phelps methodology, but at the end of the day,

17  the entire allocation went on the books and records of

18  Exar as patents.

19    Q.   Now, Hi -- I'm sorry, Duff & Phelps estimated

20  that 2 percent represented a reasonable royalty rate

21  that a user would pay for the patents and core

22  technology of Hi/Fn, correct?

23    A.   I believe that's -- that was their conclusion,

24  yes.

25    Q.   And in that conclusion, they also considered,

1  in addition to Hi/Fn's patents, Hi/Fn's trade secrets,

2  right?

3       A.   Again, I know that was part of the analysis

4  based on their ultimate allocation of value to patents

5  on the books and records of Exar.  I'm not sure they

6  found any value to Hi/Fn's trade secrets.

7       Q.   And the number of patents that Exar obtained

8  when it acquired Hi/Fn was approximately 40 patents and

9  applications, correct?

10      A.   I believe the number I saw was 43, so that

11 sounds about right.

12      Q.   And the hypothetical negotiation, you base

13 your damages opinion on, that's discussing a license to

14 just the three patents asserted by Packet Intelligence,

15 right?

16      A.   That's correct.

17      Q.   Now, your ultimate royalty rate for the

18 license to those three asserted patents is 3.5 percent?

19      A.   Based on the market approach.

20      Q.   You would agree that that is a 75 percent

21 increase over Duff & Phelps's 2 percent royalty rate

22 for -- that a user would pay for a license to 43 patents

23 and applications and trade secrets, right?

24      A.   That's correct.

25      Q.   That acquisition took place in 2009?

1     A.   Yes, sir.

2     Q.   Exar owned the patents for approximately three

3  years -- what I'm saying -- let me rephrase that.

4          Exar owned the three asserted patents for

5  approximately three years when it sold them in 2012 to

6  Packet Intelligence, correct?

7     A.   I believe that's correct.

8     Q.   And Exar sold Packet Intelligence a total of

9  10 U.S. patents, 14 foreign patents; is that right?

10     A.   I don't remember the exact number, but that

11  sounds about right.

12     Q.   In your opinion -- it's your opinion that

13  Packet Intelligence was able to purchase those patents

14  at a discount, right?

15     A.   I think the facts show that they purchased

16  those patents at a discount, yes.

17     Q.   And that's because the patents could be

18  asserted against Excel -- Exar's customers so Packet

19  Intelligence would have recognized that, and it's your

20  opinion they would have been able to negotiate a

21  discounted price?

22     A.   I -- I think that may -- that's part of it.

23  Part of it is that Exar was a company that wasn't using

24  the technology and was supplying products to companies

25  who would have been using the technology.  So from

1  Exar's standpoint, there would have been a hesitation to

2  try to license those patents to their customers.

3      Q.   Is it because those patents could then be used

4  to be asserted against Exar's customers?

5      A.   I don't know if I would go so far as to say

6  asserted against them, but they would -- I think they

7  would have been hesitant to attempt to license patents

8  to their customers.

9      Q.   If Exar is selling patents that are going to

10  potentially be used to bring a lawsuit against Exar's

11  customers, wouldn't Exar charge a premium, make the

12  price higher for those patents, rather than putting them

13  out into the marketplace at a discount?

14      A.   Not necessarily.

15      Q.   Indeed, you note in your expert report that

16  Exar's customers include Huawei and Cisco, right?

17      A.   Yes.

18      Q.   And they ended up being sued by Packet

19  Intelligence on the same patents they purchased from

20  Exar, right?

21      A.   Yes.

22      Q.   Mr. Bergman, with -- in connection with your

23  market approach, you indicated that the Huawei agreement

24  between Packet Intelligence and Huawei was an indicator

25  of value in your analysis; is that right?

1    A.    No, sir.

2    Q.    What was incorrect about that?

3    A.    It wasn't the agreement itself.  It was Packet

4 Intelligence's insistence on a particular royalty rate

5 because Packet Intelligence would have been a party to

6 this hypothetical negotiation.  Knowing their mindset

7 going into that hypothetical negotiation is a relevant

8 factor in the determination of a reasonable royalty.

9 So I did not use the agreement itself.  I used Packet

10 Intelligence's negotiation posture for that agreement.

11    Q.    That agreement, the payment terms were for

12 Huawei to pay $140,000, right?

13    A.    That's correct.

14    Q.    And this agreement ran -- covered all of

15 Packet Intelligence's U.S. patents, correct?

16    A.    I believe that's correct.

17    Q.    That includes 10 -- at least 10 U.S. patents?

18    A.    It's been awhile since I've looked at the

19 agreement, but I think that that's right.

20    Q.    And here, the hypothetical agreement between

21 Packet Intelligence and NetScout is just to the three

22 asserted patents, right?

23    A.    That's correct.

24    Q.    And one of the reasons you didn't rely upon

25 the actual agreement between Packet Intelligence and

1    Huawei was because Huawei was discontinuing its U.S.

2    product line; is that right?

3         A.   That was one factor of many, yes.

4         Q.   Did you also consider in your analysis that

5    NetScout would be discontinuing its G10 and GeoBlade

6    product line?

7         A.   I did not.

8         Q.   You indicated that the Cisco license was also

9    an indicator of value in your market approach, right?

10        A.   I believe it's something that the parties to

11   the hypothetical negotiation would have taken into

12   account, yes.

13        Q.   Now, Cisco is much larger than NetScout and

14   Tektronix, right?

15        A.   If you compare company to company, yes.  But I

16   think if you look at the probe market, which is what

17   we're talking about here, Tektronix and NetScout, based

18   on the market share document that I presented in my

19   direct, Cisco is not even in that market -- or not

20   represented by that market share chart.

21        Q.   Are you aware that Cisco is the 12th largest

22   IT company in the United States?

23        A.   I wasn't aware of that specifically, but it

24   doesn't surprise me.

25        Q.   Are you aware that it has more than 70,000

1  employees?

2      A.   Again, I wasn't aware of that number, but that

3  doesn't surprise me.

4      Q.   Are you aware that Tektronix has 500 employees

5  in Plano?

6      A.   I wasn't aware of the number, but that doesn't

7  surprise me.

8      Q.   That license agreement between Cisco and

9  Packet Intelligence, that included license to all of

10 Packet Intelligence's patents and applications, right?

11     A.   That's correct.

12     Q.   That would include 10 U.S. patents, right?

13     A.   Yes.

14     Q.   11 U.S. patent applications?

15     A.   The 11 patent applications that are listed in

16 the Cisco agreement are -- or 10 of those 11 are the

17 same 10 -- represent the same 10 patents that were

18 actually issued.  So from that standpoint, it double

19 counts the number of patents.

20          The 11th patent was the provisional

21 application that was filed.  So it would -- that -- that

22 was never meant to be a patent to begin with.  So just

23 purely from a U.S.-based standpoint, there were 10

24 patents licensed under the Cisco agreement.

25     Q.   And foreign patents were also licensed in that

1  agreement, as well, correct?

2       A.    That's correct.

3       Q.    Approximately 11 foreign patents?

4       A.    I don't remember exactly.  There were some

5  issues about double counting and in the foreign patents,

6  as well, but I think it would have been eight or nine,

7  something like that.

8       Q.    When you're referring to double counting, are

9  you -- are you suggesting that the foreign patents are

10 a -- an equivalent of a U.S. patent?

11      A.    No, what I'm saying is that in -- in the list

12 of foreign patents in the Cisco application, there were

13 a list of foreign applications, as well as foreign

14 patents, and so there would be a -- I think it was a

15 Japanese -- one or two of the Japanese patents, it

16 listed the application in that list, and then

17 subsequently listed the issued patent for that

18 application.  So effectively it was the same patent.

19      Q.    Mr. Bergman, the license agreement with Cisco

20 licensed all of Cisco's products, didn't it?

21      A.    I believe so.

22      Q.    Not just its routers?

23      A.    I believe all Cisco's products.

24      Q.    Not just its probes, right?

25      A.    I believe it was all Cisco's products.

1     Q.   And it is your opinion that the license

2  agreement between Packet Intelligence and Cisco would

3  not be used in the hypothetical negotiation as a basis

4  to determine a reasonable royalty, correct?

5     A.   That's correct.

6     Q.   Didn't make your damages figure go up or down,

7  right?

8     A.   It didn't make it go up or down, but it did

9  give me comfort that the ultimate determination of a

10 reasonable royalty was reasonable.

11    Q.   Mr. Bergman, you testified about citations to

12 the three asserted patents.  You recall that?

13    A.   I do.

14    Q.   And based on your review of those forward

15 citations, you determined that they indicated the three

16 patents are valuable?

17    A.   I think it indicates that they have value.

18    Q.   Now, you didn't actually review each of those

19 patent citations, did you?

20    A.   Not in preparation of my report, no.

21    Q.   You didn't look to see whether those citations

22 criticized the asserted patents, did you?

23    A.   I didn't look at them.  So I can't answer that

24 question.

25    Q.   Did you determine whether you double counted

1  any of the citations?

2      A.   I did not.

3      Q.   So you wouldn't know, for example, whether the

4  citations were by the patent examiner or by the patent

5  applicant, right?

6      A.   I didn't do that level of review.

7      Q.   You testified this morning about a separate

8  approach to calculating damages under an income

9  approach, correct?

10     A.   Yes, sir.

11     Q.   One step in your income approach is that you

12 opine that traffic characterization makes up 50 percent

13 of the value of the software in the accused G10 and

14 GeoBlade products, right?

15     A.   Based on the facts and circumstances of this

16 case, yes.

17     Q.   And part of the basis for that assumption is

18 your one-hour -- one-hour conversation with Dr. Almeroth

19 on the day your report was due, right?

20     A.   One part, yes.

21     Q.   Now, you recall yesterday that Dr. Almeroth

22 testified that deep packet inspection alone does not

23 infringe?

24     A.   Yes, sir.

25     Q.   This allocation of 50 percent, it was not a

1  precise mathematical calculation, right?

2      A.    It was not.  It was an estimate.

3      Q.    You next opined that the asserted patents in

4  this case make up 50 percent of the value of traffic

5  characterization, right?

6      A.    Yes, sir.

7      Q.    And, again, the basis for that assumption is

8  your one-hour conversation with Dr. Almeroth on the day

9  your report was due, right?

10     A.    It was based on a review of the percentage of

11 traffic that can be characterized using the prior art

12 technology versus the percent of traffic that can be

13 characterized using best of breed solutions, like

14 NetScout's solution, and an understanding from Dr.

15 Almeroth that the vast majority of that increase is due

16 to the patents-in-suit.

17     Q.    When you refer to the prior art technology,

18 are you referring to what you discussed as well-known

19 ports?

20     A.    Yes, sir.

21     Q.    Isn't RMON2 TrackSessions an alternative that

22 also relies on well-known ports?

23     A.    If it were an alternative, it wasn't

24 identified by NetScout.

25     Q.    You didn't consider the TrackSessions

1  alternative in reaching your 50 percent estimate, did

2  you?

3      A.   Sorry, can you ask me that question one more

4  time?

5      Q.   You didn't consider whether TrackSessions was

6  a well-known port in reaching your 50 percent estimate

7  that the patents make up 50 percent of the value of

8  traffic characterization, did you?

9      A.   I did not.

10     Q.   Mr. Bergman, it's not your opinion that the

11 functionality alleged to be covered by the asserted

12 patents in this case drive sales of the G10 and GeoBlade

13 products, right?

14     A.   It is not my opinion that it drives sales.

15     Q.   In one of your slides, Mr. Bergman, you wrote:

16 Given Tektronix's interest and support of the

17 NAVL-enabled DPC option --

18          MR. CARR:  Strike that.  I'll start over.

19     Q.   (By Mr. Carr)  You discussed at -- a witness,

20 David Yurkerwich, in your testimony this morning,

21 correct?

22     A.   I'm sorry, can -- the question got a little

23 jumbled.  So can you try it again?

24     Q.   You mentioned -- you mentioned a report

25 provided by David Yurkerwich in your testimony this

1  morning, correct?

2       A.   That's correct.

3       Q.   And you had a slide where you said:  Given

4  Tektronix's interest and support of the NAVL-enabled DPC

5  option at the time of the hypothetical negotiation, I

6  have concluded that they would have agreed to the three

7  and a half percent royalty rate.

8            Now, that discussion is referring to

9  NAVL-enabled DPC option, correct?

10      A.   I just want to be clear because I don't think

11 it was in your question, that that slide and what you

12 just read was Dr. -- or Mr. Yurkerwich's opinion, not my

13 opinion.

14      Q.   Right.  And he was talking about the

15 NAVL-enabled DPC feature, right?

16      A.   Yes.

17      Q.   And that feature is not in all the accused G10

18 and GeoBlade products, right?

19      A.   It's my understanding that that's an optional

20 feature in the product.

21      Q.   In fact, you considered that to be a

22 non-accused product, right?

23      A.   That's not my opinion, but it -- it is -- it

24 is an optional product, and I believe it is in my

25 non-accused -- the list of additional products that

1  would have been degraded but for these patents.  I think

2  it's in that list.

3      Q.   Is it your understanding that there were only

4  two sales in the United States of the NAVL-enabled DPC

5  feature?

6      A.   I don't recall exactly.

7      Q.   Do you recall that the total revenue for those

8  two sales in the United States is for 147 -- $147,000 --

9  I'm sorry.  $147,928?

10     A.   I don't recall.

11     Q.   You testified about a hypothetical negotiation

12 in 2010 between Packet Intelligence and NetScout, right?

13     A.   That's correct.

14     Q.   And that negotiation never actually took

15 place, right?

16     A.   It did not.

17     Q.   In fact, Packet Intelligence didn't exist in

18 2010, right?

19     A.   That's correct.

20     Q.   NetScout and Tektronix didn't even learn about

21 these patents until this lawsuit was filed in 2016,

22 right?

23     A.   I think based on the forward citation

24 information I've reviewed, I don't think that's correct.

25     Q.   Are you aware of any evidence that Packet

1  Intelligence tried to license the three asserted patents

2  to NetScout or Tektronix prior to filing this lawsuit?

3     A.   I don't know one way or the other.

4     Q.   Now, in 2010, Tektronix made and sold the G10

5  product, right?

6     A.   That's correct.

7     Q.   And Tektronix sold the GeoBlade starting in

8  2015, right?

9     A.   I can't remember if it was 2014 or 2015, but

10  in that time frame, yes.

11     Q.   In your damages testimony this morning, you

12  assume that the three asserted patents are valid and

13  infringed, correct?

14     A.   I think the law requires me to assume that,

15  yes.

16     Q.   And if the patents are not valid, then there

17  are no damages, right?

18     A.   I believe that's correct.  It's more of a

19  legal question, but I believe that's right.

20     Q.   And if the patents are not infringed, then

21  there are no damages?

22     A.   Same response, I think that's right.

23             MR. CARR:  Pass the witness.

24             THE COURT:   Counsel, approach the bench.

25             (Bench conference.)

1          THE COURT:  You do have some redirect,

2  Mr. Davis?

3          MR. DAVIS:  Yes, briefly, Your Honor.

4          THE COURT:  Okay.  Mr. Carr, at least

5  twice in this trial, I've heard references to Tektronix

6  has 500 employees in Plano.  You wouldn't be saying they

7  were in Plano if they were in Mumbai, and I wouldn't let

8  the other side be painting you as having foreign

9  employees.  It's not fair for you to paint yourself as a

10  hometown/home district employer.  You can reference the

11  number of employees, but I don't want to hear anymore

12  references to where they're located, okay?

13          MR. CARR:   I understand.

14          MR. DAVIS:   Your Honor, may I speak to

15  that real quick?  I was going to approach you during one

16  of the next witnesses, Mr. Kenedi, about this issue

17  because they have done that twice.  And I'm prepared to

18  cross their witnesses on the issue.

19          The fact that Net -- NetScout is not just

20  Tektronix 500 employees in Plano, but NetScout is a

21  worldwide company that has 3,000 employees.  And I think

22  we're entitled to do this not only to rebut the fact

23  that they've violated the motion in limine, but that

24  they've used the 500 employees in Plano as a comparison

25  and are a contrast against the size of Cisco to say that

1  Cisco is a huge company and they're a small 500-person

2  company.  And that's inaccurate.

3            THE COURT:  We're -- we're going to avoid

4  any geographical connotations going forward.  If you

5  want to make it clear that NetScout is more than

6  Tektronix, and they have more employees than the 500

7  that have been mentioned, that's fine.  And if you want

8  to make it clear from a high level that their other

9  employees are in other locations, that's fine.  But

10 we're going to avoid we're local, we're not local, we're

11 foreign, we're domestic, we're hometown employers, we're

12 out-of-town interlopers.  That's not a part of this

13 trial.  And it shouldn't have come in the two times it's

14 come in.  And it's not coming in again, okay?

15            MR. DAVIS:  Okay.  Thank you.

16            THE COURT:  Wait a minute.  Wait a

17 minute.  I want to make it clear to Defendant, I think

18 Defendant knows this.  I assume this -- Mr. Bergman is

19 your last witness before you rest?

20            MR. DAVIS:  Yes, Your Honor.

21            THE COURT:  Okay.  I'll defer any motions

22 under Rule 50(a) from the Defendant until all the

23 evidence is in, and I'll hear motions under 50(a) from

24 both parties then.  But just in case you're under a

25 different impression, I will not hear motions by

1  Defendant under Rule 50(a) when the Plaintiff rests,

2  okay?

3                     MR. CARR:  Okay.

4                     THE COURT:  All right.  Let's proceed.

5                     (Bench conference concluded.)

6                     THE COURT:  All right.  Redirect of the

7  witness by the Plaintiff?

8                     MR. DAVIS:  Yes, Your Honor.

9                          REDIRECT EXAMINATION

10 BY MR. DAVIS:

11     Q.   Mr. Bergman, you were asked on

12 cross-examination about the fact that Packet

13 Intelligence has asserted less than all the patents in

14 this case.  If Packet Intelligence asserted more patents

15 in this case or less patents in this case, would that

16 change the economic footprint and the value that

17 NetScout has used of the patented technology?

18     A.   It's my understanding, based on discussions

19 with Packet Intelligence and -- and Mr. Brunell's

20 testimony yesterday, that the additional -- the addition

21 of other patents wouldn't have changed the overall

22 value.

23     Q.   Now, we've heard a few times in this trial

24 about the fact that NetScout -- or Tektronix has 500

25 employees in Plano.  And we've heard about it in the

1   context of comparing it to Cisco, and that Cisco is a

2   much bigger company.  Are you aware of the size of

3   NetScout?

4       A.   Not precisely.  I know it's a much bigger

5   company than -- than Tektronix by itself.

6       Q.   Now, you mention --

7               THE COURT:  Mr. Bergman, speak up,

8   please, sir.

9               THE WITNESS:  I'm sorry.

10              THE COURT:  If I can't hear you or if I'm

11  straining to hear you, I worry that the jury is having

12  the same trouble and certainly the people in the

13  gallery, so please try to make yourself heard.

14              THE WITNESS:  I apologize.

15              THE COURT:  Go ahead, Counsel.

16              MR. DAVIS:  Thank you, Your Honor.

17      Q.   (By Mr. Davis)  You mentioned that for Cisco,

18  even though it's a bigger company, what is the relative

19  size of Cisco and NetScout in the relevant market?

20      A.   So when -- part of the issue with the Cisco

21  agreement and why I couldn't determine it to be

22  comparable is the methodology that I need to employ is

23  to make sure that I can put the two companies on equal

24  footing, that Cisco is paying 19 and a half million

25  dollars for a license to the patents.  How do I make

1    that comparable to what NetScout would be paying?

2            And so Cisco would not pay a royalty based on

3    its total global footprint for every product that it

4    makes.  It would only focus on those products that

5    embodied the patents.  That was -- that's the only thing

6    that it would pay for.

7            And for a number of Cisco products -- Cisco

8    sells very large integrated routers that have a

9    tremendous amount of functionality in them.  And from my

10   understanding of the accused products in the Cisco case,

11   the classification features would be a small portion of

12   those overall products.

13           As opposed to this case, from NetScout's

14   perspective, where the classification features are core

15   to the functionality.  And as Mr. Singhal said, they

16   wouldn't sell any of them without classification

17   features.

18           So because of the inability to compare the

19   footprint of what Cisco is paying for versus what

20   NetScout would pay for in a hypothetical negotiation, it

21   doesn't make sense.  It's a complete apples and oranges

22   comparison.

23           Cisco's total number of employees and total

24   number of -- of revenue generated worldwide has

25   absolutely nothing to do with this investigation.

1    Q.   Now, you were also asked on cross-examination

2  about the Huawei license.  And you were asked whether

3  you considered in this case whether NetScout was going

4  to discontinue the accused products in this case.  Do

5  you recall that -- being questioned about that?

6    A.   I do.

7    Q.   Now, when was the first time that you've heard

8  that NetScout may be discontinuing the products?

9    A.   I seem to recall some testimony in the

10  record -- I don't recall from which NetScout

11  representative -- that there was a discussion about

12  maybe -- maybe discontinuing the products, but I don't

13  recall exactly.

14    Q.   Are you aware of whether they discontinued the

15  products today?

16    A.   I don't know.  And, frankly, it's not relevant

17  to my analysis because I'm performing a valuation from

18  the date of first infringement, which is December 2010,

19  up until today.  Whether or not they discontinue the

20  products after the fact doesn't have a bearing on my

21  reasonable royalty.

22    Q.   Now, is it typical for a company that is

23  settling a patent lawsuit to license all of the patents

24  in a portfolio?

25    A.   It's not only typical, it's pretty much

1   standard.

2       Q.   So is the fact that Cisco took a license to

3   settle its lawsuit to Packet Intelligence to all of the

4   patents in the PI portfolio, does that change your

5   analysis at all?

6       A.   It's -- it's something you need to consider.

7   You need to look at what the totality of the licensing

8   agreement is, but in -- in my experience, any settlement

9   agreement, any licensing agreement for patents are going

10  to include the totality of the patent portfolio.

11      Q.   Now, Mr. Bergman, what is -- what are the

12  products that are accused in this lawsuit?

13      A.   The GeoProbe G10 and the GeoBlade.

14      Q.   You were asked on cross-examination about the

15  NAVL -- excuse me, the NAVL-enabled DPC feature.  And

16  you were asked about whether you knew that for that

17  feature, only $147,000 had been sold.  Are you aware of

18  that?

19      A.   I remember that testimony, yeah.

20      Q.   And does that -- does that data point change

21  your analysis at all with respect to what's actually

22  accused in this case?

23      A.   No.  Again, my understanding is that the core

24  traffic classification features built within these

25  products are what is infringing these patents, and

1   that's my relevant accused product base.

2       Q.   And finally, you were asked about whether

3   NetScout knew of the patents prior to 2016.  Is

4   NetScout's knowledge of these patents relevant at all to

5   the -- to the reasonable royalty analysis?

6       A.   It's not.

7                MR. DAVIS:  No further questions, Your

8   Honor.

9                THE COURT:  You pass the witness?

10               MR. DAVIS:  I pass -- pass the witness,

11  Your Honor.

12               THE COURT:  Is there additional cross,

13  Mr. Carr?

14               MR. CARR:  Nothing further, Your Honor.

15               THE COURT:  All right.  Mr. Bergman, you

16  may step down, then.

17               THE WITNESS:  Thank you.

18               THE COURT:  All right.  Plaintiff, call

19  your next witness.

20               MR. DAVIS:  Your Honor, members of the

21  jury, at this time, the Plaintiff rests.

22               THE COURT:  All right.  The Plaintiff

23  having rested its case-in-chief, we'll proceed with the

24  Defendants' case-in-chief.

25               Defendants, are you prepared to call your

1  first witness?

2              MS. SMITH:  We are, Your Honor.  Our

3  first -- first witness for NetScout will be Mr. Richard

4  Kenedi.

5              THE COURT:  All right.  Mr. Kenedi, if

6  you'll come take a seat on the witness stand.  You've

7  previously been sworn, correct?

8              THE WITNESS:  Correct.

9              THE COURT:  All right.

10              MR. KRAEUTLER:  Your Honor, during Mr.

11  Kenedi's testimony, we're going to use a demonstrative

12  that is a blow-up, and may I at the appropriate time put

13  an easel here?  I'll just block our table and nothing

14  else so the jury can see it.

15              THE COURT:  I think that will work.

16              MR. KRAEUTLER:  Thank you, Your Honor.

17              THE COURT:  If I have a problem with it,

18  I'll let you know.

19              MR. KRAEUTLER:  I know you will, sir.

20              THE COURT:  Go ahead -- go ahead and use

21  it.

22              MR. KRAEUTLER:  All right.

23              THE COURT:  Or attempt to use it.

24              All right.  Counsel, you may proceed with

25  your direct examination.

1    RICHARD KENEDI, DEFENDANTS' WITNESS, PREVIOUSLY SWORN

2                    DIRECT EXAMINATION

3   BY MR. KRAEUTLER:

4        Q.   Sir, will you introduce yourself to the jury?

5        A.   Yes, my name is Richard Kenedi.

6        Q.   Mr. Kenedi, where do you work?

7        A.   I work at NetScout.

8        Q.   And how long have you worked at NetScout?

9        A.   I've worked at NetScout since July of 2015.

10       Q.   What is your position there?

11       A.   I am president of new markets business unit.

12       Q.   Have you ever testified before?

13       A.   I have not.

14       Q.   Prior to NetScout, did you work at Tektronix?

15       A.   Yes, I did.

16       Q.   How long did you work at Tektronix?

17       A.   I started with Tektronix in 2005.

18       Q.   And -- and can you tell us, do you have a

19  family?

20       A.   I do.  I have a wife of -- she's -- I met her

21  in Texas.  She's -- of 25 years.  We celebrated our 25th

22  anniversary last year.

23       Q.   And do you have any children?

24       A.   I do.  We have a 20-year-old daughter and an

25  18-year-old son.

1     Q.    Where did you grow up?

2     A.    A combination of Canada, the United States.

3     Q.    And could you please describe your educational

4  background?

5     A.    I have a Bachelor's of applied science with

6  electrical engineering.  And a Master's of business

7  administration.

8     Q.    How did you come to live and work in the

9  United States?

10     A.    I started my career in Toronto, Canada working

11  for a company called Bell Northern Research which was a

12  subsidiary of Northern Telecom.  And in 1990 they were

13  expanding their -- their development for mobile systems

14  in the United States, and I had an option of going to

15  California or Texas, and I elected to come to Texas.

16     Q.    Are you a U.S. citizen?

17     A.    Yes.  Shortly after moving to -- to the Texas

18  area, I met my wife, as I mentioned earlier, and I was

19  eligible to become a citizen in 1996, and I became a

20  citizen at that time.

21     Q.    Can you describe generally the positions you

22  held at Tektronix between 2005 when you joined the

23  company and 2015?

24     A.    Yeah.  Sure.  I started in 2005 as senior

25  director of diagnostics, general manager, senior

1   director of diagnostics.

2          Over the course of time, I got additional

3   responsibilities.  In about the 2010 time frame, I was

4   promoted to vice president of testing optimization.

5          Shortly after that, in 2011, I took on a role

6   of vice president of products and portfolio.

7          And then in 2014, I was promoted to president

8   of Tektronix Communications.

9      Q.   And did you remain in that position until

10  Tektronix became part of NetScout during 2015?

11     A.   That's correct.

12     Q.   Through your work at Tektronix, are you

13  familiar with Tektronix's corporate history?

14     A.   Yes.

15     Q.   And through your work at NetScout, are you

16  familiar generally with NetScout's corporate history?

17     A.   Yes.

18     Q.   Prior to appearing here today, did you prepare

19  a demonstrative exhibit that would show information

20  about the -- the two companies?

21     A.   Yes, I did.

22     Q.   And is that in the form of a timeline?

23     A.   Yes, it is.

24          MR. KRAEUTLER:  Your Honor, may I?  Thank

25  you.

```
 1                    THE COURT:  You may.

 2                    MR. KRAEUTLER:  And, Your Honor, may I

 3   invite the witness to -- to speak from the -- the board?

 4                    THE COURT:  I don't see any need for

 5   that.  We have a laser pointer if you want him to point

 6   to something specifically on the board, but I see no

 7   reason he should leave the witness stand.

 8                    MR. KRAEUTLER:  Okay.  I understand.

 9   And it is -- it is visible to you, Mr. Kenedi?

10                    THE WITNESS:  It is visible to me.

11                    MR. KRAEUTLER:  Okay.

12                    THE COURT:  You can certainly move it

13   closer if you need to.

14                    MR. KRAEUTLER:  Your Honor, let me then

15   just request -- may I stand here so I can see --

16                    THE COURT:  As long as you'll be loud

17   enough to where we're all hearing you.

18                    MR. KRAEUTLER:  Okay.  I'll do my best,

19   Your Honor.

20        Q.   (By Mr. Kraeutler)  So --

21                    MR. DAVIS:  Your Honor, may I -- may I

22   reposition?

23                    THE COURT:  You may.

24                    MR. DAVIS:  Thank you, Your Honor.

25        Q.   (By Mr. Kraeutler)  So, Mr. Kenedi, what is
```

1  shown in the top portion of the document?

2      A.    There's a timeline of Tektronix

3  Communications's history in the top portion, the red

4  portion, if you will.

5      Q.    And what is shown in the bottom portion?

6      A.    A very brief overview of the NetScout history.

7      Q.    Now, the top portion shows not only key events

8  in the history of the corporation but also some product

9  information; is that correct?

10     A.    Correct.

11     Q.    The accused products in this case are the

12 GeoProbe G10 product and the GeoBlade product.  In what

13 year was the G10 product introduced to the market?

14     A.    The G10 product was introduced in 2010.

15     Q.    And the GeoBlade product?

16     A.    The GeoBlade product was introduced in 2014.

17     Q.    And are those products -- are those products

18 both members of a GeoProbe family of products?

19     A.    They are.

20     Q.    And can you describe what the timeline shows

21 as to the GeoProbe family?

22     A.    Yes.  If I may, actually, just to introduce

23 the jury to a little bit of the history, in 1989, there

24 was a company formed called Inet in Plano, and that

25 company actually produced the first GeoProbe, which was

1   the 12U, and the 12U introduced capability to support

2   what we call the call trace application.  It also

3   supported second generation wireless capabilities that

4   was just coming into the marketplace.

5        Q.   And then what was the next step in the

6   development of the GeoProbe family?

7        A.   As new technology was being introduced, third

8   generation wireless capabilities, we introduced a new

9   GeoProbe called the 14U that supported that 3G

10  technology, but it also provided additional scale to the

11  probing platform as these networks, AT&T, Verizon, et

12  cetera.  These networks were growing, they had more

13  subscribers so we had to have higher performance probes

14  introduced to support that.

15       Q.   And then what was the next step in the

16  development of the GeoProbe family?

17       A.   In 2004, Inet was acquired by Tektronix.  When

18  Inet was acquired by Tektronix, we -- we came into

19  Tektronix, if you will, and Tektronix already was an

20  existing company that was providing instrumentation

21  capabilities.  You might have heard of oscilloscopes,

22  logic analyzers, those types of components, so they

23  created a division called Instruments.  And then Inet

24  basically formed the communication division.

25            THE COURT:  Mr. Kenedi, the Court

1  Security Officer has given you a laser pointer.  If

2  you'd care to use that addressing the board.

3                    THE WITNESS:  Okay.

4                    THE COURT:  You don't have to, but it's

5  there if you'd like to use it.

6                    THE WITNESS:  I appreciate that.  Thank

7  you.

8                    THE COURT:  All right.  Please continue.

9       A.    After Tektronix acquired Inet, as we discussed

10  earlier, the -- the next GeoProbe that was introduced

11  was the G10 in 2010, and then the GeoBlade in 2014.

12      Q.    (By Mr. Kraeutler)  And I think you've now

13  discussed some of the key events in the corporate

14  history of Tektronix, including the founding of Inet,

15  the acquisition of Inet by Tektronix.  What is the next

16  thing that happened in terms of the corporate history of

17  Tektronix?

18      A.    There's actually one thing that is not on the

19  chart that I will also mention because it was brought up

20  a little bit earlier.

21              In 2007, Danaher Corporation acquired

22  Tektronix.  And when Tektronix moved into the Danaher

23  Corporation, which had roughly 60 different operating

24  companies, they created two operating companies.  One

25  was Tektronix, Inc., the instrument portion of

1  Tektronix.   The other one was Tektronix Communications.

2  So we went into the Danaher family of operating

3  companies at that time.

4          In 2015, NetScout acquired Tektronix

5  Communications, along with other operating companies

6  from Danaher.

7      Q.    Now, the products at issue, what kinds of

8  customers are those products sold to?

9      A.    Telephone or telecom service providers.

10     Q.    And what is -- what are the products used for

11 by the telephone companies?

12     A.    We would -- these probes that we created, we

13 would put them into these networks.  You can imagine

14 AT&T as an example, it has capabilities all across the

15 United States.  We would deploy our probes across the

16 United States, and it would assist them with

17 troubleshooting and performance management of their

18 network.

19     Q.    Now, let me ask you just to look at the bottom

20 portion of the board, and what information is depicted

21 there?

22     A.    A -- a very brief outline of NetScout

23 history -- corporate history.

24     Q.    And could you describe that history?

25     A.    Yes.  In 1984, the company was formed under

the name of Frontier Software Development, the bottom

left corner of the diagram.  It was actually founded by

Anil Singhal, who is the current CEO of NetScout.  And

it was formed in Chelmsford, Massachusetts.

In 1997, the name was changed to NetScout

Systems.  And obviously other things occurred through

the course of history, but in 2015, as we mentioned, it

was the acquisition of Tektronix Communications.

Q.   How many employees does NetScout currently

have?

A.   I believe just under 3100 employees.

Q.   And are they located in the United States and

other parts of the world?

A.   Yes.

Q.   Has the Tektronix business continued?

A.   Yes.

Q.   And what is the current name of Tektronix

Texas?

A.   NetScout Texas.

Q.   And does that company continue to manufacture

products?

A.   Yes, it does.

Q.   What kinds of products?

A.   Software products, probing products.

Q.   And what kinds of customers does NetScout sell

1  to generally?

2       A.   NetScout Texas or NetScout?

3       Q.   NetScout Texas?

4       A.   NetScout Texas sells to service providers --

5  telephone company service providers.

6       Q.   Does -- does NetScout Texas sell to any other

7  type of company?

8       A.   No.

9       Q.   Can you provide any examples of the customers?

10      A.   The customers would be AT&T, Verizon,

11 CenturyLink, Cricket, those types of providers.

12      Q.   Does net -- does -- did Tektronix or does the

13 current NetScout Texas business ever sell to enterprise

14 data network customers?

15      A.   No.

16      Q.   What is the function of a probe in the context

17 of the customers of Tektronix and now the NetScout Texas

18 business?

19      A.   I can give you an example.  I'm sure

20 everyone's had cellular service and has used mobile

21 phones.  One example would be if you had a dropped call

22 while you were using your phone, we would provide the

23 ability for the service provider to be able to

24 understand why that call was dropped, as well as do

25 performance management on the overall network.

1    Q.   Has -- did Tektronix ever compete with Cisco?

2    A.   No.

3    Q.   Do you compete with Cisco today in the

4  telephone service provider market?

5    A.   No.

6    Q.   The probes at issue in this case, the G10

7  GeoProbe and the GeoBlade probe, do they contain both

8  hardware and software?

9    A.   Yes, they do.

10    Q.   Is the hardware proprietary?

11    A.   Yes.  The G10 and GeoBlade are proprietary

12  platforms.

13    Q.   Could they be characterized as commodity

14  products?

15    A.   Not at all.

16    Q.   How important to the functionality of these

17  probes, the G10 and the GeoBlade, is the hardware?

18    A.   I'd say extremely.  One of the things that is

19  very, very important for us is the ability to perform,

20  to be able to be successful at what we do in these very

21  large networks, and be able to do it at a price

22  performance range that would meet our customer needs.

23       So we built specialized hardware capability in

24  order to get that performance for our customers.

25    Q.   How do the telephone company customers use the

1  data that is collected by the GeoProbe products?

2      A.   They use it for troubleshooting and

3  performance management.

4      Q.   And what do you mean by troubleshooting?

5      A.   The example that I used for a dropped call

6  would be an example where they could look at one of our

7  applications and understand where in the network there

8  was an issue that might have caused that dropped call.

9      Q.   And how do they use the products for

10  performance management?

11      A.   There's some performance indicators, as we

12  call them, that are generated.  And they can look at

13  those performance indicators and understand how various

14  different elements or how services within the network

15  are performing.

16      Q.   Prior to March 2016, when this lawsuit was

17  filed, had you ever heard of Packet Intelligence?

18      A.   I did not.

19      Q.   Had you ever heard of the Dietz patents?

20      A.   I did not.

21      Q.   Had you ever heard of Russell Dietz or Joseph

22  Maixner or -- of any of the alleged inventors in this

23  case?

24      A.   I did not.

25      Q.   Had anyone contacted Tektronix on behalf of

1  Packet Intelligence to make inquiries about the GeoProbe

2  products?

3       A.   I am not aware of any communication.

4       Q.   Had anyone contacted Tektronix to determine

5  whether Tektronix would be willing to license any

6  particular products in the Dietz family -- or patents,

7  rather, in the Dietz family?

8       A.   No.

9                 MR. KRAEUTLER:  Pass the witness.

10                THE COURT:  All right.  Cross-examination

11  by the Plaintiff.

12                MR. DAVIS:  Yes, Your Honor.

13                THE COURT:  Are you going to use this

14  demonstrative in your cross, Mr. Davis?

15                MR. DAVIS:  Briefly I am, Your Honor, and

16  I'd also like to use the easel.

17                THE COURT:  All right.  Then we'll leave

18  it up.

19                Let's proceed.

20                MR. DAVIS:  Thank you, Your Honor.

21                THE COURT:  And, Mr. Kraeutler, while

22  he's using the demonstrative, if you want to reposition

23  yourself so that you can see the board, you're welcome

24  to do that, okay?

25                MR. KRAEUTLER:  Thank you, Your Honor.

1          THE COURT:  Let's go forward.

2          MR. DAVIS:  Thank you, Your Honor.  And

3   just briefly I can go ahead and use this and take care

4   of that.

5                    CROSS-EXAMINATION

6   BY MR. DAVIS:

7      Q.   You mentioned, Mr. Kenedi, that in 2015,

8   NetScout was -- acquired Tektronix; is that correct?

9      A.   Tektronix Communications, that's correct.

10     Q.   And what was the -- what was the value of that

11  acquisition?

12     A.   There was four operating companies that were

13  acquired, and the overall value of the acquisition was

14  $2.3 billion.

15     Q.   And do you have any sense for the amount of

16  revenue of those -- that group of companies that the

17  Tektronix component -- that represented?

18     A.   It was in the range of $800 million.

19     Q.   Okay.  Thank you.

20          MR. DAVIS:  Your Honor, I don't think I

21  need this anymore.  May I remove it?

22     A.   Mr. Davis, can I just make sure it's clear

23  that was the combination of all four companies?

24  That's -- that was the question, correct?

25          THE COURT:  All right.

```
 1       Q.   (By Mr. Davis)  Yes.

 2       A.   Yes.  Okay.

 3                 THE COURT:  You may take the

 4   demonstrative down if you're through with it.

 5                 MR. DAVIS:  Thank you, Your Honor.

 6   You can actually leave that there if you'd like.  I'm

 7   going to use that.

 8                 MR. CARR:  All right.

 9                 MR. DAVIS:  Thank you.

10       Q.   (By Mr. Davis)  Now, we've heard a lot in this

11   case about Tektronix Plano, employees, there's only 500,

12   and I believe on direct examination, we've heard for the

13   first time that NetScout is a global company with over

14   3,000 employees; is that correct?

15       A.   That's correct.

16       Q.   Okay.  And you understand, sir, that how many

17   employees are in Plano versus anywhere else in the world

18   is really not relevant to the issues in this case?

19       A.   I would not know its relevance, sir.

20       Q.   You don't know whether those issues are

21   relevant to this case?

22       A.   I -- it depends on the circumstance and the

23   question being asked around it.

24                 THE COURT:  Approach the bench, Counsel.

25                 (Bench conference.)
```

1          THE COURT:  You covered it with Bergman,

2 you've now covered it with him, I don't want any more

3 geographical references as to who has employees where.

4 The number of employees is fine.  But we're not going to

5 try this on who's located in Plano, who's located

6 outside of Plano, okay?

7          MR. DAVIS:  Your Honor, if I can just

8 make one observation.

9          THE COURT:  You've -- you've had more

10 than enough opportunity.

11          MR. DAVIS:  Okay.  All right.

12          THE COURT:  Let's move on.

13          MR. DAVIS:  All right.

14          (Bench conference concluded.)

15          THE COURT:  Let's proceed.

16    Q.   (By Mr. Davis)  Mr. Kenedi, I think you've

17 testified on direct that NetScout does not compete with

18 Cisco; is that correct?

19    A.   NetScout Texas, that's correct.

20    Q.   Okay.

21          MR. DAVIS:  Could we see, please,

22 PTX-120.

23          I'm sorry that's the wrong exhibit.  190.

24          Thank you, yes.

25          And if I could have Page 11.

1          All right.  And if you could, please,

2  highlight the -- the second full paragraph.

3      Q.   (By Mr. Davis)  Now, this is the 10-K from --

4  from NetScout; is that correct?

5      A.   I didn't see the front cover fast enough to --

6          MR. DAVIS:  Could you go back to the

7  front page, please?

8      A.   Yes, it is the 10-K.

9      Q.   (By Mr. Davis)  It's the 2016 annual report on

10  Form 10-K, correct?

11      A.   Correct.

12          MR. DAVIS:  If we could go back to Page

13  11, please.

14          If we could highlight, again, the second

15  full paragraph -- sorry, the next paragraph.

16      Q.   (By Mr. Davis)  It says here, sir, that:  In

17  the service provider market, we compete with probe

18  vendors, network equipment manufacturers, big data and

19  analytics vendors, and virtualization vendors.  These

20  vendors include Alcatel-Lucent, Astellia, Anritsu,

21  Cisco, Empirix.

22          And the list goes on.  Do you see that, sir?

23      A.   I do.

24      Q.   You're here today, sir, as the corporate

25  representative of NetScout; is that right?

```
 1          A.   Yes, I am.

 2          Q.   So you are the face of NetScout for this

 3   trial?

 4          A.   That is correct.

 5          Q.   And NetScout in this case is making some

 6   accusations; is that correct?

 7          A.   NetScout is making accusations?

 8          Q.   Yes.

 9          A.   Can you please elaborate?

10          Q.   Well --

11               MR. DAVIS:   Could I have the opening

12   slide, Page 28.

13               Sorry, from the opening transcript.

14          Q.   (By Mr. Davis)  Now, this was the transcript

15   of the opening statement that was delivered in this case

16   by your attorney.  And if you will read with me, in Line

17   5, Mr. Kraeutler said:  This case is about taking

18   something that doesn't belong to you.  It's about stolen

19   ideas, and it's about taking credit for what other

20   people have done.

21               Do you see that, sir?

22          A.   I do.

23          Q.   So in this case, you are accusing Mr. Dietz of

24   stealing something, aren't you?

25          A.   You can interpret it that way from this
```

1  sentence, yes.

2      Q.   I don't think there's any interpretation here,

3  sir.  Doesn't it say "stolen"?

4      A.   Yes.

5      Q.   And you're also accusing Mr. Dietz of taking

6  credit for what other people have done; is that correct?

7      A.   That's correct.

8      Q.   Okay.  And, Mr. Kenedi, are you here to stand

9  up -- stand behind those allegations?

10     A.   Yes.

11     Q.   And it is your belief that Mr. Dietz has lied

12  and stolen, is that your opinion?

13     A.   It is my belief through my -- through my

14  Counsel that the claims against NetScout are false.

15     Q.   And it's your belief, and your Counsel has

16  apparently given you these beliefs, that Mr. Dietz has

17  lied and that he's stolen and you're here to represent

18  those -- those accusations, aren't you?

19     A.   My belief is formed from the experts within

20  our company.  My belief is also formed from both

21  internal and external counsel that we've used for this

22  case.

23     Q.   Okay.  And it's your belief and it's your

24  accusation that Mr. Dietz is a liar and a thief,

25  correct?

1    A.    It's my belief in what is written on the

2 screen.

3              MR. DAVIS:  Objection, Your Honor.

4 Non-responsive.

5              THE COURT:  Overruled.

6    Q.    (By Mr. Davis)  Now -- and -- and -- okay.

7 And what is written on the screen is that Mr. Dietz

8 stole something and that he's taking credit for

9 something that doesn't belong to him, correct?

10    A.    Yes, absolutely correct.

11    Q.    So --

12              MR. DAVIS:  Your Honor, if I may approach

13 the easel?

14              THE COURT:  You may.

15    Q.    (By Mr. Davis)  I'd like to walk you through,

16 sir, some of the characters in this case and talk about

17 them individually because there are certain characters

18 in this case that I think represent --

19              THE COURT:  Let's ask him questions,

20 Mr. Davis, don't tell him what you want to talk about.

21    Q.    (By Mr. Davis)  Let's start with Mr. Dietz,

22 please.

23              THE COURT:  You may move to see the easel

24 if you want to, Mr. Kraeutler.

25              MR. KRAEUTLER:  I was standing for a

1  different reason, Your Honor.

2          THE COURT:  Well, tell me what that

3  reason is.

4          MR. KRAEUTLER:  I -- I was going to

5  listen to the question.

6          THE COURT:  You can hear better standing

7  up than sitting down?

8          MR. KRAEUTLER:  No, I'll sit down, but

9  I -- I -- I may be up again soon.

10          THE COURT:  If you would like to move so

11  that you can see what he writes on the board, you're

12  welcome to; otherwise, maintain your position at the

13  bar.

14          Let's proceed.

15          MR. KRAEUTLER:  Thank you, Your Honor.

16      Q.   (By Mr. Davis)  Now, Mr. Dietz in this case

17  obviously does not agree with you in your accusation

18  that he's a liar and a thief, does he?

19      A.   I don't know what he believes, sir.

20      Q.   Well, you were here in the courtroom when he

21  testified, weren't you?

22      A.   Yes, I was.

23      Q.   And you heard him deny vehemently the

24  accusations that you made against him?

25      A.   I did.

1    Q.    Okay.  So you do know that he disagrees with
2 you, correct?
3    A.    I do know what he testified yesterday, yes,
4 sir.
5    Q.    Okay.  So Mr. Dietz doesn't agree with you
6 about the accusations that you've made.
7         What about Mr. Maixner, you heard him take the
8 stand and testify.  Does he agree with you that -- that
9 Mr. Dietz is a liar and a thief?
10    A.    I don't know what Mr. Maixner believes.
11    Q.    Well, did you hear him testify, sir?
12    A.    I did.
13    Q.    Did you hear him deny that he got -- that they
14 got their ideas for the inventions anywhere other than
15 their own creative effort?
16    A.    I did.  I did hear that.
17    Q.    Okay.  Now, the other inventors, do you have
18 any -- any reason to believe that the other inventors on
19 these patents agreed with you that Mr. Dietz stole and
20 lied about the inventions in this case?
21    A.    Again, Mr. Davis, I'm not familiar with what
22 those other inventors believe.
23    Q.    You don't have any reason to think that they
24 agree with you, correct?
25    A.    I don't have any reason to think about the

1  other inventors, sir.

2      Q.   Well, the other inventors are part of the

3  invention, aren't they?

4      A.   Yes.

5      Q.   And if the other -- and they all signed the

6  same oath to the Patent Office representing that what

7  they invented was their own, correct?

8      A.   I would -- I would believe so, yes.

9      Q.   And so you don't have any reason to believe

10  that the other inventors were lying to the Patent

11  Office, do you?

12      A.   I do not have any reason, sir.

13      Q.   What about the company Apptitude, did you hear

14  Mr. Dietz testify about Apptitude?

15      A.   Yes.

16      Q.   Apptitude was the company that he worked for,

17  correct?

18      A.   Yes.

19      Q.   And you heard about how Mr. Dietz's boss came

20  to him and said, look, we need to get some patents on

21  your technology, do you remember that?

22      A.   Yes.

23      Q.   Do you think Apptitude had any reason to

24  believe that Mr. Dietz had lied or stolen the ideas for

25  inventions from the RMON group?

1    A.    I don't really know the details of the

2  relationship between Apptitude and Mr. Dietz.

3    Q.    But as far as you know, you don't have any

4  reason to believe that Apptitude was in on the lies or

5  the stealing?

6    A.    I -- I don't know anything about Apptitude.

7  It was the first time I heard about the company.

8    Q.    Okay.  And Apptitude put money and resources

9  into getting the patents on the technology, didn't they?

10    A.    If Mr. Dietz said so, then I would assume that

11  that is the case.

12    Q.    You remember hearing testimony about a company

13  called Hi/Fn?

14    A.    I do.

15    Q.    Okay.  And do you recall that testimony?

16    A.    Yes.

17    Q.    Do you think that Hi/Fn had any belief that

18  Mr. Dietz stole or lied about getting the patents?

19    A.    I do not know Hi/Fn's position on it, sir.

20    Q.    Okay.  Well, you do know that Hi/Fn paid money

21  to acquire the company, don't you?

22    A.    From what I heard yesterday, yes.

23    Q.    And part of the value of that company was the

24  patents?

25    A.    I would assume so.

1    Q.   Okay.  What about the United States Patent

2  Office, the United States Patent Office have any reason

3  to believe that Mr. Dietz lied or stole to get the

4  inventions -- about the inventions in his patents?

5    A.   I would assume if the United States Patent

6  Office received all the information necessary, they

7  would have no reason to assume anywise.

8    Q.   Well, and -- but we do know that the United

9  States Patent Office issued the patents, correct?

10   A.   Yes, we do.

11   Q.   And we do know that the Patent Office was

12  aware of RMON, correct?

13   A.   Just from what we heard yesterday.

14   Q.   I mean, RMON is all throughout the patent,

15  isn't it?

16   A.   I understand it's referenced, yes, but I have

17  not read the patent.

18   Q.   Okay.  So you haven't read the patent?

19   A.   I have not.

20   Q.   And yet you've come in here and you've decided

21  that Mr. Dietz has lied and stolen about his inventions?

22   A.   Yes.

23   Q.   In fact, Mr. Anil Singhal, who's going to

24  testify later, he hasn't read the patent either, has he?

25   A.   I do not know.

1      Q.    What about the company Exar, do you recall

2  hearing testimony about Exar?

3      A.    Yes.

4      Q.    And do you recall how much money Exar paid to

5  acquire -- to acquire Hi/Fn?

6      A.    I do not recall.

7      Q.    Does $59 million sound about right?

8      A.    I -- now that you mention it, yes, I remember

9  the number.

10      Q.    What about Packet Intelligence?  Packet

11  Intelligence, do they have any reason to believe that

12  Mr. Dietz lied or stole to get the inventions in this

13  case?

14      A.    I do not know, sir.

15      Q.    Packet Intelligence started a business based

16  upon the Dietz portfolio, didn't it?

17      A.    Yes, they did.

18      Q.    And you heard Mr. Brunell testify that he

19  actually read the RMON specification before buying the

20  patents-in-suit, didn't he?

21      A.    Yes, he did.

22      Q.    Do you think that Mr. Brunell would put his

23  own money into buying a company if he thought that there

24  was some issue with those patents?

25      A.    It appeared that Mr. Brunell was very

carefully placing his money into those patents.

Q.   What about all the companies that forward cited to the patents at issue in this case?  There were hundreds of them, weren't there?

A.   As I understand it, yes.

Q.   Okay.  Now -- and then what about Cisco? Cisco was a company that paid a lot of money to take a license to these patents, didn't they?

A.   Yes.

Q.   And we've all discussed how much that license was for, correct?

A.   Yes.

Q.   Did Cisco allege that Mr. Dietz had stolen these patents?

A.   I do not know the conversation between Cisco and Packet Intelligence.

Q.   Do you think Cisco would pay that kind of money if they thought that Mr. Dietz had lied or stolen to get the patents?

A.   It's possible.

Q.   You also know that Cisco was part of the RMON group, correct?

A.   I'm not familiar with the RMON group.

Q.   What about Huawei?  Huawei is another company that took a license to these patents.  Did Huawei assert

1  that the patents were invalid because Mr. Dietz had

2  stolen or lied to get them?

3       A.   I do not know Huawei's position on the

4  patents.

5       Q.   Okay.   Now, with regard to Mr. Dietz, you're

6  aware, sir, that Mr. Dietz has a top secret security

7  clearance, correct?

8       A.   I heard so yesterday.

9       Q.   They don't give top security -- top secret

10  security level clearances to people that lie, do they?

11                 MR. KRAEUTLER:   Objection.

12                 THE COURT:   State your objection.

13                 MR. KRAEUTLER:    Your Honor, it's well

14  beyond the scope of direct.

15                 MR. DAVIS:  Your Honor, he's not --

16                 MR. KRAEUTLER:   And -- and relevance,

17  it's not adding anything.

18                 MR. DAVIS:   Your Honor, he's the

19  corporate rep of the company.   He's here to defend the

20  claims that he's made against Mr. Dietz.   I'm entitled

21  to -- to question him about the validity of those

22  claims.

23                 THE COURT:   I don't see that this witness

24  has any knowledge about what is or isn't required to

25  obtain a top secret security clearance.   I'm going to

1    sustain the objection.  It calls for the witness to

2    speculate beyond his knowledge.

3                      Let's proceed.

4        Q.   (By Mr. Davis)  You did hear, sir, that Mr.

5    Dietz does have a top secret level security clearance?

6        A.   Yes, I did.

7                      MR. KRAEUTLER:  Objection.

8                      THE COURT:  What's your objection?

9                      MR. KRAEUTLER:  It's the same objection,

10   Your Honor.

11                     THE COURT:  No.  He asked him a question:

12   Did he hear that Mr. Dietz had a top -- top secret

13   security clearance?  He has personal knowledge of that

14   because he was in the courtroom yesterday when Mr. Dietz

15   testified to it.  That objection is overruled.

16                     Answer the question, Mr. Kenedi.

17       A.   Yes, I did hear that yesterday.

18       Q.   (By Mr. Davis)  You also heard that he took

19   lie detector tests?

20       A.   I don't recall that yesterday.

21       Q.   Do you recall that Mr. Dietz testified that he

22   is the chief security officer and general manager of

23   industrial Internet cyber security?

24       A.   Yes.

25       Q.   Do you have any understanding of what that job

```
 1  entails?

 2        A.   I do not know the details.

 3        Q.   Did you hear Mr. Dietz testify about the fact

 4  that that involves protecting our energy systems?

 5        A.   Yes.

 6        Q.   Including nuclear power plants?

 7        A.   Yes.

 8        Q.   Mr. Dietz has a job in this case, doesn't he?

 9        A.   Mr. Dietz has a job in this case?

10               MR. DAVIS:  Strike that.

11        Q.   (By Mr. Davis)  Mr. Dietz has a job, doesn't

12  he?

13        A.   Yes, he does.

14        Q.   We just described that job.  Mr. Dietz does

15  not have any financial interest in the outcome of this

16  case, does he?

17        A.   He said he did not.

18        Q.   He has no -- he gets -- he does not get

19  compensated based upon whether this jury awards for

20  Packet Intelligence or not, does he?

21        A.   He said he did not.

22        Q.   He traveled from California to come here to

23  testify of his own volition, didn't he?

24        A.   I do not know.

25        Q.   Now, you don't have any reason to believe that
```

1  any of these companies that we just discussed believed

2  that Mr. Dietz lied or cheated to get the patents, do

3  you?

4      A.   As I said, sir, I do not know the beliefs of

5  those companies.

6      Q.   In fact, you, sir, are the only one who is

7  accusing Mr. Dietz of lying and cheating to get these

8  patents, aren't you?

9      A.   Of the list that you have on that board,

10 yes --

11     Q.   Now --

12     A.   -- as far as I know.

13     Q.   You're not aware of anyone else, are you?

14     A.   I'm not aware of anyone else.

15     Q.   When did NetScout make the accusation that Mr.

16 Dietz had lied and cheated to get the patents in this

17 case?

18     A.   In our opening statement, I would assume

19 formally, but I'm not aware of whether it was done

20 earlier or not.

21     Q.   In the context of this lawsuit, right, sir?

22     A.   Yes.

23     Q.   They had never made that accusation before

24 2016 when this lawsuit was filed; is that correct?

25     A.   I do not know.

1     Q.   Now, Mr. Marwaha -- I'm sorry, Mr. Singhal,

2  he's known Mr. Dietz for a long time, correct?

3     A.   I do not know their relationship.

4     Q.   You didn't hear that Mr. Dietz and Mr. Singhal

5  were on the RMON -- part of the RMON Working Group

6  together?

7     A.   Yes, I did.

8     Q.   And that that relationship stretches back to

9  the mid-1990s?

10    A.   If that's when the RMON Group was formed,

11 then, yes, that would be accurate.

12    Q.   Okay.  And for all that time, from the

13 mid-'90s until today, almost 20 years, it wasn't until

14 this lawsuit was filed that somebody decided to accuse

15 Mr. Dietz of lying and cheating?

16    A.   I believe it's the case that once we were

17 aware that these -- these patent infringement

18 accusations became -- you know, were applied to

19 NetScout, that it became something reasonable to do.

20              MR. DAVIS:  If I could have DX-21,

21 please.

22    Q.   (By Mr. Davis)  Do you remember seeing this

23 slide in opening statement, sir?

24    A.   Vaguely, yes.

25    Q.   Okay.  And do you see here where at the top it

1  says remote network monitoring MIB protocol identifiers?

2      A.   Yes.

3      Q.   And the date is November 25, 1996?

4      A.   Yes.

5      Q.   Now, do you see below here where it says

6  inventor information?

7      A.   Yes.

8      Q.   Now, this is the document that Mr. Dietz --

9  I'm sorry, Mr. Rosenfeld prepared for Mr. Dietz to take

10  notes about his invention.  Do you recall that?

11      A.   Yes.

12      Q.   Now, do you -- do you recall that in -- in

13  your opening in this case, the top document was

14  juxtaposed to the bottom document in this slide; is that

15  correct?

16      A.   Yes.

17      Q.   And the inference is that Mr. Dietz

18  invented -- came up with his invention in December of

19  1996, a month after the RMON MIB protocol identifiers

20  document.  Do you see that?

21      A.   I do.

22      Q.   Okay.

23          MR. DAVIS:  If we could, please, have

24  DX-517, Page 7.

25      Q.   (By Mr. Davis)  Now, you remember on Mr.

1  Dietz's direct examination where he testified that he

2  actually didn't come up with the -- he didn't conceive

3  of the invention until January of 1998; do you recall

4  that testimony?

5       A.   I don't recall everything that Mr. Dietz said.

6       Q.   Okay.  Well, Mr. Dietz was shown this very

7  document, and he testified that he, in 1998, developed a

8  new process for the pattern recognition system that

9  would enable the system to run at higher speeds

10 required.

11          Do you see that, sir?

12      A.   I do.

13      Q.   And do you recall that he testified that the

14 December 1996 date was when he started working on the

15 ideas?

16      A.   Again, I don't recall specifically what he

17 said.

18      Q.   Now, if Mr. Dietz is going to lie and steal to

19 take credit for something that the RMON Working Group

20 did, why would he do -- tell Mr. Rosenfeld that the

21 first time he started working on it was in 19 --

22 December of 1996, a month after the RMON Working Group

23 published their paper?

24              MR. KRAEUTLER:  Objection.

25              THE COURT:  State your objection,

 1   Counsel.

 2                   MR. KRAEUTLER:  It's -- it's

 3   argumentative, and there's no foundation.

 4                   MR. DAVIS:  Your Honor, I don't think I

 5   need to have a foundation to ask him a question on cross

 6   about his accusations.

 7                   THE COURT:  Just a minute.

 8                   Well, it calls for the witness to

 9   speculate about the mind of Mr. Rosenfeld, and that's

10   improper, and I'm going to sustain the objection on that

11   basis.

12                   Let's proceed.

13       Q.   (By Mr. Davis)  It says here, sir, that Mr.

14   Dietz put in his description to Mr. Rosenfeld that it

15   was not until January of 1998 that he developed this new

16   process; is that correct?

17       A.   That's what it says, yes, sir.

18       Q.   Doesn't it make more sense that if Mr. Dietz

19   was going to lie and steal from RMON, that he would try

20   to predate the RMON specification?

21       A.   I do not know, sir.

22       Q.   Now, you're aware, sir, that in a patent

23   infringement case, it's the claims of the patent that

24   the jury is to look to to determine whether a product

25   infringes, are you aware of that, sir?

 1          A.    I am aware.

 2          Q.    Were you here during -- well, you were here

 3   during opening statement, weren't you, when -- when your

 4   attorneys were giving NetScout's position in this case?

 5          A.    Yes, I was.

 6                MR. DAVIS:   Could I please have the

 7   Tuesday morning transcript, Pages 39 to 40?

 8          Q.    (By Mr. Davis)   Now, this is -- this was the

 9   opening statement that was delivered by your lawyers,

10   and it says:   In this case, TrackSessions were the

11   ability to identify conversational flows was important

12   to customers who wanted detailed information about the

13   nature of traffic in -- on their data networks.   It was

14   important to companies that ran data --

15                MR. DAVIS:   Next page, please.

16          Q.    (By Mr. Davis)   -- networks.   It was not

17   important to the telephone companies.   They were

18   interested in things like troubleshooting and call

19   tracing.   They were interested in whether calls went

20   through.

21                Do you see that, sir?

22          A.    I do.

23          Q.    And at the bottom of this call-out here, it

24   says:   The base product -- products monitor connection

25   flows only.   They don't use TrackSessions.   They don't

1  do what the patent claims.

2          Now, have you read the claims in this case,

3  sir?

4      A.   I have not.

5      Q.   Do you know whether the word "TrackSessions"

6  appears in any of the claims of the asserted patents?

7      A.   I do not.

8      Q.   All right.  And you understand, sir, that it

9  is the claims and not the attorney's words that the jury

10 is supposed to apply to the products in this case?

11     A.   Yes.

12     Q.   So if the claims don't say "TrackSessions,"

13 they're not supposed to look for TrackSessions in the

14 accused products; is that right?

15     A.   Can you please repeat that?

16     Q.   If the claims don't say "TrackSessions," they

17 don't look to TrackSessions to determine infringement;

18 is that correct?

19     A.   I don't know.

20     Q.   Okay.  Now, the other thing that was said is

21 that --

22             MR. DAVIS:  If you can go back -- back to

23 the top of this page.

24     Q.   (By Mr. Davis)  It says it was not important

25 to the telephone companies.  They were interested in

1  things like troubleshooting and call tracing.

2          Now, we do know, sir, that your products, the

3  accused products in this case, are important to

4  telephone companies, aren't they?

5      A.   The G10 and GeoBlade are important to the

6  telephone companies, yes.

7      Q.   They're very important to telephone companies,

8  aren't they?

9      A.   Yes, we like to think that they bring a lot of

10  value to the telephone companies.

11      Q.   Now, Mr. Kenedi, is it fair to say that you

12  don't have any respect for Mr. Dietz's patents in this

13  case?

14      A.   I don't think that's fair to say.  I don't

15  know.

16      Q.   Okay.  Well, you understand, sir, that you, on

17  behalf of your company, are accusing Mr. Dietz of lying

18  and stealing to get his patents?

19      A.   Yes.

20      Q.   Okay.  Thank you.

21              MR. DAVIS:  No further questions, Your

22  Honor.

23              THE COURT:  All right.  Redirect?

24              MR. KRAEUTLER:  Thank you, Your Honor.

25              THE COURT:  Are you going to use that

1  demonstrative in your redirect, Counsel?

2          MR. KRAEUTLER:  No, why don't we --

3          THE COURT:  If you're not, let's take it

4  down.

5          MR. KRAEUTLER:  Okay.

6          THE COURT:  All right.  Now let's proceed

7  with redirect.

8                  REDIRECT EXAMINATION

9  BY MR. KRAEUTLER:

10     Q.   Mr. Kenedi, is troubleshooting important to

11  telephone companies?

12     A.   Yes.

13     Q.   Is call tracing important to telephone

14  companies?

15     A.   Yes.

16     Q.   Is identifying conversational flows important

17  to telephone companies?

18     A.   Not that I'm aware of.

19     Q.   You were questioned about why you made no

20  accusations about Mr. Dietz before this lawsuit.  Had

21  you ever heard of Packet Intelligence before March of

22  2016 when your company was sued?

23     A.   No.

24     Q.   Had you ever heard of the Dietz portfolio of

25  patents before March 2016 when your company was sued?

1      A.   No.

2                MR. KRAEUTLER:  No further questions.

3  I'll pass the witness, Your Honor.

4                THE COURT:  Is there further

5  cross-examination?

6                MR. DAVIS:  Briefly, Your Honor.

7                If I could have PTX-168, Page 1, please.

8                And if you could highlight starting in

9  the section that says Powerful Platform Maximizes

10 Capacity and Flexibility.

11     Q.   (By Mr. Davis)  Now, if you can read at the

12 top here, sir, do you see where it says:  Network

13 traffic volumes are already at an all-time high with

14 more growth on the horizon.  At over a billion

15 smartphone users worldwide, your subscribers' insatiable

16 appetites for mobile data will quickly outpace your

17 ability to cost-effectively monitor it - until now?

18     A.   I do see that, yes.

19     Q.   Is it still your opinion, sir, that the mobile

20 telephone companies and their networks, that your

21 products are not important to them?

22                MR. KRAEUTLER:  Objection,

23 mischaracterizes.

24                THE COURT:  Overruled.  Answer the

25 question, please.

1      A.   Can you please repeat that?

2      Q.   (By Mr. Davis)  Is it still your opinion, sir,

3 after reading your own document that your products are

4 not important to -- to telephone companies?

5      A.   I don't recall saying that our products were

6 not important to telephone companies.

7                THE MR. DAVIS:  No further questions, Your

8 Honor.

9                THE COURT:  You pass the witness?

10                MR. DAVIS:  I pass the witness, Your

11 Honor.

12                THE COURT:  Is there further direct,

13 Mr. Kraeutler?

14                MR. KRAEUTLER:  No, Your Honor.

15                THE COURT:  Okay.  Mr. Kenedi, you may

16 step down.

17                THE WITNESS:  Thank you.

18                THE COURT:  All right.  Ladies and

19 gentlemen, I'm advised by the clerk's office that your

20 lunch is here or will be here in the next minute or two.

21 So we're going to use this opportunity to break for our

22 lunch recess.  It's a quarter until noon.  We will

23 reconvene at 12:30.

24                Please bring your notebooks with you as

25 you exit the courtroom to have lunch in the jury room.

1  I remind you of all my instructions, including not to

2  discuss the case among yourselves.  Enjoy your lunch,

3  and we'll be back in 45 minutes to continue.

4                  The jury is excused for lunch.

5                  COURT SECURITY OFFICER:  Rise for the

6  jury.

7                  (Jury out.)

8                  THE COURT:  The Court stands in recess

9  for lunch.

10                 COURT SECURITY OFFICER:  All rise.

11                 (Recess.)

12                 ***********************************

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                        CERTIFICATION

3

4            I HEREBY CERTIFY that the foregoing is a true

5    and correct transcript from the stenographic notes of

6    the proceedings in the above-entitled matter to the best

7    of my ability.

8

9

10   /s/Shelly Holmes_____              _10/11/17_____
     SHELLY HOLMES, CSR, TCRR                           Date
11   OFFICIAL COURT REPORTER
     State of Texas No.:  7804
12   Expiration Date:  12/31/18

13

14

15

16

17

18

19

20

21

22

23

24

25