IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | |
|---|---|
| PACKET INTELLIGENCE LLC, § § *Plaintiff*, § § v. § § NETSCOUT SYSTEMS, INC., § TEKTRONIX COMMUNICATIONS, § TEKTRONIX TEXAS, LLC, § § *Defendants*. § | CIVIL ACTION NO. 2:16-CV-00230-JRG |

## MEMORANDUM OPINION AND ORDER

Before the Court is Defendants NetScout Systems, Inc. and NetScout Systems Texas, LLC's (f/k/a Tektronix Texas, LLC d/b/a Tektronix Communications) (collectively, "NetScout") Rule 50(b) Renewed Motion for Judgment as a Matter of Law of No Infringement (Dkt. No. 314) and Rule 50(b) Renewed Motion for Judgment as a Matter of Law of Invalidity Under 35 U.S.C. §§ 102(a), 102(f), and 101 (Dkt. No. 317). The Court heard oral argument on the motions on May 21, 2019. (Dkt. No. 339.) Having considered the motions, briefing, the parties' oral arguments, and trial record, the Court is of the opinion that each motion should be and hereby is **DENIED**.

I. **BACKGROUND**

Plaintiff Packet Intelligence LLC ("PI") sued NetScout for patent infringement on March 15, 2016. (Dkt. No. 1.) PI alleged that NetScout's GeoProbe 10 ("G10") and GeoBlade (collectively, the "Accused Products") literally[1] infringe Claims 10 and 17 of U.S. Patent No. 6,665,725 (the "'725 Patent"); Claims 1 and 5 of U.S. Patent No. 6,839,751 (the "'751 Patent"); and Claims 19 and 20 of U.S. Patent No. 6,954,789 (the "'789 Patent") (collectively, the "Asserted

---

[1] PI did not assert infringement under the theory of doctrine of equivalents.

1

Claims" or "Patents-in-Suit").[2] (*Id.*) PI also alleged willful infringement and sought pre-suit damages. (*Id.*) NetScout asserted several defenses, including invalidity under 35 U.S.C. §§ 101, 102, 103, and 112; failure to properly name all inventors under 35 U.S.C. § 102(f); inequitable conduct; and unclean hands. (Dkt. No. 205 at 9–11.) The case proceeded to trial, and the jury returned a verdict in favor of PI, finding that the Asserted Claims were willfully infringed, none of the Asserted Claims were invalid, and that PI was entitled to damages in the amount of $5.75 million as a running royalty. (Dkt. No. 237.) Following submission of the evidence to the jury, the Court conducted a bench trial as to the equitable issues and concluded that NetScout had failed to show that PI's claims were barred under the doctrines of unclean hands or inequitable conduct. (Dkt. Nos. 242, 306.) The Court entered final judgment on September 7, 2018, designating PI as the prevailing party. (Dkt. No. 307 at 2.)

NetScout now moves pursuant to Federal Rule of Civil Procedure 50(b) for an order that (1) the Accused Products, G10 and GeoBlade, do not infringe the Asserted Claims (Dkt. No. 314) and (2) the Asserted Claims are invalid under 35 U.S.C. §§ 102(a), 102(f), and 101 (Dkt. No. 317).[3]

## II. LEGAL STANDARDS

### A. Federal Rule of Civil Procedure 50(b)

Judgment as a matter of law is appropriate if "the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for [a] party" on an issue. Fed. R. Civ. P. 50(a)(1). "The grant or denial of a motion for judgment as a matter of law is a procedural issue

---

[2] In the complaint, PI also alleged infringement of U.S. Patent Nos. 6,771,646 and 6,651,099, but withdrew its claims relating to those patents before trial. (Dkt. No. 132 at 13.)
[3] NetScout only raises 35 U.S.C. §101 "to remove any doubt that that [*sic*] its invalidity arguments based upon 35 U.S.C. § 101 are preserved for appeal." (Dkt. No. 317 at 20.)

not unique to patent law, reviewed under the law of the regional circuit in which the appeal from the district would usually lie." *Finisar Corp. v. DirectTV Group, Inc.*, 523 F.3d 1323, 1332 (Fed. Cir. 2008). The Fifth Circuit "uses the same standard to review the verdict that the district court used in first passing on the motion." *Hiltgen v. Sumrall*, 47 F.3d 695, 699 (5th Cir. 1995). Thus, "a jury verdict must be upheld unless 'there is no legally sufficient evidentiary basis for a reasonable jury to find as the jury did.'" *Id.* at 700 (quoting Fed. Civ. R. P. 50(a)(1)). The jury's verdict must be supported by "substantial evidence" for each claim. *Am. Home Assurance Co. v. United Space All.*, 378 F.3d 482, 487 (5th Cir. 2004).

Under Fifth Circuit law, the court is to be "especially deferential" to a jury's verdict and must not reverse the jury's findings unless they are not supported by substantial evidence. *Baisden v. I'm Ready Prods., Inc.*, 693 F.3d 491, 499 (5th Cir. 2012). "Substantial evidence is defined as evidence of such quality and weight that reasonable and fair-minded men [and women] in the exercise of impartial judgment might reach different conclusions." *Threlkeld v. Total Petroleum, Inc.*, 211 F.3d 887, 891 (5th Cir. 2000). The moving party is entitled to judgment as a matter of law unless "the evidence points so strongly and so overwhelmingly in favor of the nonmoving party that no reasonable juror could return a contrary verdict." *Int'l Ins. Co. v. RSR Corp.*, 426 F.3d 281, 296 (5th Cir. 2005) (citing *Cousin v. Tran Union Corp.*, 246 F.3d 359, 366 (5th Cir. 2001)). However, "[t]here must be more than a mere scintilla of evidence in the record to prevent judgment as a matter of law in favor of the movant." *Arismendez v. Nightingale Home Health Care, Inc.*, 493 F.3d 602, 606 (5th Cir. 2007).

In evaluating a motion under Rule 50, the court must "draw all reasonable inferences in the light most favorable to the verdict and cannot substitute other inferences that [the court] might regard as more reasonable." *E.E.O.C. v. Boh Bros. Const. Co., L.L.C.*, 731 F.3d 444, 451 (5th Cir.

2013) (internal citation omitted). "[T]he court must give credence to the evidence favoring the nonmovant as well as that 'evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses.'" *See Ellis v. Weasler Eng'g Inc.*, 258 F.3d 326, 337 (5th Cir. 2001) (quoting 9A WRIGHT & MILLER § 2529). However, in doing so, the court may not make credibility determinations or weigh the evidence, as those are solely functions of the jury. *See id. (*quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150–51 (2000)).

### B. Infringement

To prove patent infringement under 35 U.S.C. § 271, a plaintiff must show by a preponderance of the evidence the presence of every element, or its equivalent, in the accused product or service. *Lemelson v. United States*, 752 F.2d 1538, 1551 (Fed. Cir. 1985). First, the claim must be construed to determine its scope and meaning; and second, the construed claim must be compared to the accused device or service. *Absolute Software, Inc. v. Stealth Signal, Inc.*, 659 F.3d 1121, 1129 (Fed. Cir. 2011) (citing *Carroll Touch, Inc. v. Electro Mech. Sys., Inc.*, 15 F.3d 1573, 1576 (Fed. Cir. 1993)). "A determination of infringement is a question of fact that is reviewed for substantial evidence when tried to a jury." *ACCO Brands, Inc. v. ABA Locks Mfr. Co.*, 501 F.3d 1307, 1311 (Fed. Cir. 2007).

### C. Invalidity

An issued patent is presumed valid. 35 U.S.C. § 282(a). To rebut this presumption, a party must prove invalidity by clear and convincing evidence. *Id.* ("The burden of establishing invalidity of a patent or any claim thereof shall rest on the party asserting such invalidity."); *Microsoft Corp. v. I4I Ltd. P'ship*, 564 U.S. 91, 95 (2011) ("We consider whether § 282 requires an invalidity defense to be proved by clear and convincing evidence. We hold that it does.").

### i. Anticipation

A patent claim is invalid as anticipated if "the invention was known or used by others in this country, or patented or described in a printed publication in this or a foreign country, before the invention thereof by the applicant for patent." 35 U.S.C. § 102(a) (2012) (pre-AIA). "A claim is anticipated only if each and every element is found within a single prior art reference, arranged as claimed." *Virnetx, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1323 (Fed. Cir. 2014). Anticipation is a factual question reviewed for substantial evidence. *Id.*

### ii. Inventorship

Under 35 U.S.C. §102(f) (pre-AIA), "[a] person shall be entitled to a patent unless—he did not himself invent the subject matter sought to be patented." 35 U.S.C. §102(f). "[T]his subsection mandates that a patent accurately list the correct inventors of a claimed invention" and "failure to name them renders a patent invalid." *Pannu v. Iolab Corp.*, 155 F.3d 1344, 1349–50 (Fed. Cir. 1998). The Federal Circuit has explained that "[d]etermining 'inventorship' is nothing more than determining who conceived the subject matter at issue." *In re VerHoef*, 888 F.3d 1362, 1365 (Fed. Cir. 2018) (internal citation omitted). "When an invention is made jointly, the joint inventors need not contribute equally to its conception." *Id.* at 1366. All that is required is that the joint inventor made a significant contribution to the conception or reduction to practice of the invention. *Id.* (quoting *Pannu*, 155 F.3d at 1351). Proper inventorship is reviewed for substantial evidence. *Id.* at 1365.

## III. DISCUSSION

### A. The Patents-in-Suit

The Patents-in-Suit are directed to monitoring and classifying information that is transmitted over a network. (Dkt. No. 245, 10/17/17 P.M. Trial Tr. at 102:12–14.) *See also* '789 Patent at 1:48–51 ("The present invention relates to computer networks, specifically to the real-time elucidation of packets communicated within a data network, including classification according to protocol and application program."); '751 Patent at 1:38–41 (same); '725 Patent at 1:41–44 (same). Information is generally transmitted over a network via groups of "packets" that flow from one connection point to another. (Dkt. No. 244, 10/17/17 A.M. Trial Tr. at 51:11–52:13.) For example, to display an advertisement on a webpage, a request is sent over the Internet (the network) from the user's device (first connection point) to the server (second connection point). The server responds to the request by delivering the appropriate information in the form of packets back to the device. This singular flow of packets between the user and the server is called a "connection flow." *See, e.g.*, '789 Patent 2:41–43 ("The term 'connection flow' is commonly used to describe all the packets involved with a single connection."); (Dkt. No. 245, 10/17/17 P.M. Trial Tr. at 109:15–19 (Dr. Almeroth, PI's infringement expert, explained that a "connection flow" is "kind of one sequence of requests and responses" and "can involve multiple requests over the same connection".).)

Transmitting information over a network usually involves transferring packets across multiple connection flows. (Dkt. No. 245, 10/17/17 P.M. Trial Tr. at 108:23–111:12.) For example, if a user opens Facebook on her phone, multiple requests will be sent from the phone to individual servers to access different pieces of information that are necessary to fill in the entire

webpage—*e.g.*, a request to display images of the user's news feed, a request to play a video, a request to display an advertisement. (*Id.*) The individual servers will then respond to those requests by sending the appropriate packets of information back to the phone. (*Id.*) Each of those requests and responses are different connection flows that are ultimately assembled for display as a single website by a browser. (*Id.*)

As the number of users and networks have grown over time, there has been a corresponding increase in the number of services that require multiple servers—and hence, an increase in the number of connection flows transmitted over the network. '789 Patent at 1:55–67. (*See also* Dkt. No. 244, 10/17/17 A.M. Trial Tr. at 53:5–56:16.) To ensure the continued operation of such services, network providers need to determine which flows are related to the same application or online service. (Dkt. No. 244, 10/17/17 A.M. Trial Tr. at 53:5–56:16.) For example, Facebook may generate two different connection flows to display information on the user's device—a first flow in which Facebook is sending pictures and a second flow in which Facebook is sending videos. If the network monitor cannot associate those two flows as belonging to Facebook, then it will have an incomplete view of how much traffic is attributable to that particular online service. (*Id.* at 55:23–56:16 ("[T]hat web page that you're using [is] made up of lots of these different connection flows. And the problem is . . . how do I know that that's all related to that one app or . . . web page . . . .").)

Network monitors that could recognize packets as belonging to the same connection flow were well-known in the prior art when the Patents-in-Suit were filed. *See, e.g.*, '789 Patent at 2:42–44. (*See also* Dkt. No. 245, 10/10/2017 P.M. Trial Tr. at 181:22–182:8.) However, these prior art monitors could not identify *disjointed* connection flows as belonging to the *same conversational flow*. *See, e.g.*, '789 Patent at 3:56–59 ("What distinguishes this invention from

7

prior art network monitors is that it has the ability to recognize disjointed flows as belonging to the same conversational flow."). (*See also* Dkt. No. 245, 10/10/2017 P.M. Trial Tr. at 189:1–5 ("Q. Would you agree that the prior art does not link, in your opinion, conversation – connection flows into conversation flows? A. Yes."); Dkt. No. 248, 10/11/2017 P.M. Trial Tr. at 132:17–138:16; Dkt. No. 250, 10/12/2017 P.M. Trial Tr. at 42:15–48:22.) This inability to associate different connection flows was a crucial limitation in the prior art because applications often transmit data via multiple connection flows. *See* '751 Patent at 3:2–5 ("[P]rior art systems cannot collect some important performance metrics that are related to a complete sequence of packets of a flow or to several disjointed sequences of the same flow in a network."); '725 Patent at 12:29–33 (explaining that using the disclosed inventions reveals "[w]hat may seem to prior art monitors to be some unassociated flow . . . to be a sub-flow associated with a previously encountered sub-flow"); '789 Patent at 15:31–34 (same).

The Patents-in-Suit address this problem and describe how disjointed connection flows can be associated with a single conversational flow to more precisely associate traffic with a particular application or protocol. *See* '789 Patent at 1:48–51 ("The present invention relates to computer networks, specifically to the real-time elucidation of packets communicated within a data network, including classification according to protocol and application program."); '751 Patent at 3:2–5 ("[P]rior-art systems cannot collect some important performance metrics that are related to a complete sequence of packets of a flow or to several disjointed sequences of the same flow in a network."); '725 Patent at 1:66–2:6 ("Not only should all the packets be detected and analyzed, but for each of these packets the network monitor should determine the protocol (e.g., http, ftp, H.323, VPN, etc.), the application/use within the protocol (e.g., voice, video, data, real-time data, etc.), and an end user's pattern of use within each application or the application context (e.g.,

options selected, service delivered, duration, time of day, data requested, etc.)."). (Dkt. No. 245, 10/10/2017 P.M. Trial Tr. at 12:7–23, 102:12–20 ("[W]hat we're talking about . . . [i]dentifying the underlying protocols, the applications that are being used, and the user activity that's caused those packets to flow through the network to try and achieve an understanding about how the network is being used.").)

### B. Infringement

At trial, PI alleged, and the jury found, that NetScout's G10 and GeoBlade products practice the Asserted Claims. Specifically, the jury found that the Accused Products literally infringe Claims 10 and 17 of the '725 Patent; Claims 1 and 5 of the '751 Patent; and Claims 19 and 20 of the '789 Patent. (Dkt. No. 237 at 2.)

Pursuant to Rule 50(b), NetScout moves to vacate the verdict. It contends that the Accused Products do not practice what it calls the "conversational flow" limitations and is therefore entitled to judgment as a matter of law of no infringement. (Dkt. No. 314.) NetScout argues that each Asserted Claim requires associating connection flows into conversational flows. This position stems from (1) PI's repeated assertions before trial that the Asserted Claims require associating packets into conversational flows; (2) this Court's decision finding the claims patent-eligible because they include this requirement; and (3) the Parties' agreed upon construction of "conversational flows," the elements and steps recited in the Asserted Claims, the patents' specifications and intrinsic record, and the named inventors' testimony. (*Id.* at 4–13.) NetScout asserts that PI failed to present any evidence that the Accused Products ever actually associate connection flows into conversational flows. (*Id.* at 16–20.) Instead, PI's infringement expert, Dr. Alermoth, allegedly presented a new theory at trial that the "Asserted Claims do not actually *require* associating or correlating flows of packets into 'conversational flows'" and "that the

9

Accused Products still infringe because they store information that '*can be used*' to associate connection flows into 'conversational flows.'" (*Id.* at 1 (emphasis added).) NetScout contends that "Dr. Alermoth's new interpretation, heard for the first time at trial, is not correct" and "impermissibly broadened the scope of the claims to read them onto the Accused Products." (*Id.* at 2.)

NetScout also argues that the only product that supposedly did correlate connection flows into conversational flows was an optional feature that was never used or sold with the Accused Products. (*Id.* at 18–22.) According to NetScout, PI presented evidence that the Web Page Download Time KPI feature in the Accused Products associates connection flows into conversational flows. (*Id.*) However, Dr. Alermoth admitted at trial that this feature was never used or sold. (*Id.*) As a result, NetScout asserts that no reasonable jury could have found that the Accused Products infringe the Asserted Claims.

The Court has conducted a careful review of the trial record and concludes that "a reasonable jury would . . . have a legally sufficient evidentiary basis to find" infringement. Fed. R. Civ. P. 50(a). For each Asserted Claim, PI's infringement expert, Dr. Alermoth, applied the Court's claim constructions to determine their scope. (Dkt. No. 245, 10/10/17 P.M. Trial Tr. at 121:16–123:8.) He then provided the jury a claim-by-claim, element-by-element analysis of how each claim limitation, as construed, reads on the Accused Products. He explained that based on a review of source code, internal documents, and deposition testimony regarding the Accused Products, each element of the Asserted Claims is present in the Accused Products. He began his analysis with Claim 19 of the '789 Patent, which PI told the jury was an "exemplary claim" of the Asserted Claims. (Dkt. No. 244, 10/10/17 A.M. Trial Tr. at 14:23–25; Dkt. No. 245, 10/10/17 P.M. Trial Tr. at 144:4–152:16 (Claim 19 of the '789 Patent).) Dr. Alermoth then testified about

10

the remaining claims, referring back to his testimony on Claim 19 where the limitations were the same and providing additional evidence for new or different limitations. (Dkt. No. 245, 10/10/17 P.M. Trial Tr. at 152:17–153:19 (Claim 10 of the '789 Patent), 155:14–165:20 (Claim 1 of the '751 Patent); 165:24–166:20 (Claim 5 of the '751 Patent), 167:3–176:7 (Claim 10 of the '725 Patent); 176:11–178:7 (Claim 17 of the '725 Patent).)

"For most of [the claim] elements . . . NetScout never challenged Dr. Alermoth's opinion during trial and does not appear to contest them now [on Rule 50(b)]." (Dkt. No. 323 at 2 (citing Dkt. No. 245, 10/10/17 P.M. Trial Tr. at 127:8–134:1, 138:16–144:4).) Rather, NetScout challenges the sufficiency of Dr. Alermoth's testimony regarding "conversational flows" and asserts that such testimony does not support the jury's finding of infringement. (*See* Dkt. No. 314.) Having reviewed the trial record, however, the Court finds that substantial evidence supports the jury's finding that the Accused Products did meet the "conversational flow" limitations.

Most relevant here is Dr. Alermoth's testimony regarding elements 19(d)–(f) of Claim 19 of the '789 Patent. Those elements recite:

> . . . . (d) a memory for storing a database comprising none or more flow-entries for previously encountered conversational flows, each flow-entry identified by identifying information stored in the flow-entry;
>
> (e) a lookup engine coupled to the output of the parser subsystem and to the flow-entry memory and configured to lookup whether the particular packet whose parser record is output by the parser subsystem has a matching flow-entry, the looking up using at least some of the selected packet portions and determining if the packet is of an existing flow; and
>
> (f) a flow insertion engine coupled to the flow-entry memory and to the lookup engine and configured to create a flow-entry in the flow-entry database, the flow-entry including identifying information for future packets to be identified with the new flow-entry, the lookup engine configured such that if the packet is of an existing flow, the monitor classifies the packet as belonging to the found existing flow; and if the packet is of a new flow, the flow insertion engine stores a new flow-entry for the new flow in the flow-entry database, including identifying information for future packets to be identified with the new flow-entry . . . .

11

Claim 19, '789 Patent. Applying the Court's claim constructions, Dr. Alermoth explained what these elements require and how the Accused Products meet each of them.

With respect to element 19(d), Dr. Alermoth testified that "the idea would be that you're keeping track of not only the connection flows, but also the conversational flows. And you do that by keeping a copy of them in the memory." (Dkt. No. 245, 10/10/17 P.M. Trial Tr. at 117:18–21.) He stated that the "flow state block" or "FSB" in the Accused Products is "the portion of the memory where the database is stored that contained the flow-entries." (*Id.* at 135:5–7.) He showed the jury "corresponding source code for this called Fsb.c," which "defines the source code in the computer that's used to – to then track flows." (*Id.* at 135:8–10.) He explained that information stored in the FSB is "a whole number of fields that get associated with a particular flow-entry." (*Id.* at 136:2–5.) He concluded that "the requirement of the claim is to have a memory for storing a database comprising none or more flow-entries" and that he had "shown what the flow-entries are." (*Id.* at 136:21–23.) He further stated that the claim required that such flow-entries be "for previously encountered conversational flows" and that he had similarly "shown . . . some of the information in the flow record that can be used to correlate or associate flow-entries into conversational flows." (*Id.* at 136:24–137:2.) *To confirm that the Accused Products practice the claimed limitations*, Dr. Alermoth described an optional feature—not itself accused of infringement—called the Web Page Download Time Estimation, which generates data analytics based on information stored in the FSB. (*Id.* at 137:8–138:14.) He explained that this feature "demonstrate[s] that information in the flow record is *sufficient to identify* the flow-entry and also

to allow it to associate with previously-encountered conversational flows," as required by the claim. (*Id.* at 138:8–11 (emphasis added).)[4]

Dr. Alermoth engaged in a similar analysis for element 19(e). He explained that this element recites a "look-up engine. And the function of the look-up engine, as it's described in the words of the claim here, roughly is to look at packets that come in and determine whether they're for an existing flow or whether they're for a new flow." (*Id.* at 138:20–25.) He showed the jury a source code file, FSPP_G10.c, and testified that "on Page 3 of this source code file, there is a function to search the FSB, to search the flow state block, and determine if packets coming in match with an existing flow-entry or not." (*Id.* at 139:9–13.)[5]

Finally, Dr. Alermoth stated that element 19(f) requires a "flow insertion engine." (*Id.* at 139:23–24.) He explained that "once you looked up the flow, if it finds a flow, it can update that flow-entry with information from the packet that was just observed. If there isn't an existing flow that's found, then it can create a new flow-entry." (*Id.* at 139:24–140:3.) Based on source code for the FSB, he opined that the Accused Products practice these limitations. (*Id.* at 140:8–142:12 (explaining that source code says "[c]reate and initialize a new flow," "talks about monitoring and classifying the packet," and "looking at updating elements of that flow-entry," as required by element 19(f)).)[6]

---

[4] Dr. Alermoth testified that for element 19(d), "the documentation and evidence that shows that the way that GeoBlade works is similar to the G10." (Dkt. No. 245, 10/10/17 P.M. Trial Tr. at 149:20–21; *see also id.* at 150:19–22 ("So all of the evidence that I pointed to earlier about Fsb.c source code file, the flow header document, all of that is exactly the same evidence that I've relied on for the rest of this limitation."); *id.* at 150:3–22 (citing deposition testimony from Mr. Curtin, who testified about a document that "show[ed] how the functions of the G10 map to the GeoBlade").)

[5] For the GeoBlade, Dr. Alermoth presented source code that met this limitation. (Dkt. No. 245, 10/10/17 P.M. Trial Tr. at 151:4–10.) *See also* PTX-203.

[6] For the GeoBlade, Dr. Almeroth presented source code that met this limitation. (Dkt. No. 245, 10/10/17 P.M. Trial Tr. at 151:17–21.) *See also* PTX-203.

The Court finds that the strength and sufficiency of record evidence, as discussed above, adequately supports the jury's verdict of infringement. NetScout contends that Dr. Alermoth presented a "new (and erroneous) interpretation of the Asserted Claims" at trial that contradicted his deposition testimony and expert report, and that had he provided testimony on the "proper interpretation" of the claims, no reasonable jury could have found infringement. (Dkt. No. 314 at 1, 22.) Even if true, NetScout never raised the issue during its cross-examination of Dr. Alermoth. Nor did it object at trial to his testimony as beyond the scope of his expert report. The argument was simply never raised prior to the return of the jury's verdict, and as such, is irrelevant and improper under Rule 50(b). *See Paez v. Gelboym*, 578 Fed. Appx. 407, 408 n.1 (5th Cir. 2014) ("We do not consider evidence that was not presented to the jury."); *see also West v. Media Gen. Operations, Inc.*, 250 F. Supp. 2d 923, 947 (E.D. Tenn. 2002) ("When deciding the plaintiffs' Rule 50(b) motion, the Court is limited to reviewing only the evidence presented to the jury at trial. The Court cannot grant a Rule 50(b) motion and set aside the jury's verdict based on information that was not introduced into evidence at trial and not taken into consideration by the jury.").

The Court's role in ruling on a Rule 50(b) motion is to determine whether there is a "legally sufficient evidentiary basis" from the trial record to support the jury's verdict. Fed. R. Civ. P. 50(a). "Where a jury [such as here] is presented with two conflicting positions at trial and there is reasonable evidence and argument to support both positions, the fact that the jury ultimately sided with one party over the other does not support entry of JMOL." *Core Wireless Licensing S.A.R.L. v. LG Elecs., Inc.*, No. 2:14-cv-00911-JRG, 2016 WL 4440255, at *7 (E.D. Tex. Aug. 23, 2016), *aff'd*, 880 F.3d 1356 (Fed. Cir. 2018). Ultimately, the jury was entitled to credit Dr. Alermoth's testimony over NetScout's expert. *Id.* ("[T]he Court will not supplant the judgment of the jury."). Accordingly, the jury's verdict of infringement must stand undisturbed.

## C. Invalidity

At trial, NetScout alleged that the Asserted Claims are invalid because (1) the claims are anticipated under 35 U.S.C. §102(a) (pre-AIA) and (2) the Patents-in-Suit fail to name all inventors as required by 35 U.S.C. §102(f) (pre-AIA). Specifically, NetScout argued that its network monitor, the 6010 probe with software version 4.5 (the "NetScout Probe"), implemented the industry-standard "Track Sessions" functionality. (*Id.* at 1.) NetScout submits that it presented evidence and testimony from Rajeev Nadkarni, a NetScout engineer, and its expert, Mr. Waldbusser, which showed that Track Sessions "actually associated related connection flows into 'conversational flows,' just like the invention described and claimed in the Asserted Patents." (*Id.*) NetScout also argued that the Asserted Claims are invalid because the Patents-in-Suit do not name the RMON working group as an inventor. The RMON working group "devised . . . 'Track Sessions'" and "was the true source of the essential feature of the Asserted Claims, [which was] what Russel Dietz and the other named inventors claimed in the patents as 'conversational flows.'" (*Id.* at 2.)

NetScout asserts that PI's attempts to rebut invalidity do not provide substantial evidence for the jury to find that NetScout failed to show anticipation or improper inventorship. (*Id.* at 13–20; Dkt. No. 328 at 3–4.) First, PI's expert, Dr. Alermoth, testified that there were different versions of Track Sessions implemented in the NetScout Probe and that these differences cast doubt as to (1) whether Mr. Waldbusser "follow[ed] a proper methodology with respect to anticipation" and (2) whether the NetScout Probe with version 4.5 of Track Sessions actually functioned in the manner set forth in the claims. (Dkt. No. 250, 10/12/17 P.M. Trial Tr. at 40:9–42:12.) NetScout concedes that its fact witness, Mr. Nadkarni, did testify that there were two versions of Track Sessions—version 4.5 (the initial release) and version 4.5.3 (the patch release).

15

(Dkt. No. 317 at 14.) NetScout argues, however, that Mr. Nadkarni confirmed at trial that Version 4.5.3 addressed "small problems, like bugs" and "would [not] have changed the functionality of 'Track Sessions' [in version 4.5]." (*Id.* (citing Dkt. No. 248, 10/11/17 P.M. Trial Tr. at 107:15–23).)

NetScout also argues that Dr. Alermoth's testimony about the differences between Track Sessions and the Asserted Claims was premised on "phantom claim limitations." (*Id.* at 15.) According to NetScout, Dr. Alermoth first told the jury that the claims require conversational flows to be comprised of separate connection flows and that every connection flow of a conversational flow had to be maintained in a *separate* flow-entry. (*Id.* at 16 (citing Dkt. No. 250, 10/12/17 P.M. Trial Tr. at 45:3–6).) He allegedly opined that the NetScout Probe does not anticipate because it maintained information about different connections all in *one* flow-entry and not in separate entries. (*Id.* at 16–17.) NetScout further characterizes PI's Opposition as stating that the claims require the tracking of simultaneous or parallel connection flows and that since the NetScout Probe describes a sequence of flows, there is no anticipation. (Dkt. No. 328 at 3–4.) NetScout claims that neither of these purported limitations is required by the Patents-in-Suit and that such an interpretation would exclude a preferred embodiment of the claims. (*Id.*) As a result, NetScout contends that no reasonable jury could have found that the Asserted Claims are not invalid, and moves to vacate the jury's finding of no invalidity. (*See* Dkt. No. 237 at 4.)

The Court has conducted a careful review of the trial record and finds no valid reason to depart from the jury's verdict. Judgment as a matter of law is granted only if the jury's verdict has no legally sufficient evidentiary basis. Fed. R. Civ. P. 50(a)(1). NetScout does not show this in its motion. Instead, NetScout summarizes the competing evidence presented at trial and asks the Court to reweigh the evidence in its favor. For example, NetScout complains about Dr. Alermoth's

16

testimony in response to its expert, Mr. Waldbusser. At trial, Mr. Waldbusser opined that the NetScout Probe with Track Sessions anticipated the Asserted Claims because it practiced the "conversational flow" limitation. He explained that Track Sessions "links together, *join[s] together connections* starting on well-known ports with second connections that --- that are on dynamically assigned ports." (Dkt. No. 248, 10/11/17 P.M. Trial Tr. at 156:6–9 (emphasis added).) In particular, he testified that the NetScout Probe with Track Sessions practiced the "conversational flow" limitation recited in element 19(d) of the '789 Patent:

> Well, this limitation also required that – evidence of conversational flows, and remember that's where we're going to remember the port number and *join the connections together* and so
>
> . . .
>
> So here we remember the port number. We – we put the port number in this port mapper packet, examine that packet, correlate the red key to the new purple key where we're – where we're remembering the port number. That's the process that I'm about to show you. So it – part of it is unsurprisingly in trackses.h with – for TrackSessions.
>
> . . .
>
> The pp.c has the – has the code that remembers the port. That Line 1817 actually remembers the port, and the highlighted comment above it tells a little bit about what it's doing. It's assigning the new port for the previously asked program, and then assigning the port. And then on the next slide it shows the – *the code that swaps the hash bucket*. And then it –
>
> . . .
>
> Well, it means that we're – it essentially means we're adding this new entry to the table.
>
> . . .
>
> Oh, when I found those things, I realized that I found all the elements for the conversational flow.

(*Id.* at 209:18–211:5 (emphasis added).)

17

PI's expert, Dr. Alermoth, disagreed. He opined that (1) Mr. Waldbusser's analysis was flawed because he focused only on two words in the claim— "conversational flow"—as a single limitation, when in fact the claims required much more, and (2) the NetScout Probe did not associate different connection flows with the same conversational flow and instead replaced one flow with another. He explained to the jury:

> But when Mr. Waldbusser did an analysis of this claim with respect to conversational flows, the only thing that he looked at was the two words "conversational flows" and one limitation of Claim 19(d). Two words out of 29 words for that limitation and nothing for any of the other limitations
>
> . . .
>
> It's two words as part of a --- of other words in a single limitation. ***And it's important to read the rest of the words.***
>
> . . .
>
> So if you go to the next slide from Waldbusser, 211, he then talks about how --- well, the first part was packets of a protocol start on a well-known port, and then transfer them to dynamically assigned ports. That means that it goes to this new port that's different than what the original port was.
>
> So even though there's two different connections that are happening here, what TrackSessions is trying to do is put them into a single flow-entry. And that's what he's shown down here at the bottom. It's not two flow-entries. It's a single flow-entry.
> . . .
>
> So in this instance, you have one flow-entry. And, for example, all of the packets that were exchanged over these two different connections are counted as the one flow-entry. There aren't two separate flow-entries. They aren't – they then aren't tied together. So it's a very different concept.
>
> ***On cross-examination, he was asked whether or not there was a way to determine, using this flow-entry, how many packets could be attributed to this first connection versus packets attributed to the second connection. And he answered that there was not. And I agree with that. Because there's the only one flow-entry, all of the packets are associated with that one flow-entry. And so there isn't the concept of a conversational flow that can relate different independent flows to each other***.

> . . .
>
> And *so this idea of just having one flow-entry that's changed*, *as opposed to maintaining existing flow-entries, creating new flow-entries, and then correlating and relating those flow-entries together to create conversational flows is not what happens when you just swap out the port number and maintain one flow-entry*.

(Dkt. No. 250, 10/12/17 P.M. Trial Tr. at 21:7–19; 28:9–29:14; 45:11–16 (emphasis added).)

NetScout claims that Dr. Alermoth manufactured "phantom claim limitations" to side-step invalidation. (Dkt. No. 317 at 1–2.) However, Dr. Alermoth's opinions represent one fair reading of the claims. Each party's expert applied the Court's claim constructions to opine on what a person of ordinary skill in the art would understand the claims to require. (Dkt. No. 248, 10/11/17 P.M. Trial Tr. at 202:11–203:8; Dkt. No. 250, 10/12/17 P.M. Trial Tr. at 17:18–21.) In view of those competing opinions, the jury was entitled to credit the testimony of Dr. Alermoth over Mr. Waldbusser and find that the NetScout Probe does not practice each limitation in the Asserted Claims. "The Court will not supplant the judgment of the jury." *Core Wireless*, 2016 WL 4440255, at *7.

Even in the absence of Dr. Alermoth's rebuttal testimony, PI has pointed to other evidence in the record that supports the jury's verdict of no invalidity:

- "Mr. Dietz [a named inventor] testified that the Track Sessions port-swapping technique was very different than the claimed technique—and those differences were intentional because RMON left implementation techniques open, and he further testified (consistent with Dr. Alermoth) that the NS Probe did not have application layer visibility and thus could not have classified conversational flows as claimed." (Dkt. No. 333 at 2; *see also* Dkt. No. 244, 10/10/17 A.M. Trial Tr. at 89:22–25; 90:13–23; 99:24–100:21; 109:13–110:5; 114:10–115:10; 125:14–127:5.)

- Mr. Waldbusser admitted on cross-examination that he initially "did not think PI's claims were the same as the NS Probe with Track Sessions," (Dkt. No. 333 at 1), and that he concluded that "what the patent was describing

19

was the same thing as TrackSessions" "during [his] work for this case." (Dkt. No. 249, 10/12/17 A.M. Trial Tr. at 40:13–16).) According to PI, this exposed Mr. Waldbusser to the jury "as being more of a hired gun than an objective expert." (Dkt. No. 333 at 1.)

Each of these are different reasons why the jury could have found that NetScout failed to prove invalidity by clear and convincing evidence. Nothing more is required to defeat a Rule 50(b) motion. Drawing all reasonable inferences in favor of the verdict and without making any credibility decisions, the Court finds that the verdict is supported by substantial evidence presented at trial. Accordingly, NetScout's motion for judgment as a matter of law of no invalidity should be denied.[7]

## IV. CONCLUSION

For the reasons set forth above, NetScout's Rule 50(b) Renewed Motion for Judgment as a Matter of Law of No Infringement (Dkt. No. 314) and NetScout's Rule 50(b) Renewed Motion for Judgment as a Matter of Law of Invalidity Under 35 U.S.C. §§ 102(a), 102(f) and 101 (Dkt. No. 317) are each **DENIED**.

**So ORDERED and SIGNED this 31st day of May, 2019.**

_____
RODNEY GILSTRAP
UNITED STATES DISTRICT JUDGE

---

[7] NetScout argues that the NetScout Probe with Track Sessions anticipates the Asserted Claims. NetScout also argues that since the RMON working group devised Track Sessions, it should have been a named inventor of the Patents-in-Suit per 35 U.S.C. § 102(f). Since the Court finds that the jury had a reasonable basis to find that the NetScout Probe with Track Sessions does not anticipate, the jury necessarily had a reasonable basis to reject NetScout's argument that RMON, the group that devised Track Sessions, should have been a named inventor on the Patents-in-Suit.

20