IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | | |
|---|---|---|
| PACKET INTELLIGENCE LLC, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | CIVIL ACTION NO. 2:16-CV-00230-JRG |
| NETSCOUT SYSTEMS, INC., | § | |
| TEKTRONIX COMMUNICATIONS, | § | |
| TEKTRONIX TEXAS, LLC, | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM OPINION AND ORDER

Before the Court is Defendants NetScout Systems, Inc. and NetScout Systems Texas, LLC's (f/k/a Tektronix Texas, LLC d/b/a Tektronix Communications) (collectively, "NetScout") Motion for Judgment as a Matter of Law of No Pre-Suit Damages Pursuant to Fed. R. Civ. P. 50(b) (Dkt. No. 315) and Renewed Motion for Judgment as a Matter of Law of No Willful Infringement Pursuant to Fed. R. Civ. P. 50(b) (Dkt. No. 316). The Court heard oral argument on the motions on May 21, 2019. (Dkt. No. 339.) Having considered the parties' motions, briefing, oral arguments, and trial record, the Court is of the opinion that each motion should be and hereby is **DENIED**.

### I. BACKGROUND

Plaintiff Packet Intelligence LLC ("PI") sued NetScout for patent infringement on March 15, 2016. (Dkt. No. 1.) PI alleged that NetScout's GeoProbe 10 ("G10") and GeoBlade (collectively, the "Accused Products") literally[1] infringe Claims 10 and 17 of U.S. Patent No. 6,665,725 (the "'725 Patent"); Claims 1 and 5 of U.S. Patent No. 6,839,751 (the "'751 Patent");

---
[1] PI did not assert infringement under the theory of doctrine of equivalents.

1

and Claims 19 and 20 of U.S. Patent No. 6,954,789 (the "'789 Patent") (collectively, the "Asserted Claims" or "Patents-in-Suit").[2] (*Id.*) PI also alleged willful infringement and sought pre-suit damages. (*Id.*) NetScout asserted several defenses, including invalidity under 35 U.S.C. §§ 101, 102, 103, and 112; failure to properly name all inventors under 35 U.S.C. § 102(f); inequitable conduct; and unclean hands. (Dkt. No. 205 at 9–11.) The case proceeded to trial, and the jury returned a verdict in favor of PI, finding that the Asserted Claims were willfully infringed, none of the Asserted Claims were invalid, and that PI was entitled to damages in the amount of $5.75 million as a running royalty. (Dkt. No. 237.) Following submission of the evidence to the jury, the Court conducted a bench trial as to the equitable issues and concluded that NetScout had failed to show that PI's claims were barred under the doctrines of unclean hands or inequitable conduct. (Dkt. Nos. 242, 306.) The Court entered final judgment on September 7, 2018, designating PI as the prevailing party. (Dkt. No. 307 at 2.)

NetScout now moves pursuant to Federal Rule of Civil Procedure 50(b) for an order that vacates (1) the jury's award of $3.5 million in pre-suit damages (Dkt. No. 315) and (2) the jury's finding of willful infringement (Dkt. No. 316).

## II. LEGAL STANDARDS

### A. Federal Rule of Civil Procedure 50(b)

Judgment as a matter of law is appropriate if "the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for [a] party" on an issue. Fed. R. Civ. P. 50(a)(1). "The grant or denial of a motion for judgment as a matter of law is a procedural issue not unique to patent law, reviewed under the law of the regional circuit in which the appeal from

---

[2] In the complaint, PI also alleged infringement of U.S. Patent Nos. 6,771,646 and 6,651,099, but withdrew its claims relating to those patents before trial. (Dkt. No. 132 at 13.)

the district would usually lie." *Finisar Corp. v. DirectTV Grp., Inc.*, 523 F.3d 1323, 1332 (Fed. Cir. 2008). The Fifth Circuit "uses the same standard to review the verdict that the district court used in first passing on the motion." *Hiltgen v. Sumrall*, 47 F.3d 695, 699 (5th Cir. 1995). Thus, "a jury verdict must be upheld unless 'there is no legally sufficient evidentiary basis for a reasonable jury to find as the jury did.'" *Id.* at 700 (quoting Fed. R. Civ. P. 50(a)(1)). The jury's verdict must be supported by "substantial evidence" for each claim. *Am. Home Assurance Co. v. United Space All.*, 378 F.3d 482, 487 (5th Cir. 2004).

Under Fifth Circuit law, the court is to be "especially deferential" to a jury's verdict and must not reverse the jury's findings unless they are not supported by substantial evidence. *Baisden v. I'm Ready Prods., Inc.*, 693 F.3d 491, 499 (5th Cir. 2012). "Substantial evidence is defined as evidence of such quality and weight that reasonable and fair-minded men [and women] in the exercise of impartial judgment might reach different conclusions." *Threlkeld v. Total Petroleum, Inc.*, 211 F.3d 887, 891 (5th Cir. 2000). The moving party is entitled to judgment as a matter of law unless "the evidence points so strongly and so overwhelmingly in favor of the nonmoving party that no reasonable juror could return a contrary verdict." *Int'l Ins. Co. v. RSR Corp.*, 426 F.3d 281, 296 (5th Cir. 2005) (citing *Cousin v. Tran Union Corp.*, 246 F.3d 359, 366 (5th Cir. 2001)). However, "[t]here must be more than a mere scintilla of evidence in the record to prevent judgment as a matter of law in favor of the movant." *Arismendez v. Nightingale Home Health Care, Inc.*, 493 F.3d 602, 606 (5th Cir. 2007).

In evaluating a motion under Rule 50, the court must "draw all reasonable inferences in the light most favorable to the verdict and cannot substitute other inferences that [the court] might regard as more reasonable." *E.E.O.C. v. Boh Bros. Const. Co., L.L.C.*, 731 F.3d 444, 451 (5th Cir. 2013) (internal citation omitted). "[T]he court must give credence to the evidence favoring the

nonmovant as well as that 'evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses.'" *See Ellis v. Weasler Eng'g Inc.*, 258 F.3d 326, 337 (5th Cir. 2001) (quoting 9A WRIGHT & MILLER § 2529). However, in doing so, the court may not make credibility determinations or weigh the evidence, as those are solely functions of the jury. *See id. (*quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150–51 (2000)).

### B. Pre-Suit Damages

To obtain pre-suit damages, a patent owner must show either that it (1) provided the accused infringer with actual notice of infringement or (2) complied with the marking requirements of 35 U.S.C. § 287(a). If a patent owner fails to comply with the marking statute, then it may only recover damages from the time it provided actual notice of the alleged infringement. 35 U.S.C. §287(a).

The marking statute provides:

> Patentees, and persons making, offering for sale, or selling within the United States any patented article for or under them, or importing any patented article into the United States, may give notice to the public that the same is patented, either by [1] fixing thereon the word "patent" or the abbreviation "pat.", together with the number of the patent, or [2] by fixing thereon the word "patent" or the abbreviation "pat." together with an address of a posting on the Internet, accessible to the public without charge for accessing the address, that associates the patented article with the number of the patent, or when, from the character of the article, this cannot be done, by fixing to it, or to the package wherein one or more of them is contained, a label containing a like notice. In the event of failure so to mark, no damages shall be recovered by the patentee in any action for infringement, except on proof that the infringer was notified of the infringement and continued to infringe thereafter, in which event damages may be recovered only for infringement occurring after such notice. Filing of an action for infringement shall constitute such notice.

35 U.S.C. § 287(a).

The marking statute applies to both the patentee and those who make and sell patented articles under the patentee's authorization. *Maxwell v. J. Baker, Inc.,* 86 F.3d 1098, 1111 (Fed.

4

Cir. 1996). "[W]ith third parties unrelated to the patentee, it is often more difficult for a patentee to ensure compliance with the marking provisions. A 'rule of reason' approach is justified in such a case and substantial compliance may be found to satisfy the statute." *Id.* Thus, "[w]hen the failure to mark is caused by someone other than the patentee, the court may consider whether the patentee made reasonable efforts to ensure compliance with the marking requirements. The rule of reason is consistent with the purpose of the constructive notice provision—to encourage patentees to mark their products in order to provide notice to the public of the existence of the patent and to prevent innocent infringement." *Id.* at 1111–12.

"[A]n alleged infringer who challenges the patentee's compliance with § 287 bears an initial burden of production to articulate the products it believes are unmarked 'patented articles' subject to § 287." *Arctic Cat Inc. v. Bombardier Recreational Prods. Inc.,* 876 F.3d 1350, 1368 (Fed. Cir. 2017). This initial burden is a "low bar" and "the alleged infringer need only put the patentee on notice that he or his authorized licensees sold specific unmarked products which the alleged infringer believes practice the patent. The alleged infringer's burden is a burden of production, not one of persuasion or proof." *Id.* "Once the alleged infringer meets its burden of production, however, the patentee bears the burden to prove the products identified do not practice the patented invention." *Id.* The patentee bears the ultimate burden of proving compliance with marking. *Id.*

### C. Willful Infringement

Section 284 of the Patent Act provides that, in the case of infringement, courts "may increase the damages up to three times the amount found or assessed." 35 U.S.C. § 284. Whether enhanced damages are warranted and in what amount are within the sound discretion of the trial court. *Halo Elects., Inc. v. Pulse Elects., Inc.*, 136 S. Ct. 1923, 1932 (2016). The Supreme Court

5

has explained that such damages "are not to be meted out in a typical infringement case, but are instead designed as a 'punitive' or 'vindictive' sanction for egregious infringement behavior." *Id.* at 1932. Conduct warranting enhancement has been variously described as "willful, wanton, malicious, bad-faith, deliberate, consciously wrongful, flagrant, or—indeed—characteristic of a pirate." *Id.*

Willful infringement may justify, but does not mandate, an award of enhanced damages. *Read Corp. v. Protec, Inc.*, 970 F.2d 816, 816 (Fed. Cir. 1992). "To willfully infringe a patent, the patent must exist and one must have knowledge of it." *State Indus., Inc. v. A.O. Smith Corp.*, 751 F.2d 1226, 1236 (Fed. Cir. 1985); *see also WBIP, LLC v. Kohler Co.*, 829 F.3d 1317, 1341 (Fed. Cir. 2016) ("Knowledge of the patent alleged to be willfully infringed continues to be a prerequisite to enhanced damages."). Willful infringement requires some sort of intentional conduct—whether it be subjective or objective. *Halo*, 136 S. Ct. at 1932; *see also Arctic Cat*, 876 F.3d at 137 (explaining that "*Halo* emphasized that subjective willfulness alone—i.e., proof that the defendant acted despite a risk of infringement that was 'either known or so obvious that it should have been known to the accused infringer,' can support an award of enhanced damages").

Willful infringement is a question of fact reviewed for substantial evidence. *WBIP*, 829 at 1341–42. It is "generally measured against the knowledge of the actor at the time of the challenged conduct" and "can arise pre- or post-suit." *Huawei Techs. Co. v. T-Mobile U.S., Inc.*, No. 2:16-cv-00052-JRG-RSP, 2017 WL 1129951, at *4 (E.D. Tex. Feb. 21, 2017), *report and recommendation adopted*, No. 2:16-cv-00052-JRG-RSP, 2017 WL 1109875 (E.D. Tex. Mar. 24, 2018) (quoting *Halo*, 136 S. Ct. at 1933). "Whether an act is 'willful' is by definition a question of the actor's intent, the answer to which must be inferred from *all the circumstances*."

*Indus., Inc. v. IPS Corp.*, 721 Fed. Appx. 959, 970 (Fed. Cir. 2018) (quoting *Gustafson, Inc. v. Intersystems Indus. Prods., Inc.*, 897 F.2d 508, 510–511 (Fed. Cir. 1990) (emphasis in original)).

**III. DISCUSSION**

**A. Pre-Suit Damages**

At trial, PI alleged, and the jury found, that PI was entitled to $3.5 million for NetScout's pre-suit infringement of the Asserted Claims. (Dkt. No. 237 at 5.) NetScout moves to vacate that finding. (Dkt. No. 315.) The Court denies the motion for the reasons set forth below.

**i. The '789 Patent—Apparatus Claims**

The Asserted Claims of the '789 Patent are apparatus claims and subject to the marking statute, 35 U.S.C. §287(a). *See* '789 Patent, Claims 19–20. NetScout contends that PI cannot recover pre-suit damages for those claims because it failed to mark products that practice the claimed inventions. (Dkt. No. 315 at 1.) Specifically, NetScout argues that PI failed to prove marking for (1) the Cisco and Huawei products and (2) the MeterFlow and MeterWorks products. (*Id.* at 4–10.)

a. Cisco and Huawei Products

With respect to Cisco and Huawei, NetScout argues that it identified products that practiced the Asserted Claims of the '789 Patent. (Dkt. No. 315 at 5 n.2.) It contends that PI submitted no evidence to the jury that such products do not practice the patent or that they were properly marked. (*Id.* at 4–5.) NetScout points to testimony from Brad Brunell, PI's corporate representative, who admitted that the Cisco and Huawei license agreements do not require marking products covered by the '789 Patent. (*Id.* at 4 (citing Dkt. No. 245, 10/10/17 P.M. Trial Tr. at 45:10–11, 75:19–25, 89:5–14; PTX-320 (PI-Cisco license agreement); PTX-301 (PI-Huawei license agreement).))

7

PI argues that NetScout defaulted on its initial burden of production. (Dkt. No. 321 at 6.) According to the jury instructions, "NetScout [had to] first show the existence of a patented article" "that practices one or more of the claims of the '789 patent" and that failure to do so meant that "Packet Intelligence [was] permitted to collect damages going six years before the filing of the complaint." (*Id.* at 3 (citing Dkt. No. 252, 10/13/17 A.M. Trial. Tr. at 47:10–49:2).) PI states that "NetScout's citations to the trial record only establish that there were prior litigations and licenses." (*Id.* at 6.) It explains that NetScout directs the Court to products that were identified in the "summary judgment briefing and [in] the complaint filed in the Cisco and Huawei litigations." (*Id.* at 8.) Since "none of those materials were presented to the jury," PI contends that it had no burden to prove marking at trial. (*Id.*)

As an initial matter, the Court finds that NetScout bore the initial burden of production *at trial*. NetScout argues that it met this burden because it identified specific products in its *summary judgment* briefing, citing Magistrate Judge Payne's decision in *Semcon IP Inc. v. Huawei Device USA, Inc.*, 2:16-cv-00437-JRG-RSP, 2017 WL 6343771, at *1 (E.D. Tex. Dec. 12, 2017) ("Accordingly, because Huawei has met its initial burden of production of notifying Semcon of products covered by the '061 Patent that Huawei believes were not marked, Semcon must satisfy its burden of showing compliance with the marking statute at trial."). In *Semcon*, Judge Payne held that the defendant had met its initial burden of production at summary judgment and that the burden automatically shifted to the plaintiff at trial. *Semcon*, 2017 WL 6343771, at *1. Here, however, the Court denied NetScout's motion for summary judgment as to pre-suit damages *in totality* (Dkt. No. 228 at 13), and confirmed at the pretrial conference that marking was "a live issue" for trial. (Dkt. No. 225, 9/19/17 Pretrial Conf. at 101:13–17; *see also* Dkt. No. 221, 9/18/17

8

Pretrial Conf. at 165:18–20). As such, NetScout still had to identify for the jury specific patented articles that required marking.[3]

Having reviewed the trial record, the Court determines that the jury had a "sufficient evidentiary basis" to find that NetScout failed to identify specific Huawei or Cisco products that should have been marked for the '789 Patent. Fed. R. Civ. P. 50(a)(1). NetScout only presented the jury with evidence that PI had entered into prior litigations and license agreements with Huawei and Cisco that covered "products" under the '789 Patent. (*See* Dkt. No. 234, 10/10/17 P.M. Trial Tr. at 68:14–69:8, 71:15–72:10, 76:6–20, 88:20–89:12, 106:21–107:23; Dkt. No. 246, 10/10/17 P.M. Sealed Tr. 3:17–19; Dkt. No. 249, 10/12/17 A.M. Trial Tr. at 121:5–125:10; Dkt. No. 300, 10/11/17 A.M. Trial Tr. at 75:19–25.) The license agreements did not identify any specific licensed products (*See* PTX-301 (Huawei license); PTX-320 (Cisco License), and at no time during the trial did NetScout identify any for the jury. Consistent with the Court's instructions to the jury and given that no specific Huawei or Cisco products had been sufficiently identified, the jury had a reasonable basis to find that PI did not have to prove marking for those unidentified products. *Compare Arctic Cat*, 876 F.3d at 1368 (finding defendant met initial burden of production because it "introduced the licensing agreement between Honda and Arctic Cat" and identified "fourteen Honda PWCs from three versions of its Aquatrax series sold between 2002 and 2009"), *with Lexos Media IP, LLC v. Jos. A. Bank Clothiers, Inc.*, No. 14-cv-6544(KAM) (GRB), 2018 WL 2684104, at *2 (D. Del. June 5, 2018) (finding defendant had not met initial burden of production because "Defendant had not yet identified what licensees were at issue, *or*

---

[3] This case was tried before the Federal Circuit decided *Arctic Cat Inc. v. Bombardier Recreational Prods., Inc.*, 876 F.3d 1350 (Fed. Cir. 2017). NetScout does not object to the marking instruction given to the jury and agrees that the instruction was consistent with *Arctic Cat*. (Dkt. No. 342, JMOL Hearing at 38:23–25 ("Now, this Court's marking instruction to the jury was consistent with that holding from the Federal Circuit.").)

9

*which 'specific unmarked products' those licensees sold* that Defendant believes read on the patents-in-suit") (emphasis added).

### b. MeterFlow and MeterWorks Products

NetScout also argues that PI failed to mark the MeterFlow and MeterWorks products (collectively, the "Meter Products"). (Dkt. No. 315 at 5–10.) According to NetScout, Exar, a predecessor-in-interest to the Patents-in-Suit, sold "unmarked MeterFlow software products" that "practice the '789 Patent." (*Id.* at 5–7.) NetScout explains that the following evidence establishes the Meter Products as patented articles:

- Testimony from Mr. Ham, Exar's corporate representative, that the Patents-in-Suit "were underlying the technology that was being sold as MeterFlow and MeterWorks" and that those patents "were derived from the development work that was done to generate the products" of "MeterFlow, MeterWorks" and "were related [to] flow classification." (Dkt. No. 249, 10/12/17 A.M. Trial Tr. at 138:12–25, 141:1–23.)

- Testimony and evidence showing that the provisional application for the '789 Patent represented MeterFlow as a preferred embodiment of the invention. (Dkt. No. 244, 10/10/17 A.M. Trial Tr. at 106:21–107:23 (testimony of Mr. Dietz, named inventor of Patents-in-Suit); Dkt. No. 249, 10/12/17 A.M. Trial Tr. at 121:5–125:10 (testimony of Mr. Rosenfeld, prosecuting attorney for the '789 Patent); PT-X010 (sworn declaration from Mr. Dietz for the '789 Patent); DX-274 (email from Mr. Dietz to the "MeterFlow team"); DX524 (email from Mr. Lazar, VP and CFO of Apptitude, another company that previously owned the Patents-in-Suit).)

(*Id.* at 5–7.) NetScout argues that PI provided no evidence that such products had been marked and that PI's own corporate representative, Mr. Burnell, "conceded that he was not aware of any prior owners of the Patents-in-Suit, including Exar, marking their products with any patent numbers." (*Id.* at 5 (citing Dkt. No. 245, 10/10/17 P.M. Trial Tr. at 88:20–89:4); *id.* at 7–10.)

In response, PI argues that "there was substantial evidence before the jury showing that no version of the Meter [P]roducts practiced any claim of the '789 patent." (Dkt. No. 332 at 4.) PI identifies the following evidence from the trial:

- Testimony from Mr. Dietz, a named inventor of the Patents-in-Suit, that "MeterWorks never embodied the inventions." (Dkt. No. 244, 10/10/17 A.M. Trial Tr. at 105:5–106:3.)

- Testimony from Mr. Dietz that (1) there were "many versions of MeterFlow;" (2) MeterFlow "differ[ed] in capability from version to version;" and (3) while the provisional application stated that MeterFlow was to be a preferred embodiment, the final application changed that; "Dr. Rosenfeld [the prosecuting attorney] knew. . . that [MeterFlow] was not to be. . . used as a preferred embodiment going forward, and it was removed from all of the patents that were actually filed and finally issued" because "[MeterFlow] was a piece of software . . . that evolved" and "it was going to give the wrong indication that all of those past versions that use that marketing term, MeterFlow, were – were the current version, and they weren't." (*Id.* at 122:6–124:1.)

(Dkt. No. 321 at 9–11; Dkt. No. 332 at 3–4.) PI also argues that "NetScout selectively quotes Mr. Ham to imply that the underlying technology for the patents was sold as MeterFlow and MeterWorks." (Dkt. No. 321 at 10.) PI argues that Mr. Ham "testified that he had not read the patents or compared the claims to any Meter [P]roducts":

> Q. Now, you mentioned that you weren't supporting any products anymore for the patents. Is it your understanding that certain products were covered by these patents?
>
> A. I can't draw a direct correlation because I don't – I haven't looked at the patents or – or read the patents, but I believe that they were underlying the technology that was being sold as MeterFlow and MeterWorks.
>
> . . . .
>
> Q. Now, I believe you testified – you mentioned earlier that – that certain products – at least it was your understanding that certain products sold by Hi/Fn were protected by at least some of the patents; is that right?
>
> A. I believe that some of the patents were the basis – that they were derived from the development work that was done to generate the products.
>
> Q. And these are patents that were ultimately sold by Exar to Packet Intelligence?
>
> A. I – I don't know specifics of the patents, but I believe that they were related to those products, yes.
>
> Q. Okay. And in – when you say related, what – what is your understanding of—

> A. That they were basic flow classification – they were related [to] flow classification, which is what the product was based on.
>
> Q. And when you say products, which products are you referring to?
>
> A. MeterFlow, MeterWorks.
>
> Q. But outside of kind of that general understanding, you – you haven't looked at the – at the patents themselves; is that right?
>
> A. That's correct.
>
> Q. And you haven't actually compared those products to the patent claims; that right?
>
> A. That's correct.
>
> Q. And you haven't actually consulted any Markman orders or other documentation concerning how the claims of the patents are interpreted; is that right?
>
> A. That's correct.
>
> Q. So sitting here today, you can't actually make a representation that any of those products were actual commercial embodiments of the – of any of the patents; is that right?
>
> A. That's correct.

(Dkt. No. 321 at 10–11 (citing Dkt. No. 249, 10/12/17 A.M. Trial Tr., at 138:17–142:16).) PI submits that based on the foregoing, the jury had a reasonable basis to find that NetScout had not identified any patented articles for the '789 Patent that should have been marked.

The Court has conducted a careful review of the trial record and finds that the jury had a substantial evidentiary basis to conclude that PI was not obligated to mark the Meter Products. Mr. Ham, Exar's corporate representative, testified that he "[could not] actually make a representation that any of [the Meter] [P]roducts were actual commercial embodiments of the – of any of the patents." (Dkt. No. 249, 10/12/17 A.M. Trial Tr. at 142:12–16.) Similarly, Mr. Dietz, an inventor of the Patents-in-Suit, testified that none of those products practiced the claimed

inventions. (Dkt. No. 244, 10/10/17 A.M. Trial Tr. at 105:14–16, 105:24–106:3.) In fact, PI presented *unrebutted* testimony that while the *provisional* application for the '789 Patent referenced MeterFlow as a preferred embodiment, the *final* application omitted any such statements because the inventors did not think MeterFlow practiced the invention. (*Id.* at 122:6–124:1.) The jury was entitled to credit this evidence over the competing testimony and evidence from NetScout, including Mr. Ham's competing testimony that he "believed" the MeterFlow and MeterWorks products were the "underlying technology" of the Patents-in-Suit, and that the Patents-in-Suit were "derived from" and "related to" those products. (Dkt. No. 249, 10/12/17 A.M. Trial Tr., at 138:17–142:16.)

In deciding a Rule 50(b) motion, the Court is careful to "draw all reasonable inferences in the light most favorable to the verdict," and to not substitute its own inferences for those made by the jury. *Boh Bros.*, 731 F.3d at 451; *Ellis*, 258 F.3d at 337. Ultimately, the Court finds that there is more than a "mere scintilla of evidence" favoring the nonmovant, and as such, denies NetScout's judgment as a matter of law of no pre-suit damages as it relates to the Meter Products. *Arismendez*, 493 F.3d at 606.

### ii. The '725 and '751 Patents—Method Claims

The Asserted Claims of the '725 and '751 Patents are not subject to the marking statute because they are method claims. *See* '725 Patent, Claims 10, 17; '751 Patent, Claims 1, 5; *see also ActiveVideo Networks v. Verizon Commc'ns*, 694 F.3d 1312, 1335 (Fed. Cir. 2012) ("[I]f the patent is directed only to method claims, marking is not required."). Since the Court granted NetScout's motion for summary judgment of no pre-suit indirect infringement, PI could only obtain pre-suit damages based on NetScout's direct infringement of those claims. (Dkt. No. 228 at 13.) NetScout argues that PI "presented no evidence of revenue or damages resulting from

13

testing or internal use of [the] accused products by NetScout itself." (Dkt. No. 315 at 11.) Instead, PI's damages expert, Mr. Bergman, calculated the royalty base using only the U.S. *sales* of the Accused Products. (*Id.* at 11 (citing Dkt. No. 300, 10/11/17 A.M. Trial Tr. at 25:2–14) (emphasis added).) As a result, "there was no damages argument, theory, or evidence based on NetScout's own use of the asserted patents" that "supports any damages for pre-suit infringement of the '751 and '725 method patents." (Dkt. No. 329 at 5.)

Having reviewed the evidence at trial, the Court finds no reason to vacate the jury's damages award. PI has identified substantial evidence in the record showing that it is entitled to pre-suit damages based on NetScout's own use of the Accused Products:

- Dr. Alermoth testified that his infringement opinions were based on NetScout's admissions that it used the Accused Products in the United States, which he understood included "both testing . . . [and] instances where [NetScout] used those probes out in the field." (Dkt. No. 245, 10/10/17 P.M. Trial Tr. at 156:4–25.)

- "Mr. Mawraha, NetScout's Product Manager, testified that NetScout technicians implement the infringing systems and methods at customer sites . . . through the NetScout Service Delivery Organization." (Dkt. No. 321 at 11 (citing Dkt. No. 245, 10/10/17 P.M. Trial Tr. at 2:11:5–212:25).)

- "Mr. Lindahl, NetScout's Former Sr. Finance and Accounting Director, testified that NetScout 'customer[s] will pay [NetScout] to use [its] own equipment to monitor the network to do an analysis, a study, to help them solve some sort of issue'" and that NetScout has "a business where [it] monitor[s] – where [it] test[s] cell phone towers, network-planning type work," which may include "tak[ing] one of [its] own probes and go[ing] into a network to perform service." (*Id.* at 11–12 (citing Dkt. No. 245, 10/10/17 P.M. Trial Tr. at 232:7–24).)

PI explains that its damages expert, Mr. Bergman, testified that the above activities "drive sales of the products and revenue to NetScout." (Dkt. No. 321 at 12 (citing Dkt. No. 300, 10/11/17 A.M. Trial Tr. at 57:22–59:6).) Such testimony was consistent with the Court's jury instructions, which provided that, in its damages calculation, the jury may consider "the effect of selling the patented

14

specialty in promoting sales of other products of the licensee, the existing value of the invention to the licensee as a generator of sales of its non-patented items, and the extent of such derivative or convoyed sales." (Dkt. No. 252, 10/13/17 All Day Trial Tr. at 42:34–43:3).) The jury, therefore, had a sufficient basis to find that NetScout's own use of the claimed methods drove U.S. sales of the Accused Products and justified an award of pre-suit damages for the '725 and '751 method patents. NetScout's failure to respond to the above evidence in its briefing only reinforces this conclusion.

### B. Willful Infringement

NetScout argues that there is no substantial evidence to support the jury's finding of willfulness. First, NetScout states that in briefing on PI's motion for enhanced damages (Dkt. No. 269), "PI conceded there was no evidence of copying or motivation to harm" and "this Court determined that NetScout's noninfringement and invalidity defenses were in good faith." (Dkt. No. 316 at 1 (citing Dkt. No. 305 at 6 (Court's order granting PI's motion for enhanced damages)).) NetScout also argues that it had no pre-suit knowledge of the Patents-in-Suit and that "[o]nce apprised of PI's infringement claims, NetScout promptly investigated and, relying on technical experts and its counsel, formed noninfringement and invalidity defenses in good faith." (*Id.* at 3 (citing Dkt. No. 300, 10/11/17 A.M. Trial. Tr. at 110:11–12, 116:18–19; Dkt. No. 248, 10/11/17 P.M. Trial. Tr. at 87:11–16).) Finally, NetScout argues that there was no willful infringement because it began to "phase out sales of the accused G10 and GeoBlade products before trial." (*Id.* at 4 (citing Dkt. No. 248, 10/11/17 P.M. Trial. Tr. at 38:20–39:21; Dkt. No. 303 at 6 (Court's order granting-in-part PI's motion for an on-going royalty)).) In view of the foregoing, NetScout submits that there "is no evidence in the record that shows infringement that 'was wanton,

15

malicious, in bad faith, deliberate, consciously wrong, or flagrant," and is therefore entitled to judgment as a matter of law of no willful infringement. (*Id.* at 1.)

The Court disagrees. As an initial matter, NetScout's motion is partly based on material that was not before the jury. (*See* Dkt. No. 316 at 1 (citing Dkt. No. 305 at 6 (Court's order granting PI's motion for enhanced damages)).) Such evidence is irrelevant because under Rule 50(b), "the Court is limited to reviewing only the evidence presented to the jury at trial." *West v. Media Gen. Operations, Inc.*, 250 F. Supp. 2d 923, 947 (E.D. Tenn. 2002); *see also Paez v. Gelboym*, 578 Fed. Appx. 407, 408 n.1 (5th Cir. 2014) ("We do not consider evidence that was not presented to the jury."). NetScout also misstates the law. NetScout argues that there can be no willful infringement because it did not have pre-suit knowledge of the Patents-in-Suit. (Dkt. No. 316 at 3.) It claims that "'whether a willful infringement claim based solely on post-suit conduct is cognizable'" "is an open question." (*Id.* (internal citations omitted).) It is well-settled, *at least in this District*, that post-conduct behavior can establish willful infringement. *See Ericsson Inc. v. TCL Commc'n Tech. Holdings, Ltd.*, No. 2:15-cv-00011-RSP, 2017 WL 5137401, at *5 (E.D. Tex. Nov. 4, 2017) ("The Federal Circuit, however, has at least suggested that there is no per se rule precluding a finding of willful infringement based solely on conduct occurring after the lawsuit is filed) (citing *Mentor Graphics Corp. v. EVE-USA, Inc.*, 851 F.3d 1275, 1295–96 (Fed. Cir. 2017)).

Finally, notwithstanding the above, PI presented substantial evidence at trial that supports the jury's verdict of willful infringement. For example, Mr. Kenedi, NetScout's corporate representative, admitted that even though he had not read the Patents-in-Suit, his position was that Mr. Dietz lied and stole the claimed inventions. (Dkt. No. 300, 10/11/17 A.M. Trial. Tr. at 116:18–22.) Similarly, NetScout's CEO, Mr. Singhal, testified that he could not remember if he had read the Patents-in-Suit or even a summary about them. (Dkt. No. 248, 10/11/17 P.M. Trial Tr. at

87:11–88:4.) NetScout argues that it presented testimony that it began to phase out the Accused Products before trial. However, as PI points out in its Opposition and Sur-Reply, Mr. Singhal confirmed that "if a customer demands the old product, we [i.e., NetScout] *will sell* to [the customer]." (*Id.* at 39:1–2 (emphasis added).) The jury was entitled to consider NetScout's decision to continue selling the Accused Products in its willfulness calculation. *See Milwaukee Elec. Tool Corp. v. Snap-On Inc.*, 288 F. Supp. 3d 872, 887 (E.D. Wis. 2017) ("Here, there was far more evidence that Snap-On carried on years of lucrative infringing sales after failing to respond to the October 2011 licensing letter with a minimally adequate analysis of whether a license would be necessary. Snap-On's knowledge of the existence of the patent was not the sole basis for the jury's finding [of willfulness]."); *Polara Eng'g, Inc. v. Campbell Co.*, 237 F. Supp. 3d 956, 978–79 (C.D. Cal. 2017), *aff'd in part, vacated in part, remanded sub nom.*, 894 F.3d 1339 (Fed. Cir. 2018) (holding that defendant Campbell's decision to continue sales "was among the 'totality of the circumstances' that was appropriately considered by the jury to assess the egregiousness of Campbell's conduct"); *see also Avocent Huntsville Corp. v. ClearCube Tech., Inc.*, No. 03-02875, 2006 WL 2109503, at *27 (N.D. Ala. July 28, 2006) (finding that defendant's continued sales of accused products "may fall under the rubric of the 'totality of the circumstances' test, tending to show [defendant's] infringement was (and continues to be) willful").

Accordingly, the Court finds that the jury's verdict of willfulness is more than adequately supported by the record. NetScout's motion to vacate the same is denied.

## IV. CONCLUSION

For the reasons set forth above, NetScout's Motion for Judgment as a Matter of Law of No Pre-Suit Damages Pursuant to Fed. R. Civ. P. 50(b) (Dkt. No. 315) and Renewed Motion for

Judgment as a Matter of Law of No Willful Infringement Pursuant to Fed. R. Civ. P. 50(b) (Dkt. No. 316) are each **DENIED**.

**So ORDERED and SIGNED this 4th day of June, 2019.**

_____
RODNEY GILSTRAP
UNITED STATES DISTRICT JUDGE