**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | |
|---|---|
| PACKET INTELLIGENCE LLC, | § |
| | § |
| | § |
| *Plaintiff*, | § |
| | § |
| v. | § |
| | §   CIVIL ACTION NO.  2:16-CV-00230-JRG |
| NETSCOUT SYSTEMS, INC., | § |
| TEKTRONIX COMMUNICATIONS, | § |
| TEKTRONIX TEXAS, LLC, | § |
| | § |
| *Defendants*. | § |

**MEMORANDUM OPINION AND ORDER**

Before the Court are the following briefs and motions filed by Plaintiff Packet Intelligence LLC ("PI") and Defendants NetScout Systems, Inc. and NetScout Systems Texas, LLC (formerly known as Tektronix Texas, LLC d/b/a Tektronix Communications) (collectively, "NetScout" or "Defendants"):

1. **PI's Opening Brief Concerning Post-Appeal Issues** and the related briefing (Dkt. Nos. 367, 372, 376, 377) as well as **NetScout's Opening Brief Regarding Issues on Remand** and the related briefing (Dkt. Nos. 369, 373, 375, 378) (all collectively, the "Post-Appeal Briefing");

2. **NetScout's Motion to Dismiss and Enter Final Judgment in its Favor or, in the Alternative, to Stay the Case** (the "Motion to Dismiss or Stay") (Dkt. No. 380); and

3. **NetScout's Motion for Leave to File a Supplemental Brief Regarding Ongoing Royalties** (the "Motion for Leave") (Dkt. No. 381).

Having considered the motions before the Court, the related briefing, and the applicable law, and for the reasons stated herein, the Court concurrently issues its Amended Final Judgment

and finds that the Motion to Dismiss or Stay (Dkt. No. 380) and the Motion for Leave (Dkt. No. 381) should be **DENIED**.

## I.      BACKGROUND

### A.  Trial and Post-Trial Motion Practice

PI originally filed its complaint against NetScout asserting infringement of U.S. Patent Nos. 6,665,725 (the "'725 Patent"), 6,939,751 (the "'751 Patent"), and 6,954,789 (the "'789 Patent") (collectively, the "Asserted Patents") on March 15, 2016. (Dkt. No. 1). This case was tried to a jury between October 10, 2017, and October 13, 2017. The jury returned a verdict finding that NetScout willfully infringed at least one claim of the Asserted Patents, that the Asserted Patents were not invalid, and that PI was entitled to a $3.5 million award for pre-suit infringement and a $2.25 million award for post-suit infringement. (Dkt. No. 237). The jury answered that such sums were intended as a running royalty. (*Id.* at 6).

On September 7, 2018, the Court entered its Final Judgment. (Dkt. No. 307). The Final Judgement awarded PI: $5,750,000 in compensatory damages as a running royalty, enhanced damages in the amount of $2,800,000, and set an ongoing royalty rate of 1.55% of the revenue received by Defendants produced by the post-verdict infringing conduct of the accused G10 and GeoBlade products through the life of the Asserted Patents. (*Id.*).

The $3.5 million pre-suit damages award was a result of the jury rejecting NetScout's marking defense. *Packet Intel. LLC v. NetScout Sys., Inc.*, 965 F.3d 1299, 1313 (Fed. Cir. 2020) *cert. denied*, No. 20-1289, 2021 WL 1520847 (Apr. 19, 2021); (*see also* Dkt. No. 237). In its Motion for Judgement as a Matter of Law of No Pre-Suit Damages (the "JMOL") pursuant to Fed. R. Civ. P. 50(b) filed on October 5, 2018, NetScout argued that PI could not recover pre-suit damages because PI failed to mark its licensees' products that practiced the claimed inventions.

(Dkt. No. 315 at 1). Specifically, NetScout argued that PI failed to prove: (1) marking for the Cisco and Huawei products, (2) marking for the MeterFlow and MeterWorks products, and (3) that infringement of any method claims could support the pre-suit damages award. (*Id.* at 4–7, 10–12). The Court denied Netscout's Motion for JMOL under Federal Rule of Civil Procedure 50(b) finding that "the jury had a 'sufficient evidentiary basis' to find that NetScout failed to identify specific Huawei or Cisco products that should have been marked for the '789 Patent." (Dkt. No. 344 at 9). The Court further found that the jury had a sufficient basis to conclude that "NetScout's own use of the claimed methods [of the '725 and '751 Patents] drove U.S. sales of the Accused Products and justified an award of pre-suit damages." (*Id.* at 15). Accordingly, the Court declined to alter its Final Judgment which included the $3.5 million pre-suit damages award.

## B. Appeal and Remand on the Discrete Issue of Pre-Suit Damages and Any Enhancement Thereof

NetScout appealed the Final Judgment, and the Federal Circuit issued its opinion on July 14, 2020, affirming this Court's judgment as to infringement, validity, and willfulness. *Packet Intel.*, 965 F.3d at 1313, 1316. However, the Federal Circuit held that "[b]ecause Packet Intelligence failed to present substantial evidence to the jury that matched the limitations in any claim of the '789 patent to the features of the MeterFlow product, NetScout [was] entitled to judgment as a matter of law that it is not liable for pre-suit damages based on infringement of the '789 patent." *Id.* at 1314. The Federal Circuit also rejected PI's theory that "internal testing, customer support, and customer training was pre-suit activity infringing the method patents" and found that the method claims also could not support pre-suit damages under PI's damages theory. *Id.* at 1314–15. Accordingly, the Circuit reversed the award of pre-suit damages, and "any enhancement thereof [was] vacated." *Id.* at 1316. This Court's Final Judgement was affirmed "in all other respects." *Id.* at 1303.

Now on remand, the sole issue before this Court is amending its Final Judgment to remove the pre-suit damages award and to remove the amount of the enhancement, if any, tied to the now-reversed award of pre-suit damages. The parties filed a Joint Motion to Lift Stay and Request for Status Conference (the "Joint Motion") to "address the remaining issues in light of the Federal Circuit's decision to 'reverse the district court's pre-suit damages award and vacate the Court's enhancement of that award.'" (Dkt. No. 364 at 4). The Court held a telephonic status conference on June 2, 2021, to discuss the remaining issues in light of the Federal Circuit's opinion and ordered the parties to file briefing regarding the same. (Dkt. No. 366). The Post-Appeal Briefing concluded on July 20, 2021. (Dkt. Nos. 377, 378). However, on September 17, 2021, Netscout filed its Motion to Dismiss or Stay (Dkt. No. 380) in light of post-appeal proceedings before the Patent Office (the "PTO") and the Motion for Leave (Dkt. No. 381) requesting to file additional briefs regarding the previously awarded ongoing royalty. The Court considers each in turn.

## II.     THE POST-APPEAL BRIEFING

In the Post-Appeal Briefing, the parties raise two disputes regarding how the Court should implement the Circuit Court's decision at *Packet Intelligence LLC v. NetScout Sys., Inc.*, 965 F.3d 1299 (Fed. Cir. 2020).

First, the parties dispute whether reversal of the $3.5 million in pre-suit damages necessitates modification of the $2.8 million enhanced damages award, and if so, how the Court should modify the enhancement. Specifically, both parties argue that no modification is necessary, yet reach opposite conclusions as to whether the enhancement should be retained in full or completely removed.[1] Alternatively, the parties dispute how the Court should modify the

---

[1] *See* Dkt. No. 367 at 1 (PI arguing that the enhancement should not be modified and should be reinstated in full); Dkt. No. 369 at 4–8, 10 (NetScout arguing that the Court need not modify the enhancement and should instead reconsider the *Read* factors to arrive at "no enhanced damages").

enhancement.[2] For the reasons stated below, the Court finds that the Federal Circuit's opinion necessitates modification of the enhanced damages award and that the proper modification is to vacate $1,704,347.83 of the enhancement (the enhancement tied to the reversed $3.5 million pre-suit damages award) and retain $1,095,652.17 of the enhancement (the enhancement tied to the affirmed $2.25 million post-suit damages award).

Second, the parties dispute whether the reversal of pre-suit damages justifies an alteration of the ongoing royalty rate of 1.55%. (*See* Dkt. No. 367 at 7; Dkt. No. 369 at 9). The Court finds that the pre-suit damages award played a significant role in the Court's calculation of the initial base ongoing royalty rate. Accordingly, and as explained below, the Court finds that the ongoing royalty rate—a form of ongoing equitable relief that this Court retains the authority to modify—should be altered from 1.55% to 1.355%.

## A. Legal Standard

"The mandate rule provides that 'issues actually decided [on appeal]—those within the scope of the judgment appealed from, minus those explicitly reserved or remanded by the court—are foreclosed from further consideration.'" *Amado v. Microsoft Corp.,* 517 F.3d 1353, 1360 (Fed. Cir. 2008) (quoting *Engel Indus., Inc. v. Lockformer Co.,* 166 F.3d 1379, 1383 (Fed. Cir. 1999). "[W]hile a mandate is controlling as to matters within its compass, on the remand a lower court is free as to other issues." *Engel Indus.,* 166 F.3d at 1382 (quoting *Sprague v. Ticonic Nat'l Bank*, 307 U.S. 161 (1939)). Unless remanded by the appellate court, all issues within the scope of the appealed judgment are deemed "incorporated within the mandate and thus precluded from further adjudication." *Id.* at 1383. "The scope of the issues presented . . . on appeal must be

---

[2] *See* Dkt. No. 372 at 2–4 (NetScout arguing that the enhancement should be modified and reduced proportionally based on the surviving post-suit damages award); Dkt. No. 376 at 1–2 (PI responding that a proportional reduction is improper).

measured by the scope of the judgment appealed from . . . [and] not by the arguments advanced by the appellant." *Id.* at 1382 (citing *Sprague*, 307 U.S. at 168). A contrary holding would allow appellants to present appeals in a "piecemeal and repeated fashion," and would lead to the "untenable result that a party who has chosen not to argue a point on a first appeal should stand better as regards the law of the case than one who had argued and lost." *Id.* at 1382.

## B.  Discussion

The Court first considers the parties' positions regarding the enhanced damages award and concludes that a proportional reduction of the enhancement—which leaves intact the portion of the enhancement tied to the surviving post-suit damages—is warranted to properly comply with the Federal Circuit's mandate.

### 1.   The Court Need Not Reconsider the *Read* Factors

NetScout first asserts that the "Federal Circuit vacated this Court's prior enhancement award and there is no reason to reinstate *any* of [the] enhancement now." (Dkt. No. 369 at 1) (emphasis added). In effect, NetScout argues that on remand, the Federal Circuit vacated the entire award of enhanced damages such that this Court should reconsider the *Read* factors to determine whether enhancement is warranted in the first place. (*See id.* at 4–9; Dkt. No. 372 at 1, 4–8) (suggesting that "the Federal Circuit vacated the prior enhancement award and this Court should now re-weigh the relevant [*Read*] factors in light of the current circumstances to determine whether any enhancement is justified on remand"). NetScout's argument asserts that no modification of the enhancement is necessary. Rather, NetScout invites the Court to set aside the entire enhancement and reconsider whether any enhancement is warranted—despite the Federal Circuit's clear language that:

we reverse the district court's pre-suit damages award and vacate the court's enhancement *of that award*. We affirm the district court's judgment *in all other respects*.

*Packet Intel.*, 965 F.3d at 1303 (emphasis added).

PI asserts that the mandate rule prevents the Court from reconsidering the *Read* factors and that NetScout's argument "is grounded in the false premise that the 'Federal Circuit vacated this Court's [entire] prior enhancement award.'" (Dkt. No. 373 at 2) (quoting Dkt. No. 369 at 1). PI notes that "[t]he mandate rule requires a district court on remand to effect [the Appellate Court's] mandate and to do nothing else." (*Id.* at 3) (quoting *Art Midwest, Inc. v. Atlantic Ltd. P'ship XII*, 742 F.3d 206, 213 (5th Cir. 2014)). In PI's view, here, the mandate was that "[t]he district court's award of pre-suit damages is reversed, and *any enhancement thereof* is vacated." (*Id.* at 2) (quoting *Packet Intel.*, 965 F.3d at 1316 (emphasis added)). Accordingly, PI argues that "the Federal Circuit did not remand with instructions to start the enhanced damages analysis anew, but rather only to remove any portion tied to the jury's pre-suit award, if any." (*Id.* at 3). Thus, PI argues that it would be improper for the Court to revisit the *Read* factor analysis for the portion of enhanced damages tied to the post-suit damages award, which was not reversed by the Federal Circuit.

The Court agrees with PI that the mandate rule precludes a re-analysis of the *Read* factors given that the Federal Circuit remanded with instructions to vacate only the portion of the enhancement tied to the reversed pre-suit damages, if any:

> Because the district court erred in denying NetScout's motion for judgment as a matter of law on pre-suit damages, we **reverse the district court's pre-suit damages award and vacate the court's enhancement** *of that award*. We affirm the district court's judgment in all other respects.
> . . .
> Accordingly, the judgement of the district court is affirmed as to infringement, validity, and willfulness. The district court's **award of pre-suit damages is reversed, and** *any enhancement thereof* **is vacated**.

*Packet Intel.* 965 F.3d at 1303, 1316. As discussed above, the mandate rule provides that "issues actually decided [on appeal]—those within the scope of the judgment appealed from, minus those explicitly reserved or remanded by the court—are foreclosed from further consideration." *Amado*, 517 F.3d at 1360. Here, the issues explicitly reserved for this Court on remand are the reversal of pre-suit damages and the vacatur of the enhancement tied to such pre-suit damages, if any. Notably, the Federal Circuit did not remand with instructions to alter or vacate the post-suit damage award or the corresponding enhancement thereof. The award of post-suit damages, the Court's balancing of the *Read* Factors, and the portion of the enhancement tied to post-suit damages are thus within the scope of the Federal Circuit's mandate,[3] and the mandate rule operates as a bar to this Court reconsidering the *Read* factors or vacating the enhancement tied to the post-suit damage award. As a result, the Court proceeds by determining the portion of the enhancement tied to the pre-suit damages award, vacating that portion of the enhancement, if any, and amending its Final Judgement accordingly.

---

[3] "[A]n issue that falls within the scope of the judgment appealed from but is not raised by the appellant in its opening brief on appeal is necessarily waived." *Amado*, 517 F.3d at 1360 (quoting *Engel Indus.*, 166 F.3d at 1383). Here, NetScout did not raise the propriety of the post-suit damages award or this Court's weighing of the *Read* factors in *Packet Intel. LLC v. NetScout Sys., Inc.*, 965 F.3d 1299 (Fed. Cir. 2020). The mandate rule "precludes reconsideration of any issue within the scope of the judgment appealed from—not merely those issues actually raised." *Id.* Thus, the proper inquiry is whether this Court's weighing of the *Read* factors and award of post-suit damages were within the scope of the Final Judgement appealed from in *Packet Intel.*, 965 F.3d at 1299. *See Amado*, 517 F.3d at 1360. Such issues were within the scope of the judgment because the Final Judgment entered on September 17, 2018, expressly included this Court's award of post-suit damages and the entirety of the $2.8 million enhancement based on the weighing of the *Read* factors. (Dkt. No. 307 at 2). NetScout could have challenged this Court's weighing of the *Read* factors on appeal but declined to do so. Even further, NetScout expressly challenged the propriety of the entire enhancement award on appeal—arguing that the Federal Circuit "should reverse the willfulness judgment and vacate the $2.8 million in enhanced damages." Brief of Appellants at 69, *Packet Intel LLC v. NetScout Sys., Inc.*, 965 F.3d 1299 (Fed. Cir. 2020) (Dkt. No. 20). The Federal Circuit expressly affirmed this Court's finding of willfulness and declined to vacate the entirety of the enhancement. *Packet Intel.*, 965 F.3d at 1316. In sum, the Federal Circuit upheld the portion of the enhancement tied to the post-suit damages award, and NetScout failed to challenge the award of post-suit damages or the weighing of the *Read* factors. Thus, these issues became a part of the Federal Circuit's mandate, and this Court is not required to reconsider them.

### 2.   Even if It Were Proper to Reconsider the *Read* Factors, the Court Would Exercise Its Discretion to Award Enhanced Damages

Although a reconsideration of the *Read* Factors is unwarranted, the Court—after reviewing the parties' arguments in the Post-Appeal Briefing—finds that the *Read* factors still indicate that an award of enhanced damages is appropriate.

A properly supported finding of willfulness "invites the Court to exercise its discretion to determine whether enhanced damages are appropriate under 35 U.S.C. § 284." *Core Wireless Licensing S.A.R.L. v. LG Elecs., Inc.*, No. 2:14-cv-912-JRG, Final Judgment Order, Dkt. No. 47 at 1 (E.D. Tex. Nov. 1, 2016). In addition to determining whether to award enhanced damages, courts also have discretion as to the amount of damages to be awarded. *Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 136 S. Ct. 1923, 1932 (2016) ("District courts enjoy discretion in deciding whether to award enhanced damages, and in what amount."); *see also Halo*, 136 S. Ct. at 1926 ("§ 284 allows district courts to punish the full range of culpable behavior."). The Court may increase damages up to three times the damages assessed by the Jury. *See Jurgens v. CBK, Ltd.*, 80 F.3d 1566, 1570 (Fed. Cir. 1996). To determine whether and how much to enhance damages, courts consider the "*Read* factors:"

(1) "whether the infringer deliberately copied the ideas or design of another";

(2) "whether the infringer, when he knew of the other's patent protection, investigated the scope of the patent and formed a good-faith belief that it was invalid or that it was not infringed";

(3) "the infringer's behavior as a party to the litigation";

(4) "[d]efendant's size and financial condition";

(5) "[c]loseness of the case,"

(6) "[d]uration of defendant's misconduct";

(7) "[r]emedial action by the defendant";

(8) "[d]efendant's motivation for harm"; and

(9) "[w]hether defendant attempted to conceal its misconduct."

*Read Corp. v. Portec Inc.*, 970 F.2d 816, 826–27 (Fed. Cir. 1992), *abrogated in part on other grounds by Markman v. Westview Instr. Inc.*, 52 F.3d 967 (Fed. Cir. 1995) (en banc).

As discussed above, the Court is presented with a properly supported finding of willfulness in this case—now expressly affirmed on appeal—and thus may determine whether enhanced damages are appropriate under 35 U.S.C. § 284 (assuming such revisiting is not barred by the mandate rule). *See Packet Intel.*, 965 F.3d at 1315–16 (concluding that the "jury's willfulness verdict is supported by substantial evidence").  The Court addresses each factor in turn considering the arguments raised by PI and NetScout in the Post-Appeal Briefing.

### i.   The Five *Read* Factors Previously Weighing Against Enhancement Continue to Weigh Against Enhancement

Previously, the Court found that the following five *Read* factors weighed against enhancement: (1) copying, (2) good-faith belief in noninfringement or invalidity, (3) the infringer's litigation conduct, (8) the infringer's motivation for harm, (9) the infringer's attempts to conceal its misconduct. (Dkt. No. 305 at 5–8, 13–14). On remand, NetScout argues that all five of these factors continue to weigh against enhancement.[4] (Dkt. No. 369 at 4–5; Dkt. No. 372 at

---

[4] Although NetScout first asserts that the "second *Read* factor . . . continues to weigh against enhancement," NetScout offers an alternative argument that "[i]f anything, this factor weighs more heavily against enhancement given that the Federal Circuit reversed the damages award on the pre-suit infringement and . . . split two-to-one on NetScout's Section 101 defense." (Dkt. No. 369 at 4–5). The Court finds this argument unpersuasive. First, the pre-suit damages were vacated based on a post-trial change in the law as outlined in *Arctic Cat Inc. v. Bombardier Recreational Prod. Inc.*, 876 F.3d 1350, 1356 (Fed. Cir. 2017) rather than a good-faith belief of non-infringement or invalidity on the part of NetScout. *See Packet Intel.*, 965 F.3d at 1312 ("When the district court charged the jury in this case, [the Federal Circuit] had not yet ruled on which party bears the burden of proving compliance with the marking statute. After the verdict, [the Circuit] held that an alleged infringer 'bears an initial burden of production to articulate the products it believes are unmarked 'patented articles' subject to [the marking requirement].'") (quoting *Arctic Cat*, 876 F.3d at 1368). Second, NetScout's infringement and invalidity defenses were rejected by the jury and by this Court, and those findings were upheld on appeal—with nothing in the Federal Circuit's opinion changing this Court's previous analysis of this factor, which still weighs against enhancement to the same degree as before.

4–5). PI does not contest that these factors continue to weigh against enhancement and asserts that "none of the [post-appeal *Read*] factors impact this Court's prior analysis." (*See* Dkt. No. 373). Accordingly, without opposition from PI, the Court finds that the five factors previously found to weigh against enhancement continue to weigh against enhancement.

### ii.    *Read* Factor Four Continues to Favor Enhancement

Under the fourth factor, a defendant's size and financial condition should be viewed both relative to the plaintiff and also individually to ensure that enhanced damages would "not unduly prejudice the [defendant's] non-infringing business." *Krippelz v. Ford Motor Co.*, 670 F. Supp. 2d 815, 822 (N.D. Ill. 2009) (internal citations omitted); *Read*, 970 F.2d at 827.

NetScout argues that its size and finances alone are of little relevance and that this factor should only be assessed—and only weigh against enhanced damages—in cases where the other *Read* factors strongly support enhancement. (Dkt. No. 369 at 7). PI notes that NetScout merely copies the same argument previously raised in NetScout's Opposition to Packet Intelligence's Motion for Enhanced Damages and Entry of Judgment.[5] (Dkt. No. 373 at 6; *compare* Dkt. No. 369 at 7*, with* Dkt. No. 277 at 11). Accordingly, PI asserts that the Court has already addressed—and rejected—NetScout's argument regarding this factor.

The Court again finds NetScout's arguments unpersuasive and notes that this factor is not as limited as NetScout suggests. Rather, the Court finds that ignoring the size of infringing firms would not properly ensure that the damages assessed for willful infringement are sufficient "to **punish** the full range of culpable behavior." *Halo Elecs.*, 136 S. Ct. at 1926; *but see Erfindergemeinschaft UroPep GbR v. Eli Lilly & Co.*, No. 2:15-cv-1202-WCB, 2017 WL

---

[5] The Court notes that NetScout's Post-Appeal Briefing is premised on its assertion that "the recent appeal and other changed circumstances" justify a reconsideration of the *Read* factors. (Dkt. No. 369 at 4). The Court finds it puzzling that—for this factor—NetScout asserts verbatim the same argument it raised prior to appeal in its initial opposition to PI's Motion for Enhanced Damages.

3034655, at *10 (E.D. Tex. July 18, 2017) (Bryson, J., sitting by designation) (noting that defendant's "size and financial condition, while sufficient to weather an award of an enhanced royalty, does not by itself support [plaintiff's] contention that [defendant] has engaged in conduct deserving" of enhancement). For the same reasons as before, the Court finds that this factor supports enhancement. (*See* Dkt. No. 305 at 9–10).

### iii.    *Read* Factor Five Continues to Favor Enhancement

Under the fifth factor, the Court previously found that "[t]his case was not very close." (*Id.* at 10–11). NetScout argues that the Federal Circuit "confirmed the closeness of this case by (1) reversing more than half of the compensatory damages awarded by the jury, and (2) splitting on the question [of] whether to reverse and remand the Court's denial of NetScout's patent eligibility motion." (Dkt. No. 369 at 5–6) (citing *Packet Intel.*, 965 F.3d at 1307–10, 1312–15, 1316–20). NetScout argues that the surviving $2.25 million in compensatory damages represents a significant reduction of the $15.6 million sought by PI and indicates that this case was close. (*Id.* at 6). Further, NetScout asserts that the case was close because the Federal Circuit split two-to-one on whether to reverse this Court's decision regarding the eligibility of the Asserted Patents under Section 101—although the panel's majority ultimately affirmed this Court's eligibility determination.[6] (*Id.*). Finally, NetScout argues that the case is closer than it originally appeared

---

[6] NetScout repeatedly references the panel's decision at the Circuit Court as "splitting two-to-one" on the eligibility issue and uses this to indicate that this Court should factor that split into its decisions here. (*See* Dkt. Nos. 369 at 1, 4–6, 372 at 5, 375 at 2, 377 at 1–2). This Court rejects NetScout's invitation. It is simply wrong to apply a different result to an appellate decision of two-to-one than to a decision of three-to-zero. The Circuit Court has spoken regarding eligibility, and it would be folly to take its decision less seriously when it is reached by less than a unanimous consensus among the panel members. Trial courts should not weigh the impact of appellate decisions on some sliding scale—as NetScout suggests. As Chief Justice Marshall famously said, "[i]t is emphatically the province and duty of the judicial department to say what the law is." *Marbury v. Madison*, 5 U.S. 137, 177 (1803). What the law does does not change when the judicial department speaks unanimously or by a simple majority. To act otherwise would make a mockery of stare decisis.

because the PTO has found the asserted claims invalid in IPRs instituted post-trial, yet still subject to appeal. (*Id.* at 7; *see also* Dkt. No. 379).

PI responds this case was not close because "nothing in the Federal Circuit's ruling alters [this Court's previous] findings, nor did the appellate court disagree with [the Court's findings on infringement and invalidity]." (Dkt. No. 373 at 5). PI asserts that the reversal of pre-suit damages has no bearing on the closeness of the case because it resulted from a post-verdict change in the law. (*Id.* at 5). Further, PI notes that the Court previously considered the fact that "NetScout did not present any testimony on an alternative damages theory, relying on cross-examination of PI's damages expert alone" in deciding that this case was not close. (Dkt. No. 305 at 9). PI argues that this fact remains unchanged post-appeal. (Dkt. No. 367 at 5). Finally, PI responds that, regardless of the panel's split on the eligibility issue, the findings of infringement, validity, and willfulness of the Asserted Patents were affirmed, and the Asserted Patents have not been adjudicated invalid in any final proceeding—thus, the post-appeal circumstances bolster this Court's previous conclusion under this factor. (*Id.*; *see also* Dkt. No. 382 at 3 (noting that a Final Written Decision by the PTAB is not "final" and cannot be given any preclusive effect against the patent owner until the time for appeal has expired, or any appeal has terminated) (citing *XY, LLC v. Trans Ova Genetics, L.C.*, 890 F.3d 1282, 1294 (Fed. Cir. 2018))).

The Court agrees with PI that the post-appeal developments do not shift this factor against enhancement. First, the post-verdict change in law and reversal of pre-suit damages does not affect the Court's previous analysis—which already credited NetScout by noting that the "reduction in the damages award from PI's damages demand supports NetScout's position." (Dkt. No. 305 at 11). Despite the reduction of PI's damages ask, NetScout still failed to "present any testimony on an alternative damages theory, relying on cross-examination of PI's damages expert alone." (*Id.* at

10). All other inferences regarding the closeness of the case favor PI's position, as the jury—the sole judges of the facts in this case—arrived at a verdict finding the Asserted Patents valid and willfully infringed.[7] (Dkt. No. 237). While NetScout may have raised its defenses in good-faith, the Court notes that its "inventorship defense completely collapsed during testimony at trial" and the jury accordingly "reject[ed] the position whole-cloth." (Dkt. No. 305 at 6). The jury retired to deliberate at 10:36 am and returned its verdict shortly before 2 pm, rendering a verdict fully in favor of PI after a brief period of deliberation. (Dkt. No. 242).

Further, the decision on appeal bolster's this Court's previous analysis, and the parallel proceedings at the PTO do not compel a different result. NetScout's arguments regarding the Federal Circuit's opinion are unavailing. First, the Circuit affirmed the findings of infringement, validity, and willfulness upon which this Court previously relied when weighing this factor. Second, NetScout's reliance on the concurrence-in-part and dissent-in-part regarding the eligibility of the Asserted Patents ignores the fact that the panel's majority upheld this Court's finding that the Asserted Patents were eligible and were not directed to an abstract idea.[8] *Packet Intel.*, 965 F.3d at 1309. The Court also notes that the non-final post-verdict PTO proceedings finding the asserted claims invalid do not weigh against the conclusion that this case was close. As this Court has previously recognized, "ongoing proceedings at the USPTO [do not] effectively tie the Court's hands and mandate a finding that this is a close case, especially in light of the other evidence" supporting the contrary. *SSL Servs. LLC v. Citrix Sys., Inc.*, No. 2:08-cv-158-JRG, 2012 WL

---

[7] The Court notes that the jury's finding against "[NetScout] does not automatically mean that this factor weighs in Plaintiff['s] favor." *Hako-Med USA, Inc. v. Axiom Worldwide, Inc.*, No. 06-CV-1790, 2009 WL 3064800, at *10 (M.D. Fla. Sept. 22, 2009); *see also Emcore Corp. v. Optium Corp.*, No. CV-7-326, 2010 WL 235113, at *3 (W.D. Pa. Jan. 15, 2010) ("Simply because Plaintiffs won does not mean this case was not close.").

[8] NetScout's argument remains unpersuasive. The same merely suggests an alternative ruling that would "vacate the district court's judgment of patent eligibility and *remand for the court to make factual findings* [regarding *Alice* step 2]." *Packet Intel.*, 965 F.3d at 1316 (Reyna, J., concurring-in-part, dissenting-in-part). Thus, NetScout's argument that its eligibility defense was close improperly speculates regarding this Court's conclusions on *Alice* step 2, which the Federal Circuit "[did] not reach." *Id.* at 1310.

14

4092449, at *5 (E.D. Tex. Sept. 17, 2012) *vacated and remanded on other grounds*, 769 F.3d 1073 (Fed. Cir. 2014). Having presided over the trial, this Court is intimately familiar with the evidence presented and the testimony of the witnesses and again "does not view this as a particularly close case." (Dkt. No. 305 at 10).

### iv.   *Read* Factor Six Continues to Favor Enhancement

NetScout asserts that the Court should not give factor six—the duration of the infringer's misconduct—any weight because NetScout had no pre-suit notice of the Asserted Patents and because PI never sought an injunction to prevent post-suit sales. (Dkt. No. 369 at 7–8). NetScout also argues that the Federal Circuit's reversal of pre-suit damages confirms that pre-suit infringement should not be considered under this factor. (*Id.*). In response, PI notes that the Court's previous analysis of this factor considered a period starting "at least from the date of the commencement of this suit," and thus disregarding pre-suit conduct would not change the Court's conclusion, which was not dependent on NetScout's pre-suit conduct. Further, PI argues that NetScout continues to advertise and offer infringing products for sale—thus, if anything, NetScout's duration of misconduct has only expanded, and this factor continues to weigh in favor of enhancement. (*Id.*) (citing Dkt. No. 368-1 (indicating the revenue NetScout derived from the sale of accused products in 2020 and 2021)).

The Court finds PI's arguments persuasive. The Court previously noted that "NetScout's continued infringement . . . lasted over two years and five months" from the date suit was filed. (Dkt. No. 305 at 11–12). Even considering the post-appeal circumstances, NetScout's conduct prior to appeal, which the Court previously considered, remains unchanged—and if anything, NetScout's sale of infringing products has only increased since the Court's first consideration of this factor. (*See* Dkt. Nos. 368-1, 368-2). "Given that NetScout's period of willful infringement,

15

including the period during the course of litigation, spans at least two years and continue[d] without any indication of remediation, this factor favors enhancement." (Dkt. No. 305 at 12).

### v. *Read* Factor Seven Continues to Favor Enhancement

NetScout asserts the same arguments with respect to factor seven—remedial action—as it does for factor six. Namely, NetScout argues that the Court should not give this factor any weight because "NetScout had no pre-suit knowledge of the [Asserted Patents] and PI never sought an injunction to stop ongoing sales." (Dkt. No. 372 at 7–8). NetScout further argues that this factor should not weigh in favor of enhancement because PI receives an ongoing royalty on the sale of accused products, and such sales have "dramatically diminished." (Dkt. No. 372 at 7–8; Dkt. No. 369 at 8 (citing Dkt. No. 248 at 38:20–39:21 (trial testimony of NetScout CEO that the accused products are sold only "if a customer demands the old product."))). PI notes that in the previous pre-appeal briefing related to this factor, "NetScout d[id] not argue that it has undertaken any remedial measures[,]" and the Court found that "there [was] no evidence of remedial action, only preventative action." (Dkt. No. 373 at 7) (quoting Dkt. No. 305 at 13). Further, PI argues that NetScout continues to sell the accused products and has taken no remedial action—only preventative action—post-appeal. (*Id.*).

The Court finds NetScout's arguments unpersuasive. While NetScout argues that sales of the accused products have dramatically diminished, the Court finds that NetScout has continued to advertise the accused products and has sold millions of dollars of the same post-verdict. (*See* Dkt. No. 368-1 at 2–3; Dkt. No. 373 at 7). NetScout's continued sale of the accused products bolsters this Court's earlier conclusion that "there is no evidence of remedial action, only preventative action." (Dkt. No. 305 at 13). Thus, the Court finds that this factor again weighs in favor of enhancement.

Having readdressed all *Read* Factors and considering the developments post-appeal, the Court finds that NetScout has not sufficiently shown that the balance of the factors differs from that of the Court's initial analysis. In short, regardless of the application of the mandate rule, this Court properly exercises its discretion to award an enhancement tied to the surviving post-suit damages in light of NetScout's willful infringement. Accordingly, the Court now addresses the proper method to effectuate the Federal Circuit's mandate to vacate "any enhancement [of the pre-suit damages award]." *Packet Intel.*, 965 F.3d at 1316.

### 3. A Proportional Reduction of the Enhancement is Necessary to Comply with the Federal Circuit's Opinion on Remand

In its previous Order granting $2.8 million in enhanced damages, the Court found egregious behavior was present but determined that "less than treble damages [was] appropriate" because "only a subset of the [*Read*] factors weigh[ed] in favor of enhanced damages." (Dkt. No. 305 at 15) (quoting *WCM Indus., Inc. v. IPS Corp.*, No. 2016-2211, 2018 WL 707803, at *10 (Fed. Cir. Feb. 5, 2018)). Following remand, the parties dispute the impact of the Federal Circuit's mandate to vacate the enhancement tied to the pre-suit damages award, if any.

Specifically, PI argues that the Court *only* enhanced the post-suit damages award of $2.25 million to arrive at the $2.8 million enhancement, and thus no vacatur is required. (Dkt. No. 367 at 1–4). To arrive at this conclusion, PI asserts that the only evidence supporting the Court's willfulness finding was NetScout's post-suit willful conduct.[9] PI also notes that Netscout represented in its Petition for Writ of Certiorari that "the decision below . . . permitted willfulness

---

[9] The Court previously found that following evidence supported the jury's finding of NetScout's willfulness, all of which occurred after the suit was filed: (1) testimony from NetScout's corporate representative admitting that even though he had not read the Asserted Patents, his position was that Mr. Deitz lied and stole the inventions (Dkt. No. 300 at 116:18–22); (2) testimony from NetScout's CEO that he could not remember if he had read the Asserted Patents or even a summary of them (Dkt. No. 248 at 87:11–88:4); and (3) testimony suggesting that Netscout decided to continue selling the accused products despite having notice of the Asserted Patents at least as of the date suit was filed. (*Id.* at 39:1–2; *see also* Dkt. No. 344 at 16 (noting that "[i]t is well-settled, at least in this District, that post-[suit] behavior can establish willful infringement.")).

(and enhanced damages) based solely on a [NetScout's] post-filing conduct." (Dkt. No. 367-2 at i., 4, 5, 14, 15, 17, 20) (arguing that "all of the evidence of willfulness occurred post-filing"). Without citation to authority, PI then argues that because "willfulness is a predicate to awarding enhanced damages, the [enhancement] awarded by this Court [must] stem solely from NetScout's [willful] post-suit conduct [and not from NetScout's unwilful pre-suit conduct]." (Dkt. No. 367 at 4) Thus, PI asserts that the entire enhancement is tied only to the surviving award of post-suit damages, and no vacatur is required. (*Id.*).

NetScout responds that the Court enhanced the *entire* $5.75 million compensatory damages award to arrive at the $2.8 million enhancement, and thus the award should be vacated proportionally given that $3.5 million (the pre-suit damages) of the total $5.75 million award has been reversed. (Dkt. No. 372 at 4). Netscout argues that PI never sought enhancement of only post-suit damages and clearly requested enhancement of *all* of its damages in its Motion for Enhanced Damages and Entry of Judgment. (Dkt. No. 372 at 3) (citing Dkt. No. 269 at 1 (PI "request[ing] that this Court enhance the damages that NetScout" will pay to PI, not just post-suit damages), 14 (PI requesting the Court to "enhance NetScout's damages by up to three times . . . .")). NetScout further notes that PI argued that pre-suit conduct justified an enhancement of damages when addressing *Read* factor 6, the duration of misconduct, in its Motion for Enhanced Damages and Entry of Judgment. (Dkt. No. 269 at 11) (arguing that NetScout's duration of infringement precedes the filing of the complaint). Finally, NetScout argues that the Federal Circuit knew that all the evidence related to willfulness was post-suit, yet still remanded for this Court to vacate any enhancement of pre-suit damages. (Dkt. No. 375 at 1). Accordingly, if PI were correct that the entire enhancement could only be based on willful post-suit damages, the Federal Circuit would have no need to remand to this Court to determine which portion of the enhancement

18

to vacate—as none of the enhancement could properly be tied to the non-willful pre-suit damages award. (*Id.*).

The Court finds NetScout's arguments persuasive and that the Court previously enhanced the entire compensatory damages award. Accordingly, as detailed below, the Court amends its enhancement from $2.8 million to a proportional $1,095,652.17—vacating the portion tied to the reversed pre-suit damages award and leaving intact the portion tied to the affirmed post-suit damage award.[10]  The jury found Netscout's conduct to be willful, and the compensatory damages found or assessed were $5.5 million. (Dkt. No. 307). After weighing the *Read* factors and finding that the balance warranted an enhancement on the lower end of the scale,[11] the Court enhanced the compensatory damages of $5.5 million by a factor of 1.486 to arrive at a $2.8 million enhancement and $8.55 million in total damages. (Dkt. No. 305 at 3–15). The respective values of the enhancement tied to the pre- and post-suit damages are shown below:

| Damages | Multiplier | Enhanced Damages | Enhancement Award |
|---|---|---|---|
| $3.5 mil (pre-suit) | 1.486 | $5,204,347.83 | $1,704,347.83 |
| $2.25 mil (post-suit) + | 1.486 | $3,345,652.17 | $1,095,652.17 |
| $5.75 mil | 1.486 | $8.55 mil | $2.8 mil |

---

[10] The Court notes that PI seems to argue—without reference to authority—that a court may only enhance damages for those particular infringing sales that have been determined to be willful. (*See* Dkt. No. 367 at 4). However, the patent damages statute authorizes a court to "increase *the damages* up to three times *the amount found or assessed.*" 35 U.S.C. § 284. A rule requiring a determination on a sale-by-sale basis, taking care to only enhance those particular sales found to be willful, is not supported by the statutory text or precedent and would be impractical in most cases. Rather, the Court may increase damages up to three times the damages assessed by the Jury. *See*, *Halo*, 136 S. Ct. at 1932) ("District courts enjoy discretion in deciding whether to award enhanced damages, and in what amount."); *Read*, 970 F.2d at 826 ("Under section 284 of Title 35, damages may be enhanced up to three *times the compensatory award*. An award of enhanced damages for infringement, as well as the extent of the enhancement, is committed to the discretion of the trial court."); *see also Jurgens*, 80 F.3d at 1570.

[11] At the hearing on enhanced damages, this Court stated "[t]his is not a three-times enhancement case and it's not a two-times enhancement case . . . if there is going to be enhancement, it's going to be on the lower end of the spectrum." (Dkt. No. 369-9 at 17:3–8). While the Court's discussions with parties from the bench are not always its final rulings, here, the Court notes that its final Order is consistent with the guidance provided to the parties at the hearing.

19

As indicated, $1,095,652.17 is the portion of the enhancement in this case tied to the surviving post-suit damages award. However, $1,704,347.83 of the enhancement in this case is tied to the reversed pre-suit damages award. Accordingly, the Court vacates $1,704,347.83 of the enhancement in accordance with the Federal Circuit's mandate.

The Court next considers the parties' positions regarding whether the ongoing royalty rate previously set in the Final Judgment should be amended on remand in light of the Federal Circuit's opinion reversing the jury's award of pre-suit damages.

### 4.   The Ongoing Royalty Rate Should Be Adjusted to 1.335%

Previously, "the ongoing royalty rate in this case [was] set at 1.55% of the revenue received by Defendant[s] produced by the post-verdict infringing conduct . . . of the accused G10 and GeoBlade products through the life of the asserted patents." (Dkt. No. 303 at 8). The Court began by calculating a base rate of 1.41%—the implied royalty rate based on the jury's compensatory damages award ($5.75 million divided by the infringing product revenue base of $408.3 million). (*Id.* at 7; Dkt. 266-1 at 2). The Court then increased the rate to 1.55% based on (1) the finding of liability strengthening PI's bargaining position, (2) PI's assertion and defense of its patents against other entities since 2010, and (3) PI successfully preventing the institution of IPR proceedings on its patents six times. (Dkt. No. 303 at 7).

NetScout argues that the Court should reconsider the ongoing royalty rate by calculating a new base rate relying on only the surviving post-suit damages award and post-suit royalty base. (Dkt. No. 369 at 9). PI opposes and argues that waiver and the mandate rule bar the Court from reconsidering the ongoing royalty rate, or alternatively, that any change would be insignificant. (Dkt. No. 373 at 9; Dkt. No. 367 at 8). The Court considers whether NetScout has waived its request to amend the ongoing royalty rate, and, if not, whether the Court should amend said rate.

> **i.    NetScout Did Not Waive Its Arguments and the Court May Amend Ongoing Equitable Relief**

First, PI argues that NetScout's waiver and the mandate rule preclude the Court from altering the ongoing 1.55% royalty rate. PI notes that Netscout already appealed the Final Judgment stating that PI "is entitled to an ongoing royalty for future infringement of 1.55%." *Packet Intelligence*, 965 F.3d at 1303. However, aside from the pre-suit damages award and any enhancement thereof, the Federal Circuit "affirm[ed] [this Court's] judgment in all other respects." *Id.* PI thus argues that the prior appeal forecloses any argument that the ongoing royalty rate should be altered. (Dkt. No. 367 at 7). PI also argues that Netscout waived its arguments regarding the ongoing royalty rate by failing to brief the same before the Federal Circuit. (Dkt. No. 373 at 9) (citing *Matter of T-H New Orleans Ltd. P'ship*, 116 F.3d 790, 796 (5th Cir. 1997)); *see also Amando*, 517 F.3d at 1360 ("[A]n issue that falls within the scope of the judgement appealed from but is not raised by the appellant in its opening brief on appeal is necessarily waived.").

Netscout argues that it has not waived the right to challenge the royalty rate because the royalty is a form of ongoing equitable relief that the Court retains the authority to modify going forward. (Dkt. No. 372 at 9). NetScout notes that it is "not challenging the Court's prior decision setting the ongoing royalty applicable to sales that occurred while NetScout's appeal was pending." (*Id.* at 8). Rather, "NetScout is asking the Court to reset the royalty rate that will apply going forward based on a change in circumstances." (*Id.*).

First, PI is correct that this Court's award of an ongoing royalty of 1.55% was affirmed by the Federal Circuit and, generally, "issues . . . within the scope of the judgment appealed from, minus those explicitly reserved or remanded by the [Court of Appeals] . . . are foreclosed from further consideration." *Amando*, 517 F.3d at 1360. "There is a fundamental difference, however, between the granting of retrospective relief and the granting of prospective relief. While the

mandate rule would prevent the district court from dissolving [its equitable relief] ab initio, it does not preclude the district court from modifying, or dissolving, the [equitable relief] if it determines that it is no longer equitable." *Id.* An ongoing royalty is an equitable remedy, and the Court has discretion to amend such relief. *See Paice LLC v. Toyota Motor Corp.*, 504 F.3d 1293, 1313 n.13 (Fed. Cir. 2007). Thus, the Court finds that neither waiver nor the mandate rule preclude modification of the ongoing royalty on a prospective basis should the Court find that the current rate is no longer equitable.

> ### ii.   The Court Exercises Its Discretion to Modify the Ongoing Royalty Rate by Starting at the Revised Implied Royalty Rate and Adjusting Upward in Light of Changed Circumstances

PI argues that, even if the waiver and the mandate rule do not preclude amendment of the 1.55% ongoing royalty rate, the Court "should decline to" amend the prior rate because the reversal of the "pre-suit damages award does not significantly impact" the previous starting rate of 1.41%. (Dkt. No. 367 at 8). In short, PI asserts that NetScout's proposed base rate of 1.3% "does not significantly differ" from the original starting rate of 1.41%—thus no amendment is warranted. (*Id.*). Finally, PI asserts that—if the Court accepts NetScout's request—"[t]here is no basis to lower the [ongoing royalty] rate below the [revised] implied royalty rate" of 1.3%. (Dkt. No. 378 at 3).

NetScout argues that the ongoing 1.55% royalty rate should be reset to 1.16%. (Dkt. No. 369 at 9). NetScout notes that the Court previously adjusted the implied base royalty rate upward by 0.14% because PI had successfully asserted/defended its patents since 2010, its patents had been cited more than 100 times by other patents, and PI had successfully prevented institution of IPR proceedings on its patents six times. (Dkt. No. 369 at 9–10) (citing Dkt. No. 303 at 7–8). NetScout then argues that IPRs have instituted post-verdict based on evidence and trial testimony presented by PI in this case. (*Id.* at 10). NetScout concludes that "[b]ecause the [Asserted Patents]

face imminent cancelation and accused product sales are diminishing, a downward departure from the royalty rate of the same amount [(0.14%)] is appropriate"—yielding a 1.16% ongoing royalty rate. (*Id.*).

"[W]hen calculating an ongoing royalty rate, the district court should consider the 'change in the parties' bargaining positions, and the resulting change in economic circumstances, resulting from the determination of liability. When patent claims are held to be not invalid and infringed, this amounts to a 'substantial shift in the bargaining position of the parties.'" *XY, LLC*, 890 F.3d at 1298 (internal citation omitted). Importantly, "post-verdict factors should drive the ongoing royalty rate calculation in determining whether such a rate should be different from the jury's rate." *Id.* Of particular import here, "district courts may award a lower ongoing royalty rate if economic factors have changed in the infringer's favor post-verdict." *Id.* "The district court *may* wish to consider on remand additional evidence of changes in the parties' bargaining positions and other economic circumstances that may be of value in determining an appropriate ongoing royalty." *ActiveVideo Networks, Inc. v. Verizon Comms., Inc.*, 694 F.3d 1312, 1343 (Fed. Cir. 2012) (emphasis added) (citing *Paice*, 504 F.3d at 1315 ("Upon remand, the court may take additional evidence if necessary to account for any additional economic factors arising out of the imposition of an ongoing royalty.")). Indeed, "[a party's] bargaining position [may be] even stronger after . . . appeal." *Id.*

The Court finds Netscout's arguments persuasive and concludes that reversal of the pre-suit damages award strengthens its bargaining position with respect to an ongoing royalty post-appeal. Accordingly, the Court finds that the previously set ongoing royalty rate is no longer equitable and exercises its discretion to adjust the ongoing royalty rate as follows.

As noted by both parties in the Post-Appeal Briefing, the implied royalty rate based on the surviving post-suit damages award is 1.3%—$2.25 million in post-suit damages divided by $173.3 million in sales revenue for the accused products from "Post-Complaint to Trial" found by PI's damages expert, Mr. Bergman. (*See* Dkt. No. 369 at 9; Dkt. No. 367 at 8; Dkt. No. 369-3 at 2). Previously, the Court found an upward adjustment of 0.14% from the implied royalty rate was necessary based on (1) the finding of liability strengthening PI's bargaining position, (2) PI's assertion and defense of its patents against other entities since 2010, and (3) PI successfully preventing the institution of IPR proceedings on its patents six times.[12]  (Dkt. No. 303 at 7). The Court finds that these factors still counsel in favor of an upward adjustment, albeit reduced in proportion to the reduced enhanced damages award to reflect the change in bargaining positions post-appeal. The surviving enhanced damages award is $1,095,652.17, while the previous enhanced damages award was $2,800,000.00. On remand, this Court's enhancement is thus reduced to 39.1% of its original value.[13] In light of the changed circumstances post-appeal and the decreased finding of liability against NetScout, the Court likewise reduces its previous 0.14% enhancement of the implied royalty rate to 39.1% of its value to reflect the same proportional reduction of the enhanced damages award post-appeal. Thus, the Court finds that the ongoing royalty rate should be prospectively amended to 1.355%.[14]

---

[12] At the time of the Post-Appeal Briefing, the PTAB had not issued its Final Written Opinions in the IPR proceedings regarding the Asserted Patents. (*See* Dkt. No. 379). As of September 9, 2021, the PTAB found all asserted claims unpatentable. (*Id.*). However, a Final Written Decision by the PTAB is not "final" for the purposes of issue preclusion until the time for appeal has expired or the appeal has terminated. *See* 35 U.S.C. § 318; *XY, LLC v. Trans Ova Genetics*, 890 F.3d 1282 (Fed. Cir. 2018). Accordingly, the PTAB's Final Written Decisions which have not been affirmed on appeal are not final judgements with respect to the patents and claims tried to this Court in 2017, and the Court declines to give the Final Written Decisions significant weight in this analysis in light of the speculative nature of the ongoing appeals. *See Packet Intel. v. Juniper Networks, Inc.*, No. 22-1398 (Fed. Cir. filed Jan. 25, 2022).

[13] $\frac{\$1,095,652.17}{\$2,800,000.00} = 0.391$

[14] This value reflects the 1.3% base implied royalty rate with an upward adjustment of 0.055%—which amounts to 39.1% of the Court's pre-appeal upward adjustment of 0.14%.

### III.     THE MOTION TO DISMISS OR STAY

As a preliminary matter and as discussed above, NetScout notes that the PTAB issued Final

Written Decisions on September 8 and 9, 2021 declaring the asserted claims at issue in this case

unpatentable. (Dkt. No. 380 at 1). NetScout thus argues that this Court should dismiss PI's causes

of action, disregard both the jury verdict of October 13, 2017 and September 7, 2018 Final

Judgment (affirmed on appeal as to infringement, validity, and willfulness), and enter a final

judgment in NetScout's favor. (*Id.*). NetScout basis its argument on collateral estoppel precluding

this Court from proceeding with respect to the Asserted Patents. (*Id.* at 2–3) (citing *B & B*

*Hardware, Inc. v. Hargis Indus., Inc.*, 575 U.S. 138, 148 (2015) (recognizing "where a single issue

is before a court and an administrative agency, preclusion . . . often applies")).

PI responds that the Federal Circuit has squarely rejected NetScout's proposal that

"unreviewed PTAB decisions are entitled to immediate preclusive effect for related district court

proceedings [and can render a] fully adjudicated and appealed jury verdict null and void." (Dkt.

No. 382 at 2). PI asserts that a "patent has not been canceled" and a "PTAB finding . . . does not

have preclusive effect as to this action unless and until the appeal is resolved." (*Id.* at 4) (citing

*Hologenic, Inc. v. Minerva Surgical, Inc.*, 325 F. Supp. 3d 507, 518 (D. Del. 2018), *aff'd*, 957 F.3d

1256 (Fed. Cir. 2020), *vacated and remanded*, 141 S. Ct. 2298 (2021)).

The Court finds NetScout's argument unpersuasive. Under 35 U.S.C. §318, "[i]f the Patent

Trial and Appeal Board issues a final written decision under subsection (a) and *the time for appeal*

*has expired or any appeal has terminated*, the Director shall issue and publish a certificate

canceling any claim of the patent finally determined to be unpatentable . . . ." 35 U.S.C. § 318(b)

(emphasis added). A Final Written Decision is not "final" for the purposes of patent cancelation

when it issues. *See Oil States Energy Servs., LLC v. Greene's Energy Grp., LLC*, 138 S. Ct. 1365,

1372 (2018) ("If the Board's decision becomes final, the Director must 'issue and publish a certificate' § 318(b). The certificate cancels the patent claims finally determined to be unpatentable."). As the Federal Circuit has noted, it is this subsequent "cancellation" of the patent claims that "extinguishes the underlying basis for suits based on the patent." *Fresenius USA, Inc. v. Baxter Intern., Inc.*, 721 F.3d 1330, 1340, 1344 (Fed. Cir. 2013). Here, no claims found to be willfully infringed by the jury in 2017 and affirmed on appeal in 2020 have been cancelled because the Federal Circuit has not affirmed a Final Written Decision regarding the Asserted Patents. Accordingly, the Court finds it improper to dismiss PI's causes of action or enter final judgment in NetScout's favor.[15]

In light of the above, the Court addresses the merits of NetScout's request to stay the case.

### A.  Legal Standard

The district court has the inherent power to control its own docket, including the power to stay proceedings. *Clinton v. Jones*, 520 U.S. 681, 706 (1997). How to best manage the Court's

---

[15] The Court finds *Versata Software, Inc. v. SAP Am., Inc.* instructive regarding NetScout's arguments that a non-final PTAB decision still pending on appeal should nullify a final judgment of a district court—affirmed on appeal—finding the asserted claims valid. (*See* Dkt. No. 387 at 2) (arguing that the Court should enter judgment in NetScout's favor now and allow PI to file a subsequent motion under Rule 60(b)(5) should the Federal Circuit reverse the PTAB's Final Written Decisions). There, this Court considered a Rule 60(b) Motion to relieve a defendant from a final judgment in light of a subsequent and contrary determination on validity by the PTAB and found that:

> [w]hile there is no concrete definition of "extraordinary circumstances" in the context of Rule 60, the fact that the Defendants have obtained a contrary determination regarding the validity of the asserted patent in another forum does not appear to present such circumstances. Defendants have taken advantage of a full and fair opportunity to litigate the validity of the patent before this Court, before the jury, and before the Federal Circuit, even pursuing a writ to the United States Supreme Court. To hold that later proceedings before the PTAB can render nugatory that entire process, and the time and effort of all of the judges and jurors who have evaluated the evidence and arguments would do a great disservice to the Seventh Amendment and the entire procedure put in place under Article III of the Constitution. The proceedings before the PTAB are not even final at this time, but this Court does not believe that later finality will change this calculus.

*Versata Software, Inc. v. SAP Am., Inc.*, Case No. 2:07cv153-RSP, 2014 WL 1600327, at *2 (E.D. Tex. Apr. 21, 2014).

docket "calls for the exercise of judgment, which must weigh competing interests and maintain an even balance." *Landis v. N. Am. Co.*, 299 U.S. 248, 254–55 (1936).

"District courts typically consider three factors when determining whether to grant a stay[]: (1) whether the stay will unduly prejudice the nonmoving party, (2) whether the proceedings before the court have reached an advanced stage, including whether discovery is complete and a trial date has been set, and (3) whether the stay will likely result in simplifying the case before the court." *NFC Techs. LLC v. HTC Am., Inc.*, 2015 WL 1069111, at *2 (E.D. Tex. Mar. 11, 2015) (Bryson, J.). "Based on th[ese] factors, courts determine whether the benefits of a stay outweigh the inherent costs of postponing resolution of the litigation." *Id.*

### B. Discussion

#### 1. A Stay Will Unduly Prejudice PI

Netscout argues that a stay will not unduly prejudice PI because any delay would merely postpone PI's receipt of monetary damages. (Dkt. No. 380 at 4). NetScout asserts that a delay in collecting damages "is present in every case in which a patentee resists a stay, and it is therefore not sufficient, standing alone, to defeat a motion to stay." (*Id.*) (quoting *NFC Tech, LLC v. HTC Am., Inc.*, No. 2:213-cv-1058-WCB, 2015 WL 1069111, *2 (E.D. Tex. Mar. 11, 2015)). Finally, Netscout argues that there is no prejudice to PI because the PTAB has issued Final Written Decisions declaring that the asserted claims are unpatentable. (*Id.*). Thus, NetScout alleges that "a stay will not unduly prejudice PI" because it will at most suffer a delay in receiving damages in the event the PTAB's decisions are overturned on appeal. (*Id.*).

PI responds and notes that NetScout's cited caselaw recognizes that a patentee's interest in proceeding in a timely manner in vindicating its patent rights is entitled to weight when considering this factor—just that this interest standing alone is not enough to defeat a motion to stay. *NFC*

*Tech.* 2015 WL 1069111, at *2.  PI further argues that the advanced stage of this case heightens any prejudice caused by delay because liability has already been established in its favor following trial and appeal. (Dkt. No. 382 at 12). Thus, PI asserts that its prejudice is certain, while prejudice to Netscout is speculative—dependent on the outcome of a wholly separate appeal pending before the Federal Circuit currently in its early stages. (*Id.* at 12–13) (citing *Apple Inc. v. Samsung Elecs. Co.*, 2013 WL 6225202, at *5). Finally, PI argues that it would be placed at a tactical disadvantage by a stay if NetScout is permitted to delay these proceedings in order to raise a "non-finality of judgment" argument should the third-party IPR proceeding resolve in manner beneficial to NetScout. (*Id.* at 13).

The Court finds that this factor weighs against granting a stay. PI "has an interest in timely enforcing its patents, which is entitled to weight, [even if it is] 'not sufficient, standing alone, to defeat a stay motion.'" *VirnetX, Inc. v. Apple Inc.*, No. 6:12-CV-00855-RWS, 2018 WL 398433, at *3 (E.D. Tex. Jan. 12, 2018). Further, this Court has previously found unpersuasive arguments similar to Netscout's asserting that "delay in receiving damages is not prejudicial." *See Garrity Power Servs. LLC v. Samsung Elecs. Co. Ltd.*, No. 2:20-cv-00269-JRG, Dkt. No. 227 at 4 n.1 (noting that "[w]hile a delay in recovering money damages may not rise to the same level of prejudice as delaying entry of warranted injunctive relief, such is far from non-prejudicial"). Finally, PI tried this case in 2017 and has yet to recover monetary relief despite successfully defending its finding of infringement and pre-suit damages on appeal—delaying this case further in the face of its advanced stage only increases the prejudice on PI and places it at a tactical disadvantage. *See VirnetX*, 2018 WL 398433, at *5.

## 2.   The Proceedings Have Reached an Advanced Stage

Netscout argues that "this is not a case where all issues have been finally adjudicated." (Dkt. No. 380 at 5). Although trial occurred in 2017, and the jury's verdict was substantially affirmed on appeal in 2020, NetScout argues that "the fact that at least two multifaceted and substantial issues [related to enhanced damages and the ongoing royalty rate] remain outstanding" supports a stay. (*Id.*).

PI responds that the relevant inquiry focuses on "whether the proceedings before the Court have reached an advanced stage, including whether discovery is complete and a trial date has been set." (Dkt. No. 382 at 9) (quoting *VirnetX*, 2018 WL 398433 at *3). Accordingly, PI argues that this case has been through trial, appeal, denial of certiorari, and the only remaining discrete issues on remand relate to what measure of damages should be vacated and whether the ongoing royalty should be amended. (*Id.* at 9–10). Thus, PI asserts that "[b]y any objective measure, this litigation is at the end of its life" and this factor strongly weighs against a stay. (*Id.* at 10).

While two discreet issues relating to damages remain, the jury trial in this case concluded over four years ago. (*See* Dkt. No. 252). As PI notes, the proper inquiry under this factor addresses (i) how advanced are this Court's proceedings, including (ii) whether discovery is complete, and (iii) whether a trial date has been set. *VirnetX*, 2018 WL 398433 at *3. These proceedings are at an unquestionably advanced stage—the Court and the parties have expended substantial resources in adjudicating the parties' issues. *See Orion IP, LLC v. Mercedes-Benz USA, LLC*, 2008 WL 5378040, at *8 (E.D. Tex. Dec. 22, 2008), *rev'd on other grounds*, *Orion IP, LLC v. Hyundai Motor Am.*, 605 F.3d 967 (Fed. Cir. 2010). Judicial economy and the relevant considerations under this factor therefore weigh against a stay.

### 3.   A Stay Will Not Simplify the Case

Finally, NetScout asserts that a stay of the case will simplify the issues before this Court because—in the event the Final Written Decisions of the PTAB are affirmed on appeal—the claims of the Asserted Patents will be canceled, and PI's causes of action will be extinguished. (Dkt. No. 380 at 5–6). Netscout argues that any amended judgment will be subject to vacatur by the Federal Circuit if the PTAB's Final Written Decisions are upheld on appeal and the claims are cancelled. (*Id.* at 6) (citing *XY, LLC*, 890 F.3d at 1294) (finding that "an affirmance of an invalidity finding, whether from a district court or the Board, has a collateral estoppel effect on all pending or co-pending actions").

PI responds that this factor strongly weighs against a stay because no validity issues remain before this Court—only the appropriate measure of damages. (Dkt. No. 382 at 7–8). PI notes that:

> the focus of this factor is on streamlining or obviating the trial by providing the district court with the benefit of the PTO's consideration of the validity of the patents before either the court or the jury is tasked with undertaking that same analysis.

*Smartflash LLC v. Apple Inc.*, 621 Fed. App'x 995, 1000 (Fed. Cir. 2015) (citing *NFC Tech.*, 2015 WL 1069111, at *4–5). Accordingly, PI argues that on remand, where validity is not an issue and the remaining issues are those "with which the PTO is not concerned . . . it is unclear how the PTO proceedings will simplify the case." (Dkt. No. 382 at 8) (quoting *VirnetX*, 2018 WL 398433, at *4) (citing *Smartflash*, 621 Fed. App'x at 1000).

The Court finds PI's argument persuasive. Here, "[this Court] and the jury have already addressed infringement and invalidity issues, which [have been affirmed by the Federal Circuit and] are the only questions common to the two proceedings which could be 'simplified' by agency review. The [remand] is limited solely to a consideration of the appropriate measure of damages—an issue with which the PTO is not concerned." *Id.* at 1001. Under NetScout's

reasoning, this factor would favor a stay in *every* case because speculatively waiting for IPR proceedings to potentially invalidate the patents-in-suit would always simplify the issues if such reality eventually came to pass. Such potential simplification "should be insufficient, standing alone, to support a stay motion." *See VirnetX*, 2018 WL 398433 at *4 (citing *NFC Tech.* 2015 WL 1069111, at *2). Given that the only issues remaining are discrete damages-related issues that do not overlap with the previously-affirmed issues of validity, NetScout's arguments related to estoppel are misplaced and this factor strongly weighs against granting a stay.

In sum, the Court finds that all three factors weigh against NetScout's request for a stay in the above-captioned action. Accordingly, and in light of the above, the Court finds that the Motion to Dismiss or Stay should be denied.

## IV.    THE MOTION FOR LEAVE

In the Motion for Leave, NetScout requests that the Court permit it leave "to submit a five-page supplemental brief addressing the impact of the[] recently issued PTAB invalidation decisions on the ongoing royalty" should the Court consider the Post-Appeal Briefing. (Dkt. No. 381 at 1).

Having considered the arguments raised in the Post-Appeal Briefing regarding the adjustment of the ongoing royalty rate in light of the Final Written Decisions of the PTAB currently unaffirmed on appeal, and resolving the same above, the Court finds that further briefing on the issue is not necessary. Accordingly, the Motion for Leave is **DENIED**.

## V.    CONCLUSION

For the reasons stated above and following the mandate of the Federal Circuit, the Court **VACATES** $1,704,347.83 of its previous enhanced damages award. Further, the Court **ORDERS** that the ongoing royalty assessed against NetScout be altered from 1.55% to **1.355%** effective on

a prospective basis from the date of this Order. Finally, the Court **DENIES** the Motion to Dismiss or Stay (Dkt. No. 380) and the Motion for Leave (Dkt. No. 381). The Court concurrently issues its Amended Final Judgement reflecting the above.

**So ORDERED and SIGNED this 4th day of May, 2022.**

RODNEY  GILSTRAP
UNITED STATES DISTRICT JUDGE